# 21-2019

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

ROBERT BARTLETT, TERREL CHARLES BARTLETT, LINDA JONES, SHAWN
BARTLETT, MAXINE E. CROCKETT, INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF RICKY LEON CROCKETT, MARVISE L. CROCKETT, TRACIE ARSIAGA,
INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ROBERT R. ARSIAGA,
SYLVIA MACIAS, GILBERT ARSIAGA, JR., GEORGE ARSIAGA, MATTHEW
ARSIAGA, ANGEL MUNOZ, ROBI ANN GALINDO, PATRICIA ARSIAGA, ON
BEHALF OF THE ESTATE OF JEREMY ARSIAGA, CEDRIC HUNT, STEVEN
GREENWOOD, STEVEN W. HILLER, INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF STEPHEN DUSTIN HILLER, JEREMY CHURCH, SANDRA HANKINS,
INGRID FISHER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF STEVEN
SCOTT FISHER, KRISTIN WALKER, STEVEN T. FISHER, KATHLEEN GRAMKOWSKI,

*(Caption continued on inside covers)*

On APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

**JOINT APPENDIX
VOLUME II OF V
(Pages A-301 to A-600)**

---

MICHAEL RADINE
DINA GIELCHINSKY
GARY M. OSEN
AARON A. SCHLANGER
OSEN LLC
190 Moore Street, Suite 272
Hackensack, New Jersey 07601
(201) 265-6400

*Attorneys for Plaintiffs-Appellees*

DAVID B. RIVKIN, JR.
ELIZABETH PRICE FOLEY
MARK W. DELAQUIL
KENDALL E. WANGSGARD
BAKER & HOSTETLER LLP
Washington Square
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
(202) 816-1500

*Attorneys for Movant-Appellant
and Defendant-Appellant*

DANIEL CARVILL, MARY CARVILL, PEGGY CARVILL-LIGUORI, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF FRANK T. CARVILL, PAMELA ADLE-WATTS, JOHN WATTS, GLORIA NESBITT, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DEFOREST L. TALBERT, D.J.H., A MINOR, TAWANNA TALBERT DARRING, LATASHA MARBLE, JAMES TALBERT, MIRANDA PRUITT, VELINA SANCHEZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MOSES ROCHA, ALOYSIUS SANCHEZ, JR., ROMMEL ROCHA, PHILLIP SANCHEZ, GLORIA P. REYNOSO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF YADIR G. REYNOSO, JASMIN REYNOSO, PATRICIA REYNOSO, JOSE REYNOSO, ASHLEY WELLS SIMPSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF LARRY LLOYD WELLS, CHAD WELLS, CRYSTAL STEWART, CHASITY WELLS-GEORGE, CANDICE MACHELLA, BILLY DOAL WELLS, HOPE ELIZABETH VEVERKA, DONNA JEAN HEATH, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DAVID MICHAEL HEATH, LOLA JEAN MODJESKA, JOHN DAVID HEATH, OLGA LYDIA GUTIERREZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JACOB DAVID MARTIR, ISMAEL MARTIR, NATHANIEL FOLEY, MICHAEL SCOTT DEWILDE, STEVEN MORRIS, DANIELLE DECHAINE-MORRIS, NICHOLAS MORRIS, K.M., A MINOR, MONICA ARIZOLA, ROBERTO AARON ARIZOLA, ROBERTO ARIZOLA, SR., CECILIA ARIZOLA, DANNY ARIZOLA, RICARDO ARIZOLA, GREG KLECKER, RAYMOND MONTGOMERY, PATRICIA MONTGOMERY, TONY WOOD, JOEDI WOOD, ADAM WOOD, MEGAN WOOD, LISA RAMACI, LISA RAMACI INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF STEVEN VINCENT, ISABELL VINCENT, CHARLES VINCENT, MARIA VIDAL, TAMARA HASSLER, RICHARD E. HASSLER, JOANNE SUE HASSLER, SCOTT HUCKFELDT, KATHRYN HUCKFELDT, ALISHA HUCKFELDT, MATTHEW HUCKFELDT, TIMOTHY NEWMAN, PADRAIC J. NEWMAN, AMENIA JONAUS, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JUDE JONAUS, GERNESSOIT JONAUS, DAPHNIE JONAUS MARTIN, RICKY JONAUS, MARCKENDY JONAUS, CLAIRE JONAUS, SHAREN JONAUS MARTIN, MASINA TULIAU, AUDELIA MORIN, ESTEBAN MORIN, ESTAVAN MORIN, SR., BRIANNA RENEE NAVEJAS, MARGARITO A. MARTINEZ, AMY LYNN ROBINSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JEREMIAH ROBINSON, FLOYD BURTON ROBINSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JEREMIAH ROBINSON, JACOB MICHAEL ROBINSON, LUCAS WILLIAM ROBINSON, JODEE JOHNSON, JAMES HIGGINS, WENDY COLEMAN, BRIAN RADKE, NOVA RADKE, STEVEN VERNIER, JR., CLIFFORD L. SMITH, JR., INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KEVIN J. SMITH, GEORGIANNA STEPHENS-SMITH, CORENA MARTIN, ADAM MATTIS, TERRANCE PETERSON, III, PETRA SPIALEK, DAVID G. CARDINAL, JR., INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ANTHONY CARDINAL, RICHELLE HECKER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF WILLIAM F. HECKER, III, VICTORIA HECKER, W.H., A MINOR, C.H., A MINOR, WILLIAM F. HECKER, JR., NANCY HECKER, JOHN D. HECKER, ROBERT F. MARIANO, DEBRA MARIANO, BOBBIE D. MARIANO, VICKIE MICHAY WHITE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF STEPHEN J. WHITE, GLADYS E. REYES CENTENO, VERONICA LOPEZ REYES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JASON LOPEZ REYES, ZORAIMA LOPEZ, JENNIFER LINK, SHARON JOHNSTON, KENNY LEE, TOM B. LEE, LING P. LEE, DEBORAH NOBLE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHARLES E. MATHENY, IV, DAVID NOBLE, CHARLES E. MATHENY, III, JUDY COLLADO, KAIYA COLLADO, JUSTIN WALDECK, TANJA KUHLMEIER, INDIVIDUALLY AND

ON BEHALF OF THE ESTATE OF DANIEL KUHLMEIER, ROBERT J. KUHLMEIER, THERESA A. KUHLMEIER, THERESA ANN KUHLMEIER, EDWARD KUHLMEIER, THOMAS KUHLMEIER, JOHN KUHLMEIER, ROBERT W. KUHLMEIER, PATRICK FARR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CLAY P. FARR, SILVER FARR, CARROL ALDERETE, ANTHONY ALDERETE, CHAD FARR, RAYANNE HUNTER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF WESLEY HUNTER, W.H., A MINOR, T.H., A MINOR, FABERSHA FLYNT LEWIS, CHRISTOPHER ANTHONY BERSHEFSKY, LORENZO SANDOVAL, JR., INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ISRAEL DEVORAGARCIA, LORENZO SANDOVAL, JR., ADRIAN SANDOVAL, ROSA ESTHER SANDOVAL, HENRY J. BANDHOLD, SR., INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SCOTT BANDHOLD, AFONSO BANDHOLD, MARIANA BANDHOLD, H. JOSEPH BANDHOLD, DONALD C. BANDHOLD, JOSHUA P. STEIN, NICOLE B. STEIN, NICOLE B. STEIN, A MINOR, J.S.S., A MINOR, JESSE P. STEIN, ERIK ROBERTS, E.C.R, A MINOR, ROBIN ROBERTS, JAMES CRAIG ROBERTS, CARA ROBERTS, COLIN ROBERTS, LUKE MURPHY, WILLETTE MURPHY, SHANE IRWIN, T.R., A MINOR, HELEN MARGUERITE IRWIN, NICOLE IRWIN, MARIA GOMEZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOSE GOMEZ, JOHN DANA GREER, STEPHANIE SANDER, CHRISTOPHER D. GREER, JOSEPH L. GREER, CARL K. GREER, CHRISTOPHER JOYNER, ANNE P. JOYNER, BRIAN MONTOGMERY, K.K, A MINOR, NECOLE DUNLOW SMITH, MICHAEL R. MILLS, M.R.M., A MINOR, EDDIE JO PALINSKY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JERRY A. PALINSKY, JR., JERRY A. PALINSKY, II, ADINA PALINSKY, JERRY A. PALINSKY, SR., KATHLEEN HOKE, JOEL PALINSKY, KARALEEN HERB, ERIC BRANDON STONEKING, CARRIE SUE STONEKING, FAITH RENEE STONEKING, NANETTE SAENZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CARLOS N. SAENZ, JUAN SAENZ, JOAQINA SAENZ CHORENS, LUZ MARIA ESTRADA-PULIDO, FRANCES CATHERINE CASTRO, ELVA ESPINOZA, AMANDA VACHO, ON BEHALF OF THE ESTATE OF NATHAN J. VACHO AND ON BEHALF OF E.V., A MINOR, BAYLI VACHO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF NATHAN J. VACHO, JOHN VACHO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CAROL VACHO, ASHLEY VACHO LESLIE, RONALD VEVERKA, CAROL POLLEY, DOUGLAS VEVERKA, SANDRA SOLIDAY, JEANETTE WEST, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ROBERT H. WEST, SHELBY WEST, DONNA ENGEMAN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOHN W. ENGEMAN, SHANNON SHUMATE, LAUREN SHUMATE, L.S., A MINOR, NICOLE DICENZO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DOUGLAS ANDREW DICENZO, D.D., A MINOR, LARRY DICENZO, KATHY CRANE, JOHNNY ALLEN BLAIR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ROBERT EDWARD BLAIR, CHARLEE BLAIR WEBB, C.L., A MINOR, ARNE EASTLUND, TINA EASTLUND, SVEN EASTLUND, TAYLOR EASTLUND, ELIZABETH JO EASTLUND, MATTHEW ADAMSON, R.A, A MINOR, KATHY ADAMSON, RICHARD ADAMSON, CHRISTOPHER ADAMSON, JEFFREY ADAMSON, JUSTIN ADAMSON, JAMES SHEPARD, JOHN P. SKLANEY,, III, KATHY CRABTREE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DANIEL CRABTREE, M.C., A MINOR, JUDY ANN CRABTREE, RONALD WAYNE CRABTREE, DEBRA WIGBELS, JUDY HUENINK, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF BENJAMIN J. SLAVEN, SEAN SLAVEN, NICOLE LANDON, MISTI FISHER, STEVEN J. FRIEDRICH, A.F., A MINOR, PHILIP ALAN DERISE, NORMA ALICIA CONTRERAS, JONATHAN

CONTRERAS, JR., CARLOS CONTRERAS, CESAR CONTRERAS, HERNAN CONTRERAS, NOEL CONTRERAS, DANNYEL CONTRERAS, SHARON M. PUGH, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KENNETH IRVING PUGH, BRITNEY E. CARTER, ALICIA PEARSON, DANIEL J. EVANS, JUSTIN EVANS, KEVIN GRAVES, NICHOLAS GENE KOULCHAR, MICHAEL KOULCHAR, SUHEIL CAMPBELL, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF EDGARDO ZAYAS, A.Z.C., a minor, CATHY ANDINO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF EDWIN A. ANDINO JR., LUIS JUNIOR PUERTAS, LIDIA SULLIVAN, GABRIELA D. PUERTAS VERGARA-DONOSO, CHRISTOPHER MICHAEL MELENDEZ, NARCISO MELENDEZ, CHRISTINA MELENDEZ, LAUREL BARATTIERI, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF GUY BARATTIERI, PATRICIA WHEATLEY, REBECCA BARATTIERI, NICOLE BARATTIERI, GINA TESNAR, GLORIA L. MAGANA, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KENNY FRANCES STANTON JR., MARIO STANTON, BRANDIE STANTON, TERRYMARIE STANTON, FRED FRIGO, NANNETTE BRYNE-HAUPT, LYNN FOREHAND, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF RYAN HAUPT, LANCE HAUPT, RHONDA HAUPT, TIFANY THOMPSON, SABRINA CUMBE, WILLIAM WITTE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KEVIN M. WITTE, MICHAEL MOCK, TAMMY DORSEY, ERIC PHYE, JAMES GMACHOWSKI, CONSTANCE BRIAN, AMBER HENSLEY, DAVID W. HAINES, DAWN HAINES, MACKENZIE HAINES, KARAR ALABSAWI, MICHELLE TAYLOR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DAVID G. TAYLOR, JR., J.T., a minor, PHYLLIS TAYLOR, JOHN TAYLOR, BRIAN B. TAYLOR, JUDAS RECENDEZ, TYLER NORAGER, SHALEE NORAGER, M.N., a minor, HARRY RILEY BOCK, JILL ANN BOCK, MARIAH SIMONEAUX, KOUSAY AL-TAIE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF AHMED AL-TAIE, NAWAL AL-TAIE, BASHAR AL-TAIE, HATHAL K. TAIE, LAWRENCE KRUGER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ERIC KRUGER, CAROL KRUGER, C.K., a minor, E.K., a minor, DOUGLAS KRUGER, JACKIE FARRAR-FINKEN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF PAUL FINKEN, EMILIE FINKEN, C.F., a minor, J.F., a minor, STEPHEN FINKEN, ALAN FINKEN, RICHARD FINKEN, DAVID FINKEN, MARK FINKEN, JEAN PRUITT, JOAN HENSCHEID, PETER FINKEN, LORI ANN McCOY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF GREGORY McCOY, L.M., a minor, T.M., a minor, GLENN MICHAEL COX, SANGSOON KIM, SEOP STEVE KIM, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JANG HO KIM, MICHELLE KIM, KURTISS LAMB, FRANCIS L. COTE, NANCY COTE, CHRISTOPHER COTE, SAMANTHA DUNFORD, MAXIMILLIAN SHROYER, SAMANTHA DUNFORD, CASEY REUBEN, BREE REUBEN, PATRICK REUBEN, JACKIE STEWART, MARK MUNNS, CRISTA MUNNS, SHARON DeBRABANDER, DENNIS DeBRABANDER, NICOLE DeBRABANDER, JOELLA PRATT, HELEN FRASER, RICHARD FRASER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DAVID M. FRASER, TRICIA ENGLISH, NATHAN ENGLISH, N.C.E., a minor, A.S.E., a minor, TODD DAILY, ON BEHALF OF THE ESTATE OF SHAWN L. ENGLISH, JOSHUA STARKEY, BRENT HINSON, WILLIAM HINSON, FRAN HINSON, HILARY WESTERBERG, JOHN GIBSON, STEPHANIE GIBSON WEBSTER, SEAN ELLIOTT, TRAVIS GIBSON, WILLIAM RONALD LITTLE, BRENDA LITTLE, INDIVIDUALLY AND ON BEHALF OF WILLIAM RONALD LITTLE, JR., KIRA SIKES, RANDOLPH DELBERT NANTZ, JOSHUA RYAN NANTZ, CHAQUITA TALBERT, ALOYSIUS SANCHEZ, SR., VICTORIA M. FOLEY,

INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ALEXANDER SCOTT ARREDONDO, GWENDOLYN MORIN-MARENTES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF STEVE MORIN, JR., ALVIS BURNS, KEITH VEVERKA, SUZZETTEE LAWSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ISAAC S. LAWSON, CHASTITY DAWN LAFLIN, ALEXANDER ZAYAS, COLIN HAINES, LORI ANN MCCORMICK, LORI ANN MCCORMICK INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CLINTON MCCORMICK, DEBORAH BEAVERS, DENISE VENNIX, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ALAN R. BLOHM, JEREMY BLOHM, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHRIS BLOHM, KIANA BLOHM, JAMES SMITH, MAUK MAUK, ROBERT VACCARO, JOANNE GUTCHER, CHARLOTTE FREEMAN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF BRIAN S. FREEMAN, G.F., A MINOR, I.F., A MINOR, KATHLEEN SNYDER, RANDOLPH FREEMAN, KATHALEEN FREEMAN, ALBERT SNYDER, RICHARD LEE, DANNY CHISM, ELIZABETH CHISM, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOHNATHAN B. CHISM, VANESSA CHISM, JULIE CHISM, RUSSELL J. FALTER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SHAWN P. FALTER, LINDA FALTER, MARJORIE FALTER, RUSSELL C. FALTER, JOHN SACKETT, JASON SACKETT, MICHAEL LUCAS, MARSHA NOVAK, DAVID LUCAS, TIM LUCAS, ANDREW LUCAS, SHANNON MILLICAN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOHNATHON M. MILLICAN, PAUL MITCHELL MILLICAN, NOALA FRITZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JACOB FRITZ AND THE ESTATE OF LYLE FRITZ, DANIEL FRITZ, ETHAN FRITZ, BILLY WALLACE, BILLY WALLACE, STEFANIE WALLACE, AUSTIN WALLACE, DEVON WALLACE, C.W., A MINOR, EVAN KIRBY, MARCIA KIRBY, STEVEN KIRBY, JOHNNY WASHBURN, MARVIN THORNSBERRY, CYNTHIA THORNSBERRY, A.B., A MINOR, TRACY ANDERSON, JEFFREY ANDERSON, ADAM G. STOUT, ANDREW JEFFREY ANDERSON, ELIZABETH LYNN ISLAS, ANASTASIA FULLER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ALEXANDER H. FULLER, A.F., A MINOR, L.R.-W., A MINOR, HEATH DAMON HOBSON, JODI MICHELLE HOBSON, SAMANTHA BALSLEY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MICHAEL C. BALSLEY, JODI MICHELLE HOBSON, M.D.H., A MINOR, NICHOLE GARRIGUS, DEADRA GARRIGUS, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MICKEL D. GARRIGUS, DAVID GARRIGUS, KYLA OSTENSON, MATTHEW GARRIGUS, SHAWN RYAN, SHARON Y. DUNN SMITH, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TERRENCE DUNN, DENNIS DUNN, RICHARD LANDECK, VICTORIA LANDECK, LAVONNA HARPER, MELBA ANNE F. HARRIS, PAUL D. HARRIS, HYUNJUNG GLAWSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CURTIS E. GLAWSON, YOLANDA BROOKS, CURTIS GLAWSON,, SR., KIERRA GLAWSON, SABRINA GLAWSON, ON BEHALF OF THE ESTATE OF CORTEZ GLAWSON, JAZMON REYNA, RYAN SABINISH, R.J.S., A MINOR, S.J.S., A MINOR, CARRIE THOMPSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SEAN M. THOMAS, A.T., A MINOR, DANIEL THOMAS, SR., DIANA THOMAS, DANIEL THOMAS, JR., KELLY GILLIS, MELINDA FLICK, ANN CHRISTOPHER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KWESI CHRISTOPHER, NANCY FUENTES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DANIEL A. FUENTES, ARMANDO FUENTES, JULIO FUENTES, TATYANA FUENTES, EMMA MCGARRY, D.J.F., A MINOR, JOHN KIRBY, MICHAEL MURPHY-SWEET, ELIZABETH MURPHY-SWEET, ANONA GONELLI, LINDSAY YOUNG, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF BRETT A. WALTON,

Leasa Dollar, Eugene Delozier, Michelle Klemensberg, Individually And On Behalf Of The Estate Of Larry R. Bowman, Scott Lilley, Frank Lilley, Jolene Lilley, Matthew Lilley, Ava Tomson, Individually And On Behalf Of The Estate Of Lucas V. Starcevich, Richard Tomson, Glenda Starcevich, Ariana Starcevich, Trenton Starcevich, Samantha Tomson, Andrew Tomson, Jared S. Stevens, S.W., a minor, Bradley Starcevich, Susan Maria Doskocil Hicks, Individually And On Behalf Of The Estate Of Glenn Dale Hicks, Jr., Glenn Dale Hicks, Jr., David James Hicks, John Christopher Hicks, S.L.H., a minor, Karen Funcheon, Individually And On Behalf Of The Estate Of Alexander J. Funcheon, Robert Funcheon, Dwight Martin, Individually And On Behalf Of The Estate Of Jay E. Martin, Dove Deanna Adams, Raven Adams, Lark Adams, Holly Burson, Individually And On Behalf Of The Estate Of Jerome Potter, Nancy Umbrell, Individually And On Behalf Of The Estate Of Colby J. Umbrell, Mark Umbrell, Casey Boehmer, Jeremy D. Smith, Daniel Dixon, Individually And On Behalf Of The Estate Of Ilene Dixon And The Estate Of Robert J. Dixon, Jessica Hubbard, On Behalf Of The Estate Of Robert J. Dixon, M.R., a minor, L.R., a minor, David Dixon, Daniel Austin Dixon, Gretchen Lang, Rebecca J. Oliver, Daniel C. Oliver, Kimberlee Austin-Oliver, Tiffany M. Little, Individually And On Behalf Of The Estate Of Kyle A. Little, K.L., a minor, Shelley Ann Smith, Dakota Smith-Lizotte, Kimberlee Austin-Oliver, Tiffany M. Little, Individually And On Behalf Of The Estate Of Kyle A. Little, K.L., a minor, Shelley Ann Smith, Dakota Smith-Lizotte, Shyanne Smith-Lizotte, Erin Lee Dructor, individually and on behalf of the Estate of Blake Stephens, Trent Stephens, Kathleen Stephens, Derek Stephens, Rhett Stephens, Summer Stephens, Brittani Hobson, Cynthia Conner, William Farrar, Sr., Individually and on behalf of the Estate of William Farrar, Joshua Brooks, Joyce Brooks, Daniel Tyler Brooks, Delilah Brown, individually and on behalf of the Estate of Scott J. Brown, Tonya K. Dressler, Ardith Cecil Dressler, Melissa Dressler, Tanya Suzzette Dressler, Daniel Dressler, Elizabeth Masterson, individually and on behalf of the Estate of Joshua D. Brown, Marian Brown, Wayne Brown, Danielle Sweet, A.B., a minor, G.B., a minor, Donna Kuglics, individually and on behalf of the Estate of Matthew J. Kuglics, Les Kuglicis, Emily Adams, Derek Gajdos, Tammy Denboer, Brandeaux Campbell, Ryan Wilson, Jami Lin Wilson, Matthew Lammers, Alicia Lammers, Barbara Lammers, Gary Lammers, Stacy Pate, Angel Gomez, Denise Jackson, Scott Hood, Flora Hood, Dixie Flagg, Stephanie Hood, Cheyenne Flagg, William Parker, Meghan Parker-Crockett, Andrew Moores, Sheila Tracy, Individually and behalf of the Estate of Jacob Tracy, Donald Tracy, Nichole Sweeney, Christina Sheridan, Matthew Benson, Melissa Benson, C.B., a minor, B.B., a minor, Daniel P. Benson, Carol Benson, Daniel R. Benson, Raymond Nigel Spencer, Jr., Sylvia Johnson Spencer, Michael Dean Moody, individually and on behalf of the Estate of Michael Dean Moody, Jr., Connie Moody, Kedrick Dante Moody, Drew Edwards, Donielle Edwards, Arifah Hardy, T.C., a

MINOR, AUNDRA CRAIG, JOYCE CRAIG, DEBRA COOK-RUSSELL, NASHIMA WILLIAMS CRAIG, JONATHAN CRAIG, ANDRE BROWN, MICHAEL COOK, VALENCIA COOK, KATHERINE M. CROW, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF WILLIAM J. CROW, K.A.C., A MINOR, CANDACE CATHRYN HUDSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KATHRYN ANN MONDINI, K.E.C, A MINOR, JOHN TAYLOR, CARROL ALDERETE, TRACYANDERSON, J.J., R.J.S., LORI ANN MCCORMICK, TINA EASTLUND, NANETTE SAENZ, BARBARAFARLEY, JACKIE MERK HLASTAN, KATHRYN HUCKFELDT, RANDOLPH FREEMAN, MAXINE E.CROCKETT, CAMERON FARLEY, JUAN SAENZ, THOMAS SMITH, JENNIFER RENEE YORK, BOONCHOB PRUDHOME, STEPHANIE MCCULLEY, DREW EDWARDS, RHONDA KEMPER, DANIEL C. OLIVER, CECILIA ARIZOLA, JACOB MICHAEL ROBINSON, MICHELLE TAYLOR, T.M.(A MINOR), DEREK STEPHENS, BRUCE LUKOW, KATHY KUGLER, STEPHANIE HOOD, M.R.(A MINOR), TONYA FREEMAN, MICHELLE BENAVIDEZ, EDWARD KUHLMEIER, JUSTIN ADAMSON, NICHOLE LOHRIG, ANTHONY ALDERETE, NAWAL ALTAIE, WILLIAM WITTE, ANNE P. JOYNER, CLIFFORD VAUGHN, A.F.(A MINOR), LAUREN SHUMATE, TAWANNA TALBERT DARRING, DANIEL BENAVIDEZ, SKYLAR HAKE, MICHAEL LUKOW, CHARLEE BLAIR WEBB, HENRY J. BANDHOLD, SR, JEFFREY D. PRICE, MARC STEARNS, BRANDON ARNOLD, ADAM WOOD, CHRISTOPHER LEVI, I.W., NICHOLAS GENE KOULCHAR, WAYNE BROWN, C.S.(A MINOR), B.B., GREG KLECKER, GLENN DALE HICKS, SR, ROBERT FUNCHEON, NANCY UMBRELL, COLLEEN CZAPLICKI, JOAQINA SAENZ CHORENS, DANIELCARVILL, ALOYSIUS SANCHEZ, SR, AVA TOMSON, NATHANIEL FOLEY, DONNA JEAN HEATH,AUDELIA MORIN, KATRINA COE, G.H., PHILIP ALAN DERISE, MARLYNN GONZALES, JOSHUADENMAN, CORY SMITH, ANGELA M. LAIRD, MEGAN WOOD, L.W., MATTHEW CRAIG, JUDY ANN CRABTREE, ANDREW LUKOW, DARLENE SHELTON, WESLEY WILLIAMSON, LUKE MURPHY, RAYMOND NIGEL SPENCER, SR., DEADRA GARRIGUS, KATHRYN HEAD, DENISE VENNIX, K.A.C, LARRY DICENZO, JOYCE CRAIG, CESAR CONTRERAS, EMILY LEVI, JOEDI WOOD, JOSEPH LUKOW, CANA HICKMAN, ROBIN ROBERTS, SARAH DUDEK, S.S., SEAN ELLIOTT, GEORGIANNA STEPHENSSMITH, JORDAN M. LAIRD, CHRISTOPHER BOUTEN, PATRICK WARD, MELISSA DRESSLER, TATYANA FUENTES, TANJA KUHLMEIER, ERIC PHYE, GLORIA P REYNOSO, JOAN HENSCHEID, NICHOLAS MORRIS, STEVEN J. FRIEDRICH, G.L., MATTHEW MENKE, ROBERT KUGLER, TERREL CHARLES BARTLETT, CATHY ANDINO, ADAM MATTIS, PHYLLIS TAYLOR, J.M.H., AMBER HABSIEGER, ARIANA STARCEVICH, K.A., HEATH DAMON HOBSON, S.L.H., BRENT HINSON, TIMOTHY TIFFNER, E.R., KIMBERLEE AUSTINOLIVER, MARK HURST, LISA RAMACI, KELLY GILLIS, NORMA ALICIA CONTRERAS, M.B.S., J.L.(A MINOR), JOSEPH T. MILLER, JEREMY D. SMITH, DONALD MAYES, ALAN BURKS, MEGAN PEOPLE, JOHN RICHARD TULLY, II, BRETT FARLEY, CHRISTOPHER JOYNER, ANGELICA ANDRADE, MATTHEW GARRIGUS, STEVEN T. FISHER, JENNIFER ROOSE, CASSANDRA BAILEY, ERIC NEIBERGER, SHAREN JONAUS MARTIN, TRENT STEPHENS, LEE WOLFER, NICHOLAS PROWSE, THERESA DAVIS, KAIYA COLLADO, TABITHA MCCOY, JUSTIN WALDECK, JONI ARIEL REEVES LITTLE, TAMMY DORSEY, JODEE JOHNSON, ROBERTO ARIZOLA, SR, NATHAN ENGLISH, ALISON BURKS MCRUIZ, CYNTHIA DELGADO, ANDREW BRADLEY, KEDRICK DANTE MOODY, DON JASON STONE, DONNA LEWIS, ANDY POOL, JERRY L. MYERS, JEFFREY C. MANN, GEORGE ARSIAGA, JOHN STEARNS, BRIDGET JUNEAU, BREANNA LYNN GASPER, DONNA FARLEY, AUSTIN

WALLACE, BRIAN T. SHELTON, AFONSO BANDHOLD, MARY NEIBERGER, NANCY HECKER, KIRA SIKES, RICHARD TOMSON, MACKENZIE HAINES, CHRISTOPHER BOGART, LUZ MARIA EstradaPulido, JESSICA H. WILLIAMS, NICHOLAS BAUMHOER, SANDRA HANKINS, ESTEBAN MORIN, MICHAEL KOULCHAR, GINA TESNAR, LINDSAY YOUNG, REBECCA J. OLIVER, CHARLES B. GREGSTON, JAMES SMITH, JACKIE FARRARFINKEN, SABRINA GLAWSON, MICHAEL SCOTT DEWILDE, SHANNON SHUMATE, JOHN D HECKER, LILLIAN HURST, DAVID WAYNE HARTLEY, RYAN WILSON, LOLA JEAN MODJESKA, BEVERLEY WOLFER, DENICE YORK, FABERSHA FLYNT LEWIS, KERI HAKE, PAMELA AdleWatts, ROBI ANN GALINDO, BRANDIE STANTON, KURTISS LAMB, BRYAN S. SHELTON, M.R.M, JOHNNY JAVIER MILES, JR, JACQUELINE A. SMITH, MELISSA BENSON, MARK MUNNS, CARL K. GREER, CARRIE THOMPSON, TOM B. LEE, RICHARD FRASER, JOANNE SUE HASSLER, ANDREW LUCAS, HUNTER L. LAIRD, JONATHAN CONTRERAS, SR, MARIA ALVAREZ, ALEXANDER ZAYAS, NANNETTE BryneHaupt, CONNIE HADDOCK, JENNIFER LINK, DOVE DEANNA ADAMS, CHARLOTTE FREEMAN, HOLLY BURSON, CHRISTOPHER WATTS, NATALIA WHITE, ZACHARY HAKE, T.S. (A MINOR), SEAN HARRINGTON, TAMARA RUNZEL, SHYANNE SmithLizotte, K.B., SUZZETTEE LAWSON, CEDRIC HUNT, E.C.R., GLADYS E. REYES CENTENO, LAVONNA HARPER, DAWN HAINES, ROBERT NEIBERGER, JENNIFER MORMAN, HARRY RILEY BOCK, CARLOS CONTRERAS, DEVON WALLACE, TIFFANY M. LITTLE, MARY JANE VANDEGRIFT(INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MATTHEW R. VANDEGRIFT), SAMANTHA DUNFORD, CHRISTINA MELENDEZ, CALVIN CANINE, LES KUGLICIS, WAYNE NEWBY, REBECCA BARATTIERI, KYLA OSTENSON, FRANCES CATHERINE CASTRO, JUDY HOFFMAN, BRENDA LITTLE, PAULA MENKE, CONNIE MOODY, DEBRA WIGBELS, JEAN DAMMANN, DONNA ENGEMAN, STEPHANIE KIDDER, SYLVIA JOHNSON SPENCER, DEBORAH SMITH, DEBRA CookRussell, MICHAEL HABSIEGER, H. JOSEPH BANDHOLD, I.F., MEGAN MAUK, ESTAVAN MORIN, SR, J.T.B., RAYANNE HUNTER, DANIEL BENAVIDEZ, JR, HERNAN CONTRERAS, TAYLOR EASTLUND, CHRISTINA SMITH, MICHEAL PAUL ALLEN SHELSWELL, J.M., JUDY COLLADO, DIXIE FLAGG, CHASTITY DAWN LAFLIN, ASHLEY VACHO LESLIE, RICKY JONAUS, M.R.M., TANYA EVRARD, COLIN HAINES, LUCAS WILLIAM ROBINSON, JOHN RICHARD TULLY, MARK UMBRELL, P.A., JEAN PRUITT, VERONICA PENA ANDRADE, RICHARD LEE, CAROL BENSON, ROBERTO AARON ARIZOLA, TIMOTHY NEWMAN, COLIN ROBERTS, ROBERTO ANDRADE, SR., SVEN EASTLUND, SABRINA CHAPMAN, SHANE IRWIN, SCOTT LILLEY, CRYSTAL TUTWILER, SUHEIL CAMPBELL, DOUGLAS KRUGER, DAVID FINKEN, MARIANA BANDHOLD, PETRA SPIALEK, VELINA SANCHEZ, DANIEL THOMAS, SR, PATRICIA MONTGOMERY, JAMES VAUGHN, A.L.R., K.K, DAVID C. IVERSON, KAYTRINA JACKSON, L.R., N.C.E., T.C., DIANNE O'NEILL, WILLIAM PARKER, ETHAN FRITZ, EDNA LUZ BURGOS, WILLIAM FARRAR,SR., BRANDEAUX CAMPBELL, CHRISTINA SHERIDAN, JERRY A. PALINSKY, SR, STEVE WADLEIGH, KATHLEEN HOKE, MICHELLE WEST, TIFANY THOMPSON, JESSECA LYN TSOSIE, KEVIN GRAVES, JUDAS RECENDEZ, CORENA MARTIN, DANIEL FRITZ, MIRANDA PRUITT, JAMES KINSEY, KEMELY PICKETT, JARRETT WARD, D.A.S., MARY CARVILL, JEFFREY ANDERSON, VICTOR RAY WISE II, BILLY DOAL WELLS, NICOLE BARATTIERI, NICHOLE GARRIGUS, VICTORIA LANDECK, DONNA KUGLICS, CHRISTOPHER SONGER, JESSALYN HOLT, VALENCIA COOK, LING P. LEE, ROSEMARIE ALFONSO, DANIEL

DRESSLER, LARK ADAMS, RICHARD E. HASSLER, ERIK ROBERTS, PATRICIA WHEATLEY, A.M.H., MARGARITA ARISTIZABAL, THERESA HART, MARY JANE VANDEGRIFT(INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOHN VANDEGRIFT), DANIEL MENKE, JOSEPH L. GREER, SHELLEY ANN CASEY, CHRISTOPHER MILLER, RENE POOL, JARED S. STEVENS, KENNY LEE, A.Z.C., MELINDA FLICK, JOHN GIBSON, OLGA LYDIA GUTIERREZ, FRED FRIGO, NICOLE A. KAPLAN, REBECCA L. SAMTENFINCH, TAMMY VANDERWAAL, TYLER NORAGER, BRITNEY E. CARTER, DAVID JAMES HICKS, SHANNON MILLICAN, R.A., CARLLIE PAUL, THEODORE LESTER, LORI ANN MCCOY, K.L., BOBBIE D. MARIANO, C.L.(A MINOR), ANASTASIA FULLER, RICHARD FINKEN, JOSHUA SCHICHTL, KIERRA GLAWSON, FAITH RENEESTONEKING, PATRICIA REYNOSO, BRIANNA RENEE NAVEJAS, POLOKA AIETI, DONIELLE EDWARDS, SHELBY WEST, VICTORIA M. FOLEY, RUSSEL HICKS, JR., ELVA ESPINOZA, CHAD FARR, CRISTA MUNNS, DAVID ARNOLD, ANTHONY HUDSON, JOSEPH HELTON, SR., JOHN D. LAMIE, GEORGE D. WHITE, C.F., BASHAR ALTAIE, MATTHEW LILLEY, VIVIAN PICKETT, BILLY JOHNSON, CARA ROBERTS, C.B., CHRIS FARLEY, JESSICA HUBBARD, RANDALL GEIGER, ROBERT CANINE, JOHN SACKETT, J.T., LEASA DOLLAR, JOHN MCCULLEY, CANDICE MACHELLA, MATTHEW LAMMERS, WILLIAM RONALD LITTLE, CASSIE COLLINS, CHRISTOPHER COTE, NICOLE LANDON, JOSHUA P. STEIN, CARRIE SUE STONEKING, URSULA ANN JOSHUA, MATTHEW BENSON, JAMES CANINE, CHRISTINA BIEDERMAN, MARIO STANTON, VERONICA DENISSE ANDRADE, BILLY WALLACE, DIANA THOMAS, MONICA ARIZOLA, DAKOTA SMITHLIZOTTE, LEAANN WADLEIGH, LESLIE K. REEVESHARDCASTLE, A.S.E., TONY GONZALEZ, JENNIFER LYNN HUNT, SLADE VICTOR TULLY, DOUGLAS VEVERKA, THOMAS KUHLMEIER, JOHN VACHO, KIMBERLY VESEY, ELIZABETH CHISM, AVA LANETTE BRADLEY, HILARY WESTERBERG, M.C., DEBORAH BEAVERS, MAX W. HURST, TANYA SUZZETTE DRESSLER, JAMIE BARNES, PEGGY CARVILLLIGUORI, JEFFREY ADAMSON, SAMANTHA BALSLEY, ELIZABETH JO EASTLUND, ANGEL MAYES, ALOYSIUS SANCHEZ, JR, JUDITH TIFFNER, T.R., HOPE ELIZABETH VEVERKA, A.S., ARIFAH HARDY, JUSTIN EVANS, GILBERT ARSIAGA, JR, SELICIA FIELD, A.B.(A MINOR), FRANK LILLEY, JEANNINE VAUGHN, NOEL CONTRERAS, ADINA PALINSKY, BRIAN MONTGOMERY, EMANUELA FLOREXIL, STEPHEN FINKEN, RUSSELL J. FALTER, CASEY REUBEN, M.A.H., STEVEN GREENWOOD, SEOP KIM, PAUL MITCHELL MILLICAN, JAMES TALBERT, GEORGE J. WHITE, ANITA BAKER, KARALEEN HERB, PAM MARION, KELLI D. HAKE, BRIAN G. TAYLOR, MATTHEW ARSIAGA, DONALD C. BANDHOLD, JEANNE RHEA MCMANUS, DANIEL PRICE, MARK FINKEN, K.M., VICKIE MICHAY WHITE, REBEKAH SCOTT, ERIC BILLITER, MICHAEL J. MILLER, RICHELLE HECKER, STEVEN KIRBY, MARLEN PICKETT, SHAYLYN C. REECE, GLORIA L. MAGANA, ROMMEL ROCHA, T.H., MARILYN LOUISE TULLY, TAMARA HASSLER, DAVID DIXON, BRITTANI HOBSON, HELEN FRASER, JOHN DAVID HEATH, JOHN KUHLMEIER, P.H., KIMBERLY SONGER, MATTHEW FIESER, BRIAN COKE, DEREK ALLEN HOLLCROFT, ADAM MAGERS, JOYCE BROOKS, MARICEL MURRAY, SEBASTIAN NIUMAN, SAMANTHA TUCKER, JOSHUA P.G. WOLD, ANDREW TOMSON, JACOB BAUER, JOHNNY JAVIER MILES, SR, CLAIRE JONAUS, DANNYEL CONTRERAS, STEPHANIE C. SANDER, ROBERT WHITE, CHRISTOPHER D. GREER, DANNY CHISM, MICHAEL DEAN MOODY, ROBERT VACCARO, SHALEE NORAGER, MICHAEL LUCAS, ARDELL THOMSEN, TIMOTHY W. ELLEDGE, ARNE EASTLUND, DAVID W.

HAINES, MELBA ANNE F. HARRIS, JESSE P. STEIN, RALPH THOMSEN, MICHAEL WEATHERLY, SUSAN MARIA DOSKOCIL HICKS, VERONICA LOPEZ REYES, AUNDRA CRAIG, SANDRA SOLIDAY, ANDREW MOORES, L.R.W., RONALD SLOAN, KATHLEEN SNYDER, HATHAL K. TAIE, SHEILA TRACY, ROBERT F. MARIANO, JUDY HUENINK, MICHAEL SMITH, DENNIS DUNN, CYNTHIA CONNER, IMO AIETI, CONSTANCE BRIAN, JOHN O'NEILL, DAVID KAPLAN, ELENA SHAW, G.B.(A MINOR), ANGELA ALVAREZ, AMI NEIBERGER, JOLENE LILLEY, JENNIE L. MORIN, JONATHAN CRAIG, ANDRE BROWN, JAMES DRESSLER, KATHY ADAMSON, RHETT MURPHY, MICHAEL R. MILLS, CAROL POLLEY, CYNTHIA THORNSBERRY, ALAN FINKEN, CELESTE YANTIS, KRISTIN WHITE, JASON ROBINSON, JODI MICHELLE HOBSON, SCOTT HOOD, SHAULA SHAFFER, DANIEL J. EVANS, C.W., MARION CRIMENS, GABRIELA D. PUERTAS VERGARADONOSO, DONALD TRACY, DONALD FIELD, CHRISTOPHER GOLEMBE, ANGELICA FIELD, LANI D. BOGART, FRANK L. CONVERSE, RUSSELL C. FALTER, MARVISE L. CROCKETT, JEAN MARIANO, SENOVIA FIELD, JESSICA CABOT, LORENZO SANDOVAL, JR, EUGENE DELOZIER, SHARON JOHNSTON, STACY PATE, SHILYN JACKSON, VICTORIA HECKER, MARIO BOWEN, SETH TIFFNER, JOHN P. SKLANEY, III, JOELLA PRATT, PRESTON SHANE REECE, JEREMY BAUER, DAVID G. CARDINAL, JR, JEREMY CHURCH, LAUREL BARATTIERI, EDDIE JO PALINSKY, CHEYENNE FLAGG, JOEL PALINSKY, S.J.S., BRENDA CHAND, SAMANTHA TOMSON, MICHELLE KIM, JERRY A. PALINSKY, II, LATASHA MARBLE, PHILLIP SANCHEZ, LUIS GARZA, CHRISTOPHER MICHAEL MELENDEZ, JOHN DANA GREER, PADRAIC J. NEWMAN, ALICIA PEARSON, LINDA GIBSON, CHRISTOPHER ADAMSON, ELIZABETH MASTERSON, GREGORY BAUER, M.N., KATHY CRABTREE, J.R., EVAN D. BOGART, MAXIMILLIAN SHROYER, CHASITY WELLSGEORGE, MICHELLE KLEMENSBERG, JOHNNY WASHBURN, G.F., ISABELL VINCENT, MICHAELMURPHYSWEET, MARGARITO A. MARTINEZ, JR, STEFANIE WALLACE, NATHAN NEWBY, VANESSA CHISM, ZORAIMA LOPEZ, SUSAN ARNOLD, EMILIE FINKEN, VICKIE MCHONE, JOSHUA TIFFNER, MATTHEW HUCKFELDT, JAYDEAN HAMILTON, MARIAH SIMONEAUX, SHARON M. PUGH, DONNIE MARION, JAMES CRAIG ROBERTS, AMBER HENSLEY, AMENIA JONAUS, MELISSA DOHENY, SHELLEY ANN SMITH, NOEL S. FARLEY, TAMMY KINNEY, GLORIA NESBITT, KIMBERLY MILLER, SEAN SLAVEN, ERIC BRANDON STONEKING, JULIE CHISM, DWIGHT MARTIN, KATHY CRANE, RONALD VEVERKA, TRAVIS GIBSON, NOALA FRITZ, MATTHEW L. MERGELE, LAWRENCE KRUGER, SHARON Y. DUNN SMITH, JOSE REYNOSO, BRADLEY STARCEVICH, DANIEL P. BENSON, KEITH VEVERKA, PATRICIA SMITH, E.W., SHIRLEY STEARNS, ADAM G. STOUT, ARMANDO FUENTES, RONALD WAYNE CRABTREE, SANDRA VALENCIA, KAREN FUNCHEON, ISMAEL MARTIR, E.K., BRYANT BEARFIELD, WILLIAM J. LEE, MARVIN THORNSBERRY, ANN CHRISTOPHER, CHRISTOPHER DAVID, TAUSOLO AIETI, BENJAMIN DANIEL CARRINGTON, NANCY COTE, JANET JONES, MERLESE PICKETT, NICOLE IRWIN, AMANDA VACHO, RICHARD CASEY, PERRY WHITE, SHARON DEBRABANDER, ADRIAN SANDOVAL, JAMI LIN WILSON, HYUNJUNG GLAWSON, LINDA FALTER, KARAR ALABSAWI, JASON SACKETT, ROADY LANDTISER, JEREMY BLOHM, PETER FINKEN, TERRANCE PETERSON, III, ANGELINE JACKSON, ERIC LEVI, FRANCES ROBINSON, RYAN SABINISH, SHELBY WHITE, ASHLEY GUDRIDGE HOUPPERT, JOSHUA BROOKS, MICHAEL COOK, NICHOLE SWEENEY, SARAH CROSBY, JAMES SHEPARD, STEPHANIE JUNEAU, ROBERT W. KUHLMEIER, GARY LAMMERS, LINDA JONES, SHAWN BARTLETT, TEMIKA SWINTON, JOHN

DAGGETT, LYNN FOREHAND, JANET L. RIOS, MARK E. THOMSEN, LAUREN NIQUETTE, JOEL HERNANDEZ, VICTORIA HERNANDEZ, ATHENA HALL, MATTHEW C. BEATTY, ANDREW CHARLES MAJOR, H.K., KIERSTEN HALL, JERRIN MATTHEW OGDEN, RONALD ALLDRIDGE, BROOKE KENNEY, K.R.G., TODD ALLDRIDGE, RENE GUTEL, ABIGAIL HALL, JOANN ALLDRIDGE, ANDREW JAMES RAYMOND, KANDI DANIELLE WHITESIDE, THOMAS NIQUETTE, A.M.M., ANA M. GOMEZ, RANDALL KLINGENSMITH, SHARON SMITHEY WHITESIDE, KAITLYN ADAMS, ANGELA M. GARCIA, RYAN BOWMAN, MICHAEL PASCO, ANDREW HALL, DANIEL KENNEY, CHRISTOPHER WHITESIDE, SEAN M. NIQUETTE, CHRISTOPHER SATTERFIELD, GRANT H. VON LETKEMANN, II, ASHLEY MEIKEL MAJOR, BRIAN CLARK ALLDRIDGE, SHERYL ANN CHEN, TARA HUTCHINSON, RANDI JEAN MARTZ, J.K., K.M.G., M.J.H., STEPHEN W. EVANS, JACKSON WILEY WHITESIDE, TYLER NICHOLAS OGDEN, M.T.W., RICHARD HEDGECOCK, II, MATTHEW WHITESIDE, MACKENZIE G. HALL, DIANNA ALLDRIDGE, MARY NIQUETTE, MARK A. HALL, GARY DOUGLAS FISHBECK, TONI ATTANASIO,

*Plaintiffs-Appellees,*

—against—

DR. MUHAMMAD BAASIRI,

*Movant-Appellant,*

JAMMAL TRUST BANK SAL,

*Defendant-Appellant.*

# TABLE OF CONTENTS

PAGE

EDNY Docket Entries Docket No.19-cv-00007 ......................... A-1

Amended Complaint, filed August 2, 2019 ........................... A-45

    Attachment A to Amended Complaint—
    Proposed Summons to Fenicia Bank ........................... A-867

    Exhibit 1 to Amended Complaint—
    Sale and Purchase Agreement between Lebanese Canadian
    Bank S.A.L. and Societe Generale De Banque Au Liban S.A.L.,
    dated June 22, 2011 ........................................... A-868

    Exhibit 2 to Amended Complaint—
    English and Arabic copies of ISRO's Donation Program Form .... A-872

Exhibit A to Response in Opposition to the Motion to Dismiss—
    U.S. Department of the Treasury Press Release – "Treasury
    Labels Bank Providing Financial Services to Hizballah as
    Specially Designated Global Terrorist", dated August 29, 2019 ... A-879

Pre-Motion Conference Letter to Hon. Carol B. Amon from Jammal
    Trust Bank S.A.L., dated September 1, 2020 ..................... A-887

Letter to Hon. Carol B. Amon from Gary M. Osen in Response
    to the September 1, 2020 Letter by Jammal Trust Bank S.A.L.,
    dated September 8, 2020 ....................................... A-889

August 31, 2020 Court Hearing Transcript before
    Hon. Carol B. Amon ........................................... A-891

October 26, 2020 Court Hearing Transcript before
    Hon. Carol B. Amon ........................................... A-947

Declaration of Dr. Muhammad Baasiri, filed December 30, 2020 ...... A-957

PAGE

Exhibit A to Declaration of Muhammad Baasiri—
Law 110 issued on July 11, 1991 – Reform of the Banking Sector .  A-964

Exhibit B to Declaration of Muhammad Baasiri—
Central Bank of Lebanon's Notification,
dated September 27, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-989

Second Declaration of Dr. Muhammad Baasiri,
filed December 30, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-993

Appendix to Second Declaration of Muhammad Baasiri—
Law of 1 Aug. 1963, Code of Money and Credit, (Leb.). . . . . . . . . . .  A-994

Declaration of David B. Rivkin, Jr., filed December 30, 2020 . . . . . . . .  A-1129

Declaration of Patrick Duprey, filed December 30, 2020 . . . . . . . . . . . . .  A-1130

Exhibit 1 to Declaration of Patrick Duprey—
Article titled "Lebanon Picks New Premier in Bid to Break
Political Deadlock," published on The Wall Street Journal's
website on December 19, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1133

Exhibit 2 to Declaration of Patrick Duprey —
Article titled "Lebanon's Government Resigns After Protests,
Deadly Beirut Explosion," published on The Wall Street
Journal's website on August 10, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1138

Exhibit 3 to Declaration of Patrick Duprey—
Article titled "NY-based Company Pulls out of Lebanon Bank's
Forensic Audit," published by the Associated Press on
November 20, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1146

Exhibit 4 to Declaration of Patrick Duprey—
Article titled "Lebanon's Central Bank Fuels Corruption,
Extremism Concerns," published on The Wall Street Journal's
website on November 30, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1152

iii

PAGE

Exhibit 5 to Declaration of Patrick Duprey —
Article titled "Behind the Beirut Explosion: Seven Years of
Official Neglect," published on The Wall Street Journal's
website on August 7, 2020 ...................................... A-1160

Exhibit 6 to Declaration of Patrick Duprey—
Capital Market Development Technical Note,
dated December 2013 .......................................... A-1173

Exhibit 7 to Declaration of Patrick Duprey—
Article titled "Lebanese Judge Orders 'Protective Freeze' on
Assets of C. Bank Governor," published by Reuters
on July 20, 2020 ............................................... A-1177

Exhibit 8 to Declaration of Patrick Duprey —
Article titled "Lebanese Central Bank Governor Inflated Assets
as Liabilities Grew – Audit," published by Reuters on
July 23, 2020 ................................................. A-1188

Exhibit 9 to Declaration of Patrick Duprey —
News Investigation "Lebanon's Offshore Governor" by
Organized Crime and Corruption Reporting Project ("OCCRP"),
published on their website on August 11, 2020 ................. A-1200

Second Amended Complaint Excerpts, filed on December 31, 2020 ... A-1220

January 26, 2021 Court Hearing Transcript before
Hon. Carol B. Amon .......................................... A-1228

Memorandum and Order of the Hon. Carol B. Amon,
dated August 6, 2021 ......................................... A-1272

Notice of Interlocutory Appeal, filed August 19, 2021 ............... A-1296

Qansu (SDGT) served as the firm's auditor; and Nabil Kamil al-Akhras served as the attorney.

1018.   Khodr Hussein Darwish is also partners with Safi Yehya Darwish and Ali Musa Nachar in a company known as DARCO (a/k/a DARCO Safi Darwish and Partners) operating from offices owned by Khodr Hussein Darwish.

1019.   Ali Musa Nachar owned three accounts at LCB until 2011.

1020.   Ali Musa Nachar owned account no. 171151* individually until it was closed in August 2011. That account was used to launder more than $10 million U.S. dollars in less than two years.

1021.   According to the Lebanese government, the account balance migrated to Ali Musa Nachar's account at Defendant BYBLOS BANK.

1022.   The other two accounts were owned jointly with Ali Hussein Darwish (account no. 39000* closed in July 2011, and no. 172813* closed in January 2010).

1023.   Mr. Nachar was listed as the chairman of a company in Angola named 5 Rosas Comércio e Indústria Limitada SAL Offshore whose auditor was listed as Ali Muhammad Qansu (SDGT), a member of Adham Tabaja's (SDGT) network.

1024.   Nazim Ahmad used Rilton Traders to launder proceeds worth hundreds of thousands of U.S. dollars from the Ahmad family's criminal activities in Belgium. The funds were repatriated to Lebanon (through correspondent bank accounts in New York) using the U.S. dollar-denominated accounts owned individually by Ali Musa Nachar in Lebanon. Nazim Ahmad also used G & S Diamond FZE to launder even larger sums to Mr. Nachar's U.S. dollar denominated LCB accounts.

1025.   Ibrahim Issawi also laundered significant sums (denominated in U.S. dollars) through Ali Musa Nachar's U.S. dollar-denominated accounts at LCB as well as the U.S. dollar-

223

denominated LCB accounts of Muhammad and Khodr Darwish.

1026.   As noted above, Ali Hussein Darwish owned two joint accounts with Ali Musa Nachar at LCB as well as two accounts owned jointly with Muhammad Hussein Darwish (discussed above).

1027.   Until June 22, 2012, Ali Hussein Darwish also owned a U.S. dollar-denominated account at LCB individually.

1028.   According to the Lebanese government, the account balance migrated to Defendants SGBL and BYBLOS BANK (and another bank).

1029.   Nazim Ahmad used Rilton Traders to launder hundreds of thousands of U.S. dollars in proceeds from the Ahmad family's criminal activities in Belgium to Ali Hussein Darwish. The funds were repatriated to Lebanon (using electronic funds transfers that were cleared and settled through correspondent bank accounts in New York) and deposited into Ali Hussein Darwish's individually owned U.S. dollar-denominated account at SGBL.

1030.   Ali Hussein Darwish and Muhammad Hussein Darwish's two sons, Hussein and Ibrahim, controlled an automotive part company in Ghobeiry called Interafrica Trading Company ITC SAL Offshore (a/k/a ITC). Jihad Muhammad Qansu (SDGT) served as the company's auditor, and Nabil Kamil al-Akhras served as the company's attorney.

1031.   Defendants FRANSABANK and BANK OF BEIRUT maintained accounts for and provided financial services to Interafrica Trading Company ITC SAL Offshore.

1032.   Khodr Darwish was also a shareholder in Darwish & Company in Nabatieh, together with several of his children and his business partner Safi Yahya Darwish.

1033.   The company's principal banker was Defendant SGBL (primarily through the bank's Hamra branch).

1034.   The company also owned account no. 174303* at LCB until it was forced to close in August 2012.

1035.   According to the Lebanese government, the account balance migrated to Defendant SGBL and another bank.

**f.   <u>The Khalil Nazem Ibrahim Network</u>**

1036.   Khalil Nazem Ibrahim was identified by the Lebanese government as another diamond trader with accounts at LCB who was also affiliated with Hezbollah.

1037.   His company, Société Allure SARL, was founded in 2004 and engaged in large-scale, high-volume transactions of the kind described in LCB's August 13, 2007 Internal Audit Report.

1038.   Société Allure SARL owned account no. 172049* at LCB until it was closed in September 2011. More than $30 million U.S. dollars flowed through that account in less than two years.

1039.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES also maintained an account for and provided financial services to Société Allure SARL.

1040.   According to the Lebanese government, Khalil Nazem Ibrahim owned account no. 173309* at LCB until it was closed in September 2011 and the account balance migrated to Defendant BANK AUDI (and another bank).

1041.   Samir Muhammad Hijazi was identified by the Lebanese government as an individual within Khalil Nazem Ibrahim's network.

1042.   According to the Lebanese government, Mr. Hijazi maintained account no. 340568* at LCB until it was closed in September 2011 and the account balance migrated to Defendants FENICIA BANK and BANK OF BEIRUT.

1043.   Nazim Ahmad used Rilton Traders to launder more than $950,000 U.S. dollars in proceeds from the Ahmad family's criminal activities transferred from Belgium (through New York correspondent bank accounts) to the U.S. dollar-denominated accounts at Defendant BLOM BANK owned individually by Mr. Hijazi.

1044.   The Lebanese government also identified an individual named Amine Bzeih as part of Khalil Nazem Ibrahim's network.

1045.   According to the Lebanese government, Mr. Bzeih owned account no. 53416* at LCB until August 2011, when the balance on the account transferred to Mr. Bzeih's accounts at Defendants FRANSABANK, BANK AUDI and BANQUE LIBANO-FRANÇAISE SAL.

### 3.      NARCOTICS TRAFFICKING NETWORKS

1046.   Although Hezbollah's BAC has been involved in transnational narcotics trafficking for decades, its investment in this particular illicit line of business has gone through at least three significant evolutions.

1047.   The first major evolution occurred when Hezbollah transitioned from taxing criminal organizations moving drugs through Lebanon and became directly involved in the global drug trade itself.

1048.   The second major evolution occurred when the BAC began leveraging the synergies between its diamond smuggling and illicit trade networks in Africa and its direct involvement with various drug trafficking networks and cartels.

1049.   The third major evolution coincided with the conflict between Hezbollah and Israel during the summer of 2006 and the terrorist organization's desperate need for dramatically increased revenues to help rebuild after the cease-fire was implemented.

1050.   During this third evolution, Hezbollah's BAC expanded its capabilities from

running drug trafficking networks to becoming a global logistics enterprise. Specifically, BAC's operational platform evolved from transporting and selling cocaine to offering various supply-chain, financing and advisory services to other transnational criminal networks, such as La Oficina de Envigado and the Los Zetas cartel.

1051.   This growth and evolution was all approved and overseen by Imad Mughniyah, who cultivated the BAC's global drug trafficking and organized crime in order to fund the Islamic Jihad Organization's operations, including the terrorism strategy it coordinated with the IRGC-QF in Iraq to kill and maim thousands of U.S. service members.

### a.   **Operation Titan**

1052.   The U.S. government's Operation Titan, a joint U.S. and Colombian investigation, resulted in October 2008 in a significant blow to an international cocaine smuggling and money laundering ring used, in part, to finance Hezbollah.

1053.   The two-year investigation resulted in more than 130 arrests and the seizure of $23 million U.S. Dollars by Colombian and U.S. agents.

1054.   Operation Titan successfully used confidential sources to infiltrate a significant organized crime group in Medellin Colombia identified as the Oficina de Envigado.[74]

1055.   Among those arrested was a Hezbollah facilitator named Chekri Harb, known in the Colombian drug trade as "Taliban." He was designated an SDNT in 2009.

1056.   Mr. Harb laundered hundreds of millions of dollars each year, from Panama to Hong Kong, while forwarding a percentage of his profits to Hezbollah.

1057.   While under surveillance, Mr. Harb logged extensive travel to Egypt, Lebanon, and Syria, and was in phone contact with senior Hezbollah figures.

---

[74]   Many of those arrested belonged to the Florez Upegui Organization, a network of drug traffickers based in Colombia and Guatemala with close ties to Oficina de Envigado.

1058.  In part as a result of information gathered during Operation Titan, the DEA's Counter-Narco Terrorism Operations Center ("CNTOC") began to investigate multi-ton shipments of cocaine from Colombia to the Los Zetas Mexican cartel, which were also tied to a very sophisticated network in West Africa that was moving currency via couriers back to Lebanon.

1059.  According to a 2010 report by the U.S. Congressional Research Service, law enforcement officials seized at least 46 metric tons of cocaine bound for Europe via West Africa between 2005 and 2008.

1060.  By 2012, it was estimated that as much as 300 metric tons of cocaine, worth approximately $13.5 billion, was trafficked through West Africa to Europe annually during those prior years.

1061.  The wholesale profits reaped by narco-traffickers during this period have been estimated to be approximately $3.5 billion per year.

1062.  Also, in 2008, German authorities at the Frankfurt airport arrested two Lebanese men carrying more than eight million euros raised by a Hezbollah cocaine smuggling ring. This and several subsequent arrests helped European law enforcement better understand Hezbollah's important role in drug trafficking.[75]

1063.  In 2009, Admiral James Stavridis, then commander of U.S. Southern Command, noted that narcotics traffickers "have expanded their presence in West Africa as a springboard to Europe, while also exploring new Middle Eastern and Asian markets."

1064.  According to a 2011 United Nations report, the European market for cocaine is growing rapidly:

> [T]he volume and value of the West and Central European cocaine market (US$33 billion) is approaching parity with that of the US (US$37 billion).

---

[75]    According to a U.N. report, 12 percent of individuals arrested in Germany for importing cocaine were Lebanese nationals.

> Two thirds of European cocaine users live in just three countries: The United Kingdom, Spain and Italy. With Germany and France, these countries represent 80% of European cocaine consumption.

1065.   In February 2012, Yuri Fedotov, head of the UN Office on Drugs and Crime, informed the UN Security Council that "[t]he West African transit route feeds a European cocaine market which in recent years grew four fold… We estimate that cocaine trafficking in West and Central Africa generates some US $900 million annually."

1066.   The rapid expansion of European demand for cocaine coincided with the maturation of the relationship and coordination between Hezbollah and the Colombian and Mexican drug cartels, with Hezbollah's West African logistics hubs serving as natural transit points for both cocaine and bulk cash.

### b.  Ayman Joumaa Network

1067.   Because Hezbollah maintained pre-existing criminal networks in West Africa and its IJO operatives were deeply entrenched there for decades, the significant growth in European demand for cocaine in the last fifteen years provided Hezbollah with a golden opportunity to put its sophisticated logistics capabilities to work on behalf of South and Central American drug cartels and generate vast new revenue streams.

1068.   Ayman Joumaa, one of the most important Hezbollah operatives involved in the transnational drug trade, exemplifies the marriage between Hezbollah's logistics network, the drug cartels, and the growing European demand for cocaine.

1069.   Mr. Joumaa has both been designated an SDNTK and indicted on November 23, 2011 (and charged with conspiracy to distribute narcotics and conspiracy to commit money laundering).

1070.   Mr. Joumaa owned LCB account no. 221338* in his own name until it was

229

(temporarily) frozen and transferred to Defendant SGBL.

1071.   The indictment alleged that Mr. Joumaa and his co-conspirators coordinated the shipment of tens of thousands of kilograms of cocaine, including at least 85,000 kilograms of cocaine sold to Los Zetas, between in or around 2005 to in or around 2007.

1072.   The indictment also alleged that Mr. Joumaa laundered hundreds of millions of dollars in drug proceeds from West Africa, Europe, Mexico and the United States, largely for cocaine suppliers in Colombia and Venezuela, who paid Mr. Joumaa's organization a fee of between 8 and 14 percent of the laundered proceeds.

1073.   According to the U.S. government, Mr. Joumaa and his organization operate in Lebanon, West Africa, Panama and Colombia, and launder proceeds from their illicit activities, as much as $200 million U.S. dollars per month, through various channels, including bulk cash smuggling operations and Lebanese exchange houses.

1074.   According to the U.S. government, Mr. Joumaa's organization pays fees to Hezbollah to facilitate the transportation and laundering of narcotics proceeds.

1075.   For example, Mr. Joumaa's organization has sent vast quantities of bulk cash shipments through the Beirut International Airport and regularly paid Hezbollah security to safeguard and transport the cash to its recipients, including LCB and various exchange houses discussed herein.[76]

1076.   On January 26, 2011 the U.S. Department of the Treasury designated Mr. Joumaa's drug and money laundering network. According to then-OFAC Director, Adam J. Szubin, Mr. Joumaa (SDNTK) ran "a complex money laundering scheme moving hundreds of millions of

---

[76]     A large amount of bulk cash (primarily in the form of banknotes that were denominated in U.S. dollars) was transported across the Togo and Ghana border on its way from Benin to the airport in Accra where the cash was then flown to Lebanon.

dollars of illicitly derived proceeds through businesses operated by him and his associates."

1077.   Mr. Joumaa's network used several money changers in Lebanon in order to launder the drug money, including among others, Hassan Ayash Exchange Company, Elissa Exchange Company, and New Line Exchange Trust Company, all designated SDNTKs on January 26, 2011.

1078.   The following chart diagramming the Joumaa Network was prepared by the U.S. Department of the Treasury:



1079.   On October 1, 2015, the U.S. Department of the Treasury designated four Lebanese nationals, two German nationals and eleven companies as Specially Designated Narcotics Traffickers pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act").

1080.   These individuals and entities provided support for narcotics trafficking and money laundering activities conducted by Lebanese-Colombian drug trafficker and money launderer Ayman Joumaa, key Joumaa associate Hassan Ayash, and the Joumaa criminal organization, which has ties to Hezbollah.

### c.   The Role of the Lebanese Exchange Houses

1081.   For at least two decades, money exchange businesses have played a key role as a waystation for Hezbollah BAC bulk cash to transition into the Lebanese banking system.

1082.   The exchange houses first became a major feature of Lebanon's financial sector during the Lebanese civil war and in 2001, the Lebanese Central Bank published a set of circulars expanding regulations for exchange houses operating in the country.

1083.   In 2011, the U.S. Department of the Treasury designated three of those exchange houses because of their significant roles in laundering money for the Joumaa Network: New Line Exchange Trust Company, the Elissa Exchange Company and the Hassan Ayash Exchange Company.

1084.   In 2013, the U.S. Department of the Treasury named Rmeiti Exchange and Halawi Exchange as foreign financial institutions of primary money laundering concern under Section 311 of the USA PATRIOT Act for essentially stepping in and taking over the roles played by Elissa Exchange Company and the Hassan Ayash Exchange Company in laundering money for Hezbollah and the Joumaa Network.

1085.   As noted above, "fresh" inflows of U.S. banknotes, transported to Lebanon in bulk cash shipments are a key stabilizing factor for Lebanon's precarious financial system.

1086.   From 2004 through 2011, Lebanese exchange houses were also a key transit point for Hezbollah funds flowing into Iraq to support Hezbollah's proxies and finance attacks on

American personnel, including Plaintiffs herein.

1087.   Hezbollah's BAC set aside funds from its narcotics trafficking proceeds to send to

Iraq via its preferred Lebanese exchange houses, invested some of the proceeds in Lebanese real

estate and commercial ventures and laundered the rest using elaborate trade-based money

laundering arrangements.

1088.   A 2008 transaction involving New Line Exchange illustrates one of the ways U.S.

banknotes originating from the Joumaa network transited through the Lebanese banking system to

facilitate trade-based money laundering.

1089.   Abdul Latif Fawaz worked as a courier for the Tajideen network that moved money

from Ghana to Lebanon.

1090.   In 2008, Mr. Fawaz made a cash deposit of $20,000 U.S. dollars at New Line

Exchange's branch in Beirut, Lebanon.

1091.   New Line Exchange then provided Mr. Fawaz with a receipt for his cash deposit

(identified by Cash Transaction Slip reference number "36/2008," dated July 19, 2008).

1092.   The Cash Transaction Slip identified the source of the funds as "business."

1093.   Subsequently, New Line Exchange instructed LCB to debit New Line Exchange's

U.S. dollar-denominated account no. 173902 and transfer $20,000 U.S. dollars to an individual

with an account at Defendant SGBL (number "072004440591185013").

1094.   Thus, a Hezbollah courier was able to convert U.S. banknotes into an electronic

deposit in a U.S. dollar-denominated account at a Lebanese bank (LCB) in the name of a third

party exchange house (New Line Exchange) that was then converted into another electronic funds

transfer to a seemingly unrelated U.S. dollar-denominated account at a second Lebanese bank

(SGBL) where it could be directed anywhere in the world using SGBL's correspondent bank

accounts in the United States.

1095.   Mr. Joumaa's movement of hundreds of millions of U.S. dollars into Lebanon each year provides desperately needed liquidity to the Lebanese banking system as do similar deliveries by other parallel drug trafficking networks approved by the BAC and overseen by Abdallah Safieddine.

1096.   At the same time, most Lebanese banks do not want to be seen as directly involved in processing vast sums of cash flown in primarily from West Africa. Nor do they wish to directly provide letters of credit to the Joumaa Network or other BAC procurement arms.

1097.   The Lebanese exchange houses therefore provide a valuable service both to the BAC and its drug trafficking networks as well as to Lebanon's commercial banks that prefer these intermediary financial institutions to handle the bulk cash deliveries and serve as the intermediaries for the trade-based money laundering that follows.

1098.   Lebanon's commercial banks, including Defendants, fully understand the role played by the exchange houses and fully understand their own roles in providing Hezbollah and its narcotics traffickers with access to the U.S. financial system both through the exchange houses' accounts at the banks and through the BAC corporate and individual accounts set forth above.

### i.    New Line Exchange Network

1099.   New Line Exchange Trust Company SAL ("New Line Exchange") was incorporated in May 2008 and operated by Ziyad Muhammad Youssef on behalf of Ayman Joumaa who effectively controlled the company.

1100.   Both New Line Exchange and Ziyad Muhammad Youssef were designated in January 2011 as SDNTKs for their direct involvement in Mr. Joumaa's narcotics money laundering activities.

1101.   Both New Line Exchange and Ziyad Muhammad Youssef owned accounts at LCB.

234

1102.  Mr. Youssef's U.S. dollar-denominated account no. 221418* was temporarily frozen by LCB with a balance of over $10 million U.S. dollars. According to the Lebanese government, the account balance was transferred to Defendant SGBL.

1103.  New Line Exchange LCB account no. 173902* was closed in June 2012, eighteen months after Mr. Joumaa's SDNTK designation.

1104.  New Line Exchange was also the owner of an account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES which Mr. Joumaa also used to launder narcotics proceeds through the international financial system.

1105.  New Line Exchange also conducted extensive business with the Mecattaf Exchange Network which served as a secondary banker or hawaladar to New Line Exchange.[77]

1106.  The transaction below provides an example of trade-based money laundering through the combination of bulk cash, New Line Exchange (SDNTK), a Lebanese bank (in this case Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES), U.S. correspondent bank accounts and ultimately the shipping and resale of commodities acquired through the multi-layered transaction:

---

[77]    A "hawaladar" is someone engaged in "hawala" – an alternative remittance channel that exists outside of traditional banking systems that enables individuals or companies to transfer funds through a system that records credit and debit transactions but does not involve the movement of funds either physically or through the exchange of commercial paper.

## Ayman Joumaa Network: Trade-based Money Laundering

**$49,650 U.S. dollars via New Line Exchange and Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES on October 15, 2008**



### ii.    Elissa Exchange Network

1107.   Elissa Exchange Company SARL ("Elissa Exchange") was established in 1996 and designated by the U.S. Department of the Treasury as an SDNTK in January 2011 along with its principals, Jamal Muhammad Kharrubi and Ali Muhammad Kharrubi.

1108.   During the relevant period, Elissa Exchange and its network of Lebanese companies were a prime vehicle for Hezbollah's money laundering and drug trafficking operations.

1109.   These included Phoenicia Shipping Offshore SAL (SDNTK), Elissa Holding SAL,

Solmar Offshore SAL, SOL – MAR SARL, and several companies based in Africa.[78]

1110.   LCB maintained U.S. dollar-denominated account no. 341276* for Elissa Exchange until it was frozen in June 2012.

1111.   According to the Lebanese government, (despite Elissa Exchange's SDNTK designation in 2011) the company was able to move its U.S. dollar-denominated account balance at LCB to its accounts at Defendants FENICIA BANK, MEAB BANK, LEBANON AND GULF BANK and another Lebanese financial institution.

1112.   In addition, after LCB's demise, Defendant BLOM BANK became Elissa Exchange's principal banker.

1113.   Defendant BLOM BANK (together with Defendant MEAB BANK) used its U.S. correspondent bank accounts to facilitate Elissa Exchange's electronic funds transfers for the purpose of purchasing or shipping cars on behalf of the Joumaa Network.

1114.   However, long before the U.S. designation of Elissa Exchange in 2011, it was obvious that the company was a money laundering enterprise. In fact, a 2006 LCB customer due diligence report noted that the Elissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including bulk cash smuggling on flights from Ghana to Beirut.

1115.   The report further described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.

1116.   Between January 2007 and January 2011 Elissa Exchange transferred more than

---

[78]   These includes Elissa Group SA, which operated in Benin and was owned by Ali Muhammad Kharrubi (SDNTK) and Elissa Park Cotonou/Elissa Car Park, a subsidiary of Elissa Group SA in the port city of Cotonou, Benin.

$60 million U.S. dollars to bank accounts in the United States for the purpose of purchasing or shipping cars on behalf of the Joumaa Network.

1117.   LCB held U.S. dollar-denominated account no. 341277* for Phoenicia Shipping Offshore SAL (SDNTK) (Ali Muhammad Kharubbi was listed as chairman and largest shareholder) until the account was frozen in June 2012, eighteen months after the U.S. designation.

1118.   According to the Lebanese government, despite Phoenicia Shipping Offshore SAL's designation in 2011 (as part of the Elissa Exchange Network), the company was able to move its account balance to its accounts at Defendants FENICIA BANK, BANK AUDI and FRANSABANK.

1119.   Defendant MEAB BANK's Tyre branch served as Phoenicia Shipping Offshore SAL's principal banker.

1120.   LCB also held U.S. dollar-denominated account no. 341821* for Elissa Holding SAL (SDNTK) (Ali Muhammad Kharubbi was listed as chairman and largest shareholder) until the account was temporarily frozen in June 2012.

1121.   LCB also held U.S. dollar-denominated account no. 341629* for Solmar Offshore SAL, also owned and controlled by Ali Muhammad Kharubbi, until the account was temporarily frozen in June 2012, eighteen months after the U.S. designation.

1122.   LCB also owned U.S. dollar-denominated account no. 341628* for SOL – MAR SARL until the account was temporarily frozen in June 2012.

1123.   SOL – MAR SARL was owned by Ali Muhammad Kharubbi and his brother Jamal.

1124.   LCB also owned accounts no. 341275* and 172692* for Ali Muhammad Kharrubi. Account no. 172692 was closed in January 2012 and its account balance moved to Mr. Kharrubi's account at Defendant MEAB BANK.

1125.   Mr. Kharrubi's account no. 341275* was temporarily frozen in June 2012 but the account balance nevertheless moved to Mr. Kharrubi's account at Defendant MEAB BANK.

### iii.   Hassan Ayash Exchange Network

1126.   The Hassan Ayash Exchange Company SARL ("Hassan Ayash Exchange") is a money exchange based in Beirut, Lebanon.

1127.   The Hassan Ayash Exchange was owned and controlled by Hassan Muhammad Hasan Ayash.

1128.   The exchange's principal office is located adjacent to the Caesars Park Hotel in Beirut, which is owned by Ayman Joumaa's brother, Akram Said Joumaa (SDNTK).

1129.   The Hassan Ayash Exchange owned U.S. dollar-denominated account no. 340048* at LCB that was closed in June 2012.

1130.   In 2006, at Ahmad Safa's direction, the Hassan Ayash Exchange became LCB's primary source of foreign currencies, especially U.S. dollars.

1131.   Between 2007 and 2011, the Hassan Ayash Exchange Company transferred approximately $140 million U.S. dollars to bank accounts in the United States for the purpose of purchasing or shipping used cars for the Joumaa Network.

1132.   Defendants SGBL, BLOM BANK and MEAB BANK used their accounts at U.S. correspondent banks to facilitate the Hassan Ayash Exchange Company's funds transfers for the purpose of purchasing or shipping cars on behalf of the Joumaa Network.

1133.   Hassan Ayash Exchange Company was also used by Hezbollah to channel U.S. dollars into Iraq during the relevant period.

### iv.   Halawi Exchange Network

1134.   Halawi Exchange is owned and controlled by Mahmud Fuad Halawi and his family, including Ali Ahmad Halawi and Mahmud's sons, Wa'el Halawi, Fuad Halawi and Rawad Halawi.

1135.   According to the U.S. Department of the Treasury, the Halawi family's entities

leverage common office space and operational capabilities:

> Halawi Exchange, along with other related entities, is organized under a
> holding company known as Halawi Holding SAL, which also owns several
> other related companies in Lebanon. The Halawi companies are based in
> Beirut, Lebanon, share key corporate leadership, maintain offices at the
> same addresses, share common phone numbers and common email
> addresses, and frequently reference their close connection to one another.

1136.   This network of companies (collectively, the "Halawi Network") includes the

following entities:

- Halawi Holding SAL;
- Halawi Investment Trust SAL;
- Halawi Trading & Contracting Est;
- Halawi Real Estate SAL;
- General Investment Co SARL;
- L'ambiance de Rêve SARL;
- Info Trust SAL; and
- Info Trust SARL.

1137.   Like the other Lebanese exchange houses discussed herein, the companies that form

the Halawi Network furnish money laundering and bulk cash exchange services to Hezbollah's

BAC and provide it with a means of converting banknotes into bank credit for setting off debts

through the international banking system.

1138.   Halawi Exchange owned an account at LCB through which it laundered hundreds

of millions of U.S. dollars.

1139.    On April 22, 2013, the Director of Financial Crimes Enforcement Network of the

U.S. Department of the Treasury found that Halawi Exchange "is a financial institution operating

outside the United States that is of primary money laundering concern."

1140.   The U.S. Department of the Treasury further described Halawi Exchange's

"extensive illicit financial activity on behalf of a variety of international narcotics trafficking and

money laundering networks," further noting its role in facilitating "transactions for a network of individuals and companies which launder money through the purchase and sale of used cars in the United States for export to West Africa."

1141.   Halawi Exchange was the owner of at least one account at Defendant BANK OF BEIRUT at its Clemenceau Street branch in Beirut, Lebanon and Defendant MEAB BANK at its branch in Tyre.

1142.   Halawi Holding SAL owned an account at Defendant MEAB BANK at its branch in Tyre.

1143.   Halawi Investment Trust SAL was the owner of accounts at Defendants SGBL, BLOM BANK and MEAB BANK.

1144.   Info Trust SAL was the owner of accounts at Defendants SGBL and BANK AUDI.

1145.   Info Trust SARL was the owner of at least one account at Defendant BANK AUDI.

### v.   Mecattaf Exchange Network

1146.   Mecattaf SAL is part of a network of Lebanon-based money and precious metal exchange brokerage firms controlled by the Mecattaf family.

1147.   Unlike its competitors identified herein, Mecattaf has not (yet) been designated by the United States for its role in laundering money for Hezbollah's BAC and/or Ayman Joumaa's network.

1148.   However, Mecattaf play an important role in the BAC's and Mr. Joumaa's money laundering operations, with the assistance of Defendant LEBANON AND GULF BANK.

1149.   Mecattaf SAL owned corporate account no. 11110458 at Defendant LEBANON AND GULF BANK.

1150.   Below is an example of how Mecattaf and Defendant LEBANON AND GULF

BANK played important roles in facilitating Ayman Joumaa's movement of bulk cash from narcotics trafficking through Lebanon.

1151.   The transaction below illustrates how trade-based money laundering for the BAC works. While the cash originates with Joumaa's South American narcotics network, it was ultimately converted into a seemingly unrelated purchase of food products worth $115,050 U.S. dollars in Southeast Asia that wound up being supplied to Tajideen family companies in Africa. New Line Exchange processed the bulk cash deposit and then debited its account with Mecattaf Exchange. The latter then used its account at Defendant LEBANON AND GULF BANK to transfer U.S. dollars through Defendant LEBANON AND GULF BANK's U.S. correspondent bank account to effectuate a U.S. dollar-denominated transfer to the commodity food supplier in Singapore who shipped the commodity to the Tajideen Network in Africa which, in turn, would sell the commodity food products and convert those sales back into cash in Africa:

**Ayman Joumaa Network and Tajideen Network: Trade-based Money Laundering**

$115,050 U.S. dollars via New Line Exchange, Mecattaf Exchange and Defendant LEBANON AND GULF BANK on June 21, 2010



1152.   Another transaction illustrates how the BAC uses couriers transporting bulk cash to effectuate its trade-based money laundering operations, this time using a trusted courier named Fawaz who deposited over $250,000 in U.S. banknotes with New Line Exchange (SDNTK). The funds were then debited from New Line Exchange's account at Mecattaf Exchange which, in turn, initiated an electronic wire transfer by its bank, Defendant LEBANON AND GULF BANK. The resulting transaction cleared U.S. dollars through Defendant LEBANON AND GULF BANK's U.S. correspondent bank and credited the account of a Vietnamese bank whose customer was a wholesale food supplier:

## Ayman Joumaa Network and Tajideen Network: Trade-based Money Laundering
### $269,678 U.S. dollars via New Line Exchange and Defendant LEBANON AND GULF BANK on August 5, 2009



#### vi.    Kassem Rmeiti Network

1153.   Kassem Rmeiti & Company for Exchange ("Rmeiti Exchange") is a Lebanon-based money exchanger with branches and affiliates in Switzerland and Benin. Rmeiti Exchange, through its owner, Kassem Rmeiti, also owns companies including, but not limited to, the Rmeiti Group SAL Offshore in Lebanon and Société Rmeiti SARL (a/k/a STE Rmeiti) located in Benin (collectively, the "Rmeiti Network").

1154.   As with the other Lebanese exchange houses described herein, according to the U.S. Department of the Treasury, the Rmeiti Network "uses accounts held at foreign banks that

maintain correspondent relationships with U.S. financial institutions to gain access to the U.S. financial system."

1155.   Also, according to the U.S. Department of the Treasury, Rmeiti Exchange was involved in trade-based money laundering with drug cartels for Hezbollah's benefit:

> Rmeiti Exchange, its ownership, management, and associates are involved in illicit activity that includes the same trade based money laundering activities conducted by U.S.-designated narcotics kingpin Ali Mohamed Kharrubi and Elissa Exchange, facilitate money laundering by other Lebanese exchanges on behalf of drug traffickers, and provide financial services to Hizballah.

1156.   In addition, Ali Muhammad Qansu (SDGT), who is closely affiliated with Adham Hussein Tabaja and Muhammad al-Mukhtar Fallah Kallas, served as the auditor for Rmeiti Group SAL Offshore in Lebanon.

1157.   Rmeiti Group SAL Offshore owned an account at Defendant FENICIA BANK (Verdun branch).

### vii.   Fayed Exchange Network

1158.   Fayed Exchange Company was established in 1988 by Muhammad Abd al-Rahman Fayed and his brother Mahmud Fayed.

1159.   According to the company, its origins date back to the 1950s.

1160.   During the relevant period, Fayed Exchange Co. engaged in large-scale, high-volume transactions of the kind described in LCB's August 13, 2007, Internal Audit Report.

1161.   According to the Lebanese government, Fayed Exchange Co. fell within Saleh Ali Assi's network of companies for the BAC.

1162.   Fayed Exchange Co. was the owner of U.S. dollar-denominated account no. 170505* at LCB until it was closed on June 2011.

1163.   According to the Lebanese government, when LCB closed Fayed Exchange Co.'s

account, the balance migrated to accounts owned by Fayed Exchange at Defendants BANK OF BEIRUT AND THE ARAB COUNTRIES and LEBANON AND GULF BANK.

### 4.   ARMS DEALING

1164.   Hezbollah is actively involved in arms trafficking throughout the world. Its agents operate on six continents.

1165.   Hezbollah procurement specialists and operatives acquire both kinetic weapons (*e.g.* rifles, grenades, missiles) and non-kinetic materials (*e.g.* night-vision equipment, scopes and fuses) for Hezbollah's own use as well as for profit and resale and to gain influence with governments and militia that they service.

### a.   <u>Weapons Trafficking in the United States</u>

1166.   In one leading example, Hezbollah's IJO sought to acquire approximately 1,200 Colt M4 Carbines (machine guns) from the United States.

1167.   Hasan Antar Karaki, the brother of a senior Hezbollah operative who planned a major terrorist attack in Azerbaijan, worked closely with Hassan Hodroj, a Hezbollah spokesman and head of the organization's portfolio on "Palestinian issues," to acquire weapons from around the world.

1168.   As with other Hezbollah efforts, the common denominator was criminality. Thus, Mr. Karaki and Mr. Hodroj were not only involved in procuring weapons for Hezbollah; they were also attempting to sell counterfeit U.S. currency and fake passports.

1169.   On or before July 2008, Hassan Hodroj and his son-in-law, Dib Hani Harb (also a Hezbollah operative and close associate of Mr. Karaki), engaged in a multi-layered scheme to sell counterfeit currency and fake passports to undercover U.S. law enforcement agents and acquire weapons and technology on Hezbollah's behalf.

1170.   In July 2008, an undercover U.S. law enforcement agent was advised that counterfeit money was available for purchase from Lebanon, and in September 2008, the agent was introduced to Dib Hani Harb, who was identified as someone involved in the sale of counterfeit money to support Hezbollah.

1171.   Mr. Harb also advised the undercover U.S. law enforcement agent (and later established) that he was involved in cocaine trafficking.

1172.   In April 2009, Mr. Karaki sent Mr. Harb to a meeting in southern Florida to meet with undercover law enforcement operatives. Terms were negotiated for the sale of stolen U.S. currency and multiple counterfeit currencies. Mr. Harb stated that $100 bills could be obtained for approximately 40 percent of face value and that the notes were manufactured in Iran specifically for Hezbollah's benefit.

1173.   He also demanded a 3 percent commission on every deal between undercover U.S. law enforcement agents and Hezbollah.

1174.   Mr. Harb specified that the counterfeit bills were printed in Baalbeck, Lebanon and that no one should fear criminal prosecution for this counterfeiting activity, indicating that "they" know everyone, even the judges.

1175.   At the meeting, Mr. Harb also explained that Hezbollah produced not only counterfeit currency, but also false European travel documents as well.

1176.   Mr. Harb explained that Mr. Karaki was a major figure in Hezbollah's forgery operations, and he offered several varieties of passports, including passports from Italy and the Czech Republic. (Fake British, American and French passports were also offered at a separate meeting.)

1177.   A few months after the meetings in Florida, Mr. Harb and Mr. Karaki delivered

247

fraudulent British and Canadian passports to a law enforcement operative using the pictures and biographical information he had provided.

1178.   On or about May 12, 2009, Mr. Karaki directed that the payment for the passports should be made to Mr. Harb's account at Defendant BANK AUDI - Plaza Bid Idriss, Sofil Center, Beirut 2021 8102, Lebanon, account #813364.

1179.   Mr. Harb's stated profession was "physical therapist." He maintained a clinic in Dahiya which he acknowledged to an undercover U.S. law enforcement agent was "simply a cover for his activities on behalf of Hezbollah."

1180.   In June 2009, a U.S. undercover agent first discussed the possibility of Mr. Harb acquiring Colt M4 Carbines ("M4" machine gun) for Hezbollah.

1181.   Subsequently, Mr. Harb introduced the undercover U.S. law enforcement agent to his father-in-law Hassan Hodroj and Mr. Hodroj agreed to purchase approximately 1,200 M4s at a price of approximately $1,800 U.S. dollars per M4 and stated that he was involved in weapons and technology procurement for Hezbollah.

1182.   In November 2009, Mr. Harb, Mr. Hodroj and others were indicted for, among other things, conspiring to provide material support to Hezbollah.

1183.   That same month, U.S. law enforcement contacted BANK AUDI by serving a seizure warrant on its correspondent bank seeking to freeze Mr. Harb's account (which remained active). The warrant expressly stated that Mr. Harb had been charged with providing material support to an FTO under 18 U.S.C. § 2339B, but although the correspondent confirmed BANK AUDI's receipt of transmittal of the warrant, it did not comply.

**b.  Weapons Trafficking in Nigeria**

1184.  Hezbollah has strong connections to (among others) an arms-dealing network in Nigeria.

1185.  According to a report from the Combatting Terrorism Center at West Point:

> Iran's Quds Force and [Hezbollah]'s global operations have involved Nigeria for more than a decade, but their activities were exposed in October 2010. Nigerian customs officials in Lagos seized 13 containers of weapons from a ship operated by the same French-Lebanese businessman's company that in March 2011 saw a ship bound for Sinai, Egypt, via Syria to supply weapons to Hamas in Gaza intercepted by Israeli naval commandos. The containers in Lagos, which included 107mm Katyusha artillery rockets used by [Hezbollah] against Israel in 2006, were shipped on behalf of a Tehran-based Islamic Revolutionary Guard Corps (IRGC) "front company" and were picked up at Bandar Abbas in Iran, where the IRGC has a naval base. According to Nigeria's foreign minister, the weapons were destined for a warehouse in Abuja, but shippers altered documents to send them to Gambia (presumably for anti-Senegalese rebels in Casamance). Nigerian security officials arrested four individuals: a senior Quds Force officer; a Nigerian who formerly studied in Iran and worked at Radio Tehran's Hausa language service; and two Nigerian customs officials. A fifth Iranian suspect, Sayyed Akbar Tabatabaei, who was the Quds Force Africa Corps commander, took refuge in the Iranian Embassy, flew back to Tehran with Iran's foreign minister and was reportedly reassigned to Venezuela to run Quds Force operations in Latin America. One month after these arrests, $10 million worth of heroin hidden in auto engine parts suspected of being linked to the weapons shipment in October was seized in Lagos from a ship originating in Iran.

1186.  Muhammad Ibrahim Bazzi (SDGT) organized the above-referenced weapons shipment, using LCB's Prime Bank Gambia subsidiary to help finance the deal.

1187.  One of Hezbollah's most prominent arms dealers in Nigeria is Mustafa Reda Darwish Fawaz, who was designated by the U.S. Department of the Treasury as an SDGT on February 26, 2015, "for acting for or behalf of Hizbullah."

1188.  Mustafa Fawaz has been a significant donor to Hezbollah and a member of Hezbollah's Islamic Jihad Organization.

1189.   He is a Lebanese citizen who owns a chain of supermarkets in Abuja, Nigeria called Amigo Supermarket Ltd. (SDGT) as well as the Wonderland Amusement Park and Resort Ltd. (SDGT) in Abuja, Nigeria.

1190.   According to the U.S. Department of the Treasury, since the 1990s, Mustafa Fawaz has been involved in activities related to communications, surveillance, and reporting for Hezbollah. He communicated with Hezbollah in Lebanon by e-mail and reportedly received updates and newsletters regarding Hezbollah activities and distributed this information to other Hezbollah supporters in Abuja, Nigeria.

1191.   According to the U.S. Department of the Treasury, Mr. Fawaz used special surveillance cameras based at Amigo Supermarket (SDGT) to monitor the movements of foreigners, especially Israelis. He also provided Hezbollah with a report of his visit to the U.S. Embassy in Nigeria.

1192.   As of at least mid-September 2003, Mustafa Fawaz solicited donations in Abuja, Nigeria, and helped arrange the transmission of these funds to Hezbollah in Lebanon.

1193.   Mr. Fawaz maintained multiple accounts at Defendant BLOM BANK.

1194.   In mid-May 2013, the Nigerian State Security Service arrested Mustafa Fawaz and two other men after the discovery of an arms cache in a residence in the northern Nigerian city of Kano.

1195.   On May 30, 2013 Nigerian intelligence agents escorted journalists to a property in Kano and showed them a bunker where a massive haul of weapons had been stored.

1196.   A Nigerian official, Bassey Etang, described the room as a "Hezbollah armory."

1197.   Mustafa Fawaz reportedly confessed the details of Hezbollah activities in Nigeria and identified additional names of other Hezbollah IJO cell members in Nigeria, as well as a

250

specific property in Kano, Nigeria, that was used to support terrorism.

1198.   In November of 2013, Fawaz and one of the men arrested with him were acquitted of the charges against them because Hezbollah was not an illegal organization in Nigeria.

1199.   The third man was convicted of conspiring to import weapons illegally.

1200.   Fouzi Reda Darwish Fawaz, Mustafa Fawaz's brother, was also part of Hezbollah's Nigerian network.

1201.   He was designated an SDGT by the U.S. Department of the Treasury on February 26, 2015.

1202.   Fouzi Fawaz was a Hezbollah Foreign Relations Department ("FRD") official in Abuja, Nigeria. The FRD claims to be in charge of "community relations," but the primary goal of the FRD in Nigeria was to scout recruits for Hezbollah's military units, as well as to create and support Hezbollah's terrorist infrastructure in Africa and globally.

### c.   Weapons Trafficking and Dual-Use Technologies

1203.   Vatech SARL was established in 1997 in Beirut by Fadi Hussein Serhan. Both the company and Mr. Serhan were designated by the U.S. Department of the Treasury as SDGTs in November 2015. According to the U.S. government, Mr. Serhan ran procurement supply-chain operations for Hezbollah's UAV requirements:

> Serhan is a Hizballah procurement agent and General Manager of Beirut-based company Vatech SARL, which he has used to purchase sensitive technology and equipment for Hizballah. Serhan has purchased unmanned aerial vehicles (UAVs) and accessories, and various electronic equipment from companies in United States, Europe, Asia, and the Middle East.

1204.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES maintained an account for and provided financial services to Vatech SARL at its branch in the Mazraa district of Beirut, Lebanon.

### 5. ILLICIT INTERNATIONAL TRADE

1205.   At least hundreds of millions of dollars in U.S. currency are transported annually from Benin and other West African countries to Lebanon by money couriers, hawaladars, and currency brokers.

1206.   These U.S. dollar-denominated funds include the proceeds of car sales from the Benin car parks, along with the proceeds of narcotics trafficking, money laundering proceeds, and other crimes. A significant portion of this money moves through courier and security networks controlled by Hezbollah or individuals affiliated with Hezbollah.

1207.   The proceeds of the car sales help to conceal and disguise the true source, nature, ownership, and control of the narcotics proceeds from U.S. customs and other law enforcement agencies.

1208.   For example, Elissa Group (SDNTK, discussed above)—headed by two Lebanese brothers Ali Muhammad Kharrubi (SDNTK) and Jamal Muhammad Kharrubi (SDNTK)—ran money exchange and used car selling companies in Lebanon and in Benin, Africa.

1209.   On the night of January 17, 2012, the Beninese Government arrested Ali Muhammad Kharrubi for narcotics-related money laundering. His permanent residency status was withdrawn, he was declared "persona non grata" by Beninese media, and he was extradited to the U.S. because of his ties to Hezbollah.

1210.   Similarly, according to the U.S. government, between 2003 and 2011, at least 34 individuals who transported bulk cash from Togo to Ghana also sought entry to the United States on non-immigrant visas. Most of them listed their employment as car buyers or car traders, and some identified as their points of contact U.S. car buyers who received wire transfers from LCB, the Hassan Ayash Exchange and the Elissa Exchange discussed herein.

252

1211.   Hezbollah also uses money couriers to transport millions of undeclared U.S. dollars in bulk cash shipments to Lebanon. As just one example, on December 9, 2010, three individuals connecting between airline flights through Paris on their way from Benin to Lebanon were arrested while carrying over $6.5 million U.S. dollars in undeclared U.S. currency. One of the individuals was also carrying a business card for Elissa Megastore, Elissa Exchange's car lot in Cotonou.

1212.   Hezbollah frequently blurs the lines between narcotics trafficking, illicit trade, counterfeiting and money laundering. For example, in 2007 and 2008 alone, a network of at least 44 couriers working for Hezbollah *declared* over $97 million in U.S. banknotes at the border crossing between Ghana and Togo in West Africa.

1213.   According to the U.S. government's civil complaint against LCB, Hezbollah maintained tight control over its money laundering networks:

> At least hundreds of millions of dollars in U.S. currency are transported annually from Benin and other West African countries to Lebanon by money couriers, hawaladars, and currency brokers. These U.S. dollars include the proceeds of car sales from the Benin car parks, along with the proceeds of narcotics trafficking, money laundering proceeds, and other crimes. A significant portion of this money moves through courier and security networks controlled by Hizballah or individuals affiliated with Hizballah.

1214.   One of the individuals who transported money across the border between Ghana and Togo was Hassan Chokr, a Hezbollah weapons dealer.

1215.   In another example, in 2006, U.S. law enforcement officials became aware that various individuals were attempting to purchase large quantities of purportedly stolen cellular telephones for shipment overseas.

1216.   One of these men was Moussa Ali Hamdan, a Lebanese national living in New Jersey and later Brooklyn, who conducted a side-business in buying and selling stolen electronics.

1217.   In September 2008, Mr. Hamdan introduced an undercover U.S. agent to Dib Hani Harb (discussed above), who was involved in the sale of counterfeit money to support Hezbollah.

1218.   Over the course of approximately two years, undercover U.S. agents sold counterfeit consumer goods to Mr. Hamdan and worked with Mr. Hamdan and Mr. Harb on schemes to buy counterfeit currency.

1219.   Mr. Hamdan was a relatively low-level Hezbollah operative with close ties to more senior Hezbollah operatives in Lebanon and West Africa, but like many others, his criminal endeavors relied upon The System to facilitate his activities.

1220.   While Mr. Hamdan was buying approximately $150,000 U.S. dollars of what he believed to be counterfeit consumer goods from a U.S. undercover agent, he also operated a low-end car dealership in New Jersey called MAH Auto with his business partner.

1221.   From August 2006 through February 2008, MAH Auto received approximately 80 wire transfers from Lebanon to its his U.S.-based Commerce Bank account #7857579069.

1222.   In 2007 alone, Mr. Hamdan's MAH Auto account received $8.5 million U.S. dollars from bank accounts in Lebanon.

1223.   As part of the money laundering scheme, more than 15 wire transfers totaling more than $1 million U.S. dollars were sent by Hassan Ayash Exchange (designated an SDNTK in 2011), Halawi Exchange and Kassem Rmeiti and Co. For Exchange (designated as foreign financial institutions of primary money laundering concern under Section 311 of the USA PATRIOT Act in 2013) from accounts at LCB to MAH Auto.[79]

1224.   As part of the money laundering scheme, more than $500,000 U.S. dollars were wired to New Jersey from accounts at Defendant BANQUE LIBANO-FRANÇAIS.

---

[79]   Remiti Group SAL Offshore is a sister company of Kassem Rmeiti and Company for Exchange. Its auditor / accountant is Ali Muhammad Qansu, an SDGT who works on behalf of Adham Tabaja.

1225.   As part of the money laundering scheme, more than $250,000 U.S. dollars were

wired to MAH Auto in New Jersey from accounts at Defendant BANK AUDI via JP Morgan

Chase Bank in New York. One of the BANK AUDI accounts used to make the transfer was account

no. 780554.

1226.   The funds were used in part to purchase used cars subsequently exported from the

U.S. primarily to West Africa as part of Hezbollah's money laundering efforts to launder narcotics

sales proceeds.

1227.   In November 2009, charges were filed in the Eastern District of Pennsylvania

against Moussa Ali Hamdan (together with Mr. Harb and others) for providing material support to

Hezbollah, and a host of other criminal offenses.

1228.   Before he could be arrested in New Jersey, Mr. Hamdan fled to Lebanon and later

traveled to the Tri-Border Area, where he was subsequently arrested and extradited to the United

States.

1229.   Mr. Hamdan is only one example of what the U.S. government has referred to as

Hezbollah's "Used Car Trade-Based Money Laundering Scheme":



1230.   Mr. Hamdan's MAH Auto received wire transfers in New Jersey/New York that originated with LCB, Defendants BANQUE LIBANO-FRANÇAIS and BANK AUDI, often placed by exchange houses that themselves received massive inflows of drug money collected by Hezbollah.

1231.   MAH Auto then purchased used cars in the United States and shipped them to Africa where they would be re-sold, and the proceeds would be offset against narcotics proceeds to conceal the source of the latter.

1232.   Muhammad Noureddine, who was arrested in France in January 2016, presents another example of how The System mixes trade-based money laundering with narcotics trafficking and ultimately terrorism.

1233.   Mr. Noureddine used his company, Trade Point International SARL (SDGT), to provide financial services to Adham Tabaja, the co-head of Hezbollah's BAC and his company Al-Inmaa Engineering and Contracting SARL (SDGT).

1234.   He and his associates in Europe collected cash provided by other Hezbollah operatives from Colombian drug cartels (particularly La Oficina de Envigado), used the money to buy luxury jewelry, watches and cars, and then resold these items in Lebanon or West Africa.

1235.   Mr. Noureddine worked closely with a Hezbollah operative and drug trafficker named Ghassan Diab who was based in Lagos, Nigeria but operated in other central and west African countries.

1236.   For example, law enforcement raids in Germany, France, Italy and Belgium resulted in the seizure of 500,000 Euros in bulk cash, property in the form of 70 watches valued at $9 million U.S. dollars, weapons and one luxury vehicle.

1237.   The proceeds from the re-sale of watches, jewelry and other luxury items in Lebanon and West Africa were then deposited in currency exchange houses in Lebanon or money transfer bureaus in Africa, and a portion of that money was eventually transferred to the Colombians after sizeable commissions were deducted and – according to investigators – diverted to Hezbollah for purchasing weapons used by the organization in Syria. The rest of the funds were churned through Lebanese banks (including Defendants herein) for use by Hezbollah and its IJO.

1238.   On January 28, 2016, both Mr. Noureddine and Trade Point International SARL were designated by the U.S. Department of the Treasury "for providing financial services to or in support of Hizballah."

1239.   Trade Point International SARL has maintained an account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES to facilitate its conduct.

1240.   The Treasury Department noted that Mr. Noureddine "maintained direct ties to Hizballah commercial and terrorist elements in both Lebanon and Iraq" and "transferred

substantial amounts of money in support of Hizballah's commercial investment activity in Lebanon and Iraq."

### 6.   LEBANESE LAWYERS ASSOCIATED WITH BAC COMPANIES

1241.   Hezbollah utilizes a small subset of Lebanese lawyers to help set up its network of companies. The association of one of these attorneys with an entity constitutes additional evidence that an entity or account is controlled by Hezbollah.

1242.   Hezbollah's list of preferred attorneys includes the following individuals:

### a.   <u>Ali Hassan Berro</u>

1243.   Ali Hassan Berro is an attorney for many of the companies associated with Hezbollah's money laundering network. In 2017, he even ran on Hezbollah's behalf for the post of Head of Beirut's Bar Association. Mr. Berro is affiliated with the following Hezbollah-controlled companies:

- **The Lebanese Arab Company for Touristic Services SARL**;

- **Société Orientale Libanaise d'Investissement et Développement SAL** (discussed above, account at Defendant BYBLOS BANK);

- **Shahed Pharm Drugstore SARL** (discussed above, account at Defendant LEBANON AND GULF BANK);

- **Global Touristic Services SAL** (discussed above, account at Defendant BYBLOS BANK);

- **Atlas Holding SAL** (discussed above, accounts at Defendants SGBL and BANK AUDI);

- **Assaha Travel and Tourism SARL** (discussed above);

- **Amana Sanitary and Paints Company LLC (ASPCO)**;

- **Amana Plus Company SAL** (discussed above, account at Defendant LEBANON AND GULF BANK);

- **Sanabel for Urban Studies and Architectural Design SAL** (discussed above);

- **Al-Kawthar** (discussed above); and

- **Al-Amana SARL** (discussed above, accounts at Defendants LEBANON AND GULF BANK and BYBLOS BANK).

### b. Fadi Adel Jamal al-Din

1244.  Fadi Adel Jamal al-Din is an attorney with numerous ties to Hezbollah related individuals and entities that are part of the BAC network.

1245.  Mr. Jamal al-Din served as the attorney for numerous companies established by Rana Abd al-Rahim Koleilat during her tenure at Bank Al Madina (discussed *infra*), including:

- **Rana Travel Limited SARL**;

- **Rana K. Holding SAL** (discussed below);

- **R 2679 Real Estate SAL** (discussed below);

- **Sweet SARL I&R**;

- **Al Madina Flowers SARL**;

- **R and I Real Estate SAL** (discussed below);

- **V 46 Real Estate** (discussed below);

- **MD Group Cleaning SARL**; and

- **Intimo SARL**.

1246.  Mr. Jamal al-Din served as attorney for at least four companies affiliated with senior BAC facilitator Saleh Ali Assi:

- **Al Mansouri Real Estate Company**;

- **Salasko Offshore SAL** (LCB account no. 172850*);

- **V69 Real Estate SAL**; and

259

- **Sol Blanc SAL**.

1247. Mr. Jamal al-Din served as attorney for the following companies controlled by the Nassour clan:

- **Centrum Mark SAL**;

- **Center Real Estate SAL**;

- **La National SAL** (co-founder and attorney); and

- **Serene Real Estate SAL** (co-founder and attorney).

1248. Mr. Jamal al-Din served as attorney for the following companies controlled by the Ahmad clan:

- **United Investment Group SAL** (discussed above, account at Defendant SGBL);

- **Paloma Group SAL** (discussed above, account at Defendant FRANSABANK);

- **Spider Group SAL** (discussed above);

- **Triple A for Development SAL**;

- **Hariss 929 Real Estate SAL**;

- **Golden Square SAL** (account at Defendant FRANSABANK);

- **Triple A Team Ltd.**;

- **Ali Ahmed Group - Holding SAL** (discussed above, account at Defendant FRANSABANK);

- **ACE Group SAL** (discussed above, account at Defendant FRANSABANK);

- **Diane Real Estate SAL**;

- **A&H Team SAL**; and

- **Al-Sirat Holding SAL** (discussed above).

### c. **Ali Hussein al-Ashi**

1249.   Ali Hussein al-Ashi is the attorney for many companies associated with Hezbollah's network, specifically the Tabaja Network; most prominent among them are Adham Tabaja's designated companies:

- **Al-Inmaa Engineering and Contracting SARL** (SDGT, discussed above, accounts at Defendants SGBL, FENICIA BANK, LEBANON AND GULF BANK, MEAB BANK, BANK OF BEIRUT AND THE ARAB COUNTRIES, and BANQUE LIBANO-FRANÇAISE); and

- **Al-Inmaa Group for Tourism Works** (discussed above, account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES).

1250.   He also serves as the attorney for companies within the Tabaja Network that are affiliated with Mr. Tabaja and other SDGTs such as Issam Ahmad Saad and Nabil Mahmoud Assaf:

- **New Land SARL** (discussed above, accounts at Defendants MEAB BANK and FENICIA BANK, and previously at LCB);

- **Fantasy World SARL** (discussed above, accounts at Defendants SGBL, MEAB BANK and FENICIA BANK, and previously at LCB);

- **Farah Tyre Company** (discussed above);

- **Fun World Company** (discussed above, account previously at LCB);

- **Madan Tourism Projects Company SAL "Green City"** (discussed above);

- **Alia Company SAE** (discussed above);

- **Lebanese Bread & Confectionery Company SAL** (discussed above); and

- **Development Studies SARL** (discussed above).

### d. Amer Afif Abu Khalil

1251. Amer Afif Abu Khalil is an attorney in Tyre who is closely associated with the

Tajideen Network. He is the attorney for the following Tajideen companies:

- **Afrimex (Offshore) SAL** (discussed above, accounts at Defendants BYBLOS BANK and BANK AUDI, and previously at LCB);

- **Distributions and Agencies Company SAL** (discussed above);

- **Galaxy Flame Trading SAL Offshore** (account at Defendant BANK OF BEIRUT, and previously at LCB);

- **Company for Development and Prosperity** (discussed above);

- **BMC SAL**;

- **Hyram Maritime SAL** (discussed above, account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES);

- **Al-Marjan Trading & Real Estate Development Company SAL**;

- **Lebanese Real Estate Development & Investment Company SAL** (discussed above);

- **Bream Star Line SAL Offshore** (discussed above);

- **Union Real Estate Development Company SAL** (discussed above);

- **Al Burhan Development and Development Company SAL**;

- **Al-Massar Real Estate SAL** (discussed above);

- **The General Company for Real Estate Development and Development (ALICE) SAL**;

- **Atwi and Abbas Trading Company**;

- **Trust & Safety RE. Investment SAL**;[80]

- **Al-Izdihar for Contracting SARL** (discussed above);

---

[80] The Chairman and majority shareholder is Ahmad Hassan Tajideen. Ali Muhammad Muhanna also owns shares in the company and sits on its board of directors together with Hassan Muhammad Abd al-Hassan Tajideen's wife, Najmah Hassan Jabir.

262

- **Tajco Company SAE** (discussed above); and

- **Ovlas Trading SAL (Offshore)** (discussed above, accounts at Defendants BANK AUDI and LEBANON AND GULF BANK).

1252.   In addition, he is the attorney for several more Tajideen companies, which are part of Hezbollah.

### e.   Ashraf Assem Safieddine

1253.   Ashraf Assem Safieddine was a co-founder of Inter Aliment SAL Offshore, a company controlled by senior BAC facilitator, Saleh Ali Assi.

1254.   The company owned an account at LCB where it laundered substantial sums of U.S.-denominated currency for the BAC.

1255.   According to the Lebanese government, when LCB was finally compelled to close Inter Aliment SAL Offshore's account, the account balance migrated to the company's accounts at Defendants MEAB, FRANSABANK and BANQUE LIBANO-FRANÇAISE.

1256.   Inter Aliment SAL Offshore was also the owner of accounts at Defendant BANK AUDI and SGBL.

1257.   Mr. Safieddine is an attorney who was associated with several Amhaz Network companies. Among others, he was the attorney for:

- **Teleserve Plus SAL** (SDGT, discussed above);

- **Special Operations Group SAL** (discussed above, account at Defendant BANK AUDI); and

- **Liban Stars SARL**. The following individuals were involved with the company:

  o Kamel Amhaz founded the company and owned shares in the company;
  o Jihad Hussein al-Anan was listed as co-founder, partner and authorized signatory for the company; and

  o Mr. Safieddine was listed as the company's attorney and a partner in the company.

### f. Muhammad Hussein Dakrub

1258. Muhammad Hussein Dakrub is the brother of Dima Hussein Dakrub and is also an attorney. He is also the nephew of Muhammad Abd Ali Rustam, co-founder and in some cases the managing director of companies controlled by the Ahmad clan (see above).

1259. He has served as the attorney for several companies that are controlled by Muhammad Abdallah al-Amin (SDGT discussed *infra)*.

1260. These companies include:

- **M. Marine SAL Offshore** (SDGT). Mr. Dakrub was listed as a co-founder, board member, shareholder and the company's attorney;

- **Lama Food International SAL Offshore** (SDGT). Mr. Dakrub was listed as the company's attorney;

- **Sierra Gas SAL Offshore** (SDGT). Mr. Dakrub was listed as the company's attorney;

- **Lama Foods SARL** (SDGT). Mr. Dakrub was listed as the company's attorney;

- **Thaingui SAL Offshore** (SDGT). Mr. Dakrub was listed as the company's attorney;

- **I. Prints Plus SARL**. Mr. Dakrub was listed as the company's attorney;

- **I. Prints SARL**. Mr. Dakrub was listed as the company's attorney;

- **Aya SAL Offshore**. Mr. Dakrub was listed as the company's attorney; and

- **S.I.M. SAL Offshore** (account at Defendant BANQUE LIBANO-FRANÇAISE, and previously at LCB). Mr. Dakrub was listed as the company's attorney.

### g.  Muhammad Farid Mattar

1261.   Muhammad Farid Mattar is an attorney for several companies that are controlled

by Hezbollah, including the following entities (several of which have been designated by the U.S.

Department of the Treasury):

- **Car Escort Services (Offshore) SAL** (SDGT, discussed above, account at Defendant JAMMAL TRUST BANK);

- **Spectrum International Investment Holding SAL** (SDGT, discussed above, accounts at Defendants LEBANON AND GULF BANK, BANK AUDI and JAMMAL TRUST BANK);

- **Spectrum Investment Group Holding SAL** (SDGT, discussed above, accounts at Defendants BLOM BANK, LEBANON AND GULF BANK and JAMMAL TRUST BANK);

- **Hoda for Touristic Services & Management Holding SAL** (discussed above, accounts at Defendants SGBL and BANQUE LIBANO-FRANÇAISE);

- **Phoenicia Shipping Offshore SAL** (SDNTK, accounts at Defendants BANK AUDI, FRANSABANK, MEAB BANK, and previously at LCB);

- **International Group Holding SAL** (discussed above);

- **EBD Teltac (Offshore) SAL** (discussed above, account at Defendant LEBANON AND GULF BANK);

- **Solmar Offshore SAL** (account previously at LCB);

- **International Mining Company Holding SAL**, controlled by Muhammad Bazzi and Wa'el Muhammad Bazzi, both SDGTs;

- **One Globe Operator SAL Holding** (discussed above); and

- **B.I. Group Holding SAL** (discussed above).

### h.  Nabil Kamil al-Akhras

1262.   Nabil Kamil al-Akhras is a lawyer and related to the following list of companies

affiliated with Jihad Muhammad Qansu (SDGT):

- **Amigo Travel and Transport SAL** (account at Defendant BYBLOS BANK);

- **Al-Ansab Lebanese for International Trading (Offshore) SAL**;

- **United Company (Offshore) SAL**;

- **Golden Fish (Offshore) SAL** (SDGT);

- **Ifriqiya General Trading (Offshore) SAL**;

- **Al-Ghadaf Company for Trading & General Supplies (Offshore) SAL**;

- **Al-Twazon al-Handasy for General Contracting Company (Offshore) SAL**;

- **Mega Investment Group (Offshore) SAL**;

- **Interafrica Trading Company ITC SAL Offshore** (accounts at Defendants FRANSABANK and BANK OF BEIRUT);

- **Madina SAL Offshore**;

- **International Management & Finance Holding SAL**; and

- **Blue Sky Holding SAL**.

### i. Osama Abbas Ramal

1263.   Between 2001 and 2010, Osama Abbas Ramal was mayor of Adaisseh village on behalf of the Hezbollah and Amal joint list. Mr. Ramal serves as the attorney for the following list of Hezbollah-related companies in Lebanon:

- **Lebanese Communication Group** (SDGT, discussed above);

- **Seasons Corporation for Agricultural Projects and Services SARL** (discussed above);

- **Dar al-Manar for Artistic Production and Distribution**;

- **Meamar Company for Engineering and Development SARL** (discussed above);

266

- **Al-Raed SARL** (discussed above, account at Defendant BLOM BANK);

- **Béton Plus SAL** (discussed above, account at Defendant BLOM BANK);

- **Bekaa Company for Construction and Contracting BC SARL**, affiliated with the Iranian Authority for the Rehabilitation of Lebanon;

- **Media Publi Management SARL**; and

- **Arch Consulting SARL** (discussed above, account at Defendant BLOM BANK).

### j.   Joseph George Zgheib

1264.   Joseph George Zgheib is the managing partner of Tyan & Zgheib.

1265.   He is registered as the attorney for three companies affiliated with Muhammad Ibrahim Bazzi (SDGT), at least one of which maintained an account at LCB (Global Electrical Group Holding SAL) before it was closed in 2012. Zgheib was also listed as a founder of this company as well as another company, Africa Middle East Investment Holding SAL (SDGT) owned and controlled by Bazzi.

1266.   Mr. Zgheib is registered as the attorney and co-founder for four companies affiliated with Ibrahim Issawi (and attorney for three more). At least three of the companies maintained accounts at LCB before those accounts were closed.

1267.   Mr. Zgheib is registered as the attorney and co-founder for four companies affiliated with Muhammad Issam Abu Darwish and his brother (and attorney for three more). Three of the companies – Ras Beirut 1442 SAL, Ideal Development I.D. SAL and Builders International SAL – maintained an account at LCB before the bank was forced to close it and it migrated to Defendant BANQUE LIBANO-FRANÇAISE.

267

### k.   Aline George Choucair Prince

1268.   Aline George Choucair Prince is an attorney for the law firm of Tyan & Zgheib.

1269.   She is registered as co-founder for two companies affiliated with Muhammad Ibrahim Bazzi (SDGT), at least one of which maintained an account at LCB (Global Electrical Group Holding SAL) before it was closed in 2012. Ms. Prince was also listed as a founder of Africa Middle East Investment Holding SAL (SDGT) owned and controlled by Mr. Bazzi.

1270.   Ms. Prince is listed as the co-founder of two companies controlled by Ibrahim Issawi and as co-founder of another company together with Wa'el Ahmad Issawi, who is a shareholder and a board member.

1271.   She is registered as the co-founding attorney for three companies affiliated with Muhammad Issam Abu Darwish and his brother Sami. Two of the companies – Ras Beirut 1442 SAL and Builders International SAL – maintained an account at LCB before the bank was forced to close it and the account migrated to Defendant BANQUE LIBANO-FRANÇAISE.

### l.   Claire Elias Assaf Abu Rajili

1272.   Claire Elias Assaf Abu Rajili is an attorney for the law firm of Tyan & Zgheib.

1273.   She was registered as a co-founder for Global Electrical Group Holding SAL, which is controlled by Muhammad Ibrahim Bazzi (SDGT) and which maintained an account at LCB before it was closed in 2012.

1274.   Ms. Abu Rajili was listed as the co-founder of four companies controlled by Ibrahim Issawi and as attorney for another company controlled by Ibrahim Issawi. One of those companies, Investment Group for Construction and Development SAL, owned an account at LCB before the bank was forced to close it in 2010.

1275.  She was registered as the co-founder for three companies and as attorney of one company controlled by Muhammad Issam Abu Darwish. One of the companies – Ras Beirut 1442 SAL – maintained an account at LCB before the bank was forced to close it and the account migrated to Defendant BANQUE LIBANO-FRANÇAISE.

1276.  Ms. Abu Rajili was listed as the co-founder of Builders International SAL, where Sami Issam Abu Darwish was listed as a shareholder, authorized signatory and board member.

1277.  Builders International SAL maintained account no. 32740* at LCB before the bank was forced to close it in August 2011.

## 7. LEBANESE ACCOUNTANTS / AUDITORS ASSOCIATED WITH BAC COMPANIES

1278.  Hezbollah utilizes a small subset of Lebanese accountants and auditors to help maintain and "audit" its network of companies. The association of one of these accountants or auditors with an entity or account provides additional evidence that the entity or account is controlled by Hezbollah.

### a. Jihad Muhammad Qansu

1279.  Jihad Muhammad Qansu serves as statutory auditor of numerous companies associated with Hezbollah.

1280.  On February 2, 2018, Mr. Qansu was designated as an SDGT by the U.S. Department of the Treasury for his role as financial manager of Al-Inmaa Engineering and Contracting SARL (SDGT).

1281.  Mr. Qansu is a business associate of Hezbollah operative and financier Adham Tabaja (SDGT), and assists Mr. Tabaja "in accounting matters, including resolving bank account issues."

1282.  As part of his role in Al-Inmaa, Mr. Qansu worked on the company's operations

together with Muhammad Al-Mukhtar Kallas (SDGT). He is affiliated, as founder or shareholder, with several companies that are part of the Tabaja and Tajideen networks.

1283.  Jihad Muhammad Qansu is statutory auditor of the following BAC companies:

- **Al-Inmaa Engineering and Contracting SARL** (SDGT, discussed above, accounts at Defendants SGBL, FENICIA BANK, LEBANON & GULF BANK, MEAB BANK, BANK OF BEIRUT AND THE ARAB COUNTRIES, and BANQUE LIBANO-FRANÇAISE);

- **Amigo Travel and Transport SAL** (account at Defendant BYBLOS BANK);

- **Global Touristic Services SAL (GTS)** (discussed above, account at Defendant BYBLOS BANK);

- **Golden Fish (Offshore) SAL** (SDGT). Mr. Qansu is also a shareholder (holding 495 shares), co-founder, and board member of the company;

- **Rayan Foods SAL** (discussed above);

- **Société Orientale Libanaise d'Investissement et Développement SAL**, (discussed above, account at Defendant BYBLOS BANK); and

- **Interafrica Trading Company ITC SAL Offshore** (accounts at Defendants FRANSABANK and BANK OF BEIRUT).

### b.  Mashhur Abd al-Nabi Hamqah

1284.  Mashhur Abd al-Nabi Hamqah serves as statutory auditor of the following Hezbollah-controlled entities:

- **Atlas Holding SAL** (discussed above, account at Defendants SGBL and BANK AUDI);

- **Shahed Pharm Drugstore SARL** (discussed above, account at Defendant LEBANON AND GULF BANK); and

- **Amana Plus Company SAL** (discussed above, account at Defendant LEBANON AND GULF BANK).

### c.  Shawqi Ra'if Abu Khalil

1285.  Shawqi Ra'if Abu Khalil serves as statutory auditor of numerous companies

270

associated with the Tajideen Network, including the following list of Hezbollah-controlled entities:

- **Ovlas Trading SAL (Offshore)** (discussed above, accounts at Defendants BANK AUDI SAL and LEBANON AND GULF BANK);

- **Afrimex (Offshore) SAL** (discussed above, accounts Defendants BYBLOS BANK and BANK AUDI, and previously at LCB);

- **Hyram Maritime SAL** (discussed above, account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES);

- **Al-Dalhamiya Country Club Company** (discussed above);

- **Company for Development and Prosperity** (discussed above);

- **Distributions and Agencies Company SAL** (discussed above);

- **Al-Burhan Growth and Development Company SAL**;

- **Trust & Safety RE. Investment SAL**;

- **Leaders of Supply & Products** (Offshore) SAL (accounts at Defendants BANK OF BEIRUT, BANK AUDI and LEBANON AND GULF BANK, and previously at LCB); and

- **Galaxy Flame Trading SAL Offshore**, (account at Defendant BANK OF BEIRUT, and previously at LCB).

**d.  Edmond Youssef Saadeh**

1286.  Edmond Youssef Saadeh serves as statutory auditor of the following Hezbollah-controlled entities:

- **Car Escort Services (Offshore) SAL** (SDGT, discussed above, account at Defendant JAMMAL TRUST BANK);

- **Spectrum International Investment Holding SAL** (SDGT, discussed above, accounts at Defendants LEBANON AND GULF BANK, JAMMAL TRUST BANK and BANK AUDI); and

- **Spectrum (Offshore) SAL** (discussed above).

271

### e. **Zuhayr Habib Saydani**

1287. Zuhayr Habib Saydani serves as statutory auditor of numerous companies associated with Hezbollah, including the following entities controlled by Nazim Ahmad, the Ali Ahmed Group, Faysal Mustafa Ahmad, Muhmmad Isa Abu Darwish and the Nassour clan:

- **Primo International SAL Offshore** (discussed above, accounts at Defendants BLOM BANK and BANQUE LIBANO-FRANÇAISE);

- **Blue City SAL** (discussed above, account at Defendant FRANSABANK);

- **Golden Square SAL** (account at Defendant FRANSABANK);

- **ACE Group SAL** (discussed above, account at Defendant FRANSABANK);

- **Paloma Group SAL** (discussed above, account at Defendant FRANSABANK);

- **Beirut Diam SAL** (discussed above);

- **Enovation Digital SAL**;

- **Hariss 929 Real Estate SAL**;

- **Atilla SAL**;

- **Heliopolis SAL**;

- **Millennium Management SAL**;

- **Estonia SAL**;

- **Hart Gems SAL**;

- **Diane Real Estate SAL**;

- **KD SAL - Holding**;

- **Spider Group SAL** (discussed above); and

- **AD 730 SAL**.

IX.   **DEFENDANTS' MATERIAL SUPPORT TO HEZBOLLAH**

   A.   **BANK AL MADINA: THE BETA TEST FOR LEBANESE CANADIAN BANK**

1288.   Bank Al Madina, a Lebanese financial institution that collapsed in 2003, provides a prime example of how The System in Lebanon operates and how Hezbollah capitalizes on the institutional corruption of the Lebanese state.

1289.   The collapse of Bank Al Madina also served as a prelude to migration of Hezbollah BAC accounts from that institution to LCB and eventually to Defendants in this action.

1290.   Bank Al Madina was established by Saudi interests at the end of 1982 with a single branch in Hamra. It later acquired and maintained a sister bank, United Credit Bank (UCB), which was also involved in Bank Al Madina's massive fraud, money laundering and terror financing.

1291.   In 1984 a majority stake was acquired by the Abu-Ayash family, two Druze brothers with dual Lebanese-Saudi citizenship from the town of Baakline: Adnan Abu Ayash and Ibrahim Abu Ayash.

1292.   In the 1990s the bank acquired six additional branches purchased from Prosperity Bank.

1293.   During this time, Ibrahim Abu Ayash came to rely heavily on Abd al-Rahim Koleilat as a chief aide.

1294.   Koleilat worked closely with the head of Syrian Military Intelligence in Lebanon at that time, Major General Rustom Ghazali, and the bank served as a slush fund for Syrian generals and Lebanese politicians.[81]

1295.   Koleilat's daughter, Rana Koleilat, was used a key conduit in the kickback scheme

---

[81]      For example, according to a report prepared by Fortress Global Investigations, Koleilat facilitated a large payment to the then-Syrian Defense Minister's account at Defendant BLOM BANK.

that supplied Syrian and Lebanese politicians and security services with cash, real estate, cars, and jewelry in exchange for protecting and facilitating a multibillion-dollar money laundering operation that allowed Saddam Hussein and Russian gangsters to hide income and convert dirty money into legitimate bank accounts around the world.

1296.   It also provided a haven for Hezbollah's investments and a vehicle for Hezbollah's BAC money laundering network for West African Conflict Diamonds.[82]

1297.   When Al Madina collapsed in early 2003, it had been looted of about $1.65 billion. The Lebanese Special Investigation Commission to Combat Money Laundering Crimes issued a decision on October 7, 2003 accusing Rana Koleilat, the brothers Adnan and Ibrahim Abu Ayyash, and others of stealing hundreds of millions of U.S. dollars from Bank Al Madina and forging documents to cover this theft.[83]

1298.   The exploitation and collapse of Bank Al Madina foreshadowed several patterns that would recur with LCB and which are endemic to The System:

- The involvement (within the bank itself) of a Hezbollah operative;

- Use of commercial and residential real estate as a means of converting illicit proceeds into "respectable" investments;

- Distribution of corporate and real estate holdings to family members;

- Use of overlapping networks of lawyers and auditors tied to multiple BAC networks; and

- Use of U.S. correspondent accounts to clear U.S. dollar-denominated funds transfers.

---

[82]   According to the same Fortress Global Investigations report, several million U.S. dollars were also transferred to the Martyrs Foundation Lebanon.

[83]   Adnan Abu Ayash filed a lawsuit against Bank Al Madina, United Credit Bank, Rana Koleilat and others in the United States District Court for the Southern District of New York, in November 19, 2004. Rana Koleilat herself filed a complaint in Lebanon against the Abu Ayyash brothers and others for forgery, fraudulent use, fabrication of crimes and slander, intimidation and extortion of money.

1299.   The involvement of a Hezbollah operative *within* the bank was demonstrated in 2004 when U.S. prosecutors charged Naji Antoine Abi Khalil with attempting to purchase night vision goggles and other military equipment for Hezbollah.

1300.   Khalil's connections to Bank Al Madina came to light when he bragged to undercover agents that he travelled the world picking up cash to be deposited in the bank on behalf of Hezbollah (and the Russian mafia).

1301.   Khalil was not only an employee of Bank Al Madina, but he also played in a role in at least three related companies owned and controlled by Adnan Abu Ayash and Ibrahim Abu Ayash, the owners of Bank Al Madina:

- **Al Madina Shipping Company LLC**, Company Registration Number 74500;

- **Maritime City Company**, Company Registration Number 74502; and

- **Al Madina Travel & Swimming Company**, Company Registration Number 74501.

1302.   The use of commercial and residential real estate as a means of converting illicit proceeds into "respectable" investments is illustrated by a review of corporate assets held by Rana Koleilat which show a portfolio of companies, particularly in the real estate field. It also shows that her father, Abd al-Rahim Koleilat, and mother, Masarra Salah Sanadiki, held stakes in several of these companies, and that others were held together with Hezbollah facilitator, Saleh Ali Assi.

1303.   For example, the following is a partial list of real estate holding companies that were controlled by Rana Koleilat and one or both of her parents:

- **R 2679 Real Estate SAL**, Rana Koleilat's mother is listed as a shareholder, and Fadi Adel Jamal al-Din is listed as the company's attorney;

- **Rana K. Holding SAL**, both of Rana Koleilat's parents are listed as shareholders, and Fadi Adel Jamal al-Din is listed as the company's attorney;

- **R and I Real Estate SAL**, both of Rana Koleilat's parents are listed as shareholders, and Fadi Adel Jamal al-Din is listed as the company's attorney;

- **V 46 Real Estate**, both of Rana Koleilat's parents are listed as shareholders, and Fadi Adel Jamal al-Din is listed as the company's attorney;

- **V 58 Real Estate SAL**, both of Rana Koleilat's parents are listed as founders; and

- **V 55 Real Estate SAL**, Rana Koleilat's mother is listed as a shareholder.

1304.   The following real estate holding companies were founded by Rana Koleilat but controlled by Hezbollah facilitator Saleh Ali Assi and his family:

- **V69 Real Estate SAL**; and

- **Al Mansouri Real Estate Company**.

1305.   Fadi Adel Jamal al-Din is listed as the attorney for both companies, as well as a board member and minority shareholder.

1306.   Rana Koleilat also allegedly worked closely with her boyfriend and fellow bank employee, Rene Moawad, to syphon millions of dollars for their private use.

1307.   Evidence collected by investigators for the Abu Ayash brothers indicates that much of this money flowed through correspondent accounts in New York.[84]

1308.   In the aftermath of Bank Al Madina's collapse, Rana Koleilat and the Abu Ayash

---

[84]   For example, on January 28, 2003, $2 million U.S. dollars were deposited into Rene Moawad's account at Defendant BANK OF BEIRUT in Beirut. The deposit consisted of two checks in the amount of $1 million U.S. dollars each, check #014354 drawn on Bank Al Madina and Check #297006 drawn on United Credit Bank in Beirut. One day later, Moawad apparently transferred $1 million U.S. dollars from his account at United Credit Bank via Wachovia Bank in New York to an account held by Defendant BANK OF BEIRUT for the benefit and credit of "Rene Moawad."

brothers sued and countersued, and the Central Bank of Lebanon seized whatever assets it could to pay depositors, but even fifteen years later the results of the various Lebanese investigations remain sealed.

1309.   Rana Koleilat was eventually arrested in Brazil after fleeing Lebanon but did not face any serious legal jeopardy.

1310.   Similarly, the collapse of Bank Al Madina led to certain modifications but no major adverse impact on The System.

1311.   In fact, it appears that Bank Al Madina provided a template to Hezbollah on how to more fully integrate financial institutions into its narcoterrorism conspiracy and it further demonstrated how elements of the Lebanese political system and judiciary would cover for The System when a Lebanese financial institution's illicit activities was publicly exposed.

1312.   For example, shortly after Bank Al Madina's collapse, LCB acquired its branches in predominantly Shi'a municipalities.

1313.   Many of the accounts belonging to Hezbollah's BAC network for West African Conflict Diamonds and money laundering also migrated to LCB.

1314.   Likewise, the role played by Hezbollah operative Naji Antoine Abi Khalil at Bank Al Madina (discussed above) was undertaken by Ahmad Ibrahim Safa, Associate General Manager for Branches and Operations at LCB (and former Deputy General Manager of Defendant JAMMAL TRUST BANK), who actively worked to ensure that LCB granted Hezbollah institutions exceptions from the bank's policy of requiring cash transaction slips ("CTS") for cash transactions greater than $10,000.

1315.   Georges Zard Abou Jaoude is the former Chairman and General Manager of LCB. He formerly served as the Chair of LCB's Anti-Money Laundering Committee.

1316.   Muhammad Hamdoun is the former Deputy General Manager of LCB and served on LCB's Executive Board. He served as the Vice Chair of LCB's Anti-Money Laundering Committee.

1317.   Mr. Safa reported directly to Mr. Abou Jaoude and functioned as Mr. Hamdoun's deputy and was effectively Hezbollah's representative at the bank.[85]

1318.   Several additional members of LCB's management worked at Hezbollah's direction and facilitated its use of LCB as a vehicle for its BAC operations.

1319.   In sum, over time LCB became a significant Hezbollah asset.

1320.   LCB owned Prime Bank in The Gambia and Sofibanque in the Democratic Republic of Congo.

1321.   Prime Bank was controlled by Muhammad Bazzi (SDGT) and served as Hezbollah's BAC's preeminent money laundering vehicle in West Africa.

1322.   Mr. Ghassan W. Haikal (Deputy General Manager of LCB) and Mr. Ahmad Safa served on Prime Bank's board of directors together with Mr. Bazzi's business partner, Fadi George Mazegi.

1323.   At that time, CTSs required disclosure of the source of funds deposited and were filed with the Central Bank of Lebanon.

1324.   The LCB clients granted exceptions by Ahmad Safa included Hezbollah operatives and entities, like the Martyrs Foundation Lebanon.

1325.   Ahmad Ibrahim Safa is the brother-in-law of Amin Muhammad Cherri (SDGT), a Hezbollah member of parliament, shareholder in the Lebanese Communications Group (SDGT) and business partner of Adham Tabaja (SDGT), co-head of Hezbollah's BAC.

---

[85]   In 2010, Mr. Safa left LCB and assumed a new position at Lebanon's Banking Control Commission.

**B.**  **SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL**

   **1.**  **SGBL'S PREDECESSOR, LCB, CONSPIRED WITH AND AIDED AND ABETTED HEZBOLLAH**

1326.  LCB was a commercial bank based in Beirut, Lebanon that maintained a network of 35 branches in Lebanon and a representative office in Montreal, Canada.

1327.  In 2011, the bank was eighth largest among Lebanese banks in assets.

1328.  In the years before LCB's legal implosion, the bank served as a core Hezbollah asset within The System.

1329.  As described further below, LCB provided material support that aided and abetted Hezbollah in multiple ways: maintaining accounts for Hezbollah institutions and Hezbollah officials, actively participating in Hezbollah's trade based money laundering operations, disregarding minimal anti-money laundering rules on Hezbollah's behalf, and operating banks in The Gambia and the Democratic Republic of Congo that were controlled by Hezbollah's BAC and were used by it to launder billions of U.S. dollars for the BAC and Iran.

1330.  LCB's role as a Hezbollah asset began in large part with the collapse of Hezbollah's prior bank of choice, Bank Al Madina.

1331.  Shortly after Bank Al Madina's collapse, LCB acquired its branches in predominantly Shi'a municipalities.

1332.  Many of the accounts belonging to Hezbollah's BAC network for West African Conflict Diamonds and money laundering migrated from Bank Al Madina to LCB – as they would again a decade later from LCB to Defendants herein.

1333.  Likewise, the role played by Hezbollah operative Naji Antoine Abi Khalil at Bank Al Madina (discussed above) was undertaken by Ahmad Ibrahim Safa, Associate General Manager

for Branches and Operations at LCB (and former Deputy General Manager of Defendant JAMMAL TRUST BANK).[86]

1334.  One of the key advantages for the BAC in having nearly unfettered access to a financial institution like LCB was its ability to launder vast quantities of narcotics proceeds and to use this access as a marketing tool to attract business from other transnational criminal organizations.

1335.  At the same time, as Hezbollah's narcoterrorism footprint grew, U.S. law enforcement's investigation of it intensified.

1336.  As a result, on January 26, 2011, the U.S. Department of the Treasury designated Mr. Joumaa under the Foreign Narcotics Kingpin Designation Act, together with the Hassan Ayash Exchange and the Elissa Exchange for their roles in his laundering of narcotics proceeds.

1337.  This was quickly followed on February 10, 2011, by the U.S. Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN"), issuing a proposed rule and a finding that LCB "is a financial institution of primary money laundering concern."

1338.  The proposed rule would have prohibited U.S. financial institutions from opening or maintaining correspondent or payable-through accounts for LCB.

1339.  FinCEN's action was based on its determination that there was reason to believe that LCB (and certain Lebanese exchange houses) had been routinely used by Hezbollah-affiliated drug traffickers and money launderers operating in various countries in Central and South America, Europe, Africa, and the Middle East.

1340.  FinCEN also determined that there was reason to believe that LCB managers were complicit in the network's money laundering activities:

---

[86]     In 2010, Mr. Safa left LCB and assumed a new position at Lebanon's Banking Control Commission.

> LCB managers are linked to Hezbollah officials outside Lebanon. For example, Hezbollah's Tehran-based envoy Abdallah Safieddine is involved in Iranian officials' access to LCB and key LCB managers, who provide them banking services.[87]

1341.   In February 2011, after the public disclosures by the United States government revealed that LCB was a central actor in BAC's money laundering network for Hezbollah, the potential dangers posed to The System, including the entire Lebanese banking sector, became immediately apparent.

1342.   Lebanon's Central Bank and largest commercial banks sought to treat LCB's conduct as aberrational and resolve all legal issues with the United States immediately. But as the Complaint sets forth in detail, even though the conduct of LCB and its subsidiaries in The Gambia and the Democratic Republic of Congo set it apart as Hezbollah's flagship bank, it was always only one (albeit important) financial transit point for The System.

1343.   In June 2011 SGBL acquired LCB.

1344.   In December 2011, the U.S. Department of Justice filed a civil complaint against LCB – which was by that time effectively owned and controlled by Defendant SGBL.

### a. **LCB Participated in Hezbollah's Narcotics Money Laundering Operations and Transferred Over $250 Million for Hezbollah Through its New York Correspondent Bank Accounts**

1345.   In coordination with Hezbollah-BAC commander Abdallah Safieddine, Ayman Joumaa, the previously discussed narcotics trafficker and money launderer, controlled an international network of drug traffickers that transported, distributed and sold multi-ton bulk

---

[87]     Abdallah Safieddine, who was designated an SDGT on May 17, 2018, is Hezbollah's representative to Iran and acts as a conduit between Hezbollah and the IRGC. Mr. Safieddine was responsible in large part for obtaining the resources to fund the IRGC-QF-orchestrated effort to target American service members in Iraq, and a key source of his funding for the IJO derived from narcotics trafficking.

shipments of cocaine from South America, and laundered the proceeds—as much as $200 million U.S. dollars per month on Hezbollah's behalf.

1346. In 2012, Mr. Joumaa's network was described by David S. Cohen, then-Under Secretary for Terrorism and Financial Intelligence, as "a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hezbollah."

1347. The DOJ's November 23, 2011 Joumaa indictment alleged that he and his co-conspirators "coordinated the shipment of tens of thousands of kilograms of cocaine, including at least 85,000 kilograms of cocaine sold to Los Zetas, a Mexican drug cartel, between in or around 2005 to in or around 2007."

1348. The DOJ's Joumaa indictment further alleged that he laundered hundreds of millions of dollars in drug proceeds from West Africa, Europe, Mexico and the United States, largely for cocaine suppliers in Colombia and Venezuela, who paid Mr. Joumaa's organization a fee of between 8 and 14 percent of the laundered proceeds.

1349. According to DOJ, at least hundreds of millions of dollars in U.S. banknotes were transported annually from Benin and other West African countries to Lebanon by money couriers, hawaladars, and currency brokers, often through Ghana.

1350. These U.S. dollars included the proceeds of car sales from the Benin car parks, along with the proceeds of narcotics trafficking, money laundering, and other crimes.

1351. A significant portion of this money moved through courier and security networks controlled by Hezbollah.

1352. The bulk cash was often flown from Ghana directly to Beirut's airport where Wafiq Safa's Hezbollah personnel would oversee the deliveries and ensure that the funds made their way

to Hezbollah's preferred exchange houses.

1353.   The proceeds of the car sales helped to conceal and disguise the true source, nature, ownership, and control of Hezbollah's narcotics sales proceeds (primarily from cocaine sales in Europe) from U.S. correspondent banks and law enforcement agencies.

1354.   New Line Exchange, Elissa Exchange and Hassan Ayash Exchange were all used by Hezbollah and Ayman Joumaa's network to move bulk cash into Lebanon.

1355.   LCB then served as the favored destination for the funds.

1356.   Other Defendants, including BLOM BANK and MEAB BANK, were also used to facilitate U.S. dollar–denominated transfers through their U.S. correspondent accounts, in part, for Hezbollah's benefit.

1357.   According to the U.S. government, between January 2007 and January 2011, the Hassan Ayash Exchange participated in this money-laundering conspiracy by sending approximately $142 million U.S. dollars by wire transfer to the United States to purchase or ship used cars that were ultimately sold to mask the original origin of the narcotics proceeds from U.S. correspondent banks and law enforcement agencies.

1358.   In the same period, the Elissa Exchange participated in the money-laundering conspiracy by sending approximately $62 million U.S. dollars by wire transfer to the United States to purchase or ship used cars.

1359.   Of the approximately $204 million U.S. dollars wired by the exchanges to the United States, approximately 84 percent of the money originated from accounts owned at LCB, showing the extent of LCB's involvement in the money laundering scheme.

1360.   According to the U.S. Government, both the Hassan Ayash Exchange and LCB knew that these transactions were:

[T]he proceeds of illegal activities and that the transfers were in furtherance of a scheme intended to conceal and disguise the true source, nature, ownership, and control of those proceeds, and to promote those illegal activities; and that *this money laundering scheme benefitted Hezbollah*. (Emphasis added.)

1361.  FinCEN's February 10, 2011 report described how Mr. Joumaa instructed LCB to perform wire transfers in furtherance of two money laundering schemes:

[S]ome of the funds move to LCB's U.S. correspondent accounts via suspiciously structured electronic wire transfers to multiple U.S.-based used car dealerships—some of which are operated by individuals who have been separately identified in drug-related investigations. The recipients use the funds to purchase vehicles in the United States, which are then shipped to West Africa and/or other overseas destinations, with the proceeds ultimately repatriated back to Lebanon. Other funds are sent through LCB's U.S. correspondent accounts to pay Asian suppliers of consumer goods, which are shipped to Latin America and sold, and the proceeds are laundered through a scheme known as the Black-Market Peso Exchange, in each case through other individuals referred to in this finding or via companies owned or controlled by them.

1362.  According to FinCEN, Hezbollah derived financial support from this narco-trafficking and money-laundering scheme, and LCB managers were complicit in the money laundering activities.

1363.  The U.S. Department of the Treasury also found that LCB was the favored bank for the Joumaa-Hezbollah illegal banking activity:

With respect to the exchanges and companies related to Ayman Joumaa, numerous instances indicate that substantial amounts of illicit funds may have passed through LCB. Since January 2006, hundreds of records with a cumulative equivalent value of $66.4 million identified a Lebanese bank that originated the transfer; approximately half of those were originated by LCB, for a cumulative equivalent value of $66.2 million, or 94%, thus, indicating that LCB probably is the favored bank for these exchange houses, particularly in the context of illicit banking activity. Similarly, a review of all dollar-denominated wire transfers with the two primary exchange houses either as sender or receiver between January 2004 and December 2008 showed 72% originated by one of the exchange houses through LCB.

1364.   The movement of money was also facilitated by Oussama Salhab, a Hezbollah operative born in the Bekaa Valley in Lebanon, a Hezbollah stronghold. Mr. Salhab, who is described further below, controlled a network of money couriers based primarily in West Africa.

1365.   Proceeds from the drug sales were transported by the BAC to Beirut, deposited as bulk cash into the exchange houses, which in turn deposited the currency (primarily U.S. dollars) into their LCB accounts.

1366.   Mr. Joumaa or the exchange houses he directed then instructed LCB to perform wire transfers in furtherance of at least two trade-based money laundering operations.

1367.   In the first operation, Abou Jaoude, Mr. Hamdoun, and Mr. Safa oversaw LCB's transfers of large U.S.-dollar-denominated sums used to purchase used cars throughout the United States.

1368.   The wire transfers passed through LCB's correspondent bank accounts at five New York banks: Bank of New York Mellon, Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank, and Mashreq Bank.

1369.   LCB made repeated, substantial use of the correspondent banking services of New York banks. Between 2007 and 2011, approximately 30 used-car purchasers received over 3,400 wire transfers totaling over $247 million U.S. dollars.

1370.   Account holders other than the Hassan Ayash Exchange and Elissa Exchange initiated additional wire transfers of over $59 million U.S. dollars from accounts at LCB to bank accounts in the United States to purchase or ship used cars in furtherance of the money laundering conspiracy.

1371.   Individuals linked to Hezbollah who sent wire transfers into the United States to purchase used cars as part of the money laundering scheme included Khodor Fakih, a Hezbollah

285

operative from Lebanon who worked in the car business in Cotonou, Muhammad Hassan Hammoud, a Hezbollah supporter from Lebanon who owned a shipping company in Cotonou, and Youssef Sobhi Nehme, a self-proclaimed Hezbollah supporter.

1372.   The car buyers in the United States used the money transferred from LCB via its New York correspondent banks to purchase used cars.

1373.   In the other money-laundering scheme, Abou Jaoude, Mr. Hamdoun, and Mr. Safa oversaw LCB's transfers of large amounts of U.S. dollar-denominated funds that Mr. Joumaa and other Hezbollah-affiliated drug traffickers used to buy consumer goods from Asian suppliers.

1374.   According to the U.S. government, Hezbollah derived financial support from these criminal activities, and LCB managers were complicit in the money laundering scheme.

1375.   The electronic funds transfers passed through LCB's correspondent bank accounts in the same five New York banks as in the other scheme: Bank of New York Mellon, Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank, and Mashreq Bank.

1376.   The consumer goods purchased from Asia by Mr. Joumaa's network and other Hezbollah drug traffickers were often shipped to Central and South America and sold. The proceeds of the sales were then laundered through the Black-Market Peso Exchange.

1377.   Through these trade-based money laundering operations, LCB provided funds and services to or for the benefit of Hezbollah and participated in a channel for laundering proceeds of narcotics trafficking and other unlawful activities, to generate profits, fees and commissions to be paid to Hezbollah operatives and supporters who were involved in the money laundering scheme.

### b.   LCB Maintained Accounts for Various Hezbollah-Controlled Entities

1378.   As noted above, according to a December 2011 report in *The New York Times*, after Defendant SGBL acquired LCB in June 2011, "auditors brought in to scrub [LCB's] books

discovered nearly 200 accounts that were suspicious for their links to Hezbollah and their classic signs of money laundering."

1379.  This reporting significantly *underestimated* the number of accounts maintained by LCB for Hezbollah-affiliated individuals and entities and IRGC-controlled entities.

1380.  Although neither SGBL nor the Lebanese government publicly disclosed the audit trails or lists of identified Hezbollah individuals or entities, they did compile and circulate lists of more than 200 individuals and entities linked to Hezbollah that exhibited "classic signs of money laundering."

1381.  Those classic signs of money laundering were summarized in an August 13, 2007 LCB Internal Audit Report that described, among other things, a  total amount of transactions during an 18 month period totaling $5 billion with "[l]arge amounts … being withdrawn and paid cash to different parties" and accounts showing a "big volume of movement" but "very low balances (below USD 5,000) reflecting the fact that accounts are being used [on a] transitory basis for funds transfer[s]."[88]

1382.  The 2007 Internal Audit Report largely tracked the same entities that SGBL and the Lebanese government would later flag in 2011-2012.

1383.  The list compiled by Defendant SGBL and the Lebanese government included several prominent, senior Hezbollah financiers who would later be designated SDGTs (e.g. Adham Hussein Tabaja, Muhammad Ibrahim Bazzi), as well as key currency exchange houses Hezbollah used to launder its black-market diamonds and narcotics trafficking proceeds and several of the key drug traffickers themselves (e.g. Ayman Joumaa and his brothers).

1384.  In addition, the SGBL and Lebanese government lists catalogued almost 200 other

---

[88]      *See, Nahl v. Abou Jaoude*, No. 15-cv-9755 (S.D.N.Y.).

individuals and companies that were, and are, part of Hezbollah's BAC, ranging from Conflict Diamond moguls based in West Africa to food suppliers and mineral exporters based in the Democratic Republic of Congo to diamond dealers and smugglers based in Dubai and Antwerp.

1385.   According to one of LCB's largest shareholders (Ghazi Abu Nahl), "on June 25, 2007, LCB's Internal Audit Division audited the compliance unit. The audit noted that a number of accounts at the Bank were unusually active, with large incoming and outgoing transfers. The audit also noted that many of these accounts had unusual movement of funds between accounts."[89]

1386.   As discussed herein, Hezbollah has long profited from its networks of Conflict Diamond traders and money launderers based in Africa, the Persian Gulf, Belgium and South America.

1387.   These networks, controlled by prominent BAC facilitators, were at the center of both the 2007 LCB Internal Audit and the later investigation by the Lebanese government.

1388.   At LCB, matters did not improve after 2007. According to Mr. Abu Nahl's lawsuit, a February 2010 Internal Audit Division review of the bank's Anti-Money Laundering compliance unit found "no evidence that proper and permanent control [was] being performed over some accounts witnessing frequent flow of large funds transfers" and that "the Compliance Unit does not generate on a daily basis [a] consolidated physical cash report that aggregates all cash deposits done by a single client, [on] the same day, and in multiple accounts totaling more than $10,000."

1389.   Considering that LCB maintained accounts for several exchange houses and many, if not most, of Hezbollah's leading narcotics traffickers and money launderers, the bank's policies—or rather, the absence thereof—make sense.

---

[89]     The Internal Audit report and other material facts are described in detail in *Nahl v. Abou Jaoude*, No. 15-cv-9755 (S.D.N.Y.).

1390.   For instance, as described above, LCB maintained a banking relationship with the Hassan Ayash Exchange, Elissa Exchange, and New Line Exchange Trust Co. (all designated SDNTKs on January 26, 2011).

1391.   New Line Exchange Trust Co.'s principal, Ziyad Muhammad Youssef (also designated an SDNTK), maintained an account at LCB that had a balance of over $10 million when it was frozen and migrated to SGBL.

1392.   As noted throughout the Complaint, Defendant SGBL did not freeze at least tens of millions of dollars it held for more than 200 individuals and entities linked to Hezbollah that exhibited "classic signs of money laundering."

1393.   Instead, Defendant SGBL temporarily froze a handful of accounts and watched as Hezbollah's BAC moved hundreds of its LCB accounts laterally to other Lebanese banks including nearly all Defendants.

1394.   Of course, because Defendant SGBL was itself an active participant in The System (though not on the scale of LCB), neither money laundering conducted through these identified accounts nor the individuals and entities surprised Defendant SGBL or any of the banks that picked up the BAC business LCB lost.

1395.   Although Defendant SGBL undertook a review of Hezbollah's accounts at LCB and formulated the list described above, LCB previously maintained banking relationships with numerous other Hezbollah individuals and entities that never appeared on the list.

1396.   Moreover, there is no public indication that Defendant SGBL ever closed these "phantom accounts."

1397.   For example, LCB maintained accounts for Bayt al-Mal and Yousser Company for Finance and Investment, which are key parts of Hezbollah's financing operations.

1398.   On September 7, 2006, the U.S. Department of the Treasury designated Bayt al-Mal and Yousser as SDGTs, announcing that it was "target[ing] Hizballah's Bank."

1399.   The U.S. Department of the Treasury found that "Bayt al-Mal and Yousser Company function as Hizballah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist groups and mainstream banks."

1400.   The U.S. Department of the Treasury further found that "Bayt al-Mal is a Hezbollah-controlled organization that performs financial services for the terrorist organization. Bayt al-Mal operates under the direct supervision of Hezbollah Secretary General Hassan Nasrallah. As Hizballah's main financial body, Bayt al-Mal serves as a bank, creditor, and investment arm for Hezbollah."

1401.   According to the U.S. Department of the Treasury, "Bayt al-Mal utilizes the Yousser Company for Finance and Investment to secure loans and finance business deals for Hizballah companies."

1402.   The head of Bayt al-Mal, Hussein al-Shami, was also a director of Yousser.

1403.   The U.S. Department of the Treasury described Mr. Shami as "a senior Hezbollah leader who has served as a member of Hezbollah's Shura Council [i.e., the council that runs Hezbollah] and as the head of several Hezbollah-controlled organizations, including the Islamic Resistance Support Organization. Mr. Shami is also responsible for foreign donations to Hezbollah fundraising organizations."

1404.   LCB's banking relationships with Bayt al-Mal and Yousser were managed out of LCB's Airport Road branch.

1405.   Hezbollah also maintained bank accounts at various LCB branches in Lebanon for the Martyrs Foundation-Lebanon.

1406.  As described above, the Martyrs Foundation–Lebanon is an integral part of Hezbollah and constitutes a key part of Hezbollah's social network.

1407.  LCB also maintained a banking relationship with Lebanese Arab Company for Touristic Services SARL, which was managed out of the Airport Road branch. As discussed above, this company belonged to the Al-Mabarrat Charitable Society network of companies.

1408.  LCB also maintained a banking relationship with Rayan (Offshore) LLC, which was owned by, *inter alia*, Nawaf Moussaoui (a Hezbollah public spokesperson and Member of the Lebanese Parliament), and Colonel Rida el-Moussaoui, (the brother-in-law of Muhammad Hamdoun, LCB Executive Board Member and Deputy General Manager).

1409.  LCB also maintained a banking relationship with Matrix (Offshore) SAL, owned by Qassem Muhammad Ajami and Muhammad Ali Izz-al-Din.[90]

1410.  These – and many other customer accounts – were never included in Defendant SGBL's 2011-2012 list of Hezbollah customers at LCB.

### c.  LCB Disregarded Anti-Money Laundering Rules for Individuals and Entities Associated with Hezbollah

1411.  During the relevant time period, LCB was required to complete cash transaction slips for all cash transactions greater than $10,000 U.S. dollars. CTSs required disclosure of the source of funds deposited and were filed with the Central Bank of Lebanon.

1412.  LCB's policy requiring CTSs accorded with the "Regulations on the Control of Financial and Banking Operations for Fighting Money Laundering," Basic Decision No. 7818 of the Banque du Liban (the Lebanese Central Bank), issued on May 16, 2001 (the "Regulations").

1413.  The Regulations contained "Know Your Customer" provisions whereby banks, including LCB, were required to "check the identity" of their clients.

---

[90]      Messrs. Ajami and Izz-al-Din were business associates of Tajco SARL, which is described above.

1414.   The Regulations also contained provisions whereby banks, including LCB, were required in some circumstances to enquire about the source and destination of funds, the object of the operation, and the identities of both the beneficiary and the economic rightful owner of funds. Additionally, the Regulations required banks, including LCB, to give special attention to indicators of money laundering.

1415.   In or around September 2003, Mr. Safa granted exceptions to certain LCB clients from LCB's policy of requiring CTSs for cash transactions greater than $10,000 U.S. dollars.

1416.   The clients Mr. Safa granted exceptions to included individuals and entities belonging to Hezbollah:

- **Yousser Company for Finance and Investment** (SDGT) was exempted from signing CTSs for cash transactions up to $50,000 U.S. dollars per week at the Nabatieh branch and up to $60,000 U.S. dollars per day at the Airport Road branch.

- **Farah Company for Tourism** (Farah Travels Company SARL, owned by Adham Tabaja and Issam Saad (SDGTs) among others) was exempted from signing CTSs for cash transactions up to 50 million Lebanese pounds per week at the Nabatieh branch, roughly equivalent to $33,000 U.S. dollars in 2003 dollars.

- **Martyrs Foundation** was exempted from signing CTSs for cash transactions up to to $100,000 U.S. dollars *per day* at its Airport Road branch in Beirut.

- **Fantasy World**, controlled by Mr. Tabaja, was exempted from signing CTSs for cash transactions exceeding $10,000 per day.

- **Hussein al-Shami** (SDGT), using the name Hussein Ali Muhammad Chami, was exempted from signing CTSs for cash transactions up to $30,000 U.S. dollars per week at the Nabatieh branch.

- **Wahid Mahmoud Sbeity**, another owner of Yousser, was exempted from signing CTSs for cash transactions up to $30,000 U.S. dollars per week at the Nabatieh branch.

- **Al-Shami and two other directors of Yousser** were exempted from signing CTSs for cash transactions up to $200,000 U.S. dollars per day

292

and 200 million Lebanese pounds ($132,000 U.S. dollars in 2003 dollars) per day at the Airport Road branch.

- **Al-Mabarrat Charitable Society** was exempted from signing CTSs for cash transactions up to $55,000 U.S. dollars per day at the Airport Road branch.

- **Lebanese Arab Touristic Company**, owned by Al-Mabarrat Charitable Society, was exempted from signing CTSs for cash transactions up to $22,000 U.S. dollars per day at the Airport Road branch.

- **Al-Aytam Company for General Trading and Fuels** (founded by Al-Mabarrat Charitable Society) was exempted from signing CTSs for cash transactions up to $50,000 U.S. dollars per day at the Airport Road branch.

1417.  The exemptions discussed in the preceding paragraph essentially allowed Hezbollah to transfer tens of millions of U.S. dollars in untraceable bulk cash to Lebanon.

1418.  In addition to enabling Hezbollah operatives to make large cash deposits without documentation, Mr. Safa also disregarded internal LCB reports that raised concerns about lack of documentation relating to the Elissa Exchange.

1419.  A 2006 LCB customer due diligence report noted that the Elissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including cash smuggling on flights from Ghana to Beirut.

1420.  The report further noted that LCB had limited "Know Your Customer" files for these clients and that another Lebanese commercial bank had closed its accounts with the Elissa Exchange. The report described large cash deposits into accounts held by the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.

293

### d. <u>LCB's Gambian Subsidiary, Prime Bank, Was Co-Owned by Muhammad Bazzi (SDGT)</u>

1421.   LCB was the majority shareholder (51%) of Prime Bank Limited, a private commercial bank in Serrekunda, The Gambia.

1422.   Prime Bank was officially opened as a subsidiary of LCB in May 2009.

1423.   Ghassan Wadi Haikal, Deputy General Manager of LCB, was listed as Chairman of Prime Bank, and Fadi Nasser was listed as Executive Director of the bank. Both men were instrumental in helping Hezbollah's BAC launder money through LCB.

1424.   Haikal went on to become Deputy General Manager of SGBL after it acquired LCB.

1425.   In 2012, Fadi Nasser's LinkedIn.com profile showed him as a "Senior Manager" at SGBL (having transitioned from LCB in September 2011).

1426.   Muhammad Ibrahim Bazzi (SDGT), senior BAC operative and Hezbollah financier, was the most important minority shareholder in Prime Bank. Mr. Bazzi controlled Prime Bank, which served as Hezbollah's BAC's preeminent money laundering vehicle in West Africa.

1427.   His long-time business partner, Fadi George Mazegi, was listed as a non-executive Director of the bank together with Mr. Safa.

1428.   As described above, the U.S. Department of the Treasury designated Mr. Bazzi an SDGT on May 17, 2018 for assisting in, sponsoring, or providing financial, technological or material support for—or financial or other services to or in support of—Hezbollah.

1429.   Mr. Bazzi was designated for being one of Hezbollah's top financiers, as well as for his links to drug dealers and money laundering to fund terrorism.

1430.   According to the U.S. government, Mr. Bazzi also has links to Ayman Joumaa's organization and – along with Abdallah Ali Safieddine – facilitated access to the Lebanese financial system for Iran's Central Bank between 2009 and 2010.[91]

1431.   In addition to providing millions of dollars to Hezbollah, Mr. Bazzi was a close associate of Yahya Jammeh, the then-President of The Gambia, who was identified on December 21, 2017, in the annex to EO 13818, which implemented the Global Magnitsky Human Rights Accountability Act (the "Magnitsky Act").[92] Mr. Jammeh appointed Mr. Bazzi as The Gambia's honorary Consul to Lebanon.

1432.   Mr. Bazzi derived significant amounts of money from Gambian oil contracts, which he won by providing Mr. Jammeh with illegal goods and services.

1433.   For example, Euro African Group Ltd. (SDGT), a company Mr. Bazzi controlled and in which he was the biggest shareholder, made payments in 2013 totaling $2.55 million U.S. dollars to a foundation Jammeh controlled.

1434.   Euro African Group Ltd. held exclusive rights to import fuel to The Gambia between 2008 and 2013 and held a fuel supply deal with the state-run utility. Euro African Group was designated an SDGT on May 17, 2018.[93]

1435.   Mr. Bazzi, who has been described as "Jammeh's business surrogate," was also involved in the sale of Iranian weapons to Hezbollah. He coordinated the exchange on behalf of Mr. Jammeh; the weapons were stored at Kanilai Farms in Jammeh's home village, and Mr. Bazzi allegedly used Prime Bank, LCB's subsidiary, for the financing.

---

[91]   *See, Treasury Targets Key Hizballah Financing Network and Iranian Conduit* (U.S. Department of the Treasury, May 17, 2018), *available at* https://home.treasury.gov/news/press-releases/sm0388.

[92]   The Magnitsky Act addresses human rights abuses on a global scale. It allows the U.S. government to sanction corrupt government officials implicated in abuses anywhere in the world.

[93]   It held accounts at both LCB and Defendant FRANSABANK.

1436.   Mr. Bazzi has also maintained close ties to Mr. Tabaja and Ali Youssef Charara, whom the U.S. Department of the Treasury designated SDGTs for providing material support to Hezbollah on June 10, 2015, and January 7, 2016, respectively. Both Messrs. Tabaja and Charara are described above.

1437.   According to the U.S. government, Mr. Bazzi provided funds to Mr. Tabaja, with whom he held a joint line of credit and worked closely with Abdallah Safieddine.

1438.   In sum, Mr. Bazzi coordinated his activities with the co-leaders of Hezbollah's BAC.

1439.   The following diagram, prepared by the U.S. Department of the Treasury, illustrates Mr. Bazzi's complicity in Ayman Joumaa's and Hezbollah's illicit financing networks:



#### e.  **LCB'S Subsidiary Société Financière de Banque SARL Was Used to Launder Money for Hezbollah**

1440.  As discussed herein, Hezbollah's BAC network in the Democratic Republic of Congo is a significant revenue source for the organization.

1441.  As with Prime Bank in The Gambia, Société Financière de Banque SARL ("Sofibanque") was 51 percent owned by LCB and laundered substantial sums on Hezbollah's behalf from the Democratic Republic of Congo to Lebanon.

1442.  Ghassan Wadi Haikal, Deputy General Manager of LCB, was listed as a consultant to Sofibanque.

1443.  One of the bank's major shareholders, Muhammad Hussein Darwish, was identified both by SGBL and the Lebanese government as one of the Hezbollah-related accountholders whose accounts had to be closed at LCB as part of SGBL's acquisition of LCB.

1444.  Mr. Darwish appears to have owned four accounts at LCB until 2011.

1445.  One of the bank's other major shareholders, Isam Nabih Hamad, was also identified both by SGBL and the Lebanese government as one of the Hezbollah-related accountholders whose accounts had to be closed at LCB as part of SGBL's acquisition of LCB.

#### 2.      **SGBL ACQUIRED LCB'S LIABILITIES**

1446.  On February 10, 2011, the U.S. Department of the Treasury announced the identification of LCB together with its subsidiaries as a financial institution of primary money laundering concern under Section 311 of the USA PATRIOT Act for the bank's role in facilitating the money laundering activities of an international narcotics trafficking and money laundering network.

1447.  Later that month, the head of LCB, Riad Salameh, held what was described as a "constructive" meeting with senior officials of the U.S. Department of the Treasury. At the same

time, *Reuters* reported that Mr. Salameh described LCB as "well managed" and stated that the bank "complied with international laws on money laundering."

1448.   On March 3, 2011 – *three weeks* after LCB was named a financial institution of primary money laundering concern – Mr. Salameh announced that SGBL was the winning bidder to acquire LCB.

1449.   Lebanon's *Daily Star* reported that SGBL "pledged to keep on all current employees of LCB."

1450.   Pursuant to an agreement dated June 22, 2011 (the "Sale and Purchase Agreement") between LCB and Defendant SGBL, SGBL as the "Purchaser" agreed to "receive and assume from the Seller [LCB], all of the Seller's Assets and Liabilities …." §2.1.

1451.   According to the Stipulation and Order of Settlement Regarding Lebanese Canadian Bank and Société Générale de Banque au Liban SAL ("DOJ-LCB Settlement"), LCB asserted that "LCB's Board of Directors, for commercial reasons, resolved to sell all of its assets, liabilities, rights and obligations to Société Générale de Banque au Liban S.A.L."

1452.   A copy of the portions of the Sale and Purchase Agreement disclosed on the public docket is attached hereto as **Exhibit 1**.

1453.   Section 2.3 of the Sale and Purchase Agreement stated:

> The Assumed Liabilities consist *inter alia* of any and all of the Seller's liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to the Seller's Business, all as at the Completion Date.

1454.   On September 7, 2011, the Central Council of the Central Bank of Lebanon granted its final approval of SGBL's acquisition of LCB's assets and liabilities.

1455.   LCB was immediately placed under liquidation, and it asked that its banking license be revoked, which was promptly consented to by the Central Bank of Lebanon.

1456.   In August 2012, the U.S. government filed a civil forfeiture action pursuant to 18 U.S.C. § 981(k) to seize $150 million U.S. dollars held by Defendant BANQUE LIBANO-FRANÇAISE SAL.[94]

1457.   According to the DOJ-LCB Settlement, "pursuant to an agreement dated September 8, 2011 (the "Escrow Agreement") between LCB, SGBL, and a Lebanese bank acting as escrow agent (the "Escrow Agent"), $150 million of the Purchase Price (the "Escrow Funds") was to be held in escrow by the Escrow Agent pending the satisfaction of certain conditions pursuant to the Sale and Purchase Agreement."

1458.   Although the $150 million U.S. dollars were characterized as part of the "purchase price," documents on the public docket do not clearly delineate precisely whose funds were placed in the Escrow Funds or how the Department of Justice became aware of those funds.[95]

1459.   According to the DOJ-LCB Settlement, "SGBL asserts it is an innocent purchaser of the assets and liabilities of LCB…."

1460.   However, when the United States seized the Escrow Funds pursuant to 18 U.S.C. § 981(k), it was required to making a showing that it had reason to believe the seized funds constituted criminal proceeds related to financing terrorism.

1461.   During this time, Defendant SGBL reviewed LCB's customers as described in *The New York Times* article referenced above, which detailed how "auditors brought in to scrub the

---

[94]   Section 981(k) permits the *in rem* forfeiture of funds held in U.S. correspondent bank accounts on behalf of foreign banks as a substitute for criminal funds held on deposit at the foreign bank. Federal prosecutors can now file an *in rem* forfeiture action against the equivalent amount of money that is held in a foreign bank's U.S. correspondent account, if the government can show that forfeitable funds were deposited into the account at the foreign bank. Being able to file this action enables the forfeiture of criminal assets that were previously beyond the government's reach.

[95]   Ghazi Abu Nahl's civil suit against LCB's former management team described the funds as "LCB's money."

books discovered nearly 200 accounts that were suspicious for their links to Hezbollah and their classic signs of money laundering."

1462.  As detailed throughout the Complaint, Defendant SGBL allowed most of those accounts to migrate to other Lebanese banks, including Defendants herein, but a subset of the accounts with "links to Hezbollah" that exhibited "classic signs of money laundering" migrated to Defendant SGBL and some of the most significant Hezbollah accounts (*e.g.* for the Martyrs Foundation – Lebanon) never made it on to the official list.

1463.  Ultimately Defendant SGBL paid a purchase price of $580 million U.S. dollars, subject to the final review by and approval of the Central Bank of Lebanon – which had every reason to quickly consummate this banking marriage.

1464.  In June of 2013, the U.S. Department of Justice settled with LCB and Defendant SGBL, with the U.S. government retaining $102 million of the $150 million U.S. dollars seized from the "Escrow Account" at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1465.  The result was a solid victory for all concerned parties. The Central Bank of Lebanon contained a crisis that threatened to implicate nearly the entire Lebanese banking system in Hezbollah's illicit financing; the Lebanese banking sector was freed to continue its highly lucrative financial services for Hezbollah and The System as a whole; and Hezbollah itself was freed to continue – and even more aggressively pursue its transnational crime spree with full access to the U.S. financial system, content in the belief that the United States government is, at most, prepared only to inconvenience it slightly.

1466.  In retrospect, none of this should have been surprising.

1467.  According to a U.S. Diplomatic Cable dated February 18, 2005, during a February 14, 2005 meeting with Stuart Levey, then-Head of the Office of Terrorism and Financial

Intelligence at the U.S. Department of the Treasury, and of a delegation that included Senior Adviser Adam Szubin and others, Israeli officials "provided information on a number of financial institutions and charities that they said provide funding to Hamas and Hizballah."

1468.   An Israeli official "charged that at least two banks (the Lebanese Canadian Bank and the Société Générale de Banque au Liban SAL) are 'connected directly to the financial infrastructure of Hizballah.'"

1469.   Six years and hundreds of millions of dollars to Hezbollah later, one of the banks "connected directly to the financial infrastructure of Hizballah" agreed to pay a fine and Defendant SGBL, the other bank that Israeli intelligence had identified as "connected directly to the financial infrastructure of Hizballah," had swallowed LCB without public objection from Washington.

### 3. SGBL AIDED AND ABETTED AND CONSPIRED WITH HEZBOLLAH IN ITS OWN CAPACITY BEFORE AND AFTER ITS PURCHASE OF LCB'S ASSETS AND LIABILITIES

1470.   Even after Defendant SGBL undertook its own internal investigation of LCB's customers in 2011-2012, and the Lebanese government's subsequent audit, Defendant SGBL elected to maintain accounts for more than 20 of the Hezbollah-identified individuals and entities on the auditors' lists, including, *e.g.*, Muhammad Hussein Darwish and Ali Hussein Darwish, Muhammad Issam Abu Darwish, Mustafa Faysal Ahmad, and others.[96]

1471.   Moreover, many of Hezbollah's and the Iranian governmental entities' accounts at LCB were omitted from the Lebanese reports inventorying suspect accounts at LCB and there is no indication that these (unlisted) accounts were ever closed by Defendant SGBL.

1472.   These "phantom" accounts included, among others, those held for Yousser Company for Finance and Investment (SDGT), the Martyrs Foundation – Lebanon (SDGT),

---

[96]   Mustafa Faysal Ahmad's mother's U.S. dollar-denominated account no. 172488 was never closed and remained at Defendant SGBL.

Hussein al-Shami (SDGT), Al-Mabarrat Charitable Society, Lebanese Arab Touristic Company

and Al-Aytam Company for General Trading and Fuels.

1473.   While many of these accounts at LCB were not listed in the Lebanese government

reports on LCB, at least two of the LCB accounts for U.S. designated entities such as Elissa

Holding SAL (SDNTK) and Yousser Company for Finance and Investment (SDGT) were retained

by Defendant SGBL who continued to provide them with banking services.

1474.   In addition to Defendant SGBL acquiring the liabilities of LCB, being the legal

successor-in-interest to LCB and its criminal conduct,[97] and helping The System cover its tracks

and contain the damage from the U.S. regulatory actions against LCB, SGBL has *itself* long

provided material support to, and aided and abetted, Hezbollah.

1475.   For example, independent of it acquiring the liabilities of LCB, Defendant SGBL

knowingly held accounts and provided financial services to Hezbollah's Martyrs Foundation

through Atlas Holding SAL, Martyrs Foundation's commercial arm (detailed above).

1476.   Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held

accounts and provided financial services to Hezbollah's Al-Mabarrat Charitable Society.

1477.   Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held

accounts and provided financial services to Al-Inmaa Engineering and Contracting SARL

(SDGT), the prominent Hezbollah construction and investment arm headed by Adham Tabaja

(SDGT).

1478.   Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held

accounts and provided financial services to Al-Saad Establishment for Trading of Eggs, a company

---

[97]       Although Defendant SGBL froze certain accounts, particularly those connected to Ayman Joumaa's narcotics
trafficking network, it closed, but did not freeze, the accounts of well-known senior BAC operatives such as
Muhammad Bazzi, Ali Charara, Nazim Ahmad, Saleh Asi, Hussein Issawi, Youssef Tajideen and Muhammad Hussein
Darwish.

owned and controlled by the IRGC–QF.

1479.   Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held accounts and provided financial services to the publisher of Hezbollah's *Baqiyat Allah* magazine, a Hezbollah-controlled company called Dbouk International for Printing and General Trading.

1480.   Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held accounts and provided financial services to Hoda for Touristic Services & Management Holding SAL, a company controlled by two senior Hezbollah financiers, Abbas Abdel Latif Fawaz and Ali Youssef Charara (SDGT).

1481.   Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held accounts and provided financial services to Fantasy World SARL, which operates the well-known Fantasy World amusement park in Hezbollah's stronghold of Dahiya in the southern suburbs of Beirut. Fantasy World was founded and operated by Adham Tabaja, co-chairman of Hezbollah's BAC. Fantasy World is an iconic flagship of Hezbollah's efforts to develop family-oriented and (religiously appropriate) entertainment options in Beirut's Shi'a-majority municipalities.

1482.   Independent of it acquiring the liabilities of LCB, Defendant SGBL maintained an account for and provided financial services to Fawzi Muhammad Malek, through which Nazim Ahmad and his criminal network laundered more than $400,000 through the United States on Hezbollah's behalf.[98]

1483.   According to the Lebanese government, when Nazim Ahmad's own personal account at LCB (account no. 172382) was closed in October 2011, it migrated to among other Defendant banks, SGBL.

1484.   A similar scenario occurred with the account of Said Jamil Muhammad, who co-

---

[98]      Malek also held a separate account at LCB that was closed in October 2011.

founded Aya SAL Offshore with Muhammad Abdallah al-Amin (SDGT).

1485.   Independent of its acquiring the liabilities of LCB, Defendant SGBL maintained an account for and provided financial services to Inter Aliment SAL Offshore, a company controlled by Hezbollah facilitator Saleh Ali Assi that laundered large sums of money for Hezbollah and whose account at LCB was closed as part of Defendant SGBL's acquisition of LCB.

1486.   According to the Lebanese government, the funds in Mr. Assi's U.S. dollar-denominated account no. 172197 at LCB migrated to Defendants FRANSABANK, MEAB BANK and BANQUE LIBANO-FRANÇAISE as well as remaining at Defendant SGBL.

1487.   Independent of it acquiring the liabilities of LCB, Defendant SGBL maintained an account and provided financial services to Halawi Investment Trust SAL and Info Trust SAL, sister companies within the Halawi Exchange network of companies responsible for churning bulk cash for Hezbollah's narcotics trafficking network.

1488.   As noted above, Halawi Exchange and other exchange houses deal in high-volume bulk cash transactions, and they perform a vital gateway function allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, be deposited into banks like Defendant SGBL (that exchange the cash for deposits by the Central Bank denominated in Lebanese pounds, at high interest rates).

1489.   Defendant SGBL also maintained an account and provided financial services to Hassan Ayash Exchange.

1490.   Within the parameters of The System, Halawi Exchange and Hassan Ayash Exchange received lucrative commissions, Defendant SGBL received high interest returns from financing Lebanese government debt and Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1491.   Independent of it acquiring the liabilities of LCB, Defendant SGBL maintained an account for and provided financial services to Metro Trading Company SAL Offshore, a company controlled by Hezbollah BAC operative Imad Abdul Reda Bakri that laundered large sums of money for Hezbollah.

1492.   Independent of it acquiring the liabilities of LCB, Defendant SGBL maintained an account at its Saint Charles branch and provided financial services to Mercury Development Offshore SAL. That company, controlled by Faysal Mustafa Ahmad, also maintained a U.S. dollar-denominated account at LCB that was marked for closure in 2012.

1493.   Long before it acquired LCB, Defendant SGBL fully understood its role in The System. And its own roster of customers, who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects Defendant SGBL's long-standing willingness to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

### C.   FRANSABANK SAL

1494.   Defendant FRANSABANK has knowingly maintained accounts for and provided financial services that aided and abetted several core Hezbollah-controlled organizations that are widely and publicly associated with the organization, including:

- **IRSO (SDGT)**, Chiyah Branch (a/k/a Al-Shiyah), Account numbers: 252010/692830.21 and 78.02.251.133553.0.8;

- **Martyrs Foundation–Lebanon** (SDGT), Account number: 21-10-0360062-73; and

- **Wounded Association** (*Muasassat al-Jarha*), Account number: 805458023.

1495.   The IRSO is the most explicit and notorious fundraising arm of Hezbollah's IJO.

1496.   The Martyrs Foundation–Lebanon is – and throughout the relevant period has always been (together with IRSO and Jihad al-Bina) – one of Hezbollah's flagship social organizations.

1497.   The Wounded Association belongs to and is controlled by Hezbollah and its stated purpose is to care for people wounded in the "Resistance."

1498.   Hezbollah also directly solicited funds to account no. 953113.30 at Defendant FRANSABANK's Tabaris branch in Beirut.

1499.   In August 2006, NBC News reported that the Israeli government had bombed FRANSABANK's offices in Beirut "which they claim help Hezbollah receive and move money around the world."

1500.   According to NBC News, "[t]he Fransabank General Manager tells NBC 'We have no relationship with Hezbollah or any other political party anywhere. We don't have any relation and we refuse to have one.'"[99]

1501.   Notwithstanding that denial, Defendant FRANSABANK also maintained an account for and provided financial services that aided and abetted Compu House SARL, the Hezbollah-controlled technology importer, founded and majority owned by Sultan Khalifa As'ad, Deputy Chairman of the Executive Council for Municipal Affairs, former head of Hezbollah's Finance Unit, and former director of Jihad al-Bina.

1502.   Defendant FRANSABANK maintained an account for and provided financial services to Signum International Holding SAL, a company controlled by Ali Youssef Charara (SDGT).

1503.   Defendant FRANSABANK also maintained accounts for and provided financial

---

[99]   *See* Adam Ciralsky and Lisa Myers, *Hezbollah Banks Under Attack in Lebanon* (NBC News, July 25, 2006), archived at https://web.archive.org/web/20060810204050/http://www.msnbc.msn.com/id/14015377.

services that aided and abetted Hezbollah through companies belonging to the Ahmad clan. These included accounts for Ali Ahmed Group - Holding SAL, ACE Group SAL, Blue City SAL, Golden Square SAL, and Paloma Group SAL.

1504. Defendant FRANSABANK also maintained an account for and provided financial services that aided and abetted Hezbollah through Interafrica Trading Company ITC SAL Offshore, co-founded by Ali Hussein Darwish and his family in conjunction with Jihad Muhammad Qansu (SDGT).

1505. Defendant FRANSABANK also maintained an account for and provided financial services that aided and abetted Hezbollah through Euro African Group Ltd., which was controlled by Muhmmad Bazzi and designated an SDGT on May 17, 2018.

1506. Defendant FRANSABANK also maintained an account for and provided financial services that aided and abetted Hezbollah through Wanour Real Estate SAL, controlled by Mr. Bazzi.

1507. Defendant FRANSABANK also maintained an account for and provided financial services that aided and abetted Hezbollah through Talal Khalil Chahine, including a transfer of $990,000 from his FRANSABANK account to another account belonging to Chahine.

1508. Defendant FRANSABANK maintained an account for and provided financial services to Global Supply and Consultancy SAL Offshore, a Hezbollah / BAC entity co-founded by Saleh Assi.

1509. Nazim Ahmad also used Rilton Traders to launder more than $150,000 from Belgium (through New York correspondent accounts) to Saleh Ali Assi's personal account at Defendant FRANSABANK.

1510. Nazim Ahmad also used Rilton Traders to launder at least $70,000 from Belgium

(through New York correspondent accounts) to Ramzi Muhammad Malek's account at Defendant FRANSABANK.

1511.   Defendant FRANSABANK also maintained an account for and provided financial services to Kassem Hejeij (SDGT) knowing that he was a prominent and well-known Lebanese banker and money launderer deeply connected to Hezbollah.

1512.   After the demise of LCB in 2011, Defendant FRANSABANK took over a substantial portion of LCB's blacklisted accounts and business with Hezbollah's BAC.

1513.   According to the Lebanese government, this included taking on the U.S. dollar-denominated accounts of Muhammad Bazzi (SDGT) one of the BAC's most notorious and prolific financiers and facilitators.

1514.   According to the Lebanese government, this also included taking on the U.S. dollar-denominated accounts of leading BAC facilitator Saleh Ali Assi and the blacklisted account for his large money laundering operation – Inter Aliment SAL Offshore.

1515.   It also included taking over the blacklisted accounts of Phoenicia Shipping Offshore SAL (SDNTK), controlled by Ali Muhammad Kharrubi (SDNTK).

1516.   Similarly, according to the Lebanese government, Muhammad Bazzi's Euro African Group Ltd. (SDGT) account no. 42402* migrated to Defendant FRANSABANK as did his own personal U.S. dollar-denominated account no. 170037* at LCB.

1517.   After the demise of LCB in 2011, according to the Lebanese government Defendant FRANSABANK also took over the blacklisted account of Adel Hassan Makki, the son-in-law of Ali Said Ali Ahmad and brother-in-law of Nazim Ahmad.

1518.   According to the Lebanese government, Defendant FRANSABANK also took on the blacklisted LCB accounts of Muhammad Issam Abu Darwish's business partner, Akram

Ahmad al-Bast, as well as Muhammad Issam Abu Darwish's own blacklisted U.S. dollar-denominated account.

1519.   According to the Lebanese government, Defendant FRANSABANK also took on the blacklisted LCB accounts of Mustafa Faysal Ahmad, his company – Mercury Development Offshore SAL, Platinum Residence (Muhammad Bdeir and Co.), and others.

1520.   According to the Lebanese government, Defendant FRANSABANK also took on the account balance at LCB (account no. 173599*) of Millennium Diamond Offshore SAL.

1521.   Thus, there can be no doubt that Defendant FRANSABANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant FRANSABANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided FRANSABANK with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

### D.    BLOM BANK SAL

1522.   As set forth below, Defendant BLOM BANK maintained accounts and provided vital financial services to a wide spectrum of Hezbollah entities and operatives ranging from the well-known Al-Mabarrat Charitable Society–Lebanon, founded by Sheikh Fadlallah (SDT), to Hezbollah's money-laundering exchange houses and Conflict Diamond smugglers, to narcotics traffickers and arms dealers:

- **Al-Mabarrat Charitable Society–Lebanon**;
- **Cooperative Al-Wafaa SARL**;
- **Arch Consulting SARL**;
- **Elissa Exchange Company SARL** (SDNTK);
- **Ovlas Trading SA** (SDGT);
- **Spectrum Investment Group Holding SAL** (SDGT);

- **Mustafa Reda Darwish Fawaz** (SDGT);
- **Youssef Muhammad Tajideen**;
- **Car Care Center** (SDGT);
- **Teltac Worldwide Incorporated (Offshore) SAL**; and
- **Béton Plus SAL**.

1523.   Taken as a whole, this roster of customers includes multiple designated Hezbollah persons or companies and entities, several additional persons and entities widely and openly known to be associated with and/or controlled by designated entities belonging to Hezbollah, and a rogue's gallery of companies and individuals that are part of Hezbollah's BAC's network.

1524.   Defendant BLOM BANK's roster of Hezbollah-controlled customers reflects the bank's willingness to substantially assist Hezbollah's operations by providing it with financial services, including critical access to U.S. dollar-clearing.

1525.   Defendant BLOM BANK maintained accounts for and provided financial services to Al-Mabarrat Charitable Society–Lebanon, aided and abetted Hezbollah knowing it was a prominent and well-known Hezbollah organization that was founded by Hezbollah's "spiritual leader" Sheikh Muhammad Hussein Fadlallah, who was designated a terrorist by the United States in 1995. Defendant BLOM BANK fully understood its own role in providing financial services to Al-Mabarrat Charitable Society–Lebanon.

1526.   Defendant BLOM BANK maintained an account for and provided financial services to Cooperative Al-Wafaa SARL and provided material support that aided and abetted Hezbollah knowing that Cooperative Al-Wafaa SARL was owned and controlled by Adham Tabaja (SDGT) and fully understanding its own role in providing financial services to one of Hezbollah's most senior and well known financiers.

1527.   Defendant BLOM BANK maintained an account for and provided financial services to Arch Consulting SARL and provided material support that aided and abetted Hezbollah

knowing that Arch Consulting SARL was a prominent and well-known Hezbollah organization and fully understanding its own role in providing financial services to this prominent and well-known corporate alter-ego for Hezbollah's construction arm, Jihad al-Bina (SDGT).

1528. Defendant BLOM BANK maintained an account for and provided financial services to Ovlas Trading SA (SDGT) that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Tajideen Network of companies operated on behalf of Hezbollah's BAC.

1529. Defendant BLOM BANK maintained an account for and provided financial services to Spectrum Investment Group Holding SAL (SDGT) that aided and abetted Hezbollah, knowing that it was providing financial services to this U.S.-designated, prominent and well-known part of the Charara Network of companies operated on behalf of Hezbollah's BAC.

1530. Defendant BLOM BANK maintained an account for and provided financial services to Mustafa Reda Darwish Fawaz (SDGT) that aided and abetted Hezbollah, knowing that it was providing financial services to this U.S.-designated, prominent and well-known member of Hezbollah's IJO, who has supported the organization's communications, surveillance, and arms dealing activities in West Africa. Defendant BLOM BANK fully understood its own role in providing financial services to Mustafa Reda Darwish Fawaz.

1531. Defendant BLOM BANK maintained an account for and provided financial services to Youssef Muhammad Tajideen that aided and abetted Hezbollah, knowing that he was a prominent and well-known member of Hezbollah's IJO, whose three brothers are designated SDGTs.

1532.  Defendant BLOM BANK maintained an account for and provided financial services to Kassem Tajideen (SDGT), knowing that he was a prominent and well-known Hezbollah financier.

1533.  Defendant BLOM BANK maintained an account for and provided financial services to Muhammad Bazzi (SDGT), knowing that he was a prominent and well-known Hezbollah facilitator and BAC operative.

1534.  Defendant BLOM BANK maintained an account for and provided financial services to Ali Youssef Charara (SDGT), knowing that he was a prominent and well-known Hezbollah facilitator and BAC operative.

1535.  Defendant BLOM BANK maintained an account for and provided financial services to Ali Muhammad Kharrubi (SDNTK), knowing that he was a prominent and well-known money launderer, narcotics trafficker and BAC operative.

1536.  Defendant BLOM BANK maintained an account for and provided financial services to Nazem Ahmad, knowing that he was a prominent and well-known money launderer and Conflict Diamond trafficker.

1537.  Defendant BLOM BANK maintained an account for and provided financial services to Kassem Hejeij (SDGT), knowing that he was a prominent and well-known Lebanese banker and money launderer deeply connected to Hezbollah.

1538.  Defendant BLOM BANK maintained an account for and provided financial services to Car Care Center (SDGT), knowing it was controlled by the co-head of Hezbollah's BAC, Adham Tabaja, and managed by Hussein Ali Faour (SDGT), who the United States government has identified as "a member of Hizballah's Islamic Jihad, the unit responsible for

carrying out the group's overseas terrorist activities." Car Care Center has long operated as Hezbollah's motor pool, providing vehicles to the organization as needed.

1539. Defendant BLOM BANK maintained an account for and provided financial services to Teltac Worldwide Incorporated (Offshore) SAL that aided and abetted Hezbollah, knowing it was providing these financial services to the Charara Network of companies operated on behalf of Hezbollah's BAC.

1540. Defendant BLOM BANK maintained an account for and provided financial services to Béton Plus SAL that aided and abetted Hezbollah, knowing that it was providing those financial services to part of Hezbollah's BAC, co-founded by Salah Abd al-Rauf Azz al-Din, sometimes referred to as the Lebanese "Bernie Madoff," to whom the organization transferred the large sums it received from Iran in order to invest it in Europe and America.

1541. Defendant BLOM BANK maintained an account for and provided financial services to Elissa Exchange Company SARL (SDNTK) that aided and abetted Hezbollah, knowing that it was providing financial services (directed through New York) to this major bulk cash money launderer for Hezbollah's narcotics trafficking network run by Ayman Joumaa, among others.[100]

1542. Defendant BLOM BANK maintained an account for and provided financial services to Halawi Investment Trust SAL, knowing that the Halawi Network of companies were also major bulk cash money launderer for Hezbollah's narcotics trafficking network run by Ayman Joumaa, among others.

1543. As noted above, these exchange houses deal in high-volume bulk cash transactions and they perform a vital gateway function, allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, be deposited into banks like Defendant BLOM BANK (which

---

[100]    BLOM Bank was identified by the U.S. government as one of four Lebanese banks whose New York correspondent banks were used by Lebanese exchange houses to launder money for Hezbollah.

exchange the cash for LBP deposits by the Central Bank at high interest rates).

1544.   Within the parameters of The System, Elissa Exchange Co. SARL (SDNTK) and the Halawi Network, Defendant BLOM BANK received high interest returns on the Lebanese public debt it financed and Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1545.   Nazim Ahmad used Rilton Traders to launder a minimum of $550,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Primo International SAL Offshore's U.S. dollar-denominated account in Lebanon at Defendant BLOM BANK.

1546.   Nazim Ahmad used Rilton Traders to launder a minimum of $10,000 U.S. dollars in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to his brother-in-law Rami Kamil Ya'qub Baqir's U.S. dollar-denominated account in Lebanon at Defendant BLOM BANK. According to the Lebanese government, two of his LCB accounts were closed in September 2011.

1547.   Nazim Ahmad used Rilton Traders to launder a minimum of $600,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Salman Ali Ahmad's U.S. dollar-denominated account in Lebanon at Defendant BLOM BANK.

1548.   Nazim Ahmad used Rilton Traders to launder a minimum of $6,200,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Mahmoud Nayef Ahmad's U.S. dollar-denominated account in Lebanon at Defendant BLOM BANK.

1549.   Nazim Ahmad used Rilton Traders to launder a minimum of $400,000 U.S. dollars in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to

Samir Muhammad Hijazi's U.S. dollar-denominated account in Lebanon at Defendant BLOM BANK.

1550.   According to the Lebanese government, Mr. Hijazi is associated with Khalil Nazem Ibrahim's Network.

1551.   Nazim Ahmad also used Rilton Traders to launder more than $200,000 from Belgium (through New York correspondent accounts) to Randa Muhammad Malek's account at Defendant BLOM BANK.

1552.   As set forth above, Defendant BLOM BANK fully understands its role in The System and its roster of customers who are either BAC operatives, BAC facilitators, Hezbollah/BAC-controlled bulk cash exchange house and Conflict Diamond smugglers, and money launderers, reflecting the bank's willingness to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1553.   Defendant BLOM BANK's agreement to participate in The System, to knowingly maintain accounts for BAC operatives and BAC-controlled entities and to launder U.S. dollar-denominated funds on their behalf is further supported by the fact that after the demise of LCB in 2011, several of LCB's blacklisted accounts identified as part of Hezbollah's financial operations migrated to Defendant BLOM BANK.

1554.   According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant BLOM BANK, included several accounts tied to the Ahmad Clan's diamond smuggling and money laundering networks in the Democratic Republic of Congo, such as LCB account no. 172854* and the personal account of Nazim Ahmad account no. 172382*.

1555.   According to the Lebanese government, LCB accounts for Millennium Diamond Offshore SAL, Muhammad Hussein Darwish's SOGEAC SPRL, and Mustafa Faysal Ahmad also moved to Defendant BLOM BANK.

1556.   Thus, there can be no doubt that Defendant BLOM BANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant BLOM BANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided BLOM BANK with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

**E.    MEAB BANK**

1557.   Defendant MEAB BANK was co-founded and chaired—until June 2015—by Kassem Hejeij who stepped down as a result of being designated an SDGT by the U.S. Department of the Treasury for his direct links to Hezbollah.

1558.   The bank was established to serve the needs of the Hejeij brothers, who owned a large construction business in Africa, including lucrative government contracts in Equatorial Guinea where Kassem Hejeij (SDGT) enjoys a highly profitable relationship with the country's long serving President, Teodoro Obiang.

1559.   For many years, Kassem Hejeij (SDGT) has conducted his business, including on Hezbollah's behalf, from his offices and wood-paneled board room on the fourth floor of the Coral Beach Hotel, where he owns a stake through his daughter.

1560.   At the Coral Beach, Hejeij's Executive Assistant, Zalfa Taher, manages his daily affairs and serves as a gatekeeper over his schedule and appointments.

1561.   According to the U.S. Department of the Treasury:

Hejeij is a Lebanese businessman that maintains direct ties to Hizballah organizational elements. In addition to his support to Adham Tabaja and his affiliated companies in Iraq, Hejeij has helped open bank accounts for Hizballah in Lebanon and provided credit to Hizballah procurement companies. Hejeij has also invested in infrastructure that Hizballah uses in both Lebanon and Iraq.

1562.   Hejeij's close aide and Defendant MEAB BANK manager, Adnan Yousef, has long assisted Hejeij's activities, often working with him at his private offices on the fourth floor of the Coral Beach Hotel.

1563.   In 2006, Defendant MEAB BANK's offices were targeted by Israeli jets after a fundraising appeal that aired on Hezbollah's *Al Manar* television station asked that money for the Hezbollah resistance be sent to a specific account at the bank.

1564.   Moreover, a public campaign to support **Hezbollah** was announced on June 16, 2007 asking donors to contribute the money into a **Hezbollah-owned bank account at Defendant MEAB BANK**, Account No. 10680.

1565.   Apart from Mr. Hejeij's designation as an SDGT, MEAB BANK has long been regarded as one of Hezbollah's favored bankers.

1566.   Defendant MEAB BANK has also knowingly held U.S. dollar-denominated accounts (including Account No. 004-002-036-100250-012) and provided financial services to the Imam Khomeini Relief Foundation–Lebanon (SDGT).

1567.   Defendant MEAB BANK also maintained accounts and provided financial services to Al-Inmaa Engineering and Contracting SARL (SDGT), the prominent Hezbollah construction and investment arm headed by Adham Tabaja (SDGT).

1568.   Defendant MEAB BANK also maintained an account for and provided financial services to Nest Contracting Company SAL, another company controlled by Adham Tabaja and his uncle Ahmad Ali Tabaja.

317

1569.   Defendant MEAB BANK has also knowingly held accounts and provided financial services to Fantasy World SARL, which operates the well-known Fantasy World amusement park in Hezbollah's stronghold of Dahiya in the southern suburbs of Beirut that was founded and operated by Adham Tabaja, co-chairman of Hezbollah's BAC.[101]

1570.   Fantasy World serves as a favorite meeting point for Hezbollah operatives.

1571.   Defendant MEAB BANK has also held accounts and provided financial services to Trust Compass Insurance SAL, knowing that the company was controlled by Ahmad Ali Tabaja and was a BAC company used not only by the Tabaja family for its commercial purposes but also as a Hezbollah company used to insure, *e.g.*, the organization's hospitals and other assets.

1572.   In fact, for many years, Defendant MEAB BANK has provided extensive financing to Adham Tabaja and his companies, often using properties owned by Mr. Tabaja or co-owned by him jointly with his uncle Ahmad Ali Tabaja.

1573.   For example, Adham and Ahmad Tabaja jointly acquired properties 177 14 C, 15 E, 15 H, 18 E, F, H, 19 A, D and G in Hadath, Lebanon in 2001. Those apartments were used as collateral for a loan Defendant MEAB BANK extended to Fantasy World SARL, Adham Tabaja, and various Tabaja associates, including two of his children.

1574.   In fact, Defendant MEAB BANK's financial relationship with Adham Tabaja and his corporate holdings was so extensive that Mr. Tabaja's SDGT designation (which caused him and his companies a temporary liquidity problem) prompted MEAB BANK to seek short term assistance from the Central Bank of Lebanon to forestall its own liquidity problems.

1575.   Unsurprisingly, Defendant MEAB BANK was actively involved in Hezbollah's conspiracy to launder narcotics trafficking proceeds through the sale of used cars in Africa since

---

[101]      According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK, included another Tabaja controlled company, New Land SARL.

its roots are in West Africa where its (nominally) former chairman, Kassem Hejeij (SDGT) built his business empire with Hezbollah's assistance.

1576.   Between approximately January 2007 and early 2011, MEAB knowingly move tens of millions of dollars on Hezbollah's behalf (along with three other Lebanese banks), through its correspondent bank account(s) with U.S. financial institutions located in New York that were, *inter alia*, laundered through Lebanese exchange houses.

1577.   Specifically, Defendant MEAB BANK held account 135-051861-012 for Elissa Exchange in U.S. dollars and purposefully directed U.S. dollar-clearing on behalf of Elissa Exchange through correspondent accounts in New York knowing that it was a critical bulk cash conduit for laundering narcotics trafficking proceeds on behalf of Hezbollah's BAC.

1578.   Nazim Ahmad used Primogems to launder a minimum of $400,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Elissa Exchange's U.S. dollar-denominated account in Lebanon at Defendant MEAB BANK.

1579.   Defendant MEAB BANK also maintained an account for and provided vital financial services to Phoenicia Shipping Offshore SAL (SDNTK), a sister company of Elissa Exchange.

1580.   Defendant MEAB BANK also maintained accounts for and provided vital financial services to Halawi Exchange, Halawi Holding SAL and Halawi Investment Trust SAL, all companies within the Halawi Network, knowing that the Halawi Network was a critical bulk cash conduit for laundering narcotics trafficking proceeds on behalf of Hezbollah's BAC.

1581.   As noted above, the exchange houses Defendant MEAB BANK worked closely with deal in high-volume bulk cash transactions and they perform a vital gateway function, allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, and be

deposited into banks like Defendant MEAB BANK (that exchange the cash for LBP deposits by the Central Bank at high interest rates).

1582.   Within the parameters of The System, Elissa Exchange Co. and the Halawi Exchange's network received lucrative commissions, Defendant MEAB BANK received high interest returns on the Lebanese public debt it financed and Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1583.   Defendant MEAB BANK's agreement to participate in The System, to knowingly maintain accounts for BAC operatives and BAC-controlled entities, and to launder U.S. dollar-denominated funds on their behalf is further supported by the fact that after the demise of LCB in 2011, several of LCB's blacklisted accounts identified as part of Hezbollah's financial operations migrated to Defendant MEAB BANK.

1584.   Defendant MEAB BANK maintained an account for and provided financial services to Muhammad Bazzi (SDGT), knowing that he was a prominent and well-known Hezbollah facilitator and BAC operative.

1585.   Defendant MEAB BANK maintained an account for and provided financial services to Ali Youssef Charara (SDGT), knowing that he was a prominent and well-known Hezbollah facilitator and BAC operative.

1586.   Defendant MEAB BANK also maintained an account for and provided financial services to Mr. Amine Cherri (SDGT) knowing that he was a prominent and well-known Hezbollah politician and financier deeply connected to Hezbollah, Adham Tabaja and the BAC.

1587.   Defendant MEAB BANK also maintained an account for and provided financial services to Mr. Nazim Ahmad, knowing that he was a prominent and well-known money launderer

and Conflict Diamonds trafficker.

1588.   According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK, included the personal account at LCB of Ali Muhammad Kharrubi (SDNTK).

1589.   According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK, included several accounts tied to the Ahmad Clan's diamond smuggling and money laundering networks in the Democratic Republic of Congo, such as Said Hassan Fuani (account no. 170178*), Inter Aliment SAL Offshore (account no. 172851*) and the personal account of Saleh Ali Assi (account no. 172197*).

1590.   According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK included the personal account at LCB of Ibrahim Issawi's father-in-law, Hussein Ibrahim Bdeir.

1591.   According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK also included several related to Muhammad Issam Abu Darwish, including his joint accounts with his wife Carol and business partner Akram Ahmad al-Bast.

1592.   According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK also included the personal account of Muhammad Abdallah al-Amin's (SDGT) business partner, Said Jamil Muhammad.

1593.   According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK included the personal account at LCB of Mustafa Faysal Ahmad.

1594.   According to the Lebanese government, the accounts closed by LCB that migrated

321

in whole or in part to Defendant MEAB BANK included the personal account at LCB of Safi Yahya Darwish and his joint account with Khodr Hussein Darwish.

1595.   Thus, there can be no doubt that Defendant MEAB BANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations and that the U.S. government's legal actions against LCB did not discourage Defendant MEAB BANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided MEAB BANK with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

### F.   BYBLOS BANK SAL

1596.   As set forth below, Defendant BYBLOS BANK SAL maintains accounts for a wide spectrum of Hezbollah entities and operatives ranging from the core fundraising arm of Hezbollah's terror apparatus to a front for its U.S.-designated "social welfare" arm, to various nodes within Hezbollah's BAC:

- **Islamic Resistance Support Organization**;
- **Al-Amana SARL**;
- **Global Touristic Services SAL**;
- **Société Orientale Libanaise d'Investissement et Développement SAL**;
- **Afrimex (Offshore) SAL**;
- **Etcimex**;
- **Amigo Travel and Transport SAL**; and
- **Medical Equipments and Drugs International Corporation SAL**.

1597.   Taken as a whole, this roster of customers includes the most infamous designated Hezbollah organizations and many other key elements of its BAC.

1598.   Defendant BYBLOS BANK's roster of Hezbollah-controlled customers reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial

systems and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1599.   Defendant BYBLOS BANK maintained an account for the benefit of Islamic the IRSO, an SDGT that it knows to be widely and publicly associated with Hezbollah and its IJO.

1600.   Defendant BYBLOS BANK own AML policies noted that "non-profit and charitable organizations are also used by terrorist groups as a means of raising funds and / or cover for transferring funds in support of terrorist acts."

1601.   It AML policies also noted that some non-profit organizations can provide "support functions to the terrorist movement."

1602.   As noted above, the IRSO is the most explicit and notorious fundraising arm of Hezbollah's IJO.[102]

1603.   Defendant BYBLOS BANK maintained an account for and provided financial services to Al-Amana SARL, a company that owns gas stations in Lebanon (effectively owned and controlled by Atlas Holding SAL) on behalf of the U.S.-designated Martyrs Foundation–Lebanon.

1604.   At all relevant times, Defendant BYBLOS BANK knew (and knows) that Al-Amana SARL was (and is) a Hezbollah-controlled entity.

1605.   The company is owned by Atlas Holding SAL—the well-known "investment arm" of the U.S.-designated Martyrs Foundation–Lebanon.

1606.   Defendant BYBLOS BANK maintained an account for and provided financial services to Global Touristic Services SAL (a/k/a GTS), a company effectively owned and controlled by Atlas Holding SAL on behalf of the U.S.-designated Martyrs Foundation–Lebanon.

1607.   At all relevant times, Defendant BYBLOS BANK knew (and knows) that Global

---

[102]   BYBLOS's account for the "Resistance" at its Harel Hreik branch was broadcast openly on *Al-Manar*.

Touristic Services SAL (a/k/a GTS) was (and is) a Hezbollah-controlled entity.

1608.   The company is also owned by Atlas Holding SAL.

1609.   Defendant BYBLOS BANK maintained an account for and provided financial services to Société Orientale Libanaise d'Investissement et Développement SAL knowing the company was co-founded by the Atlas Holding SAL, the investment arm of the Martyrs Foundation – Lebanon (SDGT).

1610.   Defendant BYBLOS BANK also knew that the company's chairman was Hassan Ali Tajideen and that Ali Tajideen's (SDGT) wife was a board member and that the company's auditor, Jihad Qansu (SDGT) was also a Hezbollah operative.

1611.   Defendant BYBLOS BANK maintained an account for and provided financial services to Afrimex SAL Offshore, a company founded by Youssef Muhammad Tajideen (brother of two Tajideens who are designated SDGTs).

1612.   Afrimex (Offshore) SAL is part of the Tajideen family's network of trade-based money launderers and Hezbollah's BAC.

1613.   Defendant BYBLOS BANK maintained an account for and provided financial services to ETCIMEX, a Czech company founded by Kassem Tajideen that received significant flows of U.S. dollar-denominated transfers that cleared through New York.

1614.   The Tajideen family is widely known in Lebanon and particularly in banking and real estate circles.

1615.   Like the other defendants, BYBLOS BANK knew it was doing business with and facilitating the Tajideen's illicit activities, and it also understood that the Tajideens were (and are) – like the Tabaja family, the Safieddine family and others – synonymous with Hezbollah.

1616.   Defendant BYBLOS BANK maintained an account for and provided financial

services to Amigo Travel and Transport SAL, a company that is part of Adham Tabaja's network of companies and Hezbollah's BAC.

1617.   The company management includes Jihad Muhammad Qansu, a designated SDGT identified as part of the Tabaja Network, and was co-founded by Khadir Ali Abi Haidar, who is also a director of the U.S.-designated Car Care Center (a/k/a Mikalab SARL), which is also part of Adham Tabaja's network of companies and Hezbollah's BAC.

1618.   Defendant BYBLOS BANK maintained an account for and provided financial services to Société Orientale Libanaise d'Investissement et Développement SAL, a company that it knows is part of Hezbollah's BAC.

1619.   Defendant BYBLOS BANK knew that it was aiding Hezbollah by maintaining accounts for Société Orientale Libanaise d'Investissement et Développement SAL because the company was founded by Atlas Holding SAL—the well-known "investment arm" of the U.S. designated Martyrs Foundation–Lebanon.

1620.   Its management also includes prominent Hezbollah operatives, including Hassan Ali Tajideen, the son of Ali Tajideen, a U.S.-designated Hezbollah financier and Jihad Muhammad Qansu, an SDGT, who was listed as the company's auditor.

1621.   Defendant BYBLOS BANK maintained an account for and provided financial services to Medical Equipments and Drugs International Corporation SAL (a/k/a MEDIC), a Hezbollah-controlled company established in 2013 to sell pharmaceuticals and other medical products.

1622.   At all relevant times, Defendant BYBLOS BANK knew (and knows) that Medical Equipments and Drugs International Corporation SAL was (and is) a Hezbollah-controlled entity.

1623.   The company is owned by Atlas Holding SAL—the well-known "investment arm"

of the U.S.-designated Martyrs Foundation–Lebanon that was designated seven years before the

company was established.

1624. Defendant BYBLOS BANK's roster of Hezbollah-controlled customers reflects the

bank's extensive commitment to substantially assist Hezbollah's operations by providing financial

services, including critical access to U.S. dollar-clearing, the U.S., and international financial

systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1625. It also demonstrates the interconnectedness of Hezbollah's BAC.

1626. Defendant BYBLOS BANK's roster of Hezbollah-controlled customers includes

companies with overlapping ownership and management structures that include representatives of

the Martyrs Foundation–Lebanon, the Tajideen Network and the Tabaja Network – all working on

behalf of the organization, with Defendant BYBLOS BANK providing its access to the banking

sector and USD-clearing to ensure that the BAC can carry out its mission, generate revenue for

the organization, and navigate American sanctions.

1627. Defendant BYBLOS BANK maintained an account for and provided vital financial

services to Talal Khalil Chahine, a close business associate of Muhammad Bazzi (SDGT), who

was publicly associated with the Al-Mabarrat Charitable Society.

1628. Apart from Mr. Chahine's clear association with Hezbollah and status as a fugitive

from the United States, Defendant BYBLOS BANK would have known that he was involved in

illicit activity by the abnormally large sums of U.S. dollars that moved through his account.

1629. Nazim Ahmad used Rilton Traders to launder a minimum of $10,000 in proceeds

from the Ahmad family's criminal activities from Belgium (through New York) to Hussein Ali

Atwi's U.S. dollar-denominated account in Lebanon at Defendant BYBLOS BANK

1630. Moreover, like all other financial institutions in Lebanon, Defendant BYBLOS

326

BANK was well aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB. Nonetheless, it agreed to continue providing accounts and financial services to more than a dozen Hezbollah-related individuals and companies, including Ali Hussein Darwish, Muhammad Hussein Darwish, Safi Yahya Darwish, Khodr Hussein Darwish, Ali Musa Nachar, Tarek Khalil Musa,[103] and Said Hassan Fuani.

1631.   Thus, there can be no doubt that Defendant BYBLOS BANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations and that the U.S. government's legal actions against LCB did not discourage Defendant BYBLOS BANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided BYBLOS BANK with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

1632.   In sum, Defendant BYBLOS BANK fully understands its role in The System, and its conduct both before and after the LCB scandal demonstrates the bank's willingness to substantially assist Hezbollah's operations.

1633.   By helping the IRSO to collect funds which are explicitly and notoriously raised to underwrite violence and continuing to provide financial services to BAC operatives and facilitators even after the LCB scandal exposed various networks operating within The System, Defendant BYBLOS BANK has demonstrated a willingness to actively further Hezbollah's illicit and violent activities.

### G.   BANK AUDI SAL

1634.   As set forth below, Defendant BANK AUDI maintained accounts for a wide

---

[103]     According to the Lebanese government, Muhammad Bazzi's business associate in The Gambia, Tarek Khalil Musa, held LCB account no. 170239* until October 2011.

spectrum of Hezbollah entities ranging from various nodes within Hezbollah's BAC to sub-divisions of Hezbollah's "social welfare" arm:

- **Ovlas Trading SAL (Offshore)**;
- **Ovlas Trading SA (SDGT)**;
- **Afrimex SAL Offshore**;
- **Leaders of Supply & Products (Offshore) SAL**;
- **Atlas Holding SAL**;
- **Inter Aliment SAL Offshore**;
- **Fawzi Muhmmad Malek**;
- **Khalil Nazem Ibrahim**;
- **Dib Hani Harb**;
- **Rim Reda Baqir**;
- **Premier Investment Group SAL Offshore** (SDGT);
- **Spectrum International Investment Holding SAL** (SDGT);
- **Teltac Worldwide Incorporated (Offshore) SAL**;
- **Al-Hadi Institution**;
- **Medical Equipments and Drugs International Corporation SAL**;
- **Special Operations Group SAL**;
- **Info Trust SAL**; and
- **Info Trust SARL**.

1635.   Defendant BANK AUDI maintained an account for at least four major Tajideen family companies, including Ovlas Trading SAL (Offshore), which was designated by the U.S. Department of the Treasury on December 9, 2010.

1636.   Defendant BANK AUDI also maintained an account for Ovlas Trading SA, which was designated by the U.S. Department of the Treasury on December 9, 2010.

1637.   Defendant BANK AUDI also maintained accounts for Afrimex SAL Offshore and Leaders of Supply & Products (Offshore) SAL, both Tajideen-controlled companies that actively used these accounts in trade-based money laundering on behalf of Hezbollah's BAC.

1638.   Defendant BANK AUDI maintained an account for Youssef Muhammad Tajideen and provided material support that aided and abetted Hezbollah, knowing that Mr. Tajideen and his brothers were prominent and well-known members of Hezbollah.

328

1639.   Defendant BANK AUDI was aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing Youssef Muhammad Tajideen with financial services and access to U.S. dollar-clearing.

1640.   Defendant BANK AUDI maintained an account for Atlas Holding SAL, which was founded in 2006 by the Martyrs Foundation – Lebanon and is very publicly known as the commercial arm of the Martyrs Foundation, a core Hezbollah institution and SDGT.[104]

1641.   Defendant BANK AUDI maintained an account for Inter Aliment SAL Offshore, a company controlled by the prominent BAC facilitator and known money launderer, Saleh Ali Assi.

1642.   According to the Lebanese government, Defendant BANK AUDI maintained account no. 172370* at LCB for Fawzi Muhammad Malek until it was closed in October 2011 and the balance migrated to Mr. Malek's account at Defendant BANK AUDI. Mr. Malek is a member of the Ahmad clan and has laundered money on behalf of Nazim Ahmad and his criminal network.

1643.   Nazim Ahmad used Rilton Traders to launder at least $75,000 from Belgium in U.S. dollars to the BANK AUDI account of Yusuf Abbas Mer'i, a board member of Defendant FENICIA BANK.

1644.   Khalil Nazem Ibrahim held account no. 173309* at LCB until 2011.

1645.   According to the Lebanese government, when LCB was finally compelled to close the account for Khalil Nazem Ibrahim, the balance migrated to an account at Defendant BANK AUDI.

1646.   Defendant BANK AUDI maintained U.S. dollar-denominated account no. 813364 for Dib Hani Harb, a Hezbollah weapons procurement specialist and narcotics trafficker. The account was used to transfer funds from and through New York to Hezbollah in Lebanon. As

---

[104]    According to the Martyrs Foundation, it was founded in 1990.

detailed above, at a minimum Defendant BANK AUDI independently knew that Mr. Harb's was inconsistent with his stated occupation and was being used for illicit purposes, and it eventually received direct notice of his role in Hezbollah's IJO but continued to provide him and IJO with financial services.

1647.   Nazim Ahmad used Rilton Traders and Primogems to launder more than $200,000 U.S. dollars from Belgium through U.S. correspondent banks to the Defendant BANK AUDI accounts owned by Rim Reda Baqir.

1648.   Defendant BANK AUDI maintained an account for Premier Investment Group SAL Offshore (SDGT) and provided vital financial services to the company knowing that it was controlled by one of the most senior and prolific BAC operatives, Muhammad Ibrahim Bazzi (SDGT).

1649.   Defendant BANK AUDI maintained an account for Spectrum International Investment Holding SAL (SDGT) and provided financial services knowing that the company was a prominent and well-known part of the Charara network of companies operated on behalf of Hezbollah. Charara's Network has been described by the U.S. government as "a key Hizballah support network."

1650.   Defendant BANK AUDI maintained an account for Teltac Worldwide Incorporated (Offshore) SAL and provided financial services to it knowing that the company was a prominent and well-known part of the Charara network of companies operated on Hezbollah's behalf.

1651.   Ali Ibrahim Charara, who was listed as chairman, general manager and authorized signatory for Teltac Worldwide Incorporated (Offshore) SAL, was also a co-founder of Spectrum Investment Group Holding SAL (SDGT).

1652.   Defendant BANK AUDI maintained an account for Al-Hadi Institution, a

charitable institution for disabled children owned and operated by Al-Mabarrat.

1653. While the institution provides genuine services to disabled children, it does so as part of Hezbollah's successful effort to galvanize support for its core mission and political program, i.e. Hezbollah sees Al-Mabarrat, the Martyrs Foundation, and other outreach institutions as part of its wider efforts to proselytize and harden its domestic support for its terrorist program.

1654. Defendant BANK AUDI maintained an account for Medical Equipments and Drugs International Corporation SAL (MEDIC), a Hezbollah-controlled company established in 2013 to sell pharmaceuticals and other medical products.

1655. At all relevant time Defendant BANK AUDI knew (and knows) that Medical Equipments and Drugs International Corporation SAL (MEDIC) was (and is) a Hezbollah-controlled entity.

1656. The company is owned by Atlas Holding SAL—the well-known "investment arm" of the U.S.-designated Martyrs Foundation–Lebanon, which was designated seven years before the company was established.

1657. Its management includes Qassem Muhammad Ali Bazzi—just as the other Atlas Holding SAL portfolio companies do.

1658. Defendant BANK AUDI maintained an account for Special Operations Group SAL, an arms dealing company co-founded by Hezbollah's Kamel Amhaz (SDGT).

1659. Defendant BANK AUDI's roster of Hezbollah-controlled customers reflects the bank's commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1660. This is further supported by the fact that after the demise of LCB in 2011, BANK

AUDI allowed many of LCB's blacklisted accounts identified as part of Hezbollah's financial

operations to migrate to Defendant BANK AUDI.

1661.   According to the Lebanese government, blacklisted Hezbollah accounts at LCB

that were closed but permitted to move their account balances into parallel accounts at Defendant

BANK AUDI include:

- **Al-Jiyeh for Tourism and Construction SAL**;
- **Phoenicia Shipping Offshore SAL** (SDNTK);
- **Congo Diam SPRL**;
- **Nazim Ahmad**;
- **Carol Habib**;
- **Ibrahim Issawi**;
- **Youssef Muhammad Taj al-Din**;
- **Muhammad Issam Abu Darwish**;
- **Ali Hussein Darwish**;
- **Muhammad Hussein Darwish**;
- **Nazim Khalil Ibrahim**;
- **Akram Ahmad al-Bast**;
- **Amine Bzeih**; and
- **Said Hassan Fuani**.

1662.   Like all other financial institutions in Lebanon, Defendant BANK AUDI was well

aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but

nonetheless agreed to continue providing numerous customers with financial services and access

to U.S. dollar-clearing after their accounts at LCB were targeted for closure.

1663.   Thus, there can be no doubt that Defendant BANK AUDI has known for years that

it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds

needed to support Hezbollah's operations and that the U.S. government's legal actions against

LCB did not discourage Defendant BANK AUDI from continuing to engage in this conduct. On

the contrary, the flight of Hezbollah accounts from LCB provided BANK AUDI with an

opportunity to gain additional market share in Hezbollah's financial operations with impunity.

1664.   Defendant BANK AUDI also held accounts for and provided banking services to

Info Trust SAL and Info Trust SARL, which are both owned and controlled by Halawi Exchange Network.

1665.   As noted above, Halawi Exchange and other  exchange houses deal in high-volume bulk cash transactions, and they perform a vital gateway function, allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, and be deposited into banks like Defendant BANK AUDI (that can then exchange the cash for LBP deposits by the Central Bank at high interest rates).

1666.   Within the parameters of The System, Halawi Exchange received lucrative commissions, Defendant BANK AUDI received high interest returns on the Lebanese public debt it financed and Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1667.   In sum, Defendant BANK AUDI fully understands its role in The System, and its roster of customers who are either prominent Hezbollah institutions, BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies (including multiple recipients of Nazim Ahmad's long-standing money laundering operations) reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

### H.    LEBANON AND GULF BANK SAL

1668.   As set forth below, Defendant LEBANON AND GULF BANK maintained accounts for the benefit of a wide spectrum of Hezbollah entities ranging from the most infamous arm of Hezbollah's "social welfare" apparatus to various nodes within Hezbollah's BAC run by (a) the Martyrs Foundation (SDGT), (b) companies controlled by Adham Tabaja (SDGT), (c) the

Tajideen family, (d) the Charara Network, (e) the Ahmad Clan network, and (f) the Joumaa

Network.

1669. Defendant LEBANON AND GULF BANK held accounts for and provided

financial services to:

- **Islamic Resistance Support Organization**;
- **Al-Amana SARL**;
- **Amana Plus Company SAL**;
- **Shahed Pharm Drugstore SARL**;
- **City Pharma SARL**;
- **Adham Tabaja**;
- **Al-Inmaa Engineering and Contracting SARL** (SDGT);
- **Ovlas Trading SAL (Offshore)**;
- **Ovlas Trading SA** (SDGT);
- **Leaders of Supply & Products (Offshore) SAL**;
- **Spectrum Investment Group Holding SAL**;
- **G & S Diamonds**;
- **Elissa Exchange Co. SARL**; and
- **Mecattaf SAL**.

1670. Defendant LEBANON AND GULF BANK has maintained an account for and

provided material support that aided and abetted the Hezbollah-controlled "charity" widely and

publicly associated with the organization: the IRSO, bank account numbers: 202-336254 and 202-

329665 (nominally held by the al-Ma'rifa Society and al-Bushra Society respectively—expressly

and publicly soliciting donations for the benefit of the IRSO) knowing that the IRSO was the

notorious fundraising arm of Hezbollah's IJO.

1671. Defendant LEBANON AND GULF BANK maintained an account for Al-Amana

SARL and has provided material support that aided and abetted Hezbollah, through its role in

knowingly providing financial services to this U.S.-designated, prominent and well-known part of

the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's BAC.

1672. Al-Amana SARL operates 12 gas stations under the name of AL AMANA in

Beirut, South Lebanon and the Bekaa Valley in Lebanon.

1673.   The company is owned by the Martyrs Foundation–Lebanon (SDGT) through Atlas Holding SAL.

1674.   Defendant LEBANON AND GULF BANK maintained an account for the related company (with the same founders and management), Amana Plus Company SAL, and has provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's BAC.

1675.   Defendant LEBANON AND GULF BANK maintained an account for Shahed Pharm Drugstore SARL (with largely the same Hezbollah founders and management as Al-Amana SARL and Amana Plus Company SAL) and has provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's BAC.

1676.   Defendant LEBANON AND GULF BANK maintained an account for City Pharma (with largely the same Hezbollah founders and management as Al-Amana SARL, Amana Plus Company SAL and Shahed Pharm Drugstore SARL) and has provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's BAC.

1677.   City Pharma SARL was one of several Lebanese companies controlled by Hezbollah that was caught importing counterfeit medications from Southeast Asia and transferring them to factories in Europe where they were officially labeled as having been produced in Europe.

1678.   The licenses of the 15 pharmacies were temporarily revoked, but the counterfeit

medications had reached hospitals, clinics, and pharmacies in Lebanon, where they had already been prescribed to the public.

1679.  Defendant LEBANON AND GULF BANK maintained an account for and provided vital financial services to Adham Tabaja knowing – at a minimum – that he was a senior Hezbollah leader and prominent Hezbollah project developer in Lebanon. Notwithstanding that knowledge, Defendant LEBANON AND GULF BANK loaned Mr. Tabaja money and helped him finance his projects.

1680.  Defendant LEBANON AND GULF BANK also maintained an account for and provided vital financial services to Al-Inmaa Engineering and Contracting SARL (SDGT), the prominent Hezbollah construction and investment arm headed by Adham Tabaja, again knowing that Mr. Tabaja was a senior Hezbollah leader and prominent Hezbollah project developer in Lebanon.

1681.  Defendant LEBANON AND GULF BANK maintained an account for Ovlas Trading SAL (Offshore) which was owned and controlled by the same Tajideen network that controlled Ovlas Trading SA – designated by the U.S. Department of the Treasury on December 9, 2010.

1682.  Defendant LEBANON AND GULF BANK knew that the company was controlled by the Tajideen family and knew that the Tajideens were a prominent Hezbollah family and that they were leading Hezbollah financiers and project developers in Lebanon.

1683.  Defendant LEBANON AND GULF BANK also maintained an account for Ovlas Trading SA, which was designated by the U.S. Department of the Treasury on December 9, 2010, again knowing that the Tajideen family were prominent representatives of Hezbollah within The System.

1684.   Defendant LEBANON AND GULF BANK also maintained an account for Youssef Muhammad Tajideen and provided material support that aided and abetted Hezbollah, knowing it was providing vital financial services to Hezbollah through a prominent player in The System.

1685.   Defendant LEBANON AND GULF BANK also maintained an account for Leaders of Supply & Products (Offshore) SAL and provided material support that aided and abetted Hezbollah, knowing it was providing vital financial services to Hezbollah through this Tajideen Network company.

1686.   Like all other financial institutions in Lebanon, Defendant LEBANON AND GULF BANK was well aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing Youssef Muhammad Tajideen with financial services and access to U.S. dollar-clearing after his account at LCB was targeted for closure.

1687.   Thus, there can be no doubt that Defendant LEBANON AND GULF BANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant LEBANON AND GULF BANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided LEBANON AND GULF BANK with an opportunity – within Hezbollah's stake in The System – to gain additional market share with impunity.

1688.   Defendant LEBANON AND GULF BANK maintained an account for Spectrum International Investment Group Holding SAL (SDGT) and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Charara network of companies operated on behalf of Hezbollah's BAC.

337

1689.  Defendant LEBANON AND GULF BANK maintained an account for and provided financial services to EBD Teltac (Offshore) SAL. It thereby aided and abetted Hezbollah knowing that it was providing vital and substantial assistance to a company controlled by Mr. Charara (SDGT).

1690.  Mr. Charara's Network has been described by the U.S. government as "a key Hizballah support network."

1691.  Defendant LEBANON AND GULF BANK also maintained an account for G & S Diamonds, Nazim Ahmad's vehicle for laundering hundreds of millions of dollars for Hezbollah. By providing access to U.S. correspondent banking for G & S Diamonds, Defendant LEBANON AND GULF BANK provided vital assistance that aided and abetted Hezbollah, knowing it was providing vital financial services to one of the most significant players laundering money within The System.

1692.  Defendant LEBANON AND GULF BANK also maintained an account for Elissa Exchange Co. SARL (SDNTK) and Mecattaf SAL, two key companies within Ayman Joumaa's narcotics trafficking network, as well as the Fayed Exchange, identified by the Lebanese government as associated with Saleh Ali Assi.

1693.  As noted above, these exchange houses deal in high-volume bulk cash transactions, and they perform a vital gateway function, allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, and be deposited into banks like Defendant LEBANON AND GULF BANK (that exchange the cash for LBP deposits by the Central Bank at high interest rates).

1694.  Within the parameters of The System, Elissa Exchange Co. SARL (SDNTK), Mecattaf SAL and Fayed Exchange received lucrative commissions, Defendant LEBANON AND GULF BANK received high interest returns on the Lebanese public debt it financed, and

338

Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1695.  Defendant LEBANON AND GULF BANK fully understands its role in The System, and its roster of customers who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the bank's extensive commitment to substantially assisting Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

## I.    BANQUE LIBANO-FRANÇAISE SAL

1696. Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained accounts for and provided vital financial services to the Hezbollah-controlled "charity" widely and publicly associated with the organization: the IRSO – Account numbers: 657409.17 and 657469.171.

1697. Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained an account for and provided vital financial services to the Hezbollah-controlled "charity" widely and publicly associated with the organization: Martyrs Foundation – Lebanon – Account number 506936-80.

1698. Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained an account for and provided vital financial services to Ovlas Trading SA, which was designated by the U.S. Department of the Treasury on December 9, 2010.

1699.  The company is controlled by the Tajideen family—part of Hezbollah's BAC.

1700. Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained an account for and provided vital financial services to Hoda for Touristic Services & Management

Holding SAL, a company controlled by two senior Hezbollah financiers, Abbas Abdel Latif Fawaz and Ali Youssef Charara (SDGT).

1701.   Defendant BANQUE LIBANO-FRANÇAISE SAL maintained an account for and provided vital financial services to Al-Inmaa Engineering and Contracting (SDGT), the prominent Hezbollah construction and investment arm headed by Adham Tabaja (SDGT).

1702.   Defendant BANQUE LIBANO-FRANÇAISE SAL maintained an account for and provided vital financial services to United Company for Insurance Services SARL, an insurance company established by Adham Tabaja (SDGT) in 1995.

1703.   Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained an account for and provided vital financial services to REEM Pharmaceutical SAL, a designated SDGT since 2017, owned by Muhammad Abd-al-Amir Farhat (SDGT), a Hezbollah operative with close ties to the IRGC–QF.

1704.   Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained an account for and provided vital financial services to Nazim Ahmad's Primo International SAL Offshore and to various members of the Ahmad Conflict Diamond and Money Laundering Network, including Johanna Malek and Said Hassan Fuani.

1705.   Hezbollah facilitator Saleh Ali Assi's company, Inter Aliment SAL Offshore, held a U.S. dollar-denominated account at LCB prior to December 2011 and, according to the Lebanese government, the balance in its account migrated to Defendant BANQUE LIBANO-FRANÇAISE SAL (as well as two other Defendants) after the company's account at LCB was closed.

1706.   Saleh Ali Assi's personal U.S. dollar-denominated account at LCB was closed in June 2012.

1707.   According to the Lebanese government, the balance in his account migrated to

340

Defendant BANQUE LIBANO-FRANÇAISE SAL (as well as three other Defendants).

1708.   Hezbollah facilitator Muhammad Issam Abu Darwish and his father and his wife held accounts at LCB.

1709.   All of these accounts were flagged by SGBL's 2012 audit and Lebanese government investigation.

1710.   According to the Lebanese government, when LCB was finally compelled to close Mr. Abu Darwish's accounts, the account Muhammad Issam Abu Darwish held individually (no. 172517*) migrated to Defendant BANQUE LIBANO-FRANÇAISE, the account balance he held with his wife Carol Habib (no. 172689*) also migrated to Defendant BANQUE LIBANO-FRANÇAISE (and two other defendants), and the account Mr. Abu Darwish held jointly with one of his business partners (no. 173985*), Akram Ahmad al-Bast, migrated to Defendant BANQUE LIBANO-FRANÇAISE (and four other Defendants).

1711.   According to the Lebanese government, when LCB was finally compelled to close the account for Ideal Development I.D. SAL, a company Muhammad Issam Abu Darwish and his wife owned jointly, and the account for International Contractors and Developers SAL which Muhammad Issam Abu Darwish owned with Akram Ahmad al-Bast, the balances for both companies migrated to accounts at Defendant BANQUE LIBANO-FRANÇAISE.

1712.   Muhammad Issam Abu Darwish and his wife also owned a company jointly with Muhammad's brother, Sami Issam Abu Darwish, called Ras Beirut 1442 SAL.

1713.   Ras Beirut 1442 SAL held an account at LCB until July 2011.

1714.   According to the Lebanese government, when LCB was finally compelled to close the account for Ras Beirut 1442 SAL, the balance migrated to an account at Defendant BANQUE LIBANO-FRANÇAISE.

1715.   Sami Issam Abu Darwish was a significant shareholder and board member in Builders International SAL, which also held an account at LCB until 2011.

1716.   According to the Lebanese government, when LCB was finally compelled to close the account for Builders International SAL, the balance migrated to an account at Defendant BANQUE LIBANO-FRANÇAISE.

1717.   Sami Issam Abu Darwish was a majority shareholder in S.I.M. SAL Offshore, whose chairman was Muhammad Abdallah al-Amin (SDGT). The company held account no. 44000* at LCB until August 2011.

1718.   According to the Lebanese government, when LCB was finally compelled to close the account for S.I.M. SAL Offshore, the balance migrated to an account at Defendant BANQUE LIBANO-FRANÇAISE.

1719.   Nazim Ahmad used Rilton Traders to launder a minimum of $100,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Primo International SAL Offshore's U.S. dollar-denominated account in Lebanon at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1720.   Nazim Ahmad used Rilton Traders to launder more than $2.3 million in proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (through New York) to Sleiman Ali Ahmad's personal U.S. dollar-denominated account in Lebanon at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1721.   Nazim Ahmad used Rilton Traders and Primogems to launder more than $4 million in proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (through New York) to Saleh Ali Assi's personal U.S. dollar-denominated account in Lebanon at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1722.   Nazim Ahmad used Rilton Traders to launder more than $3 million U.S. dollars in proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (all or most of the funds through New York) to Johanna Malek's personal U.S. dollar-denominated account in Lebanon at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1723.   According to the Lebanese government, when Said Hassan Fuani's account at LCB was closed in 2011, this member of the Ahmad Clan Conflict Diamond and Money Laundering Network moved his accounts to, among others, Defendant BANQUE LIBANO-FRANÇAISE SAL.

1724.   Nazim Ahmad used Rilton Traders to launder hundreds of thousands of U.S. dollar-denominated proceeds from the Ahmad family's criminal activities from Belgium to Lebanon (through New York) using an account held individually by Khodr Hussein Darwish at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1725.   Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained accounts for and provided vital financial services to Hezbollah facilitator Ibrahim Issawi and his father-in-law, Hussein Ibrahim Bdeir.

1726.   Both men held accounts at LCB until September 2011.

1727.   According to the Lebanese government, the balance in both men's personal accounts migrated to Defendant BANQUE LIBANO-FRANÇAISE SAL (as well as other Defendants).

1728.   Ibrahim Issawi's company, Socimex SPRL, held an account at LCB until July 2011.

1729.   According to the Lebanese government, when Socimex SPRL's account at LCB was closed, it migrated to Defendant BANQUE LIBANO-FRANÇAISE SAL.

1730.   According to the Lebanese government, Nabila Yaq'ub Wazni, who was a partner

in Soficom SPRL with Muhammad Hussein Darwish, held two accounts at LCB that migrated to BANQUE LIBANO-FRANÇAISE and another bank after LCB closed the accounts in August and September 2011.

1731.   Defendant BANQUE LIBANO-FRANÇAISE knowingly maintained an account for and provided vital financial services to Metro Trading Company SAL Offshore, a company controlled by senior BAC operative Imad Bakri.

1732.   According to the Lebanese government, Mr. Amine Bzeih belonged to Khalil Nazem Ibrahim's network, and when his account was closed in August 2011, it migrated to three Defendants, including BANQUE LIBANO-FRANÇAISE SAL.

1733.   SOGEAC SPRL, a company part-owned by Muhammad Hussein Darwish, held an account at LCB which was shuttered in August 2011.

1734.   According to the Lebanese government, the account balance migrated to SOGEAC's accounts at Defendants BLOM BANK and BANQUE LIBANO-FRANÇAISE.

1735.   Mustafa Faysal Ahmad was identified by the Lebanese government as one of the individuals with accounts at LCB who were affiliated with Hezbollah.

1736.   LCB closed Mustafa Faysal Ahmad's account no. 173642* at LCB in June 2012.

1737.   Mustafa Faysal Ahmad also held U.S. dollar-denominated account no. 172488* jointly with his mother, May Kamel Darwish Fawaz.

1738.   According to the Lebanese government, that account remained open at Defendant SGBL.

1739.   Yet, despite all the controversy surrounding LCB's role in laundering money for Hezbollah, according to the Lebanese government the balance for this account migrated to BANQUE LIBANO-FRANÇAISE among other Defendants.

1740.   Defendant BANQUE LIBANO-FRANÇAISE's roster of Hezbollah-controlled customers reflects the Bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1741.   Moreover, subsequent to the U.S. government's filing of its civil lawsuit against LCB, U.S. investigators learned that LCB personnel moved assets to other banks in Lebanon to hide the assets from the United States government.

1742.   In August 2012, the Southern District of New York filed an 18 U.S.C. § 981K action against five correspondent banks in the United States that were doing business with Defendant BANQUE LIBANO-FRANÇAISE that had clandestinely received $150 million from LCB after commencement of the U.S. government action against LCB.

1743.   As a result of the 981K action, Defendant BANQUE LIBANO-FRANÇAISE transferred $150 million to the United States Marshals Service account in New York, and in June 2013, the U.S. Attorney's Office for the Southern District of New York settled the civil forfeiture action against LCB, requiring it to forfeit $102 million of the $150 million frozen to the United States.

1744.   As detailed above, Defendant BANQUE LIBANO-FRANÇAISE allowed Nazim Ahmad's network to launder millions of dollars through Defendant BANQUE LIBANO-FRANÇAISE's correspondent banks in New York, and Mr. Ahmad's money laundering activities were prominently noted in the U.S. government's civil complaint against LCB.

1745.   Like all other financial institutions in Lebanon, Defendant BANQUE LIBANO-FRANÇAISE was well aware of the LCB scandal and the forced closure of Hezbollah-related

accounts at LCB but nonetheless agreed to continue providing numerous customers with financial services and access to U.S. dollar-clearing after their accounts at LCB was targeted for closure.

1746.   Finally, according to U.S. government officials, Defendant BANQUE LIBANO-FRANÇAISE was one of several banks in Lebanon that worked with LCB personnel to hide LCB's assets from the United States government following the proceedings the U.S. initiated against that institution.

1747.   In sum, Defendant BANQUE LIBANO-FRANÇAISE fully understands its role in The System, and its roster of customers who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1748.   Thus, there can be no doubt that Defendant BANQUE LIBANO-FRANÇAISE has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant BANQUE LIBANO-FRANÇAISE from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided Defendant BANQUE LIBANO-FRANÇAISE with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

### J.    BANK OF BEIRUT SAL

1749.   Defendant BANK OF BEIRUT has maintained accounts for and provided material support that aided and abetted Hezbollah's BAC.

1750.   Defendant BANK OF BEIRUT maintained an account for Youssef Muhammad

Tajideen and provided material support that aided and abetted Hezbollah, knowing that the Tajideen family were prominent representatives of Hezbollah within The System.

1751.   Defendant BANK OF BEIRUT was aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing Youssef Muhammad Tajideen with financial services and access to U.S. dollar-clearing.

1752.   The same is true for the Tajideen family's company, Galaxy Flame Trading SAL Offshore, which held account no. 43286* at LCB that was closed in August 2011 before migrating to Defendant BANK OF BEIRUT after the forced closure of Hezbollah-related accounts at LCB.

1753.   Leaders of Supply & Products (Offshore) SAL, another Tajideen family company, also held an account at LCB prior to 2011 and maintained accounts at Defendant BANK OF BEIRUT even after the company's account at LCB was closed.

1754.   Defendant BANK OF BEIRUT also maintained an account for Interafrica Trading Company ITC SAL Offshore, part of the group of companies controlled by the Darwish Network.

1755.   Defendant BANK OF BEIRUT also maintained an account for and provided vital financial services to Mustafa Reda Darwish Fawaz (SDGT), a prominent and well-known member of Hezbollah's IJO who has supported the organization's communications, surveillance, and arms dealing activities in West Africa.

1756.   Defendant BANK OF BEIRUT also maintained an account for and provided vital financial services to Compu House SARL, the Hezbollah-controlled technology importer, founded and majority owned by Sultan Khalifa As'ad, Deputy Chairman of the Executive Council for Municipal Affairs, former head of Hezbollah's Finance Unit and former director of Jihad al-Bina.

1757.   Defendant BANK OF BEIRUT also maintained an account for and provided vital financial services to Trust Compass Insurance SAL, the Hezbollah-controlled insurance company

that insures various Hezbollah-controlled hospitals and owned a significant holding in Adham Tabaja's Fun World Company SAL and LCB.

1758.   Defendant BANK OF BEIRUT also maintained an account for and provided vital financial services to Mercury Development Offshore SAL which was controlled by Mustafa Faysal Ahmad and his family. The Lebanese government identified both Mustafa Faysal Ahmad and Mercury Development Offshore SAL's accounts at LCB as Hezbollah-related accounts.

1759.   Defendant BANK OF BEIRUT has also knowingly held accounts and provided vital financial services to Medical Equipments and Drugs International Corporation SAL MEDIC, another entity that is part of Hezbollah's network of pharmaceutical companies. Although the company was established after the period relevant to this action, because it is owned by Atlas Holding SAL – i.e. Martyrs Foundation–Lebanon – Defendant BANK OF BEIRUT's willingness to provide material support to one of Hezbollah's most prominent organizations in recent years confirms that BANK OF BEIRUT continues to provide material support to Hezbollah even when its customers' ties to Hezbollah are glaring.

1760.   Nazim Ahmad used Rilton Traders to launder more than $50,000 U.S. dollars from Belgium through U.S. correspondent banks to the Defendant BANK OF BEIRUT account owned by Hijazi Trading Establishment.

1761.   Defendant BANK OF BEIRUT maintained an account for Halawi Exchange Co., which the U.S. Department of the Treasury has identified as a "substantial threat to the U.S. and international financial systems, given its extensive illicit financial activity on behalf of a variety of international narcotics trafficking and money laundering networks."

1762.   In determining that Halawi Exchange Co. was a foreign financial institution of "primary money laundering concern," the U.S. Department of the Treasury further found that

"Halawi Exchange is known to have laundered profits from drug trafficking and cocaine-related money laundering networks for a leading Hizballah official and narcotics trafficker. Halawi Exchange has also been routinely used by other Hizballah associates as a means to transfer illicit funds."

1763.   Despite Halawi Exchange's blatantly high-risk profile, churning millions of dollars in cash from Africa and moving funds to conflict zones in the Middle East, Defendant BANK OF BEIRUT continued to facilitate its activities.

1764.   According to the Lebanese government, when LCB was forced to close Mr. Hijazi's account at LCB in 2011, the balance migrated to Defendants FENICIA BANK and BANK OF BEIRUT.

1765.   Like all other financial institutions in Lebanon, Defendant BANK OF BEIRUT was well aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing Mr. Samir Hijazi, Mercury Development Offshore SAL, Galaxy Flame Trading SAL Offshore, Leaders of Supply & Products (Offshore) SAL, and others, with financial services and access to U.S. dollar-clearing after their accounts at LCB were targeted for closure.

1766.   Defendant BANK OF BEIRUT also maintained an account for Halawi Exchange a key conduit for Ayman Joumaa's narcotics trafficking network.

1767.   As noted above, Halawi Exchange and other  exchange houses deal in high-volume bulk cash transactions, and they perform a vital gateway function allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, and be deposited into banks like Defendant BANK OF BEIRUT (that exchange the cash for LBP deposits by the Central Bank at high interest rates).

1768.  Within the parameters of The System, Halawi Exchange received lucrative commissions, Defendant BANK OF BEIRUT received high interest returns on the Lebanese public debt it financed and Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1769.  Defendant BANK OF BEIRUT fully understands its role in The System, and its roster of customers who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the Bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1770.  Thus, there can be no doubt that Defendant BANK OF BEIRUT has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant BANK OF BEIRUT from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided Defendant BANK OF BEIRUT with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

### K.     BANK OF BEIRUT AND THE ARAB COUNTRIES SAL

1771.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES maintained accounts for and provided material support that aided and abetted Hezbollah's BAC.

1772.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly maintained accounts (including U.S. dollar-denominated accounts) for and provided vital financial services to the Martyrs Foundation – Lebanon which is Hezbollah-controlled and publicly

affiliated with Hezbollah.

1773.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES has knowingly held accounts and provided vital financial services to Al-Inmaa Engineering and Contracting SARL and Al-Inmaa Group for Touristic Projects SARL, both designated SDGTs and controlled by Adham Tabaja, the co-head of Hezbollah's BAC.

1774.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES provided this assistance to Adham Tabaja's Network knowing – at a minimum – that he was a senior Hezbollah leader and prominent Hezbollah project developer in Lebanon.

1775.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES has held accounts and provided vital financial services to Ovlas Trading SA (SDGT), the Lebanese arm of the Tajideen family network of companies, knowing that the Tajideen family were prominent representatives of Hezbollah within The System.

1776.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held a U.S. dollar-denominated account at its Hamra branch for New Line Exchange Trust Company SAL, the currency exchange company established by Ayman Joumaa, the notorious narcotics trafficker and Hezbollah financier. New Line Exchange Trust Company SAL was designated by the U.S. Treasury Department on January 26, 2011 for its role in laundering narcotics proceeds for Mr. Joumaa's organization. That account has been used to clear U.S. dollars through New York on behalf of New Line Exchange and Ayman Joumaa.

1777.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES held an account for Fayed Exchange Co. – a Lebanese currency exchange house identified by the Lebanese government as belonging to Saleh Ali Assi's network of companies tied to Hezbollah.

1778.   According to the Lebanese government, when Fayed Exchange Co.'s account at

LCB was closed in June 2011, the account balance migrated to the company's existing account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES.

1779.  As noted above, exchange houses like Fayed Exchange Co. deal in high-volume bulk cash transactions, and they perform a vital gateway function allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, and be deposited into banks like Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES (that exchange the cash for LBP deposits by the Central Bank at high interest rates).

1780.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES understood its role and actively agreed to participate in providing Hezbollah a gateway to transit massive infusions of cash (primarily in U.S. dollars) that flow into and through Lebanon.

1781.  Within the parameters of The System, New Line Exchange (SDNTK) and Fayed Exchange received lucrative commissions, Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES received high interest returns on the Lebanese public debt it financed and Hezbollah's BAC received access to the U.S. financial system that allowed it to engaged in trade-based money laundering on an unprecedented scale.

1782.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held accounts and provided vital financial services to Trade Point International SARL, a designated SDGT (2016) controlled by Hezbollah financier and arms dealer, Muhammad Mustafa Nur-al-Din (SDGT).

1783.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held accounts and provided vital financial services to Hyram Maritime SAL, part of the Tajideen family network of companies.

1784.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held

accounts and provided vital financial services to Société Allure SARL, a company controlled by Khalil Nazem Ibrahim.

1785.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held accounts and provided vital financial services to Vatech SARL**,** an SDGT controlled by Fadi Hussein Serhan (also an SDGT).

1786.   Mr. Serhan is a Hezbollah procurement agent who serves as the general manager of Vatech SARL, which was used to purchase sensitive technology and equipment for Hezbollah.

1787.   Mr. Serhan has purchased unmanned aerial vehicles (UAVs) and accessories, and various electronic equipment from companies in the United States, Europe, Asia, and the Middle East.

1788.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held accounts and provided vital financial services to Teltac Worldwide Incorporated (Offshore) SAL, headed by Ali Ibrahim Charara, who serves as its chairman and CEO.

1789.   Ali Ibrahim Charara is also a co-founder of Spectrum Investment Group Holding SAL, the U.S.-designated company led by Hezbollah financier, Ali Youssef Charara (SDGT).

1790.   According to the Lebanese government, when Teltac Worldwide Incorporated (Offshore) SAL's account at LCB was closed in June 2012, the account balance migrated to the company's existing account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES.

1791.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES fully understands its role in The System, and its roster of customers who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the Bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means

to evade U.S. efforts to confront Hezbollah's world-wide operations.

1792.   Thus, there can be no doubt that Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

### L.    JAMMAL TRUST BANK SAL

1793.   Defendant JAMMAL TRUST BANK has maintained an account for and provided vital financial services to the IRSO, an SDGT that it knows to be widely and publicly associated with Hezbollah and its IJO.

1794.   The IRSO has openly advertised and solicited donations published with its JAMMAL TRUST BANK account 140/028355.28/0/5 at its branch in Ghobeiry (Hezbollah's stronghold in the southern suburbs of Beirut).

1795.   As noted above, the IRSO is the most explicit and notorious fundraising arm of Hezbollah's IJO.

1796.   Defendant JAMMAL TRUST BANK has knowingly held an account and provided vital financial services to Car Escort Services (Offshore) SAL, the prominent Hezbollah automotive company which is itself an SDGT and is owned by three prominent members of Hezbollah's BAC, Ali Muhammad Kharrubi, Ali Youssef Charara and Muhammad Ibrahim Bazzi – all designated SDGTs by the U.S. Department of the Treasury.

354

1797.  Defendant JAMMAL TRUST BANK has knowingly held accounts and provided vital financial services to Spectrum International Investment Holding SAL and Spectrum Investment Group Holding SAL—both designated SDGTs and both controlled by well-known Hezbollah financier and BAC leader, Ali Charara.

1798.  Defendant JAMMAL TRUST BANK has knowingly held accounts and provided vital financial services to New All Pharma SARL, part of Hezbollah's network of pharmaceutical companies.

1799.  Defendant JAMMAL TRUST BANK has also knowingly held accounts and provided vital financial services to Medical Equipments and Drugs International Corporation SAL MEDIC, another entity that is part of Hezbollah's network of pharmaceutical companies. Although the company was established after the period relevant to this action, because it is owned by Atlas Holding SAL – i.e. Martyrs Foundation–Lebanon – Defendant JAMMAL TRUST BANK's willingness to provide material support to one of Hezbollah's most prominent organizations in recent years confirms that Defendant JAMMAL TRUST BANK continues to provide material support to Hezbollah even when its customers' ties to it are glaring.

1800.  Defendant JAMMAL TRUST BANK also knowingly held accounts and provided vital financial services to Musa Muhammad Ahmad that received illicit funds in U.S. dollars directed by Nazim Ahmad's network via Rilton Traders in Dubai and Primogems through correspondent banks in the United States.

1801.  In sum, Defendant JAMMAL TRUST BANK fully understands its role in The System, and its roster of customers who are either notorious Hezbollah fundraising institutions or BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the bank's extensive commitment to substantially assist Hezbollah's operations (including – in the case of the

IRSO – explicitly its violent terrorist activities) by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

**M.   FENICIA BANK**

1802.   Defendant FENICIA BANK agreed to participate in The System, maintained accounts for and provided material support that aided and abetted Hezbollah's BAC operatives and companies, and laundered millions of U.S. dollar-denominated funds on Hezbollah's behalf.

1803.   For example, according to the U.S. Department of the Treasury, Defendant FENICIA BANK allowed its Abbassieh branch in Lebanon to facilitate the movement of more than a million dollars in narcotics sales proceeds for Ayman Joumaa and Abbas Hussein Harb.

1804.   In June 2012, Ibrahim Chebli, manager of the Abbassieh branch of FENICIA BANK in Lebanon, was designated an SDNTK by the U.S. Department of the Treasury for facilitating the movement of millions of dollars for (among others) for Ayman Joumaa's narcotics trafficking network.

1805.   According to FinCEN, Mr. Chebli regularly coordinated and executed financial transactions—including bulk cash transfers—that were processed through the Halawi Exchange.

1806.   Nazim Ahmad used Rilton Traders to launder more than $1.4 million in proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (through New York) to the account of Abd al-Ilah Mahmud Ashur in Lebanon. Mr. Ashur is a major shareholder in Defendant FENICIA BANK, and the funds were also deposited in one of his accounts at Defendant FENICIA BANK.

1807.   Nazim Ahmad used Rilton Traders to launder more than $90,000 in proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (through New York) to the FENICIA BANK accounts of Randa Muhammad Malek in Lebanon.[105]

1808.   Defendant FENICIA BANK also knowingly held an account for and provided vital financial services to the Elissa Exchange both before and after it was designated an SDNTK, even accepting deposits moved from LCB *after* that bank was forced to shutter its Hezbollah accounts and cease operations.

1809.   Defendant FENICIA BANK also knowingly held an account for and provided vital financial services to the Phoenicia Shipping Offshore SAL (SDNTK) (owned by Elissa Holding and Ali Muhammad Kharrubi) both before and after it was designated an SDNTK, even accepting deposits moved from LCB *after* that bank was forced to shutter its Hezbollah accounts and cease operations.

1810.   Defendant FENICIA BANK also knowingly held an account for and provided vital financial services to Rmeiti Group SAL Offshore knowing that the Rmeiti Network was a critical bulk cash conduit for laundering narcotics trafficking proceeds on behalf of Hezbollah's BAC.

1811.   Defendant FENICIA BANK also maintained accounts for several of Adham Tabaja's (SDGT) key BAC companies knowing – at a minimum – that Mr. Tabaja was a prominent Hezbollah leader involved in numerous widely-publicized development projects on Hezbollah's behalf, including:

- **Al-Inmaa Engineering and Contracting SARL** (SDGT);

- **City Park SARL**;

---

[105]   Rilton Traders also transferred funds through New York to Isam Abd al-Amir Izz al-Din's account at Defendant FENICA BANK. LCB also maintained account no. 172782* for Isam Abd al-Amir Izz al-Din until it was closed in August 2012.

- **Fun World Company SAL**, whose account at LCB was forcibly closed in August 2011 and its balance split between FENICIA BANK and another non-Defendant bank;

- **Fantasy World SARL**;

- **Al-Taaoun Medical SAL**; and

- **New Land SARL**, whose account at LCB was forcibly closed in December 2011 and its balance split between FENICIA BANK and MIDDLE EAST AND AFRICAN BANK.

1812.   Defendant FENICIA BANK also provided financing to Mr. Tabaja and his network.

1813.   When LCB was forced to close the account for K.I. Group SAL Offshore in June 2011 because of its identification with Hezbollah, the balance in its account at LCB migrated to the company's accounts at Defendants FENICIA BANK, SGBL and another non-Defendant bank.

1814.   Likewise, when LCB was forced to close the accounts of Issawi network companies controlled by the Bdeir family such as Al-Jiyeh for Tourism and Construction SAL and La Voile Sur Mer SARL in September 2011 because of their identification with Hezbollah, the balance in their accounts at LCB migrated to the respective companies' accounts at Defendant FENICIA BANK.

1815.   The same thing happened yet again when LCB was forced to close the account for Hussein Issawi in August 2011 because of his role on Hezbollah's behalf: the Lebanese government concluded that Mr. Issawi's account migrated to FENICIA BANK and another non-Defendant bank.

1816.   According to the Lebanese government, when Said Hassan Fuani's account at LCB was closed in 2011, this member of the Ahmad Clan Conflict Diamond and Money Laundering Network moved his accounts to, among others, Defendant FENICIA BANK.

1817.   According to the Lebanese government, when Samir Hijazi's account at LCB was closed in 2011, this member of the Ahmad Clan Conflict Diamond and Money Laundering Network and Khalil Nazem Ibrahim Network, moved his account to Defendant FENICIA BANK.

1818.   Defendant FENICIA BANK maintained an account for and provided financial services to Kassem Tajideen (SDGT), knowing that he was a prominent and well-known Hezbollah financier.

1819.   Defendant FENICIA BANK also knowingly held an account for and provided vital financial services to Said Jamil Muhammad, who co-founded Aya SAL Offshore with Muhammad Abdallah al-Amin (SDGT).

1820.   According to the Lebanese government, when Said Jamil Muhammad's account at LCB was closed in 2012 (with a large negative balance), he moved his accounts to, among others, Defendant FENICIA BANK.

1821.   Both Ali Ahmad Choueib's (whose mother is a member of the Issawi family) personal account no. 170811* at LCB and the account (no. 174321*) of his Turkish trading company, Golden Eye Trading Ithalat Ihracat Ltd. were identified by Lebanese authorities as Hezbollah-related and closed as part of SGBL's acquisition of LCB. The account balances for both accounts (which are connected to Imad Abdul Reda Bakri's network) migrated to Defendant FENICIA BANK.

1822.   Like all other financial institutions in Lebanon, Defendant FENICIA BANK was well aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing numerous customers with financial services and access to U.S. dollar-clearing after their accounts at LCB was targeted for closure.

1823.   Added to those facts, it is worth repeated that at least two FENICIA BANK board

359

members – Abd al-Ilah Mahmud Ashur  and  Yusuf Abbas Mer'i – received a total of more than

$1.4 million from Nazim Ahmad via Rilton Traders, further manifesting the bank's participation

in the System and its management's direct ties (and benefit) from the BAC money laundering

pipeline.

1824.  In sum, Defendant FENICIA BANK fully understands its role in The System, and

its roster of customers who are either BAC operatives, BAC facilitators or Hezbollah/BAC-

controlled companies (including multiple recipients of Nazim Ahmad's long-standing money

laundering operations) reflects the bank's willingness to substantially assist Hezbollah's

operations by providing financial services, including critical access to U.S. dollar-clearing, the

U.S., and international financial systems, and essential means to evade U.S. efforts to confront

Hezbollah's world-wide operations.

1825.   Thus, there can be no doubt that Defendant FENICIA BANK has known for years

that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute

funds needed to support Hezbollah's operations and that the U.S. government's legal actions

against LCB did not discourage Defendant FENICIA BANK from continuing to engage in this

conduct. On the contrary, the flight of Hezbollah accounts from LCB provided Defendant

FENICIA BANK with an opportunity to gain additional market share in Hezbollah's financial

operations with impunity.

**X.**     **THE IRGC DEPLOYED HEZBOLLAH'S SIGNATURE WEAPONS IN IRAQ**

1826.   One of the first indications that Hezbollah operatives might be present in Iraq after

the U.S.-led invasion came in an article in *The New York Time*s published in November 2003 that

stated:

> Both American and Israeli intelligence have found evidence that Hezbollah
> operatives have established themselves in Iraq, according to current and
> former United States officials. Separately, Arabs in Lebanon and elsewhere

360

who are familiar with the organization say Hezbollah has sent what they describe as a security team of up to 90 members to Iraq. The organization has steered clear of attacks on Americans, the American officials and Arabs familiar with Hezbollah agree.

1827.   The reluctance to attack Americans was short-lived. During the next twelve months, Hezbollah would begin to gradually introduce both weapons and operational training into the Iraqi theatre that roughly corresponded to the U.S. military's effort to improve the armor protection of its vehicles.[106]

1828.   Beginning in late 2004 and into early 2005, the U.S. military began deploying up-armored HMMWVs equipped with one inch of rolled homogeneous armor ("RHA") on all doors and one-inch thick ballistic glass windows that were capable of absorbing and/or deflecting shrapnel from basic (non-technologically advanced) IEDs and small arms fire.

1829.   With the increasing ubiquity of the "up-armored" HMMWVs, improvised roadside bombs became a much less effective weapon against U.S. personnel because their blasts and shrapnel could not penetrate American vehicles' increased armor plating.

1830.   In response, the IRGC–QF directed Hezbollah to begin supplying their proxies with increasing numbers of EFPs that could defeat this newly-introduced American armor.

1831.   An EFP warhead is normally constructed with a 3- to 12-inch diameter steel pipe with one end sealed with a welded steel plate and a priming hole for the insertion of a detonator. The open end of the pipe is then packed with high-energy ("HE") explosive and closed with a copper plate.

1832.   After detonation, the explosion creates enormous pressure that accelerates the liner (copper plate) while simultaneously reshaping it into a molten slug.

---

[106]    When American troops first invaded Iraq in 2003 and occupied Baghdad, generally only the U.S. military police possessed armored vehicles.

1833.   The EFPs Hezbollah deployed in Iraq were generally made with precision manufactured concave copper disk liners and HE explosives, such as Iranian-manufactured C-4, packed behind the liner.

1834.   As with any explosive device, EFPs had to be first armed, then triggered.

1835.   "Arming" an EFP can best be described as transitioning the weapon from a passive or standby mode into an active, or ready mode. Once armed, an EFP is primed to detonate upon the occurrence of a given event.

1836.   That event is known as the "trigger."

1837.   In Iraq, EFPs were usually armed by remote frequency ("RF") or (insulated) command wire ("CW") capable of carrying a low-level electric charge with a maximum range of around 100 meters.

1838.   RF arming could be achieved using something as simple as a key-fob or as complex as a dual-tone multi-function reference board using the inside of a cell phone.

1839.   As noted above, a key signature of Hezbollah's TTP was the use of PIR devices in conjunction with EFPs.

1840.   Once remotely armed, by RF or command wire, an EFP would be triggered when the PIR would, for example, detect the heat signature of a passing vehicle and send an electrical current that set off the explosion within the EFP's casing.

1841.   In essence, passing American military vehicles would themselves trigger the EFPs.

1842.   To defeat Hezbollah's PIR triggers, Coalition Forces developed numerous counter-measures – just as the IDF had some years earlier.

1843.   For example, the American military developed a device named a "Rhino" that consisted of a flat piece of metal at the end of a boom that was attached to the front of the combat

vehicle. The metal was heated by the vehicle's engine, creating a heat signature that simulated the heat of the vehicle. When effective, the Rhino would cause an EFP's PIR trigger to mistake the Rhino for the vehicle itself, resulting in the device's premature detonation.

1844.   Hezbollah, however, had gained extensive experience countering the IDF's tactics and quickly directed its agents in Iraq to recalibrate the aim of their EFPs, angling them backward to account for the recent deployment of heat-generating decoys.

1845.   While such emplacing techniques might appear elemental, in hostile conditions they are far more complex, requiring a keen understanding of average U.S. convoy speeds, the extension lengths of the rhinos, the distance of the EFP from the target, and other battlefield variables.

1846.   To evaluate the problem set presented, make targeting adjustments, and communicate them across the battle space effectively, is enormously challenging, particularly since the Hezbollah-directed cells were subject to surveillance, arrest and targeting.

1847.   Yet, notwithstanding these complexities, with the help and direction of Hezbollah, its local Shi'a terror cells began successfully emplacing EFP arrays at precise angles that countered the Rhinos and resumed inflicting maximum damage to these moving, armored targets.

1848.   In addition to EFPs, the IRGC–QF provided their proxies in Iraq with a variety of other lethal weapons that Hezbollah had previously tested against the IDF in Lebanon.

1849.   During the 1980s and 1990s, Hezbollah frequently deployed 107 millimeter ("mm") and 122mm artillery rockets (frequently referred to as "Katyusha rockets") against IDF positions in southern Lebanon and against Israeli border towns in northern Israel.

1850.   IRGC–QF and Hezbollah proxies in Iraq trained and directed by Hezbollah used these same types of artillery rockets in their indirect fire attacks on U.S. and Coalition Forward

Operating Bases and MNF–I Headquarters in the Green Zone.

1851.   Throughout 2004-2011, Hezbollah continuously adapted and modified tactics to adjust to U.S. Military countermeasures and then instituted those adaptations through the Iraqi terror cells they directed.

## XI.      HEZBOLLAH'S CRITICAL ROLE IN TERRORIST ATTACKS IN IRAQ

1852.   Initially, the Hussein government sponsored the late Ayatollah Muhammad Sadiq al-Ṣadr, a leading Shi'a cleric in Iraq during much of Saddam Hussein's rule, as a relatively moderate counterbalance to the influence of more radical Shi'a religious leaders. The Hussein regime allowed Sadiq al-Sadr to appoint imams to lead mosques in hundreds of towns and cities.

1853.   Sadiq al-Sadr used this opportunity to develop a cohesive network under his guidance and control. He was particularly popular in the Shi'a slums of Baghdad and Basra and had established a network of mosques and social institutions that attempted to mirror Hezbollah's development in Lebanon.

1854.   Unlike many of his Shi'a clerical peers, Mr. Sadr was not particularly favorably disposed toward Iran, even after the Islamic revolution in 1979, remaining instead an Arab nationalist and supporting Arab control of the seminaries of Najaf, traditionally dominated by senior clerics who are either Iranian-born or of Iranian descent.

1855.   Nonetheless, the Hussein regime ultimately came to regard Sadr as a political threat and assassinated him and his two oldest sons, leaving his youngest son, Muqtada al-Sadr, as the de facto successor to what became known as the Sadrist Movement.

1856.   The Sadrist Movement commanded the loyalty of perhaps millions of Iraqi Shi'a, but under the Hussein regime's rule it had no military capacity; it was almost exclusively a social and political movement.

1857.   The 2003 U.S.-led invasion freed Muqtada al-Sadr and his followers from the

constraints placed on them by the Hussein regime, and the young Sadr set his sights on becoming the preeminent leader of Iraq's Shi'a community.

1858.   At the invitation of Iran's Supreme Leader, Ayatollah Khamenei, Mr. Sadr and his key deputies were formally received in Iran in June 2003, shortly after the U.S. invasion.

1859.   General Abdul Reza Shahlai—a deputy commander of the IRGC–QF—served as the "chief of protocol" for the visit and Qasem Soleimani, IRGC–QF Commander, served as host to the Sadr delegation.

1860.   Sadr also met with Ayatollah Khamenei during the visit and received assurances from General Shahlai that the IRGC–QF wanted to financially support the Sadrist movement.

1861.   Shortly thereafter, the IRGC dispatched two of Hezbollah's most senior terror operatives, Imad Mughniyah and Mustafa Badr al-Din, to help organize and birth the creation of the Sadrist Movement's armed faction.

1862.   On July 18, 2003, Sadr gave a sermon in the Great Mosque in Kufa in which he branded the newly-formed Iraqi government "nonbelievers" and announced the formation of a religious army to counter the government called "Jaysh al-Mahdi" or "JAM" – the Mahdi Army.

1863.   Hezbollah operatives were present on the ground in Iraq following the U.S. invasion in 2003 and were directly involved in providing training and support to JAM from its inception.

1864.   JAM featured several attractive assets for Iran and Hezbollah, including a strong base of support among the poorest and most disenfranchised Shi'a communities, a network of mosques and social institutions, and a vast supply of young, desperate men. However, it was an unruly and unprofessional organization ill-suited to confronting an advanced military in the way Hezbollah had successfully attacked the IDF.

1865.   Imad Mughniyah and Mustafa Badr al-Din worked closely both with Sadr and his associates and the Iranian-sponsored Badr Corps (made up of Iraqi Shi'a who opposed the Hussein regime during the 1980–1988 Iran-Iraq War), but Hezbollah remained cautious and did not encourage either Badr or JAM to immediately confront Coalition Forces.

1866.   As former Badr Corps leader and Special Group Kata'ib Hezbollah ("KH") (discussed below) founder Abu Mahdi al-Muhandis (discussed below) would later explain to the Hezbollah-affiliated channel *Al-Mayadeen*:

> **Al-Muhandis**: Of course, my relationship with martyr Imad, the great martyr Imad [Mughniyah], and martyr Mustafa Badr a-Din, started in the early 1980s. This was a strong and operational relationship. The first ones to train the first Iraqi jihadi resistance groups in the beginning of the 1980s were Imad and Mustafa. They also had a major role in organizing the resistance cells against the Americans in Iraq.
>
> **Host**: Training Iraqis here, to fight the Americans?
>
> **Al-Muhandis**: Sure, they trained Iraqis. The first Iraqi cells, I was among them, after 2003.
>
> **Host**: After 2003…
>
> **Al-Muhandis**: They had a major role; their brothers and men still have an essential role in training and planning… they have a very important role.

1867.   The same al-Muhandis was the mastermind behind the 1983 Kuwait bombings, and later became the founder of KH in Iraq and an advisor to Qasem Soleimani, the commander of the IRGC–QF. Mustafa Badr al-Din, one of Hezbollah's leading bomb-makers at the time, was arrested by Kuwait after the attacks and convicted for his role in the bombings. He later became a leading figure in Hezbollah after his escape from a Kuwaiti prison.

1868.   As previously noted, in 2008, Imad Mughniyah was killed in Syria.

1869.   Ten years after his death, several of his former protégés gathered at an elaborate ceremony to pay tribute to him and extol his contributions to the terror campaign he helped launch in Iraq.

1870.   At an event commemorating the anniversary of his death, on February 23, 2018, several Iraqi Shi'a notables spoke, including Abu Mahdi al-Muhandis, who declared: "The martyr Mughniyah is still present in all fields of confrontation as [part of] a jihadist school that terrorized the enemies...."

1871.   Qais Khazali (discussed below), also in attendance, asserted that: "The pillars of the Islamic Resistance that took place in Iraq were the fruit of the martyr Mughniyah."

1872.   He went on to say:

> I got to know him in 2003 or 2004. At that time when I met him, I didn't know that he is Imad Mughniyeh. I only knew him as "Haj Radwan."  Imad Mughniyah was the person behind the Iraqi Resistance against the American occupation of Iraq. The first generation of the commanders of the Resistance were the product of the Mughniyah's training.

1873.   Although Mughniyah was a key figure in Hezbollah's operational activities in Iraq, its political and diplomatic role in guiding Iraqi Shi'a factions was of equal, if not greater, importance.

1874.   For this purpose, Hezbollah tapped a senior member of its Political Council, Muhammad Kawtharani, to be responsible for the organization's Iraq portfolio. As the U.S. Department of the Treasury noted when it designated him an SDGT on August 22, 2013, Mr. Kawtharani was:

> [T]he individual in charge of Hizballah's Iraq activities, Kawtharani has worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups.

1875.   Mr. Kawtharani was an inspired choice because he not only previously lived in Iraq

but had also been a pupil of Ayatollah Muhammad Sadiq al-Ṣadr.

1876.   Mr. Kawtharani wasted no time in contacting one of Sadr's most trusted deputies, Mustafa al-Yaqubi, soon after (and possibly before) the overthrow of the Saddam Hussein regime by Coalition Forces in 2003.

1877.   Mustafa al-Yaqubi had frequent contact with Mr. Kawtharani through the years and appears to have served as a primary channel for communications between Hezbollah and Sadr and his JAM militia.

1878.   From June 2003 through August 2004, at Iran's direction, Hezbollah's role was primarily to organize and train JAM gunmen and try to instill some discipline and professionalism into the organization so that it could effectively threaten U.S. and Coalition Forces across Iraq. Due to its conflict with Israel in Lebanon, Hezbollah possessed hard-earned specialized knowledge on how to deploy new tactical and technological countermeasures against a modern army.

1879.   Hezbollah was the obvious and natural choice for implementing the IRGC's policies in Iraq.

1880.   First, Hezbollah operatives were, like the Iraqi Sadrists, ethnically Arabs and spoke Arabic, whereas the Iranian IRGC members were ethnically Persian and spoke Farsi.

1881.   Second, there were many long-standing personal and intellectual connections between Hezbollah and the Sadrist Movement.

1882.   According to a 2007 Multi-National Forces – Iraq ("MNF–I") report, "members of the Sadr movement have deep respect for Lebanese Hezbollah…. Hezbollah sends trainers to Iran to train Iraqi fighters on EFPs."

1883.   For instance, Muqtada al-Sadr's father-in-law was Grand Ayatollah Muhammad Baqir al-Sadr, who was a contemporary of Hezbollah's spiritual leader, Muhammad Fadlallah.

1884.   Hezbollah's leader, Hassan Nasrallah, received his religious education in Lebanon from a seminary that taught Baqir al-Sadr's teachings on Shi'ism.

1885.   Despite the affinity between Hezbollah and the leaders of the Sadrist Movement, when Hezbollah slowly began to introduce EFPs into Iraq in small numbers at the IRGC's direction (during the late autumn of 2003 and into the first half of 2004), it did so through Iran's other, more established proxy, the Badr Corps.

1886.   Unlike JAM, the Badr Corps had prior (and extensive) military training from, and its operatives had long-standing operational ties to, both the IRGC–QF and Hezbollah.[107]

1887.   Most notable among the Badr Corps cells was the so-called "Sheibani Network" named after Hamid A'atabi al-Sheibani, also known as Abu Mustafa al-Sheibani.

1888.   Accordingly, when Hezbollah introduced its most effective anti-armor weapon into Iraq, it began by training Badr Corp operatives on the emplacement of single EFPs with relatively primitive initiation systems—a process that allowed Hezbollah to test the weapons, assess the capabilities of its Iraqi proxies, and probe Coalition Forces' responses to the threat.

1889.   According to the Chilcot Report released by the British Government, "[t]he first IED attack in Iraq using an Explosively Formed Projectile (EFP) took place against a UK Warrior vehicle in al-Amara in May 2004."

1890.   By this method of slowly introducing the weapon system and directing its use against British forces, Hezbollah was able to assess the capabilities of the Badr Corp personnel, assess the effectiveness of its tactics, techniques, and procedures and adjust those TTPs based on how first British (and later American) forces responded.

---

[107]     The Badr Corps had long established four geographic commands inside Iraq, all with experience conducting attacks against the Hussein regime. The Baghdad-based command was supervised from an IRGC base in nearby Bakhtaran, Iran by Abu Mustafa al-Sheibani, whose extensive smuggling routes were used both before and after the 2003 U.S.-led invasion for transporting weapons, men and money from Iran into Iraq.

1891.   A July 2004 UK Joint Intelligence Committee ("JIC") assessment noted: "We also judge that Lebanese Hizballah will retain an influence in Iraq (Hizballah members may have been linked to the group that attacked the Sheraton Hotel) and could supply Iraqi groups with terrorist expertise and munitions."

1892.   The concern was well-founded.

1893.   On August 3, 2004, the UK Defence Intelligence Staff ("DIS") accurately predicted the evolution of the IED threat in Iraq: "IED technology in use with other Middle Eastern groups [,] especially Lebanese Hizballah, can be expected to appear in Iraq. This would include multiple systems, such as RC (Radio-Controlled) switched PIRs [Passive Infrared]."

1894.   By the summer of 2004, British intelligence had detected the EFP's appearance in southern Iraq:

> On 26 July, the DIS reported that an EFP IED had been found on 15 July in Baghdad. The DIS noted that the EFP IED design had not previously been encountered in Iraq but was, as with the find in May 2004, of a type associated with Lebanese Hizballah. There were also indications of Iranian involvement in the construction of the devices.

1895.   On December 2, 2004, a British Defence Intelligence Report titled "The Evolution of the IED Threat in Iraq" stated:

> Improvement in IED technology has been most significant in Shia areas since May [20]04, where technical progress has been made that we assess could only have been achieved through focused external assistance. *We assess that this may be due to an influx of Lebanese Hezbollah IED technology under Iranian sponsorship.* (Emphasis added.)

1896.   Similarly, the United States Department of State Country Reports on Terrorism 2006 noted:

> Since at least 2004, Hizballah has provided training and logistics to select Iraqi Shia militants, including for the construction and use of shaped charge IEDs, which Hizballah developed against Israeli forces in southern Lebanon during the late 1990s and which can penetrate heavily armored vehicles.

370

1897. At the same time, it was supplying the Badr Corp with the initial training and direction to launch EFP attacks against Coalition Forces, Hezbollah also provided training and logistical support to JAM, but did not initially furnish JAM operatives with EFPs.

1898. A Sadrist uprising led by armed JAM forces in August 2004 in the Shi'a holy city of Najaf would soon change the direction of the conflict.

1899. In Najaf in August, JAM forces launched an uprising and soon confronted U.S. Marines, other U.S. Army units, and their tactical air support.

1900. As a result, JAM suffered significant casualties.

1901. Over the course of approximately three weeks, the U.S. military lost nine soldiers and Marines.

1902. By contrast, an estimated 1,500 JAM fighters were killed and an undetermined number, most likely in the thousands, were wounded.

1903. IRGC–QF personnel were present during the bloodshed and carefully observed the fighting.

1904. The lesson from the uprising was clear—JAM members were too disorganized and undisciplined to cause any serious harm to Coalition Forces. Thus, shortly after the uprising in Najaf was brought under control, Muqtada al-Sadr authorized his deputies to create what became known as the "Special Groups" to be supported and trained by Hezbollah and funded and controlled by the IRGC.

1905. Mr. Sadr's key deputies wanted to be able to deploy more professional (and lethal) forces that could successfully attack Coalition Forces in Iraq while his "regular" JAM militia concentrated on ethnic cleansing and kidnapping Sunnis as well as its traditional criminal enterprises.

1906.  Initially, the Special Groups functioned essentially as regional commands under the overall leadership of Muqtada al-Sadr's senior deputies, including Qais al-Khazali and Akram al-Kaabi (a/k/a Akram Abbas al-Kabi).

1907.  As the U.S. military later noted:

> When Special Groups were formed, [Qais Khazali] and Akram al-Kabi were named the general supervisors, or members of the Ishraf Committee (Ishraf means oversight and supervision). Qais and Layth [Qais' brother] were directly involved with Special Groups, and in this position, they would negotiate and procure weapons and IEDs from Iran and distribute them to JAM.

1908.  Predictably, the IRGC and Hezbollah saw these newly formed Special Groups (which they helped create and organize) as an opportunity to intensify Iran's control over JAM's terror apparatus.

1909.  From the initial formation of JAM's Special Groups in 2004 through much of 2006, the IRGC used Hezbollah to train and direct Special Groups cells to target Coalition Forces.

1910.  This was confirmed by Akram Kaabi himself during a January 1, 2019 interview on Al-Nujaba TV, a channel operated by Al-Nujaba, an Iranian-backed Shi'a group formed in 2013 as an outgrowth of Special Group Asa'ib Ahl al-Haq ("AAH") (discussed below) and designated (together with Kaabi) as an SDGT on March 5, 2019.

1911.  During the interview, Kaabi stated that:

> After [the 2004 Battle of Najaf], we realized that we needed a new method, especially since the brothers from Hezbollah and from the IRGC helped us in that battle in Najaf. Even in Sadr City, there were Iranian consultants. There was an IRGC officer called Abu Ali, who was originally from Ahwaz and spoke fluent Arabic. He was with us in Najaf, and he helped us with the battle management and provided much-needed basic and important advice.

1912.  He went on to say:

> Our chief engineer in Najaf, Dr. Jassem Al-Abadi, who was martyred, was among the first to be trained by that brother from Hizbullah and by the brothers from the IRGC. So, we realized that if we acquired more

capabilities, things would improve. Our morale was high. Our mujahideen were ready to make sacrifices. So, we decided to take this path and acquire a lot of expertise. So, we developed our relationship with the brothers in Hizbullah and the IRGC. Both Hizbullah and the IRGC were open with us about everything...

1913. Kaabi was also explicit about the degree to which his exploits in Iraq were directed

and coordinated with Hezbollah's senior leadership:

After the battle of Najaf, I traveled by land to Syria and then to Lebanon, and I met Hassan Nasrallah for the first time. The brothers [in Hizbullah] did not keep any secrets from us. They were forthcoming with their years of experience. They summarized this experience and presented it to us in full detail and this, indeed, led to a significant change in our resistance on the ground.

The late Imad Mughniyah participated in my meeting [with Nasrallah]. Nasrallah and Mughniyah asked me to debrief them about the battle of Najaf – the events, and the deployment of the forces and the vehicles. Mughniyah even asked me to present everything on a blackboard so that they would get a feel for what had happened on the ground. So, I reviewed all the details. Nasrallah was... Obviously, all this happened in the second meeting. The first meeting was an official introductory meeting. Then, since I was still in Lebanon, the second meeting was held. Both Nasrallah and Mughniyah sympathized with us. Both said that they had tried to contact us many times prior to the events in Najaf and that had they succeeded we would have been able to accomplish greater victories, and to change the balance of power significantly. But they said that this was the will of the Lord and that Hezbollah will not deny us anything. They said: 'All of our capabilities and expertise are at your disposal.'

1914. Perhaps most notable, the interview specifically discussed the role of EFPs in

targeting American forces in Iraq:

At first, we used old anti-aircraft missiles to manufacture IEDs. They would cause a large explosion, with a loud noise and lots of smoke, but they had little effect on the heavily armored [American] vehicles. Penetrating this armor was no easy task.

But later, our IEDs improved. We started using explosively formed penetrators. These charges would not cause a lot of smoke or a loud explosion, but they would penetrate the armor of the tanks through a certain hole. They would explode inside the tank, destroying it and killing everyone inside.

1915.   Kaabi's narrative broadly confirms the intelligence assessment publicly disclosed over the past few years. In sum, the IRGC–QF instructed Hezbollah to create "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist cells targeting MNF–I.

1916.   Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's behest.

1917.   Unit 3800 trained, advised and directed the JAM "Special Groups" and Badr Corps in Iraq as Kaabi described.

1918.   Hezbollah also trained Special Groups and Badr Corps operatives at training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations were critical to the IRGC's operations in Iraq between 2003 and 2011.

1919.   By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naqib announced the arrest of eighteen Lebanese Hezbollah operatives on terrorism charges.

1920.   On October 10, 2005, the British Broadcasting Company (BBC) reported that:

> An armour-piercing version of the bomb - blamed for the deaths of eight British soldiers this year - marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this. (Emphasis added.)

1921.   The UK's *Belfast Telegraph* reported in 2007 that Muqtada al-Sadr publicly acknowledged his organization's coordination with Hezbollah:

> Speaking in Tufa in Iraq, Muqtada al-Sadr, the head of the Mehdi Army, admitted to 'formal links' with Hizbollah. 'We have formal links with Hizbollah, we do exchange ideas and discuss the situation facing Shiites in both countries,' he said. 'It is natural that we would want to improve ourselves by learning from each other. We copy Hizbollah in the way they fight and their tactics, we teach each other, and we are getting better through this.'

1922.   From September 2004 to late 2005, these newly-formed Special Groups conducted

low-intensity operations against the British and U.S. militaries, launching increasing numbers of

EFP attacks but mostly training in Iran and Lebanon with Hezbollah and the IRGC–QF, developing

their TTPs and preparing for the next round of conflict.[108]

1923.   As Special Groups operatives detained by Coalition Forces later explained, only

Hezbollah instructors taught Special Groups operatives the "Engineers Course" that focused on

constructing and employing EFPs.

1924.   Not every Iraqi Special Group operative received this training. One detainee

reported that "Engineers are special and have to be smart. If you are not smart no one will waste

the time and expenses to send you to Iran to train to be an engineer because you will fail."

1925.   Hezbollah also trained these "Engineers" on how to incorporate EFPs into the

tactical design of ambushing MNF–I convoys, principally to kidnap U.S. and Coalition soldiers.

The tactics for a kidnapping-ambush using EFPs closely resembled the tactics Hezbollah

developed in attempting to kidnap IDF soldiers in southern Lebanon.

1926.   One MNF–I interrogation of a Detainee revealed the extensive training he and other

Iraqi operatives received from the IRGC–QF and Hezbollah for attacking MNF–I convoys with

EFPs and other weapons:

> During one of [Detainee]'s training sessions, his group was instructed on
> techniques involving the attack of military convoys and abduction of
> POWs. Upon the arrival of a four-vehicle convoy, EFP's would be
> emplaced to disable the first three vehicles in a convoy. The attackers, who
> are hiding on one side of the road from an unidentified distance away, would
> successively fire upon the fourth vehicle with shoulder-fired missiles.
> Amidst the attack, two small groups of individuals would alternatively

---

[108]    EFPs were provided by the IRGC for the *exclusive* purpose of targeting Coalition Forces, and Hezbollah's advanced training was provided exclusively to assist Special Groups to improve their emplacement of EFPs against United States and British armored vehicles. On rare occasions certain elements defied this directive. For example, EFPs were used in the assassinations of two provincial governors and two provincial police chiefs in the latter half of 2006. The U.S. military assessed that these events were contrary to IRGC policy.

bound from the hidden area away from the road to the fourth vehicle while firing upon the fourth vehicle using small arms. The alternatively bounding small groups would advance to the vehicle, pull out any individual who is still living, and bring the individual back to an area where the attackers' own convoy of vehicles is waiting. In order to prevent a quick reaction force from arriving to aid the disabled convoys, a simultaneous mortar attack would be planned on a nearby military base. The simultaneous mortar attack would be followed through to keep the quick reaction force at the nearby base busy. Another way to prevent assistance from a quick reaction force would be to emplace more EFPs at a further distance down the same planned route as the military convoy.

1927.   An attack combining an EFP and other methods of attacking a convoy is called a "complex attack."

1928.   By 2007, MNF–I officials were reporting carefully planned, complex ambushes and retaliatory attacks on United States forces that included direct assaults on U.S. military outposts, ambushes in which American troops were captured, and complex attacks that used multiple weapons to strike more than one U.S. military target.

1929.   As Qais Khazali would later explain to his interrogators: "EFPs still come solely from Iran and there is currently nobody in Iraq manufacturing the components of an EFP."

1930.   Hezbollah and the IRGC–QF also introduced their proxies to the use of 107mm and 122mm artillery rockets (which Hezbollah had previously deployed in large numbers against the IDF in southern Lebanon and against Israeli border towns in northern Israel).

1931.   Both JAM and the Special Groups used these same types of rockets in their indirect fire attacks on U.S. and Coalition Forward Operating Bases and MNF–I Headquarters in the Green Zone.

1932.   The IRGC also supplied JAM and JAM Special Groups with 240mm rockets (also known as the Fadjr-3) developed by the Shahid Bagheri Industries division of the Aerospace Industries Organization of Iran ("AIO").

376

1933.   Not only did the IRGC supply these weapons to both Hezbollah and (later) its Iraqi Shi'a proxies (including the Special Groups), but Hezbollah's TTP in the use of these weapons was also transferred to JAM and JAM Special Groups.

1934.   During a July 2, 2007 press briefing, U.S. Brigadier General Kevin J. Bergner noted that Special Groups were trained in Iran by Hezbollah instructors in a four-week long course that was titled "Artillery."

1935.   According to General Bergner, U.S. intelligence concluded that: "This course teaches the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets."

1936.   In May 2006, senior Hezbollah commander Ali Mussa Daqduq traveled to Tehran with Youssef Hashim, a fellow Hezbollah operative and senior supervisor of Hezbollah operations in Iraq.

1937.   There they met with the Commander and Deputy Commander of the IRGC–QF Special External Operations.

1938.   Mr. Daqduq was directed to return to Iraq and report on the training and operations of the Special Groups and provide assessments on their training in mortars and rockets, use of IEDs and kidnapping operations.

1939.   General Shahlai—the aforementioned deputy commander in the IRGC–QF who met with Messrs. Daqduq and Hashim—served as the case officer or supervisor of the Special Groups.

1940.   The United States later designated General Shahlai in September 2008 "for threatening the peace and stability of Iraq and the Government of Iraq." The U.S. Department of

the Treasury further found that General Shahlai supplied weapons and training to the Iraqi Special

Groups:

> In late-August 2006, Shahlai provided material support to JAM Special Groups by supplying JAM Special Groups members with 122mm grad rockets, 240mm rockets, 107mm Katyushas, RPG-7s, 81mms, 60mm mortars, and a large quantity of C-4.

> Shahlai also approved and coordinated the training of JAM Special Groups. As of May 2007, Shahlai served as the final approving and coordinating authority for all Iran-based Lebanese Hizballah training for JAM Special Groups to fight Coalition Forces in Iraq. In late-August 2006, Shahlai instructed a senior Lebanese Hizballah official to coordinate anti-aircraft rocket training for JAM Special Groups.

1941. The United States Department of State Country Reports on Terrorism 2006 noted

that Iran provided guidance and training to Iraqi Special Groups for carrying out attacks against

MNF–I and Coalition Forces:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (Emphasis added.)

1942. The Australian government reported in 2006 that Hezbollah, along with the IRGC–

QF, was committing attacks in Iraq through insurgent groups it developed:

> Hizballah has established an insurgent capability in Iraq, engaging in assassinations, kidnappings and bombings. The Hizballah units have been set up with the encouragement and resources of Iran's Revolutionary Guards al-Qods Brigades. Hizballah has also established a special training cell known as Unit 3800 (previously known as Unit 2800) specifically to train Shia fighters prior to action in Iraq.

1943. In July 2007, General Bergner briefed the media on how the IRGC–QF used

Hezbollah operatives in Iraq: "Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups…. Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq."

1944.   Bergner further noted that: "The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms -- including explosively formed penetrators, the deadliest form of improvised explosive device -- and funding from Iran. They also have received planning help and orders from Iran."

1945.   In October 2007, the U.S. Department of the Treasury designated the IRGC–QF[109] an SDGT finding:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

1946.   The U.S. State Department's 2007 Country Reports on Terrorism stated that the IRGC–QF and Hezbollah provided Iraqi Special Groups with the tools necessary to carry out attacks against armored Coalition vehicles:

> The [IRGC–QF] continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed

---

[109]   In October 2017, the U.S. government designated the IRGC itself an SDGT "for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, the IRGC–QF."

thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devises (IEDs) and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

1947. The U.S. State Department's 2008 Country Reports on Terrorism noted that Iran and Hezbollah continued attacks on MNF–I and Coalition Forces through their Iraqi proxies by:

> Provid[ing] lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was […] providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, *in concert with Lebanese Hezbollah,* provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. (Emphasis added.)

1948. Ali Mussa Daqduq conducted multiple visits to Iraq to undertake training needs assessments, survey the operational environment, and obtain feedback from Special Groups members in Iraq on their needs.

1949. This was intended to ensure that the training being designed and staffed by Hezbollah instructors would provide the greatest benefit to their students.

1950. In addition, Mr. Daqduq's assessments provided informed feedback to the IRGC–QF logisticians on the armaments the Special Groups fighters needed to meet their needs and improve their operational performance.

1951. Hezbollah's coordination with the IRGC–QF in support of Special Groups came into stark relief on January 20, 2007 when a team of approximately twelve AAH gunmen, disguised as U.S. soldiers, entered the Provincial Joint Coordination Center ("PJCC") in Karbala,

where U.S. soldiers were conducting a meeting with local officials.

1952.   Two months later, in March 2007, Coalition Special Forces captured Mr. Qais al-Khazali, his brother Mr. Layth al-Khazali, and Mr. Daqduq in Basra.

1953.   The documents, computers and media recovered from the target site as well as the subsequent interrogations of these men significantly supplemented the U.S. military's understanding of Hezbollah's operational role in Iraq and the IRGC–QF's central role in supporting and enabling the Special Groups.

1954.   Mr. Khazali later described Mr. Daqduq as the "designer of the Special Groups."[110]

1955.   MNF–I's exploitation of a computer that was captured during the 2007 raid revealed contents that confirmed the training and evaluation role that Mr. Daqduq performed. MNF–I described the contents as follows:

> Documents seized include: spreadsheets detailing weapons and targets, step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks, including, for example; an ambush and IED attack on a MNF convoy in Karbala resulting in 4 X MNF KIA; an IED attack on a British patrol which destroyed two Land Rovers and killed the occupants; and a sniper attack on a British patrol which killed a British soldier.

1956.   According to U.S. intelligence estimates following Mr. Daqduq's 2007 arrest, the IRGC–QF provided Hezbollah and Mr. Daqduq up to $3 million in U.S. currency every *month* to run Special Groups in Iraq.

1957.   On January 9, 2008, the U.S. Department of the Treasury designated several individuals and entities "for threatening the peace and stability of Iraq and the Government of Iraq."

---

[110]   Ali Mussa Daqduq was held in U.S. detention until November 2011 with the goal to continue to hold him in U.S. custody. The Iraqi government denied the request, and he was transferred to Iraqi custody on December 18, 2011. The charges that the U.S. had brought against him were summarily rejected by an Iraqi Court in May 2012 as lacking evidence, and he was released from confinement, later returning to Lebanon.

1958.   These individuals included Ahmad Foruzandeh, a Brigadier General in the IRGC–QF.

1959.   According to the U.S. Department of the Treasury, Mr. Foruzandeh was directly involved in terrorist operations targeting MNF–I and Coalition Forces in Iraq:

> As of mid-February 2007, Foruzandeh ordered his Iranian intelligence officers to continue targeting Shia and Sunnis to further sectarian violence within Iraq. Foruzandeh is also responsible for planning training courses in Iran for Iraqi militias, including Sayyid al-Shuhada and Iraqi Hizballah [KH], to increase their ability to combat Coalition Forces. The training includes courses in guerilla warfare, light arms, marksmanship, planting improvised explosive devices (IEDs), and firing anti-aircraft missiles.

1960.   At the same time, the U.S. Department of the Treasury designated Abu Mustafa al-Sheibani for his role as the leader of the Sheibani Network, noting:

> The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.

> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

1961.   A 2010 Department of Defense report confirmed that weapons Iran delivered to its proxy militias in Iraq included EFPs (with radio-controlled, remote arming and passive infrared detonators), IEDs, anti-aircraft weapons, mortars, 107 and 122mm rockets, rocket-propelled grenades and launchers, explosives, and small arms.

1962.   The report also noted that "Lebanese Hizballah provides insurgents with the training, tactics and technology to conduct kidnappings, small unit tactical operations and employ sophisticated IEDs."

## XII.   HEZBOLLAH'S AND THE IRGC'S AGENTS & PROXIES IN IRAQ

### A.   THE BADR CORPS (a/k/a BADR ORGANIZATION)

1963.   The Badr Corps was established in 1982 as the military wing of the Supreme Council for Islamic Revolution in Iraq ("SCIRI"), which was founded by Muhammad Baqr Hakim in Iran in 1982 during the Iran-Iraq War.

1964.   From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

1965.   Like Hezbollah, the Badr Corps established clandestine offices in various businesses and social organizations in Iraq.

1966.   The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

1967.   Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF in conducting operations against Saddam Hussein's government.

1968.   The Badr Corps received training and weapons from the IRGC and Hezbollah.

1969.   Following the toppling of the Hussein regime in 2003, the IRGC saw an immediate opportunity to repatriate Muhammad Baqr Hakim into Iraq and carefully cultivate his party's growth within the new post-war political framework being developed by the Coalition Forces, while simultaneously slipping thousands of Badr Corp fighters back across the border.

1970.   After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr

Organization, and many of its operatives joined the newly formed Iraqi security forces.

1971.   Published reports indicate that thousands of members of the Badr Organization remained on the IRGC–QF payroll after 2004.

1972.   Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to IRGC proxies in Iraq from 2004 through 2011, including the previously-mentioned Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs and orchestrator of hundreds of attacks against Coalition Forces in Iraq, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a/k/a "The Engineer"), who later led Kata'ib Hezbollah (discussed further below).

1973.   The IRGC–QF's Ramazan Corps, led by General Abdul Reza Shahlai was in charge of supporting Hezbollah-trained terror cells in Iraq and remains the largest Qods Force command outside of Iran. It coordinated, armed and directed the Badr Organization.

1974.   Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament through its political wing SCIRI, it also played a significant role in facilitating Special Groups operations in Iraq.

1975.   Several senior Special Groups commanders such as Mr. al-Muhandis are, or were, Badr Organization personnel.

1976.   After 2003, the Badr Organization inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Iraqi Ministry of Interior intelligence structure and key special forces and Iraqi Army units).

1977.   This infiltration of Iraqi police, intelligence, and military units not only assisted in Badr Organization's efforts to murder former Hussein regime leaders and pursue ethnic cleansing of Sunni neighborhoods, but also made it possible for Badr Organization operatives to regularly

tip-off Special Groups' operatives of Coalition Forces' activities and provided Badr Organization's own terror cells with targeting guidance.

**B.    ASA'IB AHL AL–HAQ ("AAH" OR THE "LEAGUE OF THE RIGHTEOUS")**

1978.   The Asa'ib Ahl Al–Haq ("AAH" or the "League of the Righteous") terrorist organization was a Special Group that was advised, supported and directed by Hezbollah and funded and armed by the IRGC–QF.

1979.   It conducted numerous attacks on Iraqi Security Forces and Coalition Forces, particularly on American targets.

1980.   AAH was originally established by senior JAM commander and later MNF–I detainee, Qais al-Khazali.

1981.   Qais Khazali was a pupil of Muqtada al-Sadr's father and later one of Muqtada al-Sadr's senior deputies. But he also maintained an uneasy rivalry with the younger al-Sadr that occasionally devolved into open hostilities.

1982.   Mr. Khazali had accompanied Mr. Sadr to Tehran in 2003, and he maintained contact with senior IRGC–QF leadership when he assumed control of Special Groups cells after 2004.

1983.   According to a report by the U.S. military:

In August 2006 MAS (Muqtada al-Sadr) asked [Qais al-Khazali] to lead a delegation to Tehran to discuss the situation in Iraq and Iranian support for JAM (Jaysh al-Mahdi (JAM) Militia subordinate to Muqtada al-Sadr). According to reporting, Ali Khamenei (Sayyid Ali Hosseini Khamenei was then and is still now the Supreme Leader of Iran) met with [Qais al-Khazali] and recruited him to lead a special group known as Asayb Al–Haq, or the K2 network. The K2 network would operate with the knowledge or authorization of MAS. [Qais al-Khazali] agreed. Iran was interested in working with [Qais al-Khazali] because of his influence on MAS. Layth (al-Khazali's brother, captured with him on 20 March 2007 in Basra, served as the Operations Chief for Asayb Al–Haq) and as a liaison between the secret network formed by Qayis and the Iranians. In his position, Layth travelled

frequently between Iraq, Iran and Syria.

1984.   Mr. Qais al-Khazali and his brother Mr. Layth al–Khazali returned to Iraq, requisitioned the most experienced and capable fighters from Mr. Sadr's JAM terror cells and formed AAH.

1985.   At first, AAH appears to have remained within JAM's orbit.

1986.   At its inception, AAH was a Hezbollah-directed and IRGC-supplied cluster of terror cells that owed fealty to Mr. Sadr. Over time, it became a more cohesive entity that grew more independent of Mr. Sadr (even ceremonially). This evolution was the product of assessments made by senior Hezbollah commanders, including Mr. Daqduq, who had travelled to Iraq at the IRGC–QF's behest to evaluate the training, organization and effectiveness of the Special Groups.

1987.   Hezbollah identified Messrs. Qais Khazali and Akram Kaabi as among the more capable JAM commanders, cultivated them, and ultimately recruited them to serve as direct proxies of the IRGC–QF.

1988.   According to an April 2007 MNF–I report, Mr. Qais Khazali admitted that AAH received direct financing from the IRGC–QF.

1989.   Within months of Mr. Qais Khazali's formation of AAH, he blessed the Hezbollah-planned and orchestrated raid on the PJCC in Karbala on January 20, 2007.

1990.   As discussed more fully below, the kidnapping and murder of five American soldiers during the operation led to a concerted effort to locate the perpetrators, and it eventually resulted in the capture of both Khazali brothers in March 2007.

1991.   Thereafter, despite the capture and detention of the Khazali brothers, AAH continued to function as a full-fledged terrorist organization because of the significant funding,

training and supply of weapons it received from the IRGC, and from the training it received from, and close cooperation it maintained with, Hezbollah.

1992.   AAH was able to maintain a high-level offensive tempo from mid-2007 until the departure of United States forces from Iraq at the end of 2011, and Mr. Qais Khazali emerged from U.S. detention to become one of Iraq's most important political leaders.

1993.   In sum, from 2006 to 2011, AAH operated as the IRGC-QF's direct terror proxy targeting U.S. personnel at the direction of Hezbollah, working in concert with the IRGC–QF.

1994.   Iran harbored elements of its leadership (and their families), trained and supplied its operatives, and funded the AAH cells.

1995.   Iran used Hezbollah to train and direct AAH to commit attacks on Americans in Iraq.

1996.   AAH formally split from JAM in 2007 (though it continued to maintain significant ties with JAM cells even later).

1997.   Since that time, AAH has conducted countless attacks against U.S. and Iraqi forces, targeted kidnappings of Westerners and Iraqis, rocket and mortar attacks on the U.S. Embassy, murdered American and British soldiers; and assassinated Iraqi officials.

1998.   At his July 2, 2007 press briefing, Brigadier Gen. Bergner noted the extensive financial support the IRGC-QF provided in developing the Special Groups:

> The Qods Force also supplies the special groups with weapons and funding of 750,000 to 3 million U.S. dollars a month. Without this support, these special groups would be hard pressed to conduct their operations in Iraq […] The Qods Force goal was to develop the Iraqi special groups into a network similar to the Lebanese Hezbollah. Special groups would be unable to conduct their terrorist attacks in Iraq without Iranian-supplied weapons and other support. Like Ali Mussa Daqduq, Qais [Khazali's] main contact was [General Shahlai], the deputy commander for Qods Force Department of External Special Operations. Funding and training of the special groups started in 2004.

1999.   As MNF–I investigators would later learn, senior Lebanese Hezbollah commander Ali Mussa Daqduq not only provided training to AAH cells and advised them on terrorist operations, he also helped plan operations and had final approval over them.

2000.   Mr. Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Hezbollah's Muhammad Kawtharani and General Shahlai, the director of the IRGC–QF External Operations.

### C.   JAYSH AL MAHDI ("JAM" or the "MAHDI ARMY") AND THE PROMISED DAY BRIGADES ("PDB")

2001.   As noted above, Jaysh al-Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003 with the help of Imad Mughniyah and Mustafa Badr al-Din, two of Hezbollah's most senior commanders.

2002.   JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population.

2003.   JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

2004.   After Hezbollah and the IRGC–QF began their complete takeover of the Special Groups in 2006-2007, JAM receded to a degree.

2005.   In the summer of 2007, Mr. Sadr declared a six-month ceasefire and a ban on attacking Coalition Forces. According to a 2007 MNF–I report, during this time, Mr. Sadr was receiving approximately $2 million U.S. dollars per month from Iran.

2006.   For much of 2007-2008, he was also embroiled in political disputes with rival Shi'a parties, and JAM engaged in violent clashes with the Badr Corps in Karbala during a religious festival.

2007.   In June 2008, Mr. Sadr announced his intention to disband JAM to focus his

organization on social, cultural and religious activities, but he soon further proclaimed that he would maintain an elite force, the Promised Day Brigades ("PDB"), to carry out attacks against Coalition Forces.

2008.   The PDB received funding and weapons from the IRGC and training and direction from both Hezbollah and the IRGC–QF and deployed many EFPs against American and Coalition Forces in Iraq after July 2008.

2009.   In August 2009 alone, MNF–I attributed 15 EFP attacks in Baghdad to the PDB.

2010.   MNF–I took significant and forceful measures against the PDB, but because of the financial, logistical and operational support it received from both Hezbollah and the IRGC–QF, PDB was able to survive and continued to menace American forces in Iraq through 2011.

2011.   For example, on June 28, 2011, the PDB issued a statement claiming responsibility for ten mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

### D.   KATA'IB HEZBOLLAH ("KH")

2012.   Kata'ib Hezbollah ("KH") (Hezbollah Brigades) was active in Iraq from 2007 to 2011.

2013.   KH was founded by Abu Mahdi al-Muhandis, a member of the Badr Corps and one of the IRGC–QF's senior operatives in Iraq.

2014.   In the 1980s, al-Muhandis was a member of the Iraqi Da'wa Party, in which capacity he worked closely with the IRGC–QF and Lebanese Hezbollah.

2015.   KH's overall operations were run by Karim Ja'far Muhsin al-Ghanimi, described by the U.S. Department of the Treasury as "the overall leader of KH, which has used facilities in Iran to send weapons to Iraq." According to the U.S. government, "Ghanimi has organized KH military-related training in Iran from the IRGC–QF and Lebanese Hizballah. Ghanimi has sent

money provided by the IRGC–QF to KH leaders in Iraq."

2016.   KH functioned as Iran's premier terror proxy in Iraq, and like other Special Groups, its operatives received extensive training from the IRGC–QF and Hezbollah, including Hezbollah's TTP for the use of explosives, as well as weapons like the RPG–29, EFP, and the deployment of Katyusha rockets for indirect fire attacks on U.S. Forward Operating Bases.

2017.   According to MNF–I, IRGC–QF provided RPG–29 anti-armor weapons exclusively to KH.

2018.   The IRGC–QF also provided IRAMs almost exclusively to KH.

2019.   IRAMs are "flying IEDs"—explosive devices made from large metal canisters, such as propane gas tanks, filled with explosives, scrap metal and ball bearings, propelled into the air by rockets.

2020.   IRAMs first appeared in southern Iraq in November 2007.

2021.   Like other IEDs, IRAMs could be triggered remotely by radio control, or set to fire by way of a washing-machine timer. But, notwithstanding the fact that IRAMs were constructed from commonly-used "household" materials (such as, *e.g.*, propane tanks), proper assembly required a high-degree of technical sophistication that KH obtained from Hezbollah and the IRGC–QF.

2022.   IRAMs were "purpose-built" for one thing: being lobbed over walls and Hesco[111] barriers at short ranges, preventing interception by C-RAM defense systems[112] that were protecting Coalition Forces manning bases in Iraq.

---

[111]     Hesco barriers are a multi-cellular barrier system manufactured from welded zinc-aluminum coated steel wire mesh, joined with vertical, helical-coil joints, and lined with a heavy-duty non-woven polypropylene geotextile. Once filled with earth, sand, and dirt, the Hesco barriers provide protection against conventional fire attacks.

[112]     Counter Rocket, Artillery, and Mortar, abbreviated "C-RAM" or "Counter-RAM," is a set of systems used to detect and/or destroy incoming artillery, rockets and mortar rounds in the air before they hit their ground targets, or simply provide early warning.

2023.   The first known IRAM attack in Iraq occurred at Forward Operating Base Loyalty in Baghdad, which killed two American soldiers and wounded 16 others.

2024.   A second attack in the Sha'ab neighborhood of Baghdad resulted from an accidental explosion of IRAMs likely intended for Combat Outpost Callahan, approximately 800-yards away from where the truck carrying the IRAMs prematurely exploded, killing 18 civilians and wounding an additional 29 people.

2025.   IRAM attacks were particularly dangerous to U.S. troops, and had the potential to kill dozens in a single attack. Once launched, an incoming IRAM could not be stopped.

2026.   A soldier spotting the approach of a suspected IRAM-bearing vehicle could have as little as "two seconds to decide whether the person emerging from it ha[d] just set it for firing or [was] simply an innocent driver getting out to change a tire."[113]

2027.   IRAMs could be launched from either a frame resting on the ground or mounted on the bed of a truck and were designed to cause catastrophic damage and inflict mass casualties.

2028.   IRAMs became a signature weapon of KH.

2029.   KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout southeastern Iraq conducting, *first*, rocket-propelled grenade (RPG) attacks; *second*, 107mm and 240mm rocket attacks; *third*, IRAM attacks; and, *fourth*, EFP attacks on U.S. and Coalition Forces.

2030.   KH was also supplied by Iran with their production model of the RPG–29 anti-armor shoulder fired weapon that was first used against U.S. Forces during operations in Sadr City, Baghdad.

2031.   On June 24, 2009, the United States designated KH a Foreign Terrorist Organization.

---

[113]   Robert Burns, *'Lob Bombs' Biggest Worry for U.S. in Baghdad* (Associated Press, July 12, 2008).

391

2032.   The State Department's notice of KH's FTO designation stated that:

> [KH] has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

2033.   KH was also simultaneously designated an SDGT, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

2034.   The U.S. Department of the Treasury also designated KH pursuant to EO 13438.

2035.   The U.S. Department of the Treasury 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces…."

2036.   The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq."

2037.   The U.S. Department of the Treasury press release also stated: "[f]urther, the IRGC–Qods Force provides lethal support to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

2038.   The 2009 press release further reported that:

> Between March 2007 and June 2008, Baghdad-based Kata'ib Hizballah cell members participated in multiple rocket-propelled grenade (RPG) and improvised rocket-assisted mortar (IRAM) attacks against U.S. forces. These attacks included a May 13, 2008 RPG–29 attack on a U.S. tank located in Sha'ab, Iraq, and a February 19, 2008 IRAM attack on a U.S. base near Rustamiya, Iraq. A February 19, 2008 rocket attack in the Rustamiya area resulted in one U.S. civilian killed and injuries to U.S. civilian and Coalition Forces personnel.

As of 2008, Kata'ib Hizballah was funded by the IRGC–Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hizballah members in Iran.

Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons—including RPG–29s, IRAMs, and EFPs—against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

2039.   In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran and multiple terrorist attacks against Coalition Forces in Iraq—including KH's use of EFPs:

[A]lso known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators'— roadside bombs designed to pierce armor-hulled vehicles— and other weapons such as rocket-assisted mortars.

2040.   As noted above—and as stated by the U.S. Department of the Treasury in its July 2009 press release—throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket

and IED attacks against U.S. troops.

2041.   In this manner, Hezbollah helped publicize KH's activities and wage psychological warfare against the United States.

2042.   The U.S. Department of the Treasury designated KH's founder, Abu Mahdi al-Muhandis, an SDGT in July 2009 and announced the designation in the same press release announcing KH's designation.

2043.   The U.S. Department of the Treasury's press release noted:

> As of early 2007, al-Muhandis formed a Shia militia *group employing instructors from Hizballah* to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles.   In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)—from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapon smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

> Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks—containing mortars, Katyusha rockets, EFPs, and other explosive devices—from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft

missiles to increase the combat ability of the militias to fight Coalition Forces.

In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination. (Emphasis added.)

2044.   In a July 2010 press briefing, the then-MNF–I commander, U.S. Army General Ray Odierno, identified KH as the group behind increased threats to U.S. bases in Iraq.

2045.   General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq.

2046.   General Odierno stated, "[T]hey are clearly connected to [the] Iranian IRGC [Iranian Revolutionary Guard Corps]."

## XIII.   THE PLAINTIFFS

### 1.    THE MAY 3, 2005 ATTACK – BAGHDAD

**The Bartlett Family**

2047.   Plaintiff Robert Bartlett is a citizen of the United States and domiciled in the State of Virginia.

2048.   On May 3, 2005, Robert Bartlett, then 31, was serving in the U.S. military in Iraq.

2049.   He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2050.   The weapon used to injure Mr. Bartlett was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2051.   As a result of the attack, part of Mr. Bartlett's head was severed.

2052.   He also suffered third-degree burns on his neck, face and hands; internal bleeding; and a collapsed lung.

2053.   Mr. Bartlett has undergone multiple surgeries, including plastic surgery on his head and his bottom lip.

2054.   Mr. Bartlett nearly died on several occasions following the attack and was significantly physically impaired for several years following the attack.

2055.   Mr. Bartlett suffers from Post-Traumatic Stress Disorder ("PTSD") and has constant nightmares.

2056.   He has participated in group therapy to treat the emotional injuries he sustained as a result of the attack.

2057.   As a result of the attack, and the injuries he suffered, Plaintiff Robert Bartlett has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2058.   Plaintiff Terrel Charles Bartlett is a citizen of the United States and domiciled in the State of Arizona. He is the father of Robert Bartlett.

2059.   Plaintiff Linda Jones is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Robert Bartlett.

2060.   Plaintiff Shawn Bartlett is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Robert Bartlett.

2061.   As a result of the attack, and the injuries Robert Bartlett suffered, Plaintiffs Terrel Charles Bartlett, Linda Jones and Shawn Bartlett have experienced severe mental anguish and extreme emotional pain and suffering.

2062.   Plaintiff Robert Bartlett was discharged from the U.S. military on September 7, 2009.

2.      **THE JANUARY 12, 2004 ATTACK – BAGHDAD**

**The Crockett Family**

2063.   Ricky Leon Crockett was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

2064.   On January 12, 2004, Ricky Leon Crockett, then 37, was serving in the U.S. military in Iraq when an IED emplaced by JAM terror operatives detonated near his vehicle.

2065.   Ricky Leon Crockett died from penetrating shrapnel injuries he sustained in the explosion.

2066.   The terror cell that emplaced the IED that killed Ricky Leon Crockett was trained by Hezbollah and funded and armed by the IRGC-QF.

2067.   Plaintiff Maxine E. Crockett is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Ricky Leon Crockett.

2068.   Plaintiff Maxine E. Crockett brings an action individually and on behalf of the Estate of Ricky Leon Crockett, as its legal representative.

2069.   Plaintiff Marvise L. Crockett is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Ricky Leon Crockett.

2070.   As a result of the attack, and the death of Ricky Leon Crockett, Plaintiffs Maxine E. Crockett and Marvise L. Crockett have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

3.      **THE APRIL 4, 2004 ATTACK – BAGHDAD**

**The Arsiaga Family**

2071.   Robert R. Arsiaga was a citizen of the United States and domiciled in the State of

Texas when he was killed in Iraq.

2072.   On April 4, 2004, Robert R. Arsiaga, aged 25, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2073.   Robert R. Arsiaga was killed in the attack.

2074.   The terror cell that emplaced the IED that killed Robert R. Arsiaga was trained by Hezbollah and funded and armed by the IRGC-QF.

2075.   Plaintiff Tracie Arsiaga is a citizen of the United States and domiciled in the State of Texas. She is the widow of Robert R. Arsiaga.

2076.   Plaintiff Tracie Arsiaga brings an action individually and on behalf of the Estate of Robert R. Arsiaga, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

2077.   Plaintiff Sylvia Macias is a citizen of the United States and domiciled in the State of Texas. She is the mother of Robert R. Arsiaga.

2078.   Plaintiff Gilbert Arsiaga, Jr. is a citizen of the United States and domiciled in the State of Texas. He is the brother of Robert R. Arsiaga.

2079.   Plaintiff George Arsiaga is a citizen of the United States and domiciled in the State of Texas. He is the brother of Robert R. Arsiaga.

2080.   Plaintiff Matthew Arsiaga is a citizen of the United States and domiciled in the State of Texas. He is the brother of Robert R. Arsiaga.

2081.   Plaintiff Angel Munoz is a citizen of the United States and domiciled in the State of Texas. She is the sister of Robert R. Arsiaga.

2082.   Plaintiff Robi Ann Galindo is a citizen of the United States and domiciled in the

State of Texas. She is the sister of Robert R. Arsiaga.

2083.   Jeremy Arsiaga was a citizen of the United States at the time of the death of Robert R. Arsiaga. He was the brother of Robert R. Arsiaga. Jeremy Arsiaga died on September 4, 2015.

2084.   Patricia Arsiaga is the surviving widow of Jeremy Arsiaga. Patricia Arsiaga brings an action on behalf of the Estate of Jeremy Arsiaga.

2085.   As a result of the attack, and the death of Robert R. Arsiaga, the late Jeremy Arsiaga experienced, and Plaintiffs Tracie Arsiaga, Sylvia Macias, Gilbert Arsiaga, Jr., George Arsiaga, Matthew Arsiaga, Angel Munoz and Robi Ann Galindo have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

**The Cason Family**

2086.   Ahmed A. Cason was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

2087.   On April 4, 2004, Ahmed A. Cason, aged 24, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2088.   Ahmed A. Cason was killed in the attack.

2089.   The terror cell that emplaced the IED that killed Ahmed A. Cason was trained by Hezbollah and funded and armed by the IRGC-QF.

2090.   Plaintiff Cedric Hunt, Sr. is a citizen of the United States and domiciled in the State of Alabama. He is the stepfather of Ahmed A. Cason.

2091.   As a result of the attack, and the death of Ahmed A. Cason, Plaintiff Cedric Hunt, Sr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his

stepson's society, companionship, comfort, advice and counsel.

**The Greenwood Family**

2092.   Plaintiff Steven Greenwood is a citizen of the United States and domiciled in the State of Texas.

2093.   On April 4, 2004, Steven Greenwood, then 20, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2094.   The terror cell that emplaced the IED that injured Steven Greenwood was trained by Hezbollah and funded and armed by the IRGC-QF.

2095.   As a result of the attack, Mr. Greenwood suffered shrapnel wounds to his wrist which caused nerve damage.

2096.   He was initially treated in Iraq for his injuries, but the nerve damage could not be treated there. Approximately one week after the attack, he was sent to Landstuhl, Germany where he was further treated for his wounds.

2097.   He was then sent back to the U.S. where he had surgery to remove the shrapnel.

2098.   He also suffers from PTSD and depression.

2099.   He has sought treatment for his wounds, PTSD and depression.

2100.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Greenwood has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Hiller Family**

2101.   Stephen Dustin Hiller was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

2102.   On April 4, 2004, Stephen Dustin Hiller, aged 25, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with members of JAM in Sadr City, Iraq.

2103.   Stephen Dustin Hiller was killed by JAM rocket-propelled grenade ("RPG") fire while engaged in the exchange of gunfire with members of JAM.

2104.   The terror cell that fired at Stephen Dustin Hiller was trained by Hezbollah and funded and armed by the IRGC-QF.

2105.   Plaintiff Stephen W. Hiller is a citizen of the United States and domiciled in the State of Alabama. He is the father of Stephen Dustin Hiller.

2106.   Plaintiff Stephen W. Hiller brings an action individually and on behalf of the Estate of Stephen Dustin Hiller, as its legal representative.

2107.   As a result of the attack, and the death of Stephen Dustin Hiller, Plaintiff Stephen W. Hiller has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

### 4.      THE APRIL 9, 2004 ATTACK – BAGHDAD

**The Church Family**

2108.   Plaintiff Jeremy Church is a citizen of the United States and domiciled in the State of Missouri.

2109.   On April 9, 2004, Jeremy Church, then 26, was serving in the U.S. military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2110.   He was driving in a convoy when an IED and an RPG struck his vehicle.

2111.   The terror cell that executed the attack in which Jeremy Church was injured was trained by Hezbollah and funded and armed by the IRGC-QF.

2112.   Mr. Church suffers from hearing issues as a result of the rocket fire and detonation of the IED. He continues to experience ringing in his ears.

2113.   He has experienced severe headaches.

2114.   Mr. Church has been diagnosed with PTSD.

2115.   He has sought treatment, including counseling.

2116.   He has been prescribed anti-anxiety medications, anti-depressants, and medication to address sleep-related issues.

2117.   As a result of the attack, and the injuries he suffered, Plaintiff Jeremy Church has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2118.   Plaintiff Sandra Hankins is a citizen of the United States and domiciled in the State of Texas. She is the mother of Jeremy Church.

2119.   As a result of the attack, and the injuries Jeremy Church suffered, Plaintiff Sandra Hankins has experienced severe mental anguish and extreme emotional pain and suffering.

**The Fisher Family**

2120.   Steven Scott Fisher was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

2121.   On April 9, 2004, Steven Scott Fisher, aged 43, was serving as a civilian contractor in Iraq when the convoy in which he was traveling was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2122.   Steven Scott Fisher was killed in the attack.

2123.   The terror cell that executed the attack in which Steven Scott Fisher was killed was trained by Hezbollah and funded and armed by the IRGC-QF.

# A-481

2124.   Plaintiff Ingrid Fisher is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Steven Scott Fisher.

2125.   Plaintiff Ingrid Fisher brings an action individually and on behalf of the Estate of Steven Scott Fisher, as its legal representative.

2126.   Plaintiff Kristin Walker is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Steven Scott Fisher.

2127.   Plaintiff Steven T. Fisher is a citizen of the United States and domiciled in the State of Virginia. He is the son of Steven Scott Fisher.

2128.   Plaintiff Kathleen Gramkowski is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Steven Scott Fisher.

2129.   As a result of the attack, and the death of Steven Scott Fisher, Plaintiffs Ingrid Fisher, Kristin Walker, Steven T. Fisher, and Kathleen Gramkowski have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**5.**      **THE JUNE 4, 2004 ATTACK – BAGHDAD**

**The Carvill Family**

2130.   Frank T. Carvill was a citizen of the United States and domiciled in the State of New Jersey when he was killed in Iraq.

2131.   On June 4, 2004, Frank T. Carvill, aged 51, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and IEDs in Baghdad.

2132.   Frank T. Carvill was killed in the attack.

403

2133.   The terror cell that executed the attack in which Frank T. Carvill was killed was trained by Hezbollah and funded and armed by the IRGC-QF.

2134.   Plaintiff Mary Carvill is a citizen of the United States and domiciled in the State of New Jersey. She is the mother of Frank T. Carvill.

2135.   Plaintiff Peggy Carvill-Liguori is a citizen of the United States and domiciled in the State of New Jersey. She is the sister of Frank T. Carvill.

2136.   Plaintiff Peggy Carvill-Liguori brings an action individually and on behalf of the Estate of Frank T. Carvill, as its legal representative.

2137.   Plaintiff Daniel Carvill is a citizen of the United States and domiciled in the State of New Jersey. He is the brother of Frank T. Carvill.

2138.   As a result of the attack, and the death of Frank T. Carvill, Plaintiffs Mary Carvill, Peggy Carvill-Liguori and Daniel Carvill have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

###    6.    THE JUNE 29, 2004 ATTACK – BAGHDAD

**The Adle Family**

2139.   Patrick Adle was a citizen of the United States and domiciled in the State of Maryland when he was killed in Iraq.

2140.   On June 29, 2004, Patrick Adle, aged 21, was serving in the U.S. military in Iraq when a roadside bomb emplaced by JAM terror operatives detonated near the vehicle in which he was traveling in Baghdad.

2141.   Patrick Adle was killed in the attack.

2142.   The terror cell that emplaced the roadside bomb that killed Patrick Adle was trained by Hezbollah and funded and armed by the IRGC-QF.

2143.   Plaintiff Pamela Adle-Watts is a citizen of the United States and domiciled in the State of Maryland. She is the mother of Patrick Adle.

2144.   Plaintiff Pamela Adle-Watts brings an action individually and on behalf of the Estate of Patrick Adle, as its legal representative.

2145.   Plaintiff John Watts is a citizen of the United States and domiciled in the State of Maryland. He is the stepfather of Patrick Adle.

2146.   As a result of the attack, and the death of Patrick Adle, Plaintiffs Pamela Adle-Watts and John Watts have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

### 7.      THE JULY 27, 2004 ATTACK – BALAD RUZ

**The Talbert Family**

2147.   DeForest L. Talbert was a citizen of the United States and domiciled in the State of West Virginia when he was killed in Iraq.

2148.   On July 27, 2004, DeForest L. Talbert, then 24, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

2149.   On July 27, 2004, DeForest L. Talbert was traveling in an M998 Humvee in the vicinity of Balad Ruz close to the Iranian border and IRGC-QF smuggling routes when his vehicle was struck with an IED.

2150.   DeForest L. Talbert was killed in the attack.

2151.   The terror cell that emplaced the IED that killed DeForest L. Talbert was trained by Hezbollah and funded by the IRGC-QF.

2152.   Plaintiff Gloria Nesbitt is a citizen of the United States and domiciled in the State of Virginia. She is the mother of DeForest L. Talbert.

2153.   Plaintiff Gloria Nesbitt brings an action individually and on behalf of the Estate of DeForest L. Talbert, as its legal representative.

2154.   Plaintiff D.J.H., a minor, represented by his legal guardian Frances Hamilett, is a citizen of the United States and domiciled in the State of West Virginia. He is the son of DeForest L. Talbert.

2155.   Plaintiff Chiquita Talbert is a citizen of the United States and domiciled in the State of Virginia. She is the sister of DeForest L. Talbert.

2156.   Plaintiff Tawanna Talbert Darring is a citizen of the United States and domiciled in the State of Maryland. She is the sister of DeForest L. Talbert.

2157.   Plaintiff Latasha Marble is a citizen of the United States and domiciled in the State of Virginia. She is the sister of DeForest L. Talbert.

2158.   Plaintiff James Talbert is a citizen of the United States and domiciled in the State of Virginia. He is the brother of DeForest L. Talbert.

2159.   As a result of the attack, and the death of DeForest L. Talbert, Plaintiffs Gloria Nesbitt, D.J.H., Chiquita Talbert, Tawanna Talbert Darring, Latasha Marble and James Talbert have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice and counsel.

**8.**    **THE AUGUST 5, 2004 ATTACK – NAJAF**

**The Rocha Family**

2160.   Moses Rocha was a citizen of the United States and domiciled in the State of New Mexico when he was killed in Iraq.

2161.   On August 5, 2004, Moses Rocha, aged 33, was serving in the U.S. military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2162.   Moses Rocha was killed in the attack.

2163.   The terror cell that executed the attack in which Moses Rocha was killed was trained by Hezbollah and funded and armed by the IRGC-QF.

2164.   Plaintiff Miranda Pruitt is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Moses Rocha.

2165.   Plaintiff Velina Sanchez is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Moses Rocha.

2166.   Plaintiff Velina Sanchez brings an action individually and on behalf of the Estate of Moses Rocha, as its legal representative.

2167.   Plaintiff Aloysius Sanchez, Sr. is a citizen of the United States and domiciled in the State of New Mexico. He is the stepfather of Moses Rocha.

2168.   Plaintiff Rommel Rocha is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

2169.   Plaintiff Phillip Sanchez is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

2170.   Plaintiff Aloysius Sanchez, Jr. is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

2171.   As a result of the attack, and the death of Moses Rocha, Plaintiffs Miranda Pruitt, Velina Sanchez, Aloysius Sanchez, Sr., Rommel Rocha, Phillip Sanchez, and Aloysius Sanchez,

Jr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Reynoso Family**

2172.   Yadir G. Reynoso was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2173.   On August 5, 2004, Yadir G. Reynoso, aged 27, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Najaf, Iraq.

2174.   Yadir G. Reynoso was killed in the exchange of gunfire with JAM terror operatives.

2175.   The terror cell that fired at Yadir G. Reynoso was trained by Hezbollah and funded and armed by the IRGC-QF.

2176.   Plaintiff Gloria P. Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the mother of Yadir G. Reynoso.

2177.   Plaintiff Gloria P. Reynoso brings an action individually and on behalf of the Estate of Yadir G. Reynoso, as its legal representative.

2178.   Plaintiff Jasmin Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the sister of Yadir G. Reynoso.

2179.   Plaintiff Patricia Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the sister of Yadir G. Reynoso.

2180.   Plaintiff Jose Reynoso is a citizen of the United States and domiciled in the State of Washington. He is the brother of Yadir G. Reynoso.

2181.   As a result of the attack, and the death of Yadir G. Reynoso, Plaintiffs Gloria P. Reynoso, Jasmin Reynoso, Patricia Reynoso, and Jose Reynoso have experienced severe mental

anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**9.**   **THE AUGUST 6, 2004 ATTACK – NAJAF**

**The Wells Family**

2182.   Larry Lloyd Wells was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

2183.   On August 6, 2004, Larry Lloyd Wells, aged 22, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in the Wadi al-Salam Cemetery in Najaf, Iraq.

2184.   Larry Lloyd Wells was killed by sniper fire from JAM terror operatives.

2185.   The terror cell that fired at Larry Lloyd Wells was trained by Hezbollah and funded and armed by the IRGC-QF.

2186.   Plaintiff Ashley Wells Simpson is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2187.   Plaintiff Ashley Wells Simpson brings an action individually and on behalf of the Estate of Larry Lloyd Wells, as its legal representative.

2188.   Plaintiff Chad Wells is a citizen of the United States and domiciled in the State of Louisiana. He is the brother of Larry Lloyd Wells.

2189.   Plaintiff Crystal Stewart is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2190.   Plaintiff Chasity Wells-George is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2191.   Plaintiff Candice Machella is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2192.   Plaintiff Billy Doal Wells is a citizen of the United States and domiciled in the State of Tennessee. He is the brother of Larry Lloyd Wells.

2193.   As a result of the attack, and the death of Larry Lloyd Wells, Plaintiffs Ashley Wells Simpson, Chad Wells, Crystal Stewart, Chasity Wells-George, Candice Machella, and Billy Doal Wells have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

## 10.   THE AUGUST 15, 2004 ATTACK – NAJAF

**The Sapp Family**

2194.   Brandon Robert Sapp was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2195.   On August 15, 2004, Brandon Robert Sapp, then 21, was serving in the U.S. military in Najaf, Iraq when the M2 Bradley Fighting Vehicle he was operating rolled over a 500-pound IED emplaced by JAM terror operatives that sent the Bradley and Brandon Robert Sapp airborne, killing him.

2196.   The terror cell that emplaced the IED that killed Brandon Robert Sapp was trained by Hezbollah and funded and armed by the IRGC-QF.

2197.   Plaintiff Hope Elizabeth Veverka is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Brandon Robert Sapp.

2198.   As a result of the attack, and the death of Brandon Robert Sapp, Plaintiff Hope Elizabeth Veverka has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

410

11.      **THE AUGUST 16, 2004 ATTACK – SADR CITY**

**The Heath Family**

2199.   David Michael Heath was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

2200.   On August 16, 2004, David Michael Heath, aged 30, was serving in the U.S. military in Iraq when an IED emplaced by JAM terror operatives detonated near his vehicle followed by smalls arms fire and a subsequent RPG attack in Sadr City.

2201.   David Michael Heath was killed in the attack by a gunshot wound to his head by JAM terror operatives.

2202.   The terror cell that fired at David Michael Heath was trained by Hezbollah and funded and armed by the IRGC-QF.

2203.   Plaintiff Donna Jean Heath is a citizen of the United States and domiciled in the State of Indiana. She is the widow of David Michael Heath.

2204.   Plaintiff Donna Jean Heath brings an action individually and on behalf of the Estate of David Michael Heath, as its legal representative.

2205.   Plaintiff Lola Jean Modjeska is a citizen of the United States and domiciled in the State of Indiana. She is the mother of David Michael Heath.

2206.   Plaintiff John David Heath is a citizen of the United States and domiciled in the State of Florida. He is the father of David Michael Heath.

2207.   As a result of the attack, and the death of David Michael Heath, Plaintiffs Donna Jean Heath, Lola Jean Modjeska, and John David Heath have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

### 12.   THE AUGUST 18, 2004 ATTACK – SADR CITY

**The Martir Family**

2208.   Jacob David Martir was a citizen of the United States and domiciled in the State of Connecticut when he was killed in Iraq.

2209.   On August 18, 2004, Jacob David Martir, aged 21, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Sadr City.

2210.   Jacob David Martir was shot and killed by JAM terror operatives while engaged in the exchange of gunfire.

2211.   The terror cell that fired at Jacob David Martir was trained by Hezbollah and funded and armed by the IRGC-QF.

2212.   Plaintiff Olga Lydia Gutierrez is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Jacob David Martir.

2213.   Plaintiff Olga Lydia Gutierrez brings an action individually and on behalf of the Estate of Jacob David Martir, as its legal representative.

2214.   Plaintiff Ismael Martir is a citizen of the United States and domiciled in the State of Florida. He is the brother of Jacob David Martir.

2215.   As a result of the attack, and the death of Jacob David Martir, Plaintiffs Olga Lydia Gutierrez and Ismael Martir have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 13.   THE AUGUST 25, 2004 ATTACK – NAJAF

**The Arredondo Family**

2216.   Alexander Scott Arredondo was a citizen of the United States and domiciled in the State of Massachusetts when he was killed in Iraq.

2217.   On August 25, 2004, Alexander Scott Arredondo, aged 20, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Najaf, Iraq.

2218.   Alexander Scott Arredondo was killed by sniper fire from JAM terror operatives.

2219.   The terror cell that fired at Alexander Scott Arredondo was trained by Hezbollah and funded and armed by the IRGC-QF.

2220.   Plaintiff Victoria M. Foley is a citizen of the United States and domiciled in the State of Massachusetts. She is the mother of Alexander Scott Arredondo.

2221.   Plaintiff Victoria M. Foley brings an action individually and on behalf of the Estate of Alexander Scott Arredondo, as its legal representative.

2222.   Plaintiff Nathaniel Foley is a citizen of the United States and domiciled in the State of Massachusetts. He is the brother of Alexander Scott Arredondo.

2223.   As a result of the attack, and the death of Alexander Scott Arredondo, Plaintiffs Victoria M. Foley and Nathaniel Foley have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**14.**   **THE AUGUST 26, 2004 ATTACK – NAJAF**

**The DeWilde Family**

2224.   Plaintiff Michael Scott DeWilde is a citizen of the United States and domiciled in the State of Texas.

2225.   On August 26, 2004, Michael Scott DeWilde, then 37, was serving in the U.S. military in Iraq.

2226.   On August 26, 2004, Michael Scott DeWilde was seriously injured when he came under fire from a rocket-propelled grenade fired by JAM terror operatives.

2227.   The terror cell that executed the attack in which Michael Scott DeWilde was injured was trained by Hezbollah and funded and armed by the IRGC-QF.

2228.   As a result of the attack, Michael Scott DeWilde sustained shrapnel injuries to his arm requiring him to be medevaced from the scene and treated at the nearest Forward Operating Base.

2229.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Scott DeWilde has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**15.      THE FEBRUARY 10, 2005 ATTACK**

**The Morris Family**

2230.   Plaintiff Steven Morris is a citizen of the United States and domiciled in the State of North Carolina.

2231.   Steven Morris served in the U.S. military in Iraq on multiple rotations from March 2003 through 2011 as a member of a Special Operations Unit.

2232.   On February 10, 2005, Mr. Morris sustained a traumatic brain injury ("TBI") as well as neck and shoulder injuries when he was knocked from his armored vehicle *en* route to an operation against JAM Special Forces north of the Sab' Abkar section of Baghdad.

2233.   On a separate occasion, he sustained an additional TBI from the blast wave of an Iranian 122mm rocket launched by JAM Special Groups.

2234.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Morris has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2235.   Plaintiff Danielle Dechaine-Morris is a citizen of the United States and domiciled in the State of North Carolina. She was the wife of Steven Morris.

2236.   Plaintiff Nicholas Morris is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Steven Morris.

2237.   Plaintiff K.M., a minor represented by his legal guardian, Danielle Dechaine-Morris, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Steven Morris.

2238.   As a result of the attack, and the injuries Steven Morris suffered, Plaintiffs Danielle Dechaine-Morris, Nicholas Morris and K.M. have experienced severe mental anguish and extreme emotional pain and suffering.

2239.   Plaintiff Steven Morris was discharged from the U.S. military on October 31, 2013.

**16.** **THE JUNE 8, 2005 ATTACK – BAGHDAD**

**The Arizola Family**

2240.   Roberto Arizola, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2241.   On June 8, 2005, Roberto Arizola, Jr., aged 31, was serving in the U.S. military near Rustimaya when an IED emplaced by JAM Special Groups terror operatives detonated near his vehicle.

2242.   Roberto Arizola, Jr. was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2243.   Plaintiff Monica Arizola is a citizen of the United States and domiciled in the State of Texas. She is the widow of Roberto Arizola, Jr.

2244.   Plaintiff Roberto Aaron Arizola is a citizen of the United States and domiciled in

the State of Texas. He is the son of Roberto Arizola, Jr.

2245.   Plaintiff Roberto Arizola, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Roberto Arizola, Jr.

2246.   Plaintiff Cecilia Arizola is a citizen of the United States and domiciled in the State of Texas. She is the mother of Roberto Arizola, Jr.

2247.   Plaintiff Danny Arizola is a citizen of the United States and domiciled in the State of Texas. He is the brother of Roberto Arizola, Jr.

2248.   Plaintiff Ricardo Arizola is a citizen of the United States and domiciled in the State of Texas. He is the brother of Roberto Arizola, Jr.

2249.   As a result of the attack, and the death of Roberto Arizola, Jr., Plaintiffs Monica Arizola, Roberto Aaron Arizola, Roberto Arizola, Sr., Cecilia Arizola, Danny Arizola and Ricardo Arizola have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's brother's society, companionship, comfort, advice and counsel.

### 17.   THE JUNE 27, 2005 ATTACK – BAGHDAD

**The Klecker Family**

2250.   Deborah Klecker was a citizen of the United States and domiciled in the State of Oregon when she was killed in Iraq.

2251.   On June 27, 2005, Deborah Klecker, aged 51, was working as a civilian contractor providing mentoring and training to Iraqi police officers when she was killed by an IED planted and detonated near her vehicle by JAM Special Groups.

2252.   Deborah Klecker was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2253.   Plaintiff Greg Klecker is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Deborah Klecker.

2254.   As a result of the attack, and the death of Deborah Klecker, Plaintiff Greg Klecker has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his sister's society, companionship, comfort, advice and counsel.

18.   **THE JULY 3, 2005 ATTACK – BAGHDAD**

**The Montgomery Family**

2255.   Ryan Montgomery was a citizen of the United States and domiciled in the State of Kentucky when he was killed in Iraq.

2256.   On July 3, 2005, Ryan Montgomery, aged 22, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

2257.   Ryan Montgomery was killed in the attack.

2258.   The weapon used to kill Ryan Montgomery was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2259.   Plaintiff Raymond Montgomery is a citizen of the United States and domiciled in the State of Kentucky. He is the father of Ryan Montgomery.

2260.   Plaintiff Patricia Montgomery is a citizen of the United States and domiciled in the State of Kentucky. She is the mother of Ryan Montgomery.

2261.   Plaintiff Bryan Montgomery is a citizen of the United States and domiciled in the State of Kentucky. He is the brother of Ryan Montgomery.

2262.   As a result of the attack, and the death of Ryan Montgomery, Plaintiffs Raymond

Montgomery, Patricia Montgomery and Bryan Montgomery have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 19.   THE JULY 27, 2005 ATTACK

**The Wood Family**

2263.   Plaintiff Tony Wood is a citizen of the United States and domiciled in the State of Hawaii.

2264.   On July 27, 2005, Tony Wood, age 38, was serving in the U.S. military in Iraq.

2265.   Mr. Wood was returning to his base when his vehicle was struck by an EFP emplaced by Special Groups.

2266.   The weapon used to injure Mr. Wood was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2267.   As a result of the attack, he sustained significant injuries due to the impact of a large amount of shrapnel that pierced his body armor.

2268.   Mr. Wood received extensive medical treatment at various hospitals, where he spent a number of months.

2269.   He was also in a coma for over 40 days and developed numerous infections that required treatment.

2270.   The shrapnel affected numerous internal organs, and he underwent over 20 separate surgeries.

2271.   Mr. Wood continues to experience pain and limitations to his activities each day.

2272.   Mr. Wood suffers from PTSD and has experienced severe depression.

2273.   He has participated in treatment programs to address his emotional problems and has been on medication to address them.

2274.   As a result of the attack, and the injuries he suffered, Plaintiff Tony Wood has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2275.   Plaintiff Joedi Wood is a citizen of the United States and domiciled in the State of Hawaii. She is the wife of Tony Wood.

2276.   Plaintiff Adam Wood is a citizen of the United States and domiciled in the State of Hawaii. He is the son of Tony Wood.

2277.   Plaintiff Megan Wood is a citizen of the United States and domiciled in the State of Hawaii. She is the daughter of Tony Wood.

2278.   As a result of the attack, and the injuries suffered by Tony Wood, Plaintiffs Joedi Wood, Adam Wood and Megan Wood have experienced severe mental anguish, and extreme emotional pain and suffering.

2279.   Plaintiff Tony Wood was discharged from the U.S. military on August 22, 2016.

**20.**   **THE AUGUST 2, 2005 ATTACK – BASRA**

**The Vincent Family**

2280.   Steven Vincent was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2281.   On August 2, 2005, Steven Vincent, a 49-year old journalist, was reporting on the deteriorating security situation in Basra when he was kidnapped by JAM, taken hostage for several hours and then shot and killed by JAM operatives.

2282.   The JAM terrorist operatives that abducted and murdered Steven Vincent were trained by Hezbollah and funded and armed by the IRGC-QF and acted under their joint direction.

2283.   Plaintiff Lisa Ramaci is a citizen of the United States and domiciled in the State of New York. She is the widow of Steven Vincent.

2284.   Plaintiff Lisa Ramaci brings an action individually and on behalf of the Estate of Steven Vincent, as its legal representative.

2285.   Plaintiff Isabell Vincent is a citizen of the United States and domiciled in the State of California. She is the mother of Steven Vincent.

2286.   Plaintiff Isabell Vincent brings an action individually and on behalf of the Estate of her late husband, Charles Vincent, as its legal representative.

2287.   Charles Vincent was a citizen of the United States and was last domiciled in the State of California. He is the father of Steven Vincent.  As a result of Steven Vincent's murder, Mr. Vincent experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

2288.   As a result of the attack, and the death of Steven Vincent, Plaintiffs Lisa Ramaci and Isabell Vincent have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband/son's society, companionship, comfort, advice and counsel.

## 21.   THE AUGUST 7, 2005 ATTACK – BAGHDAD

**The Kalladeen Family**

2289.   Anthony N. Kalladeen was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2290.   On August 7, 2005, Anthony N. Kalladeen, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2291.   Anthony N. Kalladeen died on August 8, 2005 as a result of the injuries he sustained in the attack.

2292.   The weapon used to kill Anthony N. Kalladeen was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2293.   Plaintiff Maria Vidal is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Anthony N. Kalladeen.

2294.   As a result of the attack, and the death of Anthony N. Kalladeen, Plaintiff Maria Vidal has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 22.   THE SEPTEMBER 2, 2005 ATTACK – BAGHDAD

**The Hassler Family**

2295.   Plaintiff Tamara Hassler is a citizen of the United States and domiciled in the State of North Carolina.

2296.   On September 2, 2005, Tamara Hassler, then 36, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which she was traveling in Baghdad.

2297.   The weapon used to injure Tamara Hassler was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2298.   As a result of the attack, Ms. Hassler suffered bruising in her sacroiliac joint, soft tissue damage to her piriformis muscle, and injuries to her right hip.

2299.   Ms. Hassler also suffered from three bulging discs in her lower back as a result of the attack, as well as atrophied discs in her neck.

2300.   Ms. Hassler was also diagnosed with hearing loss, PTSD, and a TBI.

2301.   Ms. Hassler has been treated by numerous doctors and physical therapists for her injuries and has been prescribed medication to treat her symptoms.

2302.   As a result of the attack, and the injuries she suffered, Plaintiff Tamara Hassler has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2303.   Plaintiff Richard E. Hassler is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Tamara Hassler.

2304.   Plaintiff Joanne Sue Hassler is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Tamara Hassler.

2305.   As a result of the attack, and the injuries Tamara Hassler has suffered, Plaintiffs Richard E. Hassler and Joanne Sue Hassler have experienced severe mental anguish and extreme emotional pain and suffering.

**The Huckfeldt Family**

2306.   Plaintiff Scott Huckfeldt is a citizen of the United States and domiciled in the State of Arizona.

2307.   On September 2, 2005, Scott Huckfeldt, then 37, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2308.   The weapon used to injure Scott Huckfeldt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2309.   As a result of the attack, Scott Huckfeldt suffered injuries to his left knee.

2310.   Mr. Huckfeldt was also diagnosed with PTSD.

422

2311.   As a result of the attack, and the injuries he suffered, Plaintiff Scott Huckfeldt has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2312.   Plaintiff Kathryn Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Scott Huckfeldt.

2313.   Plaintiff Alisha Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. She is the daughter of Scott Huckfeldt.

2314.   Plaintiff Matthew Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. He is the son of Scott Huckfeldt.

2315.   As a result of the attack, and the injuries Scott Huckfeldt has suffered, Plaintiffs Kathryn Huckfeldt, Alisha Huckfeldt and Matthew Huckfeldt have experienced severe mental anguish and extreme emotional pain and suffering.

**The Newman Family**

2316.   Plaintiff Timothy Newman is a citizen of the United States and domiciled in the State of South Carolina.

2317.   On September 2, 2005, Timothy Newman, then 41, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2318.   The weapon used to injure Timothy Newman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2319.   As a result of the attack, Mr. Newman's legs were injured, and his right leg had to be amputated above the knee.

2320.   Mr. Newman's left hand was injured, and it had to be partially amputated at the wrist.

2321.   Mr. Newman received a penetrating wound to his chest and abdomen and suffered a broken spine and various broken bones.

2322.   Mr. Newman was also diagnosed with PTSD and a TBI.

2323.   As a result of the attack, and the injuries he suffered, Plaintiff Timothy Newman has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2324.   Plaintiff Padraic J. Newman is a citizen of the United States and domiciled in the State of South Carolina. He is the son of Timothy Newman.

2325.   As a result of the attack, and the injuries Timothy Newman has suffered, Plaintiff Padraic J. Newman has experienced severe mental anguish and extreme emotional pain and suffering.

## 23.    THE SEPTEMBER 6, 2005 ATTACK – BAGHDAD

**The Jonaus Family**

2326.   Jude Jonaus was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2327.   On September 6, 2005, Jude Jonaus, aged 27, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

2328.   Jude Jonaus was killed in the attack.

2329.   The weapon used to kill Jude Jonaus was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2330.   Plaintiff Amenia Jonaus is a citizen of the United States and domiciled in the State of Florida. She is the mother of Jude Jonaus.

2331.   Plaintiff Amenia Jonaus brings an action individually and on behalf of the Estate of Jude Jonaus, as its legal representative.

2332.   Plaintiff Gernessoit Jonaus is a citizen of the United States and domiciled in the State of Florida. He is the father of Jude Jonaus.

2333.   Plaintiff Daphnie Jonaus Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

2334.   Plaintiff Ricky Jonaus is a citizen of the United States and domiciled in the State of South Carolina. He is the brother of Jude Jonaus.

2335.   Plaintiff Marckendy Jonaus is a citizen of the United States and domiciled in the State of Florida. He is the brother of Jude Jonaus.

2336.   Plaintiff Claire Jonaus is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

2337.   Plaintiff Sharen Jonaus Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

2338.   As a result of the attack, and the death of Jude Jonaus, Plaintiffs Amenia Jonaus, Gernessoit Jonaus, Daphnie Jonaus Martin, Ricky Jonaus, Marckendy Jonaus, Claire Jonaus and Sharen Jonaus Martin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 24.    THE SEPTEMBER 26, 2005 ATTACK – BAGHDAD

**The Tuliau Family**

2339.   Tulsa T. Tuliau was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2340.   On September 26, 2005, Tulsa T. Tuliau, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2341.   Tulsa T. Tuliau was killed in the attack.

2342.   The weapon used to kill Tulsa T. Tuliau was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2343.   Plaintiff Masina Tuliau is a citizen of the United States and domiciled in the State of Washington. She is the mother of Tulsa T. Tuliau.

2344.   As a result of the attack, and the death of Tulsa T. Tuliau, Plaintiff Masina Tuliau has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 25.    THE SEPTEMBER 28, 2005 ATTACK – UMM QASR

**The Morin Family**

2345.   Steve Morin, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2346.   On September 28, 2005, Steve Morin, Jr., aged 34, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2347.   Steve Morin, Jr. was killed in the attack.

2348.   The weapon used to kill Steve Morin, Jr. was a Hezbollah-designed and Iranian-

manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2349.   Plaintiff Gwendolyn Morin-Marentes is a citizen of the United States and domiciled in the State of Texas. She is the widow of Steve Morin, Jr.

2350.   Plaintiff Gwendolyn Morin-Marentes brings an action individually and on behalf of the Estate of Steve Morin, Jr., as its legal representative.

2351.   Plaintiff Esteban Morin is a citizen of the United States and domiciled in the State of Texas. He is the son of Steve Morin, Jr.

2352.   Plaintiff Audelia (Audrey) Morin is a citizen of the United States and domiciled in the State of Texas. She is the mother of Steve Morin, Jr.

2353.   Plaintiff Estavan (Steve) Morin, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Steve Morin, Jr.

2354.   Plaintiff Brianna Renee Navejas is a citizen of the United States and domiciled in the State of Texas. She is the stepdaughter of Steve Morin, Jr.

2355.   As a result of the attack, and the death of Steve Morin, Jr., Plaintiffs Gwendolyn Morin-Marentes, Esteban Morin, Audrey Morin, Steve Morin, Sr. and Brianna Renee Navejas have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice and counsel.

## The Martinez Family

2356.   Plaintiff Margarito A. Martinez, Jr. is a citizen of the United States and domiciled in the State of Texas.

2357.   On September 28, 2005, Margarito Martinez, then 36, was serving in the U.S. military in Iraq.

2358.   He was driving in a convoy when an EFP emplaced by Special Groups struck the lead vehicle.

2359.   The weapon used to injure Margarito Martinez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2360.   After the lead vehicle was stuck by the EFP, Mr. Martinez got out of his vehicle to check on the occupants of the vehicle that had been struck. He saw that Steve Morin had been hit in the back of the skull and appeared to be dead.

2361.   He then checked on Elizabeth Jacobson, who had been in Steve Morin's HMMWV and observed that she had been decapitated.

2362.   Finally, he checked on Andy Martinez, who was the gunner in the HMMWV. Andy was standing in the turret and couldn't hear or see anything. Mr. Martinez got on top of the vehicle and pulled Andy out. He cut off some of Andy's clothing to start an IV line for him.

2363.   As a result of the attack, Mr. Martinez suffers from PTSD.

2364.   As a result of the attack, and the injuries he suffered, Plaintiff Margarito Martinez, Jr. has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2365.   Plaintiff Margarito Martinez was discharged from the U.S. military on April 4, 2011.

### 26.     THE OCTOBER 6, 2005 ATTACK – BAGHDAD

### The Robinson Family

2366.   Jeremiah Robinson was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

2367.   On October 6, 2005, Jeremiah Robinson, aged 20, was serving in the U.S. military

in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2368.   Jeremiah Robinson was killed in the attack.

2369.   The weapon used to kill Jeremiah Robinson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2370.   Plaintiff Amy Lynn Robinson is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Jeremiah Robinson.

2371.   Plaintiff Floyd Burton Robinson is a citizen of the United States and domiciled in the State of Arizona. He is the father of Jeremiah Robinson.

2372.   Plaintiffs Amy Lynn Robinson and Floyd Burton Robinson bring an action individually and on behalf of the Estate of Jeremiah Robinson, as its legal representatives.

2373.   Plaintiff Jacob Michael Robinson is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Jeremiah Robinson.

2374.   Plaintiff Lucas William Robinson is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Jeremiah Robinson.

2375.   As a result of the attack, and the death of Jeremiah Robinson, Plaintiffs Amy Lynn Robinson, Floyd Burton Robinson, Jacob Michael Robinson and Lucas William Robinson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Burns Family**

2376.   Plaintiff Alvis Burns is a citizen of the United States and domiciled in the State of Arizona.

2377.   On October 6, 2005, Alvis Burns, then 41, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2378.   The weapon used to injure Alvis Burns was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2379.   As a result of the blast, Alvis Burns's skull was cracked, and shrapnel was lodged in his brain.

2380.   Mr. Burns experienced brain swelling, and he underwent brain surgery. He has been diagnosed with a TBI.

2381.   Shrapnel penetrated and became embedded in Mr. Burns' face and left arm. He also sustained hearing loss as a result of the blast.

2382.   Mr. Burns fell in and out of comas and was in a vegetative state for long periods of time. He was fed through a feeding tube.

2383.   As a result of the injuries sustained in the attack and following his many procedures, Mr. Burns has had to relearn how to swallow, eat, speak, and walk.

2384.   He experiences pain in his legs and feet and currently uses an electric wheelchair and at times, a walker.

2385.   As a result of the attack, and the injuries he suffered, Plaintiff Alvis Burns has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2386.   Plaintiff JoDee Johnson is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Alvis Burns.

2387.   Plaintiff James Higgins is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Alvis Burns.

2388.   Plaintiff Wendy Coleman is a citizen of the United States and domiciled in the State of Washington. She is the sister of Alvis Burns.

2389.   As a result of the attack, and the injuries Alvis Burns has suffered, Plaintiffs JoDee Johnson, James Higgins, and Wendy Coleman have experienced severe mental anguish, and extreme emotional pain and suffering.

**The Radke Family**

2390.   Plaintiff Brian Radke is a citizen of the United States and domiciled in the State of Washington.

2391.   On October 6, 2005, Brian Radke, then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2392.   The weapon used to injure Brian Radke was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2393.   As a result of the attack, Brian Radke sustained shrapnel to his body, including a piece that clipped his carotid artery.

2394.   He also sustained shrapnel in his right leg, and he has undergone reconstructive knee surgery.

2395.   Mr. Radke's jaw was fractured in multiple locations, and he lost his right finger.

2396.   His left arm was fractured in two locations, and his median nerve was severed.

2397.   Mr. Radke has undergone numerous surgical procedures, including those to address the severed nerve and to emplace rods and to apply skin grafts in his left arm.

2398.   He was in a coma, during which time he was fed by a feeding tube and breathed through a trach tube.

2399.   Mr. Radke still has pieces of shrapnel in his body, including some fragments lodged in his brain.

2400.   His injuries have required physical therapy and occupational therapy.

2401.   Mr. Radke has been diagnosed with PTSD and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

2402.   As a result of the attack, and the injuries he suffered, Plaintiff Brian Radke has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2403.   Plaintiff Nova Radke is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Brian Radke.

2404.   As a result of the attack, and the injuries Brian Radke has suffered, Plaintiff Nova Radke has experienced severe mental anguish, and extreme emotional pain and suffering.

2405.   Plaintiff Brian Radke was discharged from the U.S. military on August 27, 2009.

**The Vernier Family**

2406.   Plaintiff Steven Vernier, Jr. is a citizen of the United States and domiciled in the State of Tennessee.

2407.   On October 6, 2005, Steven Vernier, Jr., then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2408.   The weapon used to injure Steven Vernier, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2409.   As a result of the blast, Steven Vernier, Jr. sustained shrapnel to his face, neck, right shoulder, right wrist, and his thighs.

2410.   He also sustained first degree burns.

2411.   Mr. Vernier has experienced and continues to experience hearing loss in both ears.

2412.   He has undergone procedures to remove the shrapnel.

2413.   The injuries Mr. Vernier sustained resulted in a loss of range of motion in his right shoulder and right wrist.

2414.   He has been prescribed medication for pain. The pain continues to the present day.

2415.   Mr. Vernier has experienced flashbacks, nightmares, and extreme survivor's guilt.

2416.   He has been diagnosed with PTSD and has sought counseling.

2417.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Vernier, Jr. has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 27.   THE DECEMBER 8, 2005 ATTACK – BAGHDAD

**The Smith Family**

2418.   Kevin J. Smith was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2419.   On December 8, 2005, Kevin J. Smith, aged 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2420.   Kevin J. Smith was killed in the attack.

2421.   The weapon used to kill Kevin J. Smith was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2422.   Plaintiff Clifford L. Smith, Jr. is a citizen of the United States and domiciled in the State of Florida. He is the father of Kevin J. Smith.

2423.   Plaintiff Clifford L. Smith, Jr. brings an action individually and on behalf of the Estate of Kevin J. Smith, as its legal representative.

2424.   Plaintiff Georgianna Stephens-Smith is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Kevin J. Smith.

2425.   Plaintiff Corena Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Kevin J. Smith.

2426.   As a result of the attack, and the death of Kevin J. Smith, Plaintiffs Clifford L. Smith, Jr., Georgianna Stephens-Smith, and Corena Martin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Mattis Family**

2427.   Plaintiff Adam Mattis is a citizen of the United States and domiciled in the State of Texas.

2428.   On December 8, 2005. Adam Mattis, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2429.   The weapon used to injure Adam Mattis was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2430.   Mr. Mattis was driving a HMMWV, the second vehicle in a five-vehicle convoy, when his vehicle was hit by an EFP.

2431.   Mr. Mattis was hit by shrapnel in his right arm. The shrapnel hit his bicep and went into his shoulder. The shrapnel cut and cauterized an artery.

2432.   Following the attack, he was medevaced to a combat support hospital in Iraq for initial treatment. He was not allowed to leave Iraq for further treatment to his wounds until the end of his deployment in January 2006 which resulted in Methicillin-resistant Staphylococcus aureus (MRSA), a secondary infection.

2433.   After his deployment ended in January 2006, he initially sought treatment at a civilian hospital in Savannah, Georgia and then at Fort Stewart.

2434.   Mr. Mattis has also sought treatment at the VA.

2435.   He has been diagnosed with a TBI and PTSD.

2436.   As a result of the attack, and the injuries he suffered, Plaintiff Adam Mattis has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Peterson Family**

2437.   Plaintiff Terrance Peterson, III is a citizen of the United States and domiciled in the State of Arizona.

2438.   On March 23, 2008, Terrance Peterson, then 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2439.   The weapon used to injure Terrance Peterson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2440.   Mr. Peterson was an occupant in the second vehicle traveling in a five-vehicle convoy, when his vehicle was hit by an EFP.

2441.   Mr. Peterson was hit by shrapnel in his right foot, both knees and his left arm. He had multiple fractures and tissue damage. The brachial artery in his right arm was severed.

2442.   Following the attack, Mr. Peterson was taken to FOB Loyalty to stabilize him and was then taken to Balad for surgery to repair the brachial artery. From there he was transferred to Landstuhl, Germany and then to Walter Reed Army Medical Center where he spent the next 9 months. Ultimately, he was sent to Wynn Army Hospital at Fort Stewart where he concluded his military service.

2443.   Mr. Peterson has undergone 33 surgeries as a result of the attack.

2444.   As a result of the attack, and the injuries he suffered, Plaintiff Terrance Peterson, III has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2445.   Plaintiff Petra Spialek is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Terrance Peterson, III.

2446.   As a result of the attack, and the injuries Terrance Peterson, III has suffered, Plaintiff Petra Spialek has experienced severe mental anguish, and extreme emotional pain and suffering.

## 28.   <u>THE DECEMBER 25, 2005 ATTACK – BAGHDAD</u>

**<u>The Cardinal Family</u>**

2447.   Anthony Cardinal was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

2448.   On December 25, 2005, Anthony Cardinal, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2449.   Anthony Cardinal was killed in the attack.

2450.   The weapon used to kill Anthony Cardinal was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2451.   Plaintiff David G. Cardinal, Jr. is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Anthony Cardinal.

2452.   Plaintiff David G. Cardinal, Jr. brings an action individually and on behalf of the Estate of Anthony Cardinal, as its legal representative.

2453.   As a result of the attack, and the death of Anthony Cardinal, Plaintiff David G. Cardinal, Jr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

### 29.   THE JANUARY 5, 2006 ATTACK – NAJAF

#### The Hecker Family

2454.   William F. Hecker, III was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

2455.   On January 5, 2006, William F. Hecker, III, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2456.   William F. Hecker, III was killed in the attack.

2457.   The weapon used to kill William F. Hecker, III was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2458.   Plaintiff Richelle Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the widow of William F. Hecker, III.

2459.   Plaintiff Richelle Hecker brings an action individually and on behalf of the Estate of William F. Hecker, III, as its legal representative.

2460.   Plaintiff Victoria Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of William F. Hecker, III.

2461.   Plaintiff W.H., a minor represented by his legal guardian, Richelle Hecker, is a citizen of the United States and domiciled in the State of Colorado. He is the son of William F. Hecker, III.

2462.   Plaintiff C.H., a minor represented by her legal guardian, Richelle Hecker, is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of William F. Hecker, III.

2463.   Plaintiff William F. Hecker, Jr. is a citizen of the United States and domiciled in the State of Colorado. He is the father of William F. Hecker, III.

2464.   Plaintiff Nancy Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the mother of William F. Hecker, III.

2465.   Plaintiff John D. Hecker is a citizen of the United States and domiciled in the State of New York. He is the brother of William F. Hecker, III.

2466.   As a result of the attack, and the death of William F. Hecker, III, Plaintiffs Richelle Hecker, Victoria Hecker, W.H., C.H., William F. Hecker, Jr., Nancy Hecker and John D. Hecker have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Mariano Family**

2467.   Robbie M. Mariano was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2468.   On January 5, 2006, Robbie M. Mariano, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2469.   Robbie M. Mariano was killed in the attack.

438

2470.   The weapon used to kill Robbie M. Mariano was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2471.   Plaintiff Robert F. Mariano is a citizen of the United States and domiciled in the State of California. He is the father of Robbie M. Mariano.

2472.   Plaintiff Robert F. Mariano brings an action individually and on behalf of the Estate of Robbie M. Mariano, as its legal representative.

2473.   Plaintiff Debra Mariano is a citizen of the United States and domiciled in the State of California. She is the mother of Robbie M. Mariano.

2474.   Plaintiff Bobbie D. Mariano is a citizen of the United States and domiciled in the State of California. He is the brother of Robbie M. Mariano.

2475.   As a result of the attack, and the death of Robbie M. Mariano, Plaintiffs Robert F. Mariano, Debra Mariano and Bobbie D. Mariano have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## The White Family

2476.   Stephen J. White was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

2477.   On January 5, 2006, Stephen J. White, aged 39, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2478.   Stephen J. White was killed in the attack.

2479.   The weapon used to kill Stephen J. White was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2480.   Plaintiff Vickie Michay White is a citizen of the United States and domiciled in the State of Texas. She is the widow of Stephen J. White.

2481.   Plaintiff Vickie Michay White brings an action individually and on behalf of the Estate of Stephen J. White, as its legal representative.

2482.   As a result of the attack, and the death of Stephen J. White, Plaintiff Vickie Michay White has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 30.   THE JANUARY 5, 2006 ATTACK – BAGHDAD

**The Lopez Reyes Family**

2483.   Jason Lopez Reyes was a citizen of the United States and domiciled in the Commonwealth of Puerto Rico when he was killed in Iraq.

2484.   On January 5, 2006, Jason Lopez Reyes, then 29, was serving in the U.S. military in Iraq when a dual-array EFP emplaced by Special Groups detonated near his vehicle.

2485.   Jason Lopez Reyes was killed in the attack.

2486.   The weapon used to kill Jason Lopez Reyes was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2487.   Plaintiff Gladys E. Reyes Centeno is a citizen of the United States and domiciled in Puerto Rico. She is the mother of Jason Lopez Reyes.

2488.   Plaintiff Veronica Lopez Reyes is a citizen of the United States and domiciled in Puerto Rico. She is the sister of Jason Lopez Reyes.

2489.   Plaintiff Veronica Lopez Reyes brings an action individually and on behalf of the Estate of Jason Lopez Reyes, as its legal representative.

2490.   Plaintiff Zoraima Lopez is a citizen of the United States and domiciled in the State of Texas. She is the sister of Jason Lopez Reyes.

2491.   As a result of the attack, and the death of Jason Lopez Reyes, Plaintiffs Gladys E. Reyes Centeno, Veronica Lopez Reyes, and Zoraima Lopez have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 31.   THE JANUARY 18, 2006 ATTACK – BASRA

**The Hickman Family**

2492.   Richard Thomas "Rick" Hickman was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

2493.   On January 18, 2006, Richard Hickman, aged 52, a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2494.   Richard Hickman was killed in the attack.

2495.   The weapon used to kill Richard Hickman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2496.   Plaintiff Jennifer Link is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Richard Hickman.

441

2497.   Plaintiff Sharon Johnston is a citizen of the United States and domiciled in the State of Florida. She is the sister of Richard Hickman.

2498.   As a result of the attack, and the death of Richard Hickman, Plaintiffs Jennifer Link and Sharon Johnston have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/brother's society, companionship, comfort, advice and counsel.

**32.     THE FEBRUARY 14, 2006 ATTACK – BAGHDAD**

**The Hutchinson Family**

2499.   Plaintiff Tara Hutchinson is a citizen of the United States and domiciled in the State of Texas.

2500.   On February 14, 2006, Plaintiff Tara Hutchinson, then 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated as her vehicle passed by it.

2501.   The weapon used to injure Tara Hutchinson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2502.   As a result of the attack, Ms. Hutchinson's right leg was severed above the knee, she sustained 3rd degree burns to her left foot, and the main artery in her right leg was severed.

2503.   She has undergone more than 10 surgical procedures.

2504.   Ms. Hutchinson has also been diagnosed with a TBI, depression and PTSD.

2505.   As a result of the attack, and the injuries she suffered, Plaintiff Tara Hutchinson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2506.   Plaintiff Tara Hutchinson was discharged from the U.S. military on January 26, 2010.

33. **THE FEBRUARY 17, 2006 ATTACK – BAGHDAD**

**The Lee Family**

2507.   Plaintiff Kenny Lee is a citizen of the United States and domiciled in the State of Virginia.

2508.   On February 17, 2006, Kenny Lee, then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2509.   The weapon used to injure Kenny Lee was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2510.   As a result of the attack, Kenny Lee was stunned and incapacited by the force of the concussive blast and shrapnel that entered his body in his buttocks region and partially exited from his back. Because the M1114 vehicle he was in remained operational after the detonation, Mr. Lee remained in shock and did not realize he had been hit with copper shrapnel from the EFP until he noticed that the back of his uniform was completely bloodstained.

2511.   A few days after the explosion, he discovered a concussive bruise approximately ten inches in diameter on his chest as a result of the explosion. Mr. Lee has lost flexibility due to the scarring from his injuries in addition to suffering back pain and sciatic pain.

2512.   As a result of the attack, and the injuries he suffered, Plaintiff Kenny Lee has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2513.   Plaintiff Tom B. Lee is a citizen of the United States and domiciled in the State of Connecticut. He is the father of Kenny Lee.

2514.   Plaintiff Ling P. Lee is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Kenny Lee.

443

2515.   As a result of the attack, and the injuries Kenny Lee suffered, Plaintiffs Tom B. Lee and Ling P. Lee have experienced severe mental anguish and extreme emotional pain and suffering.

**34.   THE FEBRUARY 18, 2006 ATTACK – BAGHDAD**

**The Matheny Family**

2516.   Charles E. Matheny, IV was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2517.   On February 18, 2006, Charles E. Matheny, IV, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2518.   Charles E. Matheny, IV was killed in the attack.

2519.   The weapon used to kill Charles E. Matheny, IV was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2520.   Plaintiff Deborah Noble is a citizen of the United States and domiciled in the State of Texas. She is the mother of Charles E. Matheny, IV.

2521.   Plaintiff Deborah Noble brings an action individually and on behalf of the Estate of Charles E. Matheny, IV, as its legal representative.

2522.   Plaintiff David Noble is a citizen of the United States and domiciled in the State of Texas. He is the stepfather of Charles E. Matheny, IV.

2523.   Plaintiff Charles E. Matheny, III is a citizen of the United States and domiciled in the State of Washington. He is the father of Charles E. Matheny, IV.

2524.   As a result of the attack, and the death of Charles E. Matheny, IV, Plaintiffs Deborah Noble, David Noble and Charles E. Matheny, III have experienced severe mental anguish,

extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

### 35.   THE FEBRUARY 20, 2006 ATTACK –HINDIYAH

**The Collado Family**

2525.   Jay T. Collado was a citizen of the United States and domiciled in the State of South Carolina when he was killed in Iraq.

2526.   On February 20, 2006, Jay T. Collado, aged 31, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2527.   Jay T. Collado was killed in the attack.

2528.   The weapon used to kill Jay T. Collado was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2529.   Plaintiff Judy Collado is a citizen of the United States and domiciled in the State of California. She is the widow of Jay T. Collado.

2530.   Plaintiff Kaiya Collado is a citizen of the United States and domiciled in the State of California. She is the daughter of Jay T. Collado.

2531.   As a result of the attack, and the death of Jay T. Collado, Plaintiffs Judy Collado and Kaiya Collado have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Waldeck Family**

2532.   Plaintiff Justin Waldeck is a citizen of the United States and domiciled in the State of Illinois.

2533.   On February 20, 2006, Justin Waldeck was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2534.   The weapon used to injure Justin Waldeck was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2535.   As a result of the attack, Mr. Waldeck sustained shrapnel injuries to his right knee and significant injuries to his left hand. The metacarpal bones in his left hand had to be fused, and he suffered nerve damage to his left pinky.

2536.   As a result of the attack, and the injuries he suffered, Plaintiff Justin Waldeck has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**36.**   **THE FEBRUARY 20, 2006 ATTACK – BAGHDAD**

**The Kuhlmeier Family**

2537.   Daniel Kuhlmeier was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

2538.   On February 20, 2006, Daniel Kuhlmeier, aged 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2539.   Daniel Kuhlmeier was killed in the attack.

2540.   The weapon used to kill Daniel Kuhlmeier was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2541.   Plaintiff Tanja Kuhlmeier is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Daniel Kuhlmeier.

2542.   Plaintiff Tanja Kuhlmeier brings an action individually and on behalf of the Estate of Daniel Kuhlmeier, as its legal representative.

2543.   Plaintiff K.K., a minor represented by her legal guardian, Tanja Kuhlmeier, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Daniel Kuhlmeier.

2544.   Plaintiff Robert J. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Daniel Kuhlmeier.

2545.   Plaintiff Theresa A. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Daniel Kuhlmeier.

2546.   Plaintiff Theresa Ann Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Daniel Kuhlmeier.

2547.   Plaintiff Edward Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2548.   Plaintiff Thomas Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2549.   Plaintiff John Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2550.   Plaintiff Robert W. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2551.   As a result of the attack, and the death of Daniel Kuhlmeier, Plaintiffs Tanja Kuhlmeier, K.K., Robert J. Kuhlmeier, Theresa A. Kuhlmeier, Theresa Ann Kuhlmeier, Edward Kuhlmeier, Thomas Kuhlmeier, John Kuhlmeier, and Robert W. Kuhlmeier have experienced

severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

### 37.   THE FEBRUARY 26, 2006 ATTACK – BAGHDAD

**The Farr Family**

2552.   Clay P. Farr was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2553.   On February 26, 2006, Clay P. Farr, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2554.   Clay P. Farr was killed in the attack.

2555.   The weapon used to kill Clay P. Farr was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2556.   Plaintiff Patrick Farr is a citizen of the United States and domiciled in the State of California. He is the father of Clay P. Farr.

2557.   Plaintiff Patrick Farr brings an action individually and on behalf of the Estate of Clay P. Farr, as its legal representative.

2558.   Plaintiff Silver Farr is a citizen of the United States and domiciled in the State of California. She is the stepmother of Clay P. Farr.

2559.   Plaintiff Carrol Alderete is a citizen of the United States and domiciled in the State of California. She is the mother of Clay P. Farr.

2560.   Plaintiff Anthony Alderete is a citizen of the United States and domiciled in the State of California. He is the stepfather of Clay P. Farr.

2561.   Plaintiff Chad Farr is a citizen of the United States and domiciled in the State of California. He is the brother of Clay P. Farr.

2562.   As a result of the attack, and the death of Clay P. Farr, Plaintiffs Patrick Farr, Silver Farr, Carrol Alderete, Anthony Alderete and Chad Farr have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Hunter Family**

2563.   Wesley Hunter was a citizen of the United States and domiciled in the State of New York when he was injured in Iraq.

2564.   On February 26, 2006, Wesley Hunter, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2565.   Wesley Hunter was injured in the attack, and he died on September 18, 2008 from the injuries he sustained in the attack.

2566.   The weapon used to kill Wesley Hunter was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2567.   Plaintiff Rayanne Hunter is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Wesley Hunter.

2568.   Plaintiff Rayanne Hunter brings an action individually and on behalf of the Estate of Wesley Hunter, as its legal representative.

2569.   Plaintiff W.H., a minor represented by his legal guardian Rayanne Hunter, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Wesley Hunter.

2570.   Plaintiff T.H., a minor represented by her legal guardian Rayanne Hunter, is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Wesley Hunter.

2571.   As a result of the attack, and the death of Wesley Hunter, Plaintiffs Rayanne Hunter, W.H. and T.H. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

### 38.   THE MARCH 13, 2006 ATTACK – RUSTAMIYAH

**The Lewis Family**

2572.   Bryan A. Lewis was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

2573.   On March 13, 2006, Bryan A. Lewis, aged 32, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2574.   Bryan A. Lewis was killed in the attack.

2575.   The weapon used to kill Bryan A. Lewis was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2576.   Plaintiff Fabersha Flynt Lewis is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Bryan A. Lewis.

2577.   As a result of the attack, and the death of Bryan A. Lewis, Plaintiff Fabersha Flynt Lewis has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

# A-529

### 39.   **THE MARCH 26, 2006 ATTACK – BAGHDAD**

**The Bershefsky Family**

2578.   Plaintiff Christopher Anthony Bershefsky is a citizen of the United States and domiciled in the State of Pennsylvania.

2579.   On March 26, 2006, Christopher Anthony Bershefsky, then 32, was a private contractor with Erinys International, a British security company, in Iraq. He had been in Iraq for approximately three months during this assignment. He had also previously served in the United States Marine Corps for six years and was discharged in 1998.

2580.   Mr. Bershefsky was driving an armored Ford F350 vehicle en route to his base after completing a mission a few miles outside the international zone in Baghdad. He was approximately two miles from Gate 2 to enter the international zone when his vehicle was struck by an EFP emplaced by Special Groups. The force of the blast blew through Mr. Bershefsky's door.

2581.   The weapon used to injure Mr. Bershefsky was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2582.   As a result of the attack, Mr. Bershefsky sustained a fractured pelvis, damaged sciatic nerve, muscle tissue loss due to debridement in his left leg, damages to his left foot, which was rendered mostly inoperable, a torn urethra, and additional shrapnel injuries that have caused him to have a colostomy bag and suffer from urological deficits.

2583.   In addition to the physical injuries he sustained, Mr. Bershefsky also suffers from severe depression, anxiety, and PTSD.

2584.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Anthony Bershefsky has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**40.      THE APRIL 1, 2006 ATTACK – BAGHDAD**

**The Devora-Garcia Family**

2585.   Israel Devora-Garcia was domiciled in the State of Texas when he was killed in Iraq. He became a citizen of the United States posthumously.

2586.   On April 1, 2006, Israel Devora-Garcia, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated while he was conducting a dismounted patrol.

2587.   Israel Devora-Garcia was killed in the attack.

2588.   The weapon used to kill Israel Devora-Garcia was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2589.   Plaintiff Lorenzo Sandoval, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the stepfather of Israel Devora-Garcia.

2590.   Plaintiff Lorenzo Sandoval, Sr. brings an action individually and on behalf of the Estate of Israel Devora-Garcia, as its legal representative.

2591.   Plaintiff Lorenzo Sandoval, Jr. is a citizen of the United States and domiciled in the State of Texas. He is the brother of Israel Devora-Garcia.

2592.   Plaintiff Adrian Sandoval is a citizen of the United States and domiciled in the State of Texas. He is the brother of Israel Devora-Garcia.

2593.   Plaintiff Rosa Esther Sandoval is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Israel Devora-Garcia.

2594.   As a result of the attack, and the death of Israel Devora-Garcia, Plaintiffs Lorenzo Sandoval, Sr., Lorenzo Sandoval, Jr., Adrian Sandoval and Rosa Esther Sandoval have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 41.   THE APRIL 12, 2006 ATTACK – MISIAB

### The Bandhold Family

2595.   Scott Bandhold was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2596.   On April 12, 2006, Scott Bandhold, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2597.   Scott Bandhold was killed in the attack.

2598.   The weapon used to kill Scott Bandhold was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2599.   Plaintiff Henry J. Bandhold, Sr. is a citizen of the United States and domiciled in the State of Florida. He is the father of Scott Bandhold.

2600.   Plaintiff Henry J. Bandhold, Sr. brings an action individually and on behalf of the Estate of Scott Bandhold, as its legal representative.

2601.   Plaintiff Afonso Bandhold is a citizen of the United States and domiciled in Portugal. He is the son of Scott Bandhold.

2602.  Plaintiff Mariana Bandhold is a citizen of the United States and domiciled in the State of California. She is the daughter of Scott Bandhold.

2603.  Plaintiff H. Joseph Bandhold is a citizen of the United States and domiciled in the State of New York. He is the brother of Scott Bandhold.

2604.  Plaintiff Donald C. Bandhold is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Scott Bandhold.

2605.  As a result of the attack, and the death of Scott Bandhold, Plaintiffs Henry J. Bandhold, Sr., Afonso Bandhold, Mariana Bandhold, H. Joseph Bandhold and Donald C. Bandhold have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice and counsel.

### 42.   **THE APRIL 16, 2006 ATTACK – BAWB ASH-SHAM**

**The Stein Family**

2606.  Plaintiff Joshua P. Stein is a citizen of the United States and domiciled in the State of Texas.

2607.  On April 16, 2006, Joshua P. Stein, then 22, was serving in the U.S. military in Iraq. He was traveling in a convoy from the Iraqi Police compound conducting route clearance when the vehicle he was driving, a Bradley Fighting Vehicle that was the second in the convoy, was hit with a dual-array EFP emplaced by Special Groups on the left side of the vehicle on ASR Dover in the Bawb Ash-Sham village north of Baghdad.

2608.  The weapon used to injure Joshua P. Stein was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2609.   As a result of the attack, Mr. Stein sustained double above-the-knee amputations, two broken forearms, elbow replacement in his left arm, fasciotomy on his right arm, nerve and muscle damage to both forearms causing him to lose feeling in both of his forearms, and a TBI.

2610.   He was in a coma for nearly a month following the attack and awoke from the coma in a military hospital in Texas after having been airlifted to Balad, Iraq, and Landstuhl, Germany.

2611.   Mr. Stein has received extensive medical treatment – including various surgeries and prosthetic fittings – at various hospitals, where he has spent years in treatment. He has been unable to utilize prosthetics because his right leg was not long enough after the amputation, so he is wheelchair-bound for ambulation.

2612.   As a result of the attack, and the injuries he suffered, Plaintiff Joshua P. Stein has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2613.   Plaintiff Nicole B. Stein is a citizen of the United States and domiciled in the State of Texas. She is the wife of Joshua P. Stein.

2614.   Plaintiff R.M.S., a minor, represented by her legal guardian Joshua P. Stein, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Joshua P. Stein.

2615.   Plaintiff J.S.S., a minor, represented by her legal guardian Joshua P. Stein, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Joshua P. Stein.

2616.   Plaintiff Jesse P. Stein is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Joshua P. Stein.

455

2617.   As a result of the attack, and the injuries Joshua P. Stein suffered, Plaintiffs Nicole B. Stein, R.M.S., and J.S.S. and Jesse P. Stein have experienced severe mental anguish and extreme emotional pain and suffering.

**The Shelswell Family**

2618.   Plaintiff Michael Paul Alan Shelswell is a citizen of the United States and domiciled in the State of Colorado.

2619.   On April 16, 2006, Michael Paul Alan Shelswell, then 23, was serving in the U.S. military in Iraq. He was sitting in the rear of a Bradley Fighting Vehicle traveling in a convoy from the Iraqi Police compound conducting route clearance when the Bradley was hit with a dual-array EFP emplaced by Special Groups on the left side of the vehicle on ASR Dover in the Bawb Ash-Sham village north of Baghdad.

2620.   The weapon used to injure Michael Paul Alan Shelswell was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2621.   As a result of the attack, Michael Paul Alan Shelswell was hit with the concussive blast in his face causing a TBI.

2622.   In addition, he sustained chemical burns to his face and upper body as the Bradley caught on fire as a result of the EFP detonation. He continues to suffer from vision and hearing difficulties, sustained memory loss, and he suffered a stroke in 2009 related to his injuries.

2623.   Mr. Shelswell also suffers from severe PTSD that has caused him to suffer from suicidal ideation in the past and makes it impossible for him to be in confined spaces.

2624.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Paul Alan Shelswell has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2625.   Plaintiff Michael Paul Alan Shelswell was discharged from the U.S. military on September 1, 2010.

### 43.   THE APRIL 25, 2006 ATTACK – SADR CITY

**The Roberts Family**

2626.   Plaintiff Erik Roberts is a citizen of the United States and domiciled in the State of Pennsylvania.

2627.   On April 25, 2006, Erik Roberts, then 22, was serving in the U.S. military in Iraq.

2628.   He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2629.   The weapon used to injure Mr. Roberts was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2630.   Mr. Roberts' right femur was severed.

2631.   He had more than one dozen surgeries to treat his right femur and has suffered numerous infections.

2632.   As a result of the attack, and the injuries he suffered, Plaintiff Erik Roberts has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2633.   Plaintiff E.C.R., a minor, represented by her legal representative Erik Roberts, is a citizen of the United States and domiciled in the State of Tennessee. She is the daughter of Erik Roberts.

2634.   Plaintiff Robin Roberts is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Erik Roberts.

2635.   Plaintiff James Craig Roberts is a citizen of the United States and domiciled in the State of Ohio. He is the father of Erik Roberts.

2636.   Plaintiff Cara Roberts is a citizen of the United States and domiciled in the State of Tennessee. She is the sister of Erik Roberts.

2637.   Plaintiff Colin Roberts is a citizen of the United States and domiciled in the State of Tennessee. He is the brother of Erik Roberts.

2638.   As a result of the attack, and the injuries Erik Roberts suffered, Plaintiffs E.C.R., Robin Roberts, James Craig Roberts, Cara Roberts and Colin Roberts have experienced severe mental anguish and extreme emotional pain and suffering.

**The Murphy Family**

2639.   Plaintiff Luke Murphy is a citizen of the United States and domiciled in the State of Florida.

2640.   On April 25, 2006, Luke Murphy, then 24, was serving in the U.S. military in Iraq.

2641.   He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2642.   The weapon used to injure Mr. Murphy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2643.   The explosive charge passed through Mr. Murphy's right leg, amputating it. Portions of his left leg muscles were destroyed, and he sustained a compound fracture of his left tibia and fibula, rendering his left leg useless.

458

2644.   Smoke began filling the inside of the vehicle. The vehicle ultimately crashed into a wall, and Mr. Murphy eventually found a way to exit the vehicle. He crawled on the ground, dragging the remaining stump of his right leg and injured left leg while he continued to experience significant blood loss.

2645.   Mr. Murphy has undergone over 30 procedures to address the injuries sustained in the attack, including those involving the additional shortening of the stump of his right leg and issues involving the problems that have developed with his left leg and foot.

2646.   Mr. Murphy has been prescribed anti-depressants and medication to assist with sleep issues.

2647.   As a result of the attack, and the injuries he suffered, Plaintiff Luke Murphy has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2648.   Plaintiff Willette Murphy is a citizen of the United States and domiciled in the State of Florida. She is the mother of Luke Murphy.

2649.   As a result of the attack, and the injuries Luke Murphy suffered, Plaintiff Willette Murphy has experienced severe mental anguish and extreme emotional pain and suffering.

**The Irwin Family**

2650.   Plaintiff Shane Irwin is a citizen of the United States and domiciled in the State of Florida.

2651.   On April 25, 2006, Shane Irwin, then 23, was serving in the U.S. military in Iraq.

2652.   He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

459

2653.   The weapon used to injure Mr. Irwin was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2654.   As a result of the attack, Mr. Irwin suffered lacerations, smoke inhalation and ruptured ear drums.

2655.   He also suffers from a TBI and PTSD.

2656.   As a result of the attack, and the injuries he suffered, Plaintiff Shane Irwin has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2657.   Plaintiff T.R., a minor represented by her legal guardian, Shane Irwin, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Shane Irwin.

2658.   Plaintiff Helen Marguerite Irwin is a citizen of the United States and domiciled in the State of Florida. She is the mother of Shane Irwin.

2659.   Plaintiff Nicole Irwin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Shane Irwin.

2660.   As a result of the attack, and the injuries Shane Irwin suffered, Plaintiffs T.R., Helen Marguerite Irwin and Nicole Irwin have experienced severe mental anguish and extreme emotional pain and suffering.

2661.   Plaintiff Shane Irwin was discharged from the U.S. military on April 25, 2014.

**44.    THE APRIL 28, 2006 ATTACK – BAGHDAD**

**The Gomez Family**

2662.   Jose Gomez was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2663.   On April 28, 2006, Jose Gomez, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2664.   Jose Gomez was killed in the attack.

2665.   The weapon used to kill Jose Gomez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2666.   Plaintiff Maria Gomez is a citizen of the United States and domiciled in the State of New York. She is the mother of Jose Gomez.

2667.   Plaintiff Maria Gomez brings an action individually and on behalf of the Estate of Jose Gomez, as its legal representative.

2668.   As a result of the attack, and the death of Jose Gomez, Plaintiff Maria Gomez has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 45.   THE MAY 2, 2006 ATTACK – BAGHDAD

**The Greer Family**

2669.   Plaintiff John Dana Greer is a citizen of the United States and domiciled in the State of Texas.

2670.   On May 2, 2006, John Dana Greer, then 49, was a civilian contractor with Blackwater Security Consulting in Iraq.

2671.   Mr. Greer was driving a South African Mamba vehicle in a four-vehicle caravan en route to the Iraqi Ministry of Finance when the vehicle he was driving was struck by five EFPs emplaced by Special Groups.

461

2672.   The weapon used to injure Mr. Greer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2673.   As a result of the attack, Mr. Greer lost his right hand from above the wrist and sustained third-degree burns on his upper chest.

2674.   He also suffered trauma to his back that necessitated a later L4 to S1 fusion.

2675.   Mr. Greer sustained a TBI that has impacted his short- and long-term memory.

2676.   He has also been diagnosed with PTSD.

2677.   Mr. Greer received extensive medical treatment and has undergone various surgeries and prosthetic fittings.

2678.   As a result of the attack, and the injuries he suffered, Plaintiff John Dana Greer has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2679.   Plaintiff Stephanie C. Sander is a citizen of the United States and domiciled in the State of California. She is the daughter of John Dana Greer.

2680.   Plaintiff Christopher D. Greer is a citizen of the United States and domiciled in the State of Georgia. He is the son of John Dana Greer.

2681.   Plaintiff Joseph L. Greer is a citizen of the United States and domiciled in the State of Arizona. He is the brother of John Dana Greer.

2682.   Plaintiff Carl K. Greer is a citizen of the United States and domiciled in the State of Arizona. He is the brother of John Dana Greer.

2683.   As a result of the attack, and the injuries John Dana Greer suffered, Plaintiffs Stephanie Sander, Christopher D. Greer, Joseph L. Greer, and Carl K. Greer have experienced severe mental anguish and extreme emotional pain and suffering.

462

**The Joyner Family**

2684.   Plaintiff Christopher Joyner is a citizen of the United States and domiciled in the State of North Carolina.

2685.   On May 2, 2006, Christopher Joyner, then 37, was a civilian contractor with Blackwater Security Consulting in Iraq.

2686.   Mr. Joyner was the Vehicle Commander riding in the passenger seat of the South African Mamba that was the fourth vehicle in a four-vehicle caravan en route to the Iraqi Ministry of Finance when the vehicle he was riding in was struck by an EFP array emplaced by Special Groups.

2687.   The weapon used to injure Mr. Joyner was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2688.   As a result of the attack, Mr. Joyner suffered multiple fragment wounds to his face and the globe of his right eye. He also sustained shrapnel wounds to his right upper extremity and left lower extremity.

2689.   The severity of the injuries to his right eye resulted in the loss of use of the eye, and the eye had to be surgically removed.

2690.   Mr. Joyner also sustained sinus fractures, loss of teeth, and a large wound to his right jaw.

2691.   He continues to have shrapnel lodged in his right forearm and his face.

2692.   Mr. Joyner has been diagnosed as having cognitive deficits as a result of the attack that impair his short-term memory and his ability to engage in abstract thinking and remaining on topic in conversation.

2693.   He has also received psychological treatment and counseling following the attack and was diagnosed with Acute Stress Disorder.

2694.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Joyner has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2695.   Plaintiff Anne P. "Poppy" Joyner is a citizen of the United States and domiciled in the State of North Carolina. She is the wife of Christopher Joyner.

2696.   Plaintiff Necole Dunlow Smith is a citizen of the United States and domiciled in the State of North Carolina. She is the stepsister of Christopher Joyner.

2697.   As a result of the attack, and the injuries Christopher Joyner suffered, Plaintiffs Anne P. "Poppy" Joyner and Necole Dunlow Smith have experienced severe mental anguish and extreme emotional pain and suffering.

**The Mills Family**

2698.   Plaintiff Michael R. Mills is a citizen of the United States and domiciled in the State of West Virginia.

2699.   On May 2, 2006, Michael R. Mills, then 37, was a civilian contractor with Blackwater Security Consulting in Iraq.

2700.   Mr. Mills was one of two gunners riding in an armored vehicle that was struck by a multiple EFP array emplaced by Special Groups.

2701.   The weapon used to injure Mr. Mills was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2702.   As a result of the attack, Mr. Mills sustained blast and shrapnel injuries to his face, shoulder, and torso. It also caused a torn meniscus in his left knee.

2703.   Mr. Mills received extensive medical treatment and underwent various surgeries over a number of years.

2704.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Mills has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2705.   Plaintiff M.R.M., a minor, represented by his legal guardian Michael Mills, is a citizen of the United States and domiciled in the State of New Jersey. He is the son of Michael Mills.

2706.   Plaintiff M.R.M., a minor, represented by his legal guardian Michael Mills, is a citizen of the United States and domiciled in the State of New Jersey. He is the son of Michael Mills.

2707.   As a result of the attack, and the injuries Michael Mills suffered, Plaintiffs M.R.M. and M.R.M. have experienced severe mental anguish and extreme emotional pain and suffering.

**46.** **THE MAY 3, 2006 ATTACK – NASIRIYAH**

**The Palinsky Family**

2708.   Jerry A. Palinsky, Jr. was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2709.   On May 3, 2006, Jerry A. Palinsky, Jr., aged 42, was working as a civilian contractor with EODT in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2710.   Jerry A. Palinsky, Jr. was killed in the attack.

2711.   The weapon used to kill Jerry A. Palinsky, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2712.   Plaintiff Eddie Jo Palinsky is a citizen of the United States and domiciled in the State of Washington. She is the widow of Jerry A. Palinsky, Jr.

2713.   Plaintiff Eddie Jo Palinsky brings an action individually and on behalf of the Estate of Jerry A. Palinsky, Jr., as its legal representative.

2714.   Plaintiff Jerry A. Palinsky, II is a citizen of the United States and domiciled in the State of Oregon. He is the son of Jerry A. Palinsky, Jr.

2715.   Plaintiff Adina Palinsky is a citizen of the United States and domiciled in the State of Washington. She is the daughter of Jerry A. Palinsky, Jr.

2716.   Plaintiff Jerry A. Palinsky, Sr. is a citizen of the United States and domiciled in the State of Washington. He is the father of Jerry A. Palinsky, Jr.

2717.   Plaintiff Kathleen Hoke is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Jerry A. Palinsky, Jr.

2718.   Plaintiff Joel Palinsky is a citizen of the United States and domiciled in the State of Washington. He is the brother of Jerry A. Palinsky, Jr.

2719.   Plaintiff Karaleen Herb is a citizen of the United States and domiciled in the State of Oregon. She is the sister of Jerry A. Palinsky, Jr.

2720.   As a result of the attack, and the death of Jerry A. Palinsky, Jr., Plaintiffs Eddie Jo Palinsky, Jerry A. Palinsky, II, Adina Palinsky, Jerry A. Palinsky, Sr., Kathleen Hoke, Joel Palinsky and Karaleen Herb have experienced severe mental anguish, extreme emotional pain and

suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Stoneking Family**

2721.   Plaintiff Eric Brandon Stoneking is a citizen of the United States and domiciled in the State of Virginia.

2722.   On May 3, 2006, Eric Brandon Stoneking, then 26, was working as a civilian contractor with EODT in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2723.   The weapon used to injure Eric Brandon Stoneking was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2724.   As a result of the attack, Mr. Stoneking sustained a TBI, the loss of two tendons in his right arm, major facial trauma on the left side to his upper mandible and lower jaw, and shrapnel and burns to the face, left shoulder, and torso.

2725.   He has also suffered from PTSD.

2726.   Mr. Stoneking has received extensive medical treatment at various hospitals for the extensive injuries he sustained on May 3, 2006.

2727.   As a result of the attack, and the injuries he suffered, Plaintiff Eric Brandon Stoneking has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2728.   Plaintiff Carrie Sue Stoneking is a citizen of the United States and domiciled in Germany. She is the mother of Eric Brandon Stoneking.

2729.   Plaintiff Faith Renee Stoneking is a citizen of the United States and domiciled in Germany. She is the sister of Eric Brandon Stoneking.

2730.   As a result of the attack, and the injuries Eric Brandon Stoneking suffered, Plaintiffs Carrie Sue Stoneking and Faith Renee Stoneking have experienced severe mental anguish and extreme emotional pain and suffering.

### 47.   THE MAY 5, 2006 ATTACK – BAGHDAD

**The Saenz Family**

2731.   Carlos N. Saenz was a citizen of the United States and domiciled in the State of Nevada when he was killed in Iraq.

2732.   On May 5, 2006, Carlos N. Saenz, aged 46, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2733.   Carlos N. Saenz was killed in the attack.

2734.   The weapon used to kill Carlos N. Saenz was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2735.   Plaintiff Nanette Saenz is a citizen of the United States and domiciled in the State of Nevada. She is the widow of Carlos N. Saenz.

2736.   Plaintiff Nanette Saenz brings an action individually and on behalf of the Estate of Carlos N. Saenz, as its legal representative.

2737.   Plaintiff Juan Saenz is a citizen of the United States and domiciled in the State of Nevada. He is the son of Carlos N. Saenz.

2738.   Plaintiff Joaqina Saenz Chorens is a citizen of the United States and domiciled in the State of Nevada. She is the mother of Carlos N. Saenz.

2739.   Plaintiff Luz Maria Estrada-Pulido is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

2740.   Plaintiff Frances Catherine Castro is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

2741.   Plaintiff Elva Espinoza is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

2742.   As a result of the attack, and the death of Carlos N. Saenz, Plaintiffs Nanette Saenz, Juan Saenz, Joaqina Saenz Chorens, Luz Maria Estrada-Pulido, Frances Catherine Castro and Elva Espinoza have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Vacho Family**

2743.   Nathan J. Vacho was a citizen of the United States and domiciled in the State of Wisconsin when he was killed in Iraq.

2744.   On May 5, 2006, Nathan J. Vacho, aged 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2745.   Nathan J. Vacho was killed in the attack.

2746.   The weapon used to kill Nathan J. Vacho was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2747.   Amanda Vacho is a citizen of the United States and domiciled in the State of Wisconsin. She is the legal guardian of Plaintiff E.V., a minor, and co-legal representative of the Estate of Nathan J. Vacho.

2748.   Amanda Vacho brings an action solely on behalf of Plaintiff E.V., a minor, and on behalf of the Estate of Nathan J. Vacho, as its co-legal representative.

2749.   Plaintiff E.V., a minor represented by her legal guardian Amanda Vacho, is a citizen of the United States and domiciled in the State of Wisconsin. She is the daughter of Nathan J. Vacho.

2750.   Plaintiff Bayli Vacho is a citizen of the United States and domiciled in the State of Wisconsin. She is the daughter of Nathan J. Vacho.

2751.   Plaintiff Bayli Vacho brings an action individually and on behalf of the Estate of Nathan J. Vacho, as its co-legal representative.

2752.   Plaintiff John Vacho is a citizen of the United States and domiciled in the State of Wisconsin. He is the father of Nathan J. Vacho.

2753.   Carol Vacho was a citizen of the United States at the time of the death of Nathan J. Vacho. She was the mother of Nathan J. Vacho. She died on November 9, 2013.

2754.   Plaintiff John Vacho brings an action individually and on behalf of the Estate of Carol Vacho, as its legal representative.

2755.   Plaintiff Ashley Vacho Leslie is a citizen of the United States and domiciled in the State of Wisconsin. She is the sister of Nathan J. Vacho.

2756.   As a result of the attack, and the death of Nathan J. Vacho, the late Carol Vacho experienced, and Plaintiffs E.V., Bayli Vacho, John Vacho and Ashley Vacho Leslie have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/son's/brother's society, companionship, comfort, advice and counsel.

48.     **THE MAY 6, 2006 ATTACK – DIWANIYAH**

**The Veverka Family**

2757.   David M. Veverka was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

2758.   On May 6, 2006, David M. Veverka, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2759.   David M. Veverka was killed in the attack.

2760.   The weapon used to kill David M. Veverka was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2761.   Plaintiff Ronald Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of David M. Veverka.

2762.   Plaintiff Carol Polley is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of David M. Veverka.

2763.   Plaintiff Keith Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of David M. Veverka.

2764.   Plaintiff Douglas Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of David M. Veverka.

2765.   Plaintiff Sandra Soliday is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of David M. Veverka.

2766.   As a result of the attack, and the death of David M. Veverka, Plaintiffs Ronald Veverka, Carol Polley, Keith Veverka, Douglas Veverka and Sandra Soliday have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's

society, companionship, comfort, advice and counsel.

### 49.   THE MAY 14, 2006 ATTACK – BAGHDAD

**The West Family**

2767.   Robert H. West was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

2768.   On May 14, 2006, Robert H. West, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2769.   Robert H. West was killed in the attack.

2770.   The weapon used to kill Robert H. West was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2771.   Plaintiff Jeanette West is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Robert H. West.

2772.   Plaintiff Jeanette West brings an action individually and on behalf of the Estate of Robert H. West, as its legal representative.

2773.   Plaintiff Shelby West is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of Robert H. West.

2774.   As a result of the attack, and the death of Robert H. West, Plaintiffs Jeanette West and Shelby West have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Engeman Family**

2775.   John W. Engeman was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2776.   On May 14, 2006, John W. Engeman, aged 45, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2777.   John W. Engeman was killed in the attack.

2778.   The weapon used to kill John W. Engeman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2779.   Plaintiff Donna Engeman is a citizen of the United States and domiciled in the State of Texas. She is the widow of John W. Engeman.

2780.   Plaintiff Donna Engeman brings an action individually and on behalf of the Estate of John W. Engeman, as its legal representative.

2781.   As a result of the attack, and the death of John W. Engeman, Plaintiff Donna Engeman has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

### 50.   THE MAY 21, 2006 ATTACK – MOSUL

**The Shumate Family**

2782.   Plaintiff Shannon Shumate is a citizen of the United States and domiciled in the State of Missouri.

2783.   On May 21, 2006, Shannon Shumate, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2784.   The weapon used to injure Mr. Shumate was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2785.   As a result of the attack, Shannon Shumate sustained injuries to his head and back and suffered hearing loss. Mr. Shumate continues to experience pain in his back as well as ringing in his ears and hearing loss.

2786.   As a result of the attack, he also continues to suffer from PTSD, and he experiences flash backs when he drives at night.

2787.   As a result of the attack, and the injuries he suffered, Plaintiff Shannon Shumate has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2788.   Plaintiff Lauren Shumate is a citizen of the United States and domiciled in the State of Kansas. She is the daughter of Shannon Shumate.

2789.   Plaintiff L.S., a minor, represented by her legal guardian Shannon Shumate, is a citizen of the United States and domiciled in the State of Missouri. She is the daughter of Shannon Shumate.

2790.   Plaintiff L.S., a minor, represented by his legal guardian Shannon Shumate, is a citizen of the United States and domiciled in the State of Missouri. He is the son of Shannon Shumate.

2791.   As a result of the attack, and the injuries Shannon Shumate has suffered, Plaintiffs Lauren Shumate, L.S. and L.S. have experienced severe mental anguish and extreme emotional pain and suffering.

**51.**   **THE MAY 25, 2006 ATTACK – BAGHDAD**

**The DiCenzo Family**

2792.   Douglas Andrew DiCenzo was a citizen of the United States and domiciled in the State of New Hampshire when he was killed in Iraq.

2793.   On May 25, 2006, Douglas Andrew DiCenzo, then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2794.   Douglas Andrew DiCenzo was killed in the attack.

2795.   The weapon used to kill Douglas Andrew DiCenzo was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2796.   Plaintiff Nicole DiCenzo is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Douglas Andrew DiCenzo.

2797.   Plaintiff Nicole DiCenzo brings an action individually and on behalf of the Estate of Douglas Andrew DiCenzo, as its legal representative.

2798.   Plaintiff D.D., a minor, represented by his legal guardian, Nicole DiCenzo, is a citizen of the United States and domiciled in the State of Georgia. He is the son of Douglas Andrew DiCenzo.

2799.   Plaintiff Larry DiCenzo is a citizen of the United States and domiciled in the State of Florida. He is the father of Douglas Andrew DiCenzo.

2800.   Plaintiff Kathy Crane is a citizen of the United States and domiciled in the State of New Hampshire. She is the mother of Douglas Andrew DiCenzo.

2801.   As a result of the attack, and the death of Douglas Andrew DiCenzo, Plaintiffs Nicole DiCenzo, D.D., Larry DiCenzo, and Kathy Crane have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice and counsel.

**The Blair Family**

2802.   Robert Edward Blair was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2803.   On May 25, 2006, Robert Edward Blair, then 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2804.   Robert Edward Blair was killed in the attack.

2805.   The weapon used to kill Robert Edward Blair was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2806.   Plaintiff Johnny Allen Blair is a citizen of the United States and domiciled in the State of Montana. He is the father of Robert Edward Blair.

2807.   Plaintiff Johnny Allen Blair brings an action individually and on behalf of the Estate of Robert Edward Blair, as its legal representative.

2808.   Plaintiff Charlee Blair Webb is a citizen of the United States and domiciled in the State of Florida. She is the sister of Robert Edward Blair.

2809.   As a result of the attack, and the death of Robert Edward Blair, Plaintiffs Johnny Allen Blair and Charlee Blair Webb have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 52.   THE JUNE 5, 2006 ATTACK – BAGHDAD

**The Lawson Family**

2810.   Isaac S. Lawson was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2811.   On June 5, 2006, Isaac S. Lawson, aged 35, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2812.   Isaac S. Lawson was killed in the attack.

2813.   The weapon used to kill Isaac S. Lawson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2814.   Plaintiff Suzzette Lawson is a citizen of the United States and domiciled in the State of California. She is the widow of Isaac S. Lawson.

2815.   Plaintiff Suzzette Lawson brings an action individually and on behalf of the Estate of Isaac S. Lawson, as its legal representative.

2816.   Plaintiff C.L., a minor represented by her legal guardian Suzzette Lawson, is a citizen of the United States and domiciled in the State of California. She is the daughter of Isaac S. Lawson.

2817.   As a result of the attack, and the death of Isaac S. Lawson, Plaintiffs Suzzette Lawson and C.L. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Eastlund Family**

2818.   Plaintiff Arne Eastlund is a citizen of the United States and domiciled in the State of California.

2819.   On June 5, 2006, Arne Eastlund, age 45, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

2820.   The weapon used to injure Mr. Eastlund was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2821.   Following the attack, pieces of one of the occupants of the vehicle, Isaac Lawson, landed on Mr. Eastlund's lap.

2822.   As a result of the attack, Mr. Eastlund sustained significant injuries to his back.

2823.   He also sustained burns to his body and has suffered hearing loss.

2824.   He has undergone multiple surgeries and procedures to address the injuries to his back. He continues to seek treatment for his back and neck.

2825.   Mr. Eastlund has been diagnosed with a TBI and PTSD.

2826.   As a result of the attack, and the injuries he suffered, Plaintiff Arne Eastlund has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2827.   Plaintiff Tina Eastlund is a citizen of the United States and domiciled in the State of California. She is the wife of Arne Eastlund.

2828.   Plaintiff Sven Eastlund is a citizen of the United States and domiciled in the State of California. He is the son of Arne Eastlund.

2829.   Plaintiff Taylor Eastlund is a citizen of the United States and domiciled in the State of California. She is the stepdaughter of Arne Eastlund.

2830.   Plaintiff Elizabeth Jo Eastlund is a citizen of the United States and domiciled in the State of California. She is the mother of Arne Eastlund.

2831.   As a result of the attack, and the injuries Arne Eastlund suffered, Plaintiffs Tina Eastlund, Sven Eastlund, Taylor Eastlund, and Elizabeth Jo Eastlund have experienced severe mental anguish and extreme emotional pain and suffering.

2832.   Plaintiff Arne Eastlund was discharged from the U.S. military on July 21, 2015.

**The Adamson Family**

2833.   Plaintiff Matthew Adamson is a citizen of the United States and domiciled in the State of Oklahoma.

2834.   On June 5, 2006, Matthew Adamson, age 21, was serving in the U.S. military in Iraq. He was the gunner in a vehicle ("the Adamson vehicle") traveling in the same convoy as Arne Eastlund when Mr. Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

2835.   As a result of the explosion, Mr. Adamson was thrown back, injuring his head.

2836.   The weapon used to injure Mr. Adamson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2837.   Mr. Adamson has experienced frequent and severe headaches. He also experiences memory loss.

2838.   Mr. Adamson has been diagnosed with a modified TBI.

2839.   He has also been diagnosed with PTSD.

2840.   Mr. Adamson has sought counseling and has been prescribed medication, including anti-depressants, to treat his condition.

2841.   As a result of the attack, and the injuries he suffered, Plaintiff Matthew Adamson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2842.   Plaintiff R.A., a minor represented by his legal guardian Matthew Adamson, is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Matthew Adamson.

2843.   Plaintiff Kathy Adamson is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of Matthew Adamson.

2844.   Plaintiff Richard Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the father of Matthew Adamson.

2845.   Plaintiff Christopher Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

2846.   Plaintiff Jeffrey Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

2847.   Plaintiff Justin Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

2848.   As a result of the attack, and the injuries Matthew Adamson suffered, Plaintiffs R.A., Kathy Adamson, Richard Adamson, Christopher Adamson, Jeffrey Adamson, and Justin Adamson have experienced severe mental anguish and extreme emotional pain and suffering.

2849.   Plaintiff Matthew Adamson was discharged from the U.S. military on December 19, 2012.

**The Shepard Family**

2850.   Plaintiff James Shepard is a citizen of the United States and domiciled in the State of Oklahoma.

2851.   On June 5, 2006, James Shepard, age 32, was serving in the U.S. military in Iraq. He was the Truck Commander of the Adamson vehicle, traveling in the same convoy as Arne Eastlund when Mr. Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

2852.   The weapon used to injure Mr. Shepard was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2853.   Following the attack, the Adamson vehicle traveled toward the location where Mr. Eastlund's vehicle had stopped.

2854.   After exiting his vehicle, Mr. Shepard went to the vehicle and opened the door. There, he saw Isaac Lawson moving, despite the fact that there were pieces of Lawson's face or neck visible in the interior of the vehicle.

2855.   Mr. Shepard helped remove Isaac Lawson from the vehicle.

2856.   Mr. Shepard continues to vividly recall the attack and his actions as well as what he witnessed following the attack.

2857.   He has experienced extreme survivor's guilt.

2858.   He has been diagnosed with PTSD and has sought counseling.

2859.   As a result of the attack, and the injuries he suffered, Plaintiff James Shepard has experienced severe mental anguish and extreme emotional pain and suffering.

2860.   Plaintiff James Shepard was discharged from the U.S. military on June 14, 2012.

**The Sklaney Family**

2861.   Plaintiff John P. Sklaney, III is a citizen of the United States and domiciled in the State of Oklahoma.

2862.   On June 5, 2006, John Sklaney, age 35, was serving in the U.S. military in Iraq. He was the driver of the Adamson vehicle, traveling in the same convoy as Arne Eastlund when Mr. Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

2863.   The weapon used to injure Mr. Sklaney was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2864.   Following the attack, the Adamson vehicle traveled toward the location where Mr. Eastlund's vehicle had stopped.

2865.   After exiting his vehicle, John P. Sklaney, III went to Mr. Eastlund's vehicle. He saw Isaac Lawson and that Mr. Lawson's leg had been severed.

2866.   Together with James Shepard, John P. Sklaney, III removed Mr. Lawson from the vehicle. Mr. Sklaney helped to place Mr. Lawson on a stretcher.

2867.   Mr. Sklaney has experienced survivor's guilt.

2868.   He has experienced memory loss and has been diagnosed with PTSD.

2869.   Mr. Sklaney has sought counseling and has been prescribed medication to treat depression.

2870.   As a result of the attack, and the injuries he suffered, Plaintiff John P. Sklaney, III has experienced severe mental anguish and extreme emotional pain and suffering.

2871.   Plaintiff John P. Sklaney, III was discharged from the U.S. military on July 25, 2019.

**53.   THE JUNE 8, 2006 ATTACK – AL KUT**

**The Crabtree Family**

2872.   Daniel Crabtree was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

2873.   On June 8, 2006, Daniel Crabtree, aged 31, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

Case 1:19-cv-00007-CBA-TAM   Document 105   Filed 08/02/19   Page 517 of 822 PageID #: 7785

2874.   Daniel Crabtree was killed in the attack.

2875.   The weapon used to kill Daniel Crabtree was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2876.   Plaintiff Kathy Crabtree is a citizen of the United States and domiciled in the State of Ohio. She is the widow of Daniel Crabtree.

2877.   Plaintiff Kathy Crabtree brings an action individually and on behalf of the Estate of Daniel Crabtree, as its legal representative.

2878.   Plaintiff M.C., a minor represented by her legal guardian, Kathy Crabtree, is a citizen of the United States and domiciled in the State of Ohio. She is the daughter of Daniel Crabtree.

2879.   Plaintiff Judy Ann Crabtree is a citizen of the United States and domiciled in the State of Georgia. She is the mother of Daniel Crabtree.

2880.   Plaintiff Ronald Wayne Crabtree is a citizen of the United States and domiciled in the State of Ohio. He is the father of Daniel Crabtree.

2881.   Plaintiff Debra Wigbels is a citizen of the United States and domiciled in the State of Georgia. She is the sister of Daniel Crabtree.

2882.   Plaintiff Ronald William Crabtree is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Daniel Crabtree.

2883.   As a result of the attack, and the death of Daniel Crabtree, Plaintiffs Kathy Crabtree, M.C., Judy Ann Crabtree, Ronald Wayne Crabtree, Debra Wigbels and Ronald William Crabtree have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

54.  **THE JUNE 9, 2006 ATTACK – DIWANIYAH**

**The Slaven Family**

2884.  Benjamin J. Slaven was a citizen of the United States and domiciled in the State of Nebraska when he was killed in Iraq.

2885.  On June 9, 2006, Benjamin J. Slaven aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2886.  Benjamin J. Slaven was killed in the attack.

2887.  The weapon used to kill Benjamin J. Slaven was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2888.  Plaintiff Judy Huenink is a citizen of the United States and domiciled in the State of Nebraska. She is the mother of Benjamin J. Slaven.

2889.  Plaintiff Judy Huenink brings an action individually and on behalf of the Estate of Benjamin J. Slaven, as its legal representative.

2890.  Plaintiff Sean Slaven is a citizen of the United States and domiciled in the State of Nebraska. He is the brother of Benjamin J. Slaven.

2891.  Plaintiff Chastity Dawn Laflin is a citizen of the United States and domiciled in the State of Nebraska. She is the sister of Benjamin J. Slaven.

2892.  Plaintiff Nicole Landon is a citizen of the United States and domiciled in the State of Nebraska. She is the sister of Benjamin J. Slaven.

2893.  Plaintiff Misti Fisher is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Benjamin J. Slaven.

2894.  As a result of the attack, and the death of Benjamin J. Slaven, Plaintiffs Judy

Huenink, Sean Slaven, Chastity Dawn Laflin, Nicole Landon and Misti Fisher have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 55.   THE JUNE 10, 2006 ATTACK – RUSTAMIYAH

### The Friedrich Family

2895.   Plaintiff Steven J. Friedrich is a citizen of the United States and domiciled in the State of Florida.

2896.   On June 10, 2006, Steven J. Friedrich, then 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2897.   The weapon used to injure Mr. Friedrich was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2898.   As a result of the attack, Mr. Friedrich sustained bilateral eardrum perforations and shrapnel injuries to his left forehead, right shoulder, and right leg.

2899.   He has undergone multiple surgeries on his ears and suffers from tinnitus.

2900.   As a result of the attack, and the injuries he suffered, Plaintiff Steven J. Friedrich has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2901.   Plaintiff A.F., a minor, represented by her legal guardian Steven J. Friedrich, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Steven J. Friedrich.

2902.   As a result of the attack, and the injuries Steven J. Friedrich suffered, Plaintiff A.F. has experienced severe mental anguish and extreme emotional pain and suffering.

2903.   Plaintiff Steven J. Friedrich was discharged from the U.S. military on August 20, 2014.

**56.**   **THE JULY 11, 2006 ATTACK – KARBALA**

**The Derise Family**

2904.   Plaintiff Philip Alan Derise is a citizen of the United States and domiciled in the State of Washington.

2905.   On July 11, 2006, Philip Alan Derise, then 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling outside of Karbala.

2906.   The weapon used to injure Philip Alan Derise was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2907.   As a result of the attack, Mr. Derise suffered a loss of hearing and eyesight.

2908.   Mr. Derise was also diagnosed with a concussion, a TBI, and PTSD.

2909.   As a result of the attack, and the injuries he suffered, Plaintiff Philip Alan Derise has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**57.**   **THE JULY 15, 2006 ATTACK – BAGHDAD**

**The Contreras Family**

2910.   Andres J. Contreras was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2911.   On July 15, 2006, Andres J. Contreras, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2912.   Andres J. Contreras was killed in the attack.

2913.   The weapon used to kill Andres J. Contreras was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2914.   Plaintiff Norma Alicia Contreras is a citizen of the United States and domiciled in the State of California. She is the mother of Andres J. Contreras.

2915.   Plaintiff Jonathan Contreras, Sr. is a citizen of the United States and domiciled in the State of California. He is the father of Andres J. Contreras.

2916.   Plaintiff Carlos Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2917.   Plaintiff Cesar Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2918.   Plaintiff Hernan Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2919.   Plaintiff Noel Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2920.   Plaintiff Dannyel Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2921.   As a result of the attack, and the death of Andres J. Contreras, Plaintiffs Norma Alicia Contreras, Jonathan Contreras, Sr., Carlos Contreras, Cesar Contreras, Hernan Contreras, Noel Contreras and Dannyel Contreras have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 58.   THE JULY 17, 2006 ATTACK – BAGHDAD

**The Pugh Family**

2922.   Kenneth Irving Pugh was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2923.   On July 17, 2006, Kenneth Irving Pugh, then 39, was serving in the U.S. military in Iraq when his checkpoint in southeast Baghdad came under sniper fire from JAM Special Groups.

2924.   Kenneth Irving Pugh was killed in the attack from a gunshot wound to his head.

2925.   The terror cell operatives that fired at Kenneth Irving Pugh were trained by Hezbollah and funded and armed by the IRGC-QF, and they launched the attack at the direction of both Hezbollah and the IRGC-QF, as their proxy.

2926.   Plaintiff Sharon M. Pugh is a citizen of the United States and domiciled in the State of Kentucky. She is the widow of Kenneth Irving Pugh.

2927.   Plaintiff Sharon M. Pugh brings an action individually and on behalf of the Estate of Kenneth Irving Pugh, as its legal representative.

2928.   Plaintiff Britney E. Carter is a citizen of the United States and domiciled in the State of Kentucky. She is the stepdaughter of Kenneth Irving Pugh.

2929.   Plaintiff Alicia Pearson is a citizen of the United States and domiciled in the State of Kentucky. She is the stepdaughter of Kenneth Irving Pugh.

2930.   As a result of the attack, and the death of Kenneth Irving Pugh, Plaintiffs Sharon M. Pugh, Britney E. Carter, and Alicia Pearson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

### 59.     THE JULY 22, 2006 ATTACK – SADR CITY

**The Evans Family**

2931.   Plaintiff Daniel J. Evans is a citizen of the United States and domiciled in the State of Texas.

2932.   On July 22, 2006, Daniel J. Evans, then 19, was serving in the U.S. military in Iraq. He was riding in the second vehicle of a four-vehicle convoy in the north-bound lane of Route Pluto en route to providing assistance to another unit involved in a previous IED attack in the vicinity of Sadr City when the M1114 vehicle in which he was riding in the rear passenger-side seat was hit by an EFP emplaced by Special Groups from the right side of the vehicle.

2933.   The weapon used to injure Daniel J. Evans was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2934.   As a result of the attack, Daniel J. Evans sustained a TBI having been rendered unconscious from the blast for approximately 16 hours. He also suffered from a collapsed left lung and injuries to his left shoulder.

2935.   He was also diagnosed with PTSD.

2936.   As a result of the attack, and the injuries he suffered, Plaintiff Daniel J. Evans has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2937.   Plaintiff Justin Evans is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Daniel J. Evans.

2938.   As a result of the attack, and the injuries Daniel J. Evans suffered, Plaintiff Justin Evans has experienced severe mental anguish and extreme emotional pain and suffering.

2939.   Plaintiff Daniel J. Evans was discharged from the U.S. military on November 9, 2011.

**60.**      **THE JULY 25, 2006 ATTACK – BAGHDAD**

**The Graves Family**

2940.   Joseph A. Graves was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2941.   On July 25, 2006, Joseph A. Graves, aged 21, was serving in the U.S. military in Iraq when the convoy he was travelling in came under RPG and small arms fire from JAM Special Groups operatives.

2942.   Joseph A. Graves was killed in the attack.

2943.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2944.   Plaintiff Kevin Graves is a citizen of the United States and domiciled in the State of California. He is the father of Joseph A. Graves.

2945.   As a result of the attack, and the death of Joseph A. Graves, Plaintiff Kevin Graves has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

**61.**      **THE AUGUST 26, 2006 ATTACK – JISR DIYALA**

**The Zayas Family**

2946.   Edgardo Zayas was a citizen of the United States and domiciled in the State of Massachusetts when he was killed in Iraq.

2947.   On August 26, 2006, Edgardo Zayas, aged 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. Edgardo Zayas was in a five-vehicle convoy and was serving as the driver in the lead M1114 in the convoy.

2948.   Edgardo Zayas was killed in the attack.

2949.   The weapon used to kill Edgardo Zayas was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2950.   Plaintiff Suheil Campbell is a citizen of the United States and domiciled in the State of Massachusetts. She is the widow of Edgardo Zayas.

2951.   Plaintiff Suheil Campbell brings an action individually and on behalf of the Estate of Edgardo Zayas, as its legal representative.

2952.   Plaintiff Alexander Zayas is a citizen of the United States and domiciled in the State of Massachusetts. He is the son of Edgardo Zayas.

2953.   Plaintiff A.Z.-C., a minor, represented by her legal guardian Suheil Campbell, is a citizen of the United States and domiciled in the State of Massachusetts. She is the daughter of Edgardo Zayas.

2954.   As a result of the attack, and the death of Edgardo Zayas, Plaintiffs Suheil Campbell, Alexander Zayas, and A.Z.-C. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 62.    THE SEPTEMBER 3, 2006 ATTACK – BAGHDAD

**The Andino Family**

2955.   Edwin A. Andino, Jr. was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

2956.   On September 3, 2006, Edwin A. Andino, Jr., aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2957.   Edwin A. Andino, Jr. was killed in the attack.

2958.   The weapon used to kill Edwin A. Andino, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2959.   Plaintiff Cathy Andino is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Edwin A. Andino, Jr.

2960.   Plaintiff Cathy Andino brings an action individually and on behalf of the Estate of Edwin A. Andino, Jr., as its legal representative.

2961.   As a result of the attack, and the death of Edwin A. Andino, Jr., Plaintiff Cathy Andino has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 63.    THE SEPTEMBER 20, 2006 ATTACK – BAGHDAD

**The Puertas Family**

2962.   Plaintiff Luis Junior Puertas is a citizen of the United States and domiciled in the State of Florida.

2963.   On September 20, 2006, Luis Junior Puertas, then 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. He was the

driver of the lead vehicle in a four-vehicle convoy traveling north on Route Gold adjacent to the Khansa neighborhood in the eastern portion of Baghdad when a multiple-array EFP planted inside the bottom of a newly constructed light pole detonated next to the vehicle.

2964.   The weapon used to injure Luis Junior Puertas was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2965.   As a result of the attack, Mr. Puertas lost his left foot as a result of an EFP entering the vehicle and sustained significant damage to his right leg as well. He underwent above-the-knee amputations on both legs as a result of the damages inflicted by the EFP. He also sustained a loss of equilibrium due to damage sustained to his ears.

2966.   Mr. Puertas has received extensive medical treatment – including various surgeries and prosthetic fittings – at several hospitals, where he has spent months in treatment.

2967.   As a result of the attack, and the injuries he suffered, Plaintiff Luis Junior Puertas has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2968.   Plaintiff Lidia Sullivan is a citizen of the United States and domiciled in the State of Florida. She is the mother of Luis Junior Puertas.

2969.   Plaintiff Gabriela D. Puertas Vergara-Donoso is a citizen of the United States and domiciled in the State of Florida. She is the sister of Luis Junior Puertas.

2970.   As a result of the attack, and the injuries Luis Junior Puertas suffered, Plaintiffs Lidia Sullivan and Gabriela D. Puertas Vergara-Donoso have experienced severe mental anguish and extreme emotional pain and suffering.

64.    **THE SEPTEMBER 30, 2006 ATTACK – BAGHDAD**

**The Melendez Family**

2971.   Plaintiff Christopher Michael Melendez is a citizen of the United States and domiciled in the State of Florida.

2972.   On September 30, 2006, Christopher Michael Melendez, then 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. Christopher Michael Melendez was a gunner in an M1114 vehicle on a routine patrol on Route Florida in the Mashtal neighborhood of Baghdad when his vehicle was disabled by a direct hit from an EFP on the driver's side of the vehicle.

2973.   The weapon used to injure Christopher Michael Melendez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2974.   As a result of the attack, Mr. Melendez's left leg was amputated above the knee, he sustained a TBI, an injury to his brachial plexus causing weakness in his dominant hand, tinnitus, jaw fractures, post-traumatic headaches, facial and hand nerve damage, disfiguring head and facial scarring, burns, and additional shrapnel injuries.

2975.   Mr. Melendez has received extensive medical treatment – including various surgeries and prosthetic fittings – at several hospitals, where he has spent months in treatment.

2976.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Michael Melendez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2977.   Plaintiff Narciso Melendez is a citizen of the United States and domiciled in the State of New York. He is the father of Christopher Michael Melendez.

2978.   Plaintiff Christina Melendez is a citizen of the United States and domiciled in the State of Georgia. She is the sister of Christopher Michael Melendez.

2979.   As a result of the attack, and the injuries Christopher Michael Melendez suffered, Plaintiffs Narciso Melendez and Christina Melendez have experienced severe mental anguish and extreme emotional pain and suffering.

## 65.   THE OCTOBER 4, 2006 ATTACK – BAGHDAD

### The Barattieri Family

2980.   Guy Barattieri was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2981.   On October 4, 2006, Guy Barattieri, aged 36, was serving as a civilian contractor with Falcon Security in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2982.   Guy Barattieri was killed in the attack.

2983.   The weapon used to kill Guy Barattieri was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2984.   Plaintiff Laurel Barattieri is a citizen of the United States and domiciled in the State of Washington. She is the widow of Guy Barattieri.

2985.   Plaintiff Laurel Barattieri brings an action individually and on behalf of the Estate of Guy Barattieri, as its legal representative.

2986.   Plaintiff Patricia Wheatley is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Guy Barattieri.

2987.   Plaintiff Rebecca Barattieri is a citizen of the United States and domiciled in the State of Washington. She is the sister of Guy Barattieri.

2988.   Plaintiff Nicole Barattieri is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Guy Barattieri.

2989.   Plaintiff Gina Tesnar is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Guy Barattieri.

2990.   As a result of the attack, and the death of Guy Barattieri, Plaintiffs Laurel Barattieri, Patricia Wheatley, Rebecca Barattieri, Nicole Barattieri and Gina Tesnar have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

## 66.   THE OCTOBER 13, 2006 ATTACK – BAGHDAD

### The Stanton Family

2991.   Kenny Frances Stanton, Jr. was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2992.   On October 13, 2006, Kenny Frances Stanton, Jr., then 20, was serving in the U.S. military in Iraq when his unit was struck by an IED emplaced by JAM Special Groups terror operatives in the Sholeh neighborhood in northwest Baghdad.

2993.   Kenny Frances Stanton, Jr. was killed in the attack.

2994.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2995.   Plaintiff Gloria L. Magana is a citizen of the United States and domiciled in the State of California. She is the mother of Kenny Frances Stanton, Jr.

2996.   Plaintiff Gloria L. Magana brings an action individually and on behalf of the Estate of Kenny Frances Stanton, Jr., as its legal representative.

2997.   Plaintiff Mario Stanton is a citizen of the United States and domiciled in the State of California. He is the brother of Kenny Frances Stanton, Jr.

2998.   Plaintiff Brandie Stanton is a citizen of the United States and domiciled in the State of California. She is the sister of Kenny Frances Stanton, Jr.

2999.   Plaintiff Terrymarie Stanton is a citizen of the United States and domiciled in the State of California. She is the sister of Kenny Frances Stanton, Jr.

3000.   As a result of the attack, and the death of Kenny Frances Stanton, Jr., Plaintiffs Gloria L. Magana, Mario Stanton, Brandie Stanton, and Terrymarie Stanton have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 67.   THE OCTOBER 17, 2006 ATTACK – BAQUBAH

**The Frigo Family**

3001.   Nathan J. Frigo was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

3002.   On October 17, 2006, Nathan J. Frigo, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3003.   Nathan J. Frigo was killed in the attack.

3004.   The weapon used to kill Nathan J. Frigo was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3005.   Plaintiff Fred Frigo is a citizen of the United States and domiciled in the State of Indiana. He is the father of Nathan J. Frigo.

3006.   As a result of the attack, and the death of Nathan J. Frigo, Plaintiff Fred Frigo has

experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

**The Haupt Family**

3007.   Ryan Haupt was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

3008.   On October 17, 2006, Ryan Haupt, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3009.   Ryan Haupt was killed in the attack.

3010.   The weapon used to kill Ryan Haupt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3011.   Plaintiff Nannette Bryne-Haupt is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Ryan Haupt.

3012.   Plaintiff Lynn Forehand is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Ryan Haupt.

3013.   Plaintiff Lynn Forehand brings an action individually and on behalf of the Estate of Ryan Haupt, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

3014.   Plaintiff Lance Haupt is a citizen of the United States and domiciled in the State of Arizona. He is the father of Ryan Haupt.

3015.   Plaintiff Rhonda Haupt is a citizen of the United States and domiciled in the State of California. She is the sister of Ryan Haupt.

3016.   Plaintiff Tifany Thompson is a citizen of the United States and domiciled in the

State of California. She is the sister of Ryan Haupt.

3017.   Plaintiff Sabrina Cumbe is a citizen of the United States and domiciled in the State of California. She is the sister of Ryan Haupt.

3018.   As a result of the attack, and the death of Ryan Haupt, Plaintiffs Nannette Bryne-Haupt, Lynn Forehand, Lance Haupt, Rhonda Haupt, Tifany Thompson and Sabrina Cumbe have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

**68.      THE OCTOBER 20, 2006 ATTACK – BAGHDAD**

**The Witte Family**

3019.   Kevin M. Witte was a citizen of the United States and domiciled in the State of Oregon when he was killed in Iraq.

3020.   On October 20, 2006, Kevin M. Witte, aged 27, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3021.   Kevin M. Witte was killed in the attack.

3022.   The weapon used to kill Kevin M. Witte was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3023.   Plaintiff William Witte is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Kevin M. Witte.

3024.   Plaintiff William Witte brings an action individually and on behalf of the Estate of Kevin M. Witte, as its legal representative.

3025.   As a result of the attack, and the death of Kevin M. Witte, Plaintiff William Witte has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

### 69.   THE OCTOBER 22, 2006 ATTACK – BAGHDAD

**The Mock Family**

3026.   Willsun Mock was a citizen of the United States and domiciled in the State of Kansas when he was killed in Iraq.

3027.   On October 22, 2006, Willsun Mock, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3028.   Willsun Mock was killed in the attack.

3029.   The weapon used to kill Willsun Mock was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3030.   Plaintiff Michael Mock is a citizen of the United States and domiciled in the State of Kansas. He is the father of Willsun Mock.

3031.   Plaintiff Tammy Dorsey is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Willsun Mock.

3032.   Plaintiff Eric Phye is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Willsun Mock.

3033.   As a result of the attack, and the death of Willsun Mock, Plaintiffs Michael Mock, Tammy Dorsey and Eric Phye have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Gmachowski Family**

3034.   Plaintiff James Gmachowski is a citizen of the United States and domiciled in the State of California.

3035.   On October 22, 2006, James Gmachowski, then 19, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle.

3036.   The weapon used to injure James Gmachowski was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3037.   As a result of the blast, a golf-ball-sized piece of copper was lodged in James Gmachowski's back that required invasive surgery to remove. The wound took roughly five months to heal. Mr. Gmachowski was also diagnosed with a TBI and PTSD.

3038.   As a result of the attack, and the injuries he suffered, Plaintiff James Gmachowski has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3039.   Plaintiff James Gmachowski was discharged from the U.S. military on February 14, 2016.

## 70.   THE OCTOBER 22, 2006 ATTACK – BAGHDAD

**The Brian Family**

3040.   Brian Brian was a citizen of the United States and domiciled in the State of Arkansas when he was killed in Iraq.

3041.   On October 22, 2006, Brian Brian, then 58, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3042.   The weapon used to kill Brian Brian was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3043.   Plaintiff Constance Brian is a citizen of the United States and domiciled in the State of Arkansas. She is the widow of Brian Brian.

3044.   Plaintiff Constance Brian brings an action individually and on behalf of the Estate of Brian Brian, as its legal representative.

3045.   Plaintiff Amber Hensley is a citizen of the United States and domiciled in the State of North Dakota. She is the daughter of Brian Brian.

3046.   As a result of the attack, and the death of Brian Brian, Plaintiffs Constance Brian and Amber Hensley have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**71.**   **THE OCTOBER 22, 2006 ATTACK – BAGHDAD**

**The Haines Family**

3047.   Plaintiff David W. Haines is a citizen of the United States and domiciled in the State of Kentucky.

3048.   On October 22, 2006, David W. Haines, then 41, was serving in the U.S. military in Iraq.

3049.   Mr. Haines was a member of a mounted patrol conducting a route reconnaissance to the military hospital in Baghdad when an EFP emplaced by Special Groups struck his vehicle.

3050.   The weapon used to injure Mr. Haines was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using

specialized training and components supplied by Hezbollah and the IRGC.

3051.   As a result of the attack, Mr. Haines sustained a fracture of his right femur that resulted in his right and left legs being different lengths; shrapnel injuries to his right hand, left arm, right leg, and buttocks; burns to his body; and nerve damage.

3052.   He has undergone multiple surgeries to repair the fracture to his femur and had multiple skin grafts.

3053.   As a result of the nerve damage that he incurred, Mr. Haines continues to experience limited mobility in his left arm and hand and sensation problems.

3054.   He has been diagnosed with PTSD and has sought counseling for emotional injuries resulting from the attack.

3055.   As a result of the attack, and the injuries he suffered, Plaintiff David W. Haines has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3056.   Plaintiff Dawn Haines is a citizen of the United States and domiciled in the State of Kentucky. She is the wife of David W. Haines.

3057.   Plaintiff Colin Haines is a citizen of the United States and domiciled in the State of Kentucky. He is the son of David W. Haines.

3058.   Plaintiff Mackenzie Haines is a citizen of the United States and domiciled in the State of Kentucky. She is the daughter of David W. Haines.

3059.   As a result of the attack, and the injuries suffered by David W. Haines, Plaintiffs Dawn Haines, Colin Haines and Mackenzie Haines have experienced severe mental anguish, and extreme emotional pain and suffering.

3060.   Plaintiff David W. Haines was discharged from the U.S. military on July 31, 2012.

**The Alabsawi Family**

3061.   Plaintiff Karar Alabsawi is a citizen of the United States and domiciled in the State of Pennsylvania.

3062.   On October 22, 2006, Karar Alabsawi was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3063.   The weapon used to injure Karar Alabsawi was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3064.   As a result of the attack, Mr. Alabsawi lost his left leg. He also suffered significant injuries to his left arm which he is unable to use, as well as shrapnel wounds and burns on his body.

3065.   As a result of the attack, and the injuries he suffered, Plaintiff Karar Alabsawi has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Taylor Family**

3066.   David G. Taylor, Jr. was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

3067.   On October 22, 2006, David G. Taylor, Jr., aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3068.   David G. Taylor, Jr. was killed in the attack.

3069.   The weapon used to kill David G. Taylor, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

504

3070.   Plaintiff Michelle Taylor is a citizen of the United States and domiciled in the State of Florida. She is the widow of David G. Taylor, Jr.

3071.   Plaintiff Michelle Taylor brings an action individually and on behalf of the Estate of David G. Taylor, Jr. as its legal representative.

3072.   Plaintiff J.T., a minor represented by his legal guardian, Michelle Taylor, is a citizen of the United States and domiciled in the State of Florida. He is the son of David G. Taylor, Jr.

3073.   Plaintiff Phyllis Taylor is a citizen of the United States and domiciled in the State of Florida. She is the mother of David G. Taylor, Jr.

3074.   Plaintiff John Taylor is a citizen of the United States. He is the brother of David G. Taylor, Jr.

3075.   As a result of the attack, and the death of David G. Taylor, Jr., Plaintiffs Michelle Taylor, J.T., Phyllis Taylor and John Taylor have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Taylor Family**

3076.   Plaintiff Brian G. Taylor is a citizen of the United States and domiciled in the State of Florida.

3077.   On October 22, 2006, Brian G. Taylor was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3078.   The weapon used to injure Brian G. Taylor was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3079.   As a result of the attack, Mr. Taylor lost his right leg. He also suffered injuries to
his right thigh, loss of muscle, skin and part of his femur, a dislocated knee, a damaged femoral
artery, and compartment syndrome.

3080.   As a result of the attack, and the injuries he suffered, Plaintiff Brian G. Taylor has
experienced severe physical and mental anguish and extreme emotional pain and suffering.

3081.   Plaintiff Brian G. Taylor was discharged from the U.S. military on February 5,
2011.

**The Recendez Family**

3082.   Plaintiff Judas Recendez is a citizen of the United States and domiciled in the State
of California.

3083.   On October 22, 2006, Judas Recendez was serving in the U.S. military in Iraq when
an EFP emplaced by Special Groups detonated near his vehicle.

3084.   The weapon used to injure Mr. Recendez was a Hezbollah-designed and Iranian-
manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using
specialized training and components supplied by Hezbollah and the IRGC.

3085.   As a result of the attack, both of Mr. Recendez's legs were amputated below the
knee. He also sustained shrapnel injuries to the lower part of his body from the waist down, hearing
and vision damage, and nerve damage in his left hand.

3086.   As a result of the attack, and the injuries he suffered, Plaintiff Judas Recendez has
experienced severe physical and mental anguish and extreme emotional pain and suffering.

72.      **THE OCTOBER 22, 2006 ATTACK – SADR CITY**

**The Norager Family**

3087.   Plaintiff Tyler Norager is a citizen of the United States and domiciled in the State
of Utah.

3088.   On October 22, 2006, Tyler Norager was serving in the U.S. military in Iraq when
an EFP emplaced by Special Groups detonated near his vehicle.

3089.   The weapon used to injure Mr. Norager was a Hezbollah-designed and Iranian-
manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using
specialized training and components supplied by Hezbollah and the IRGC.

3090.   As a result of the attack, Mr. Norager sustained shrapnel wounds to the face, the
right side of his body, and the top of his spine. His injuries have caused him long-term, permanent
back pain.

3091.   As a result of the attack, and the injuries he suffered, Plaintiff Tyler Norager has
experienced severe physical and mental anguish and extreme emotional pain and suffering.

3092.   Plaintiff Shalee Norager is a citizen of the United States and domiciled in the State
of Utah. She is the wife of Tyler Norager.

3093.   Plaintiff M.N., a minor represented by her legal guardian, Tyler Norager, is a citizen
of the United States and domiciled in the State of Utah. She is the daughter of Tyler Norager.

3094.   As a result of the attack, and the injuries suffered by Tyler Norager, Plaintiffs
Shalee Norager and M.N. have experienced severe mental anguish, and extreme emotional pain
and suffering.

73.     **THE OCTOBER 23, 2006 ATTACK – BAGHDAD**

**The Bock Family**

3095.   Amos Bock was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

3096.   On October 23, 2006, Amos Bock, aged 24, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3097.   Amos Bock was killed in the attack.

3098.   The weapon used to kill Amos Bock was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3099.   Plaintiff Harry Riley Bock is a citizen of the United States and domiciled in the State of Missouri. He is the father of Amos Bock.

3100.   Plaintiff Jill Ann Bock is a citizen of the United States and domiciled in the State of Missouri. She is the mother of Amos Bock.

3101.   Plaintiff Mariah Simoneaux is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Amos Bock.

3102.   As a result of the attack, and the death of Amos Bock, Plaintiffs Harry Riley Bock, Jill Ann Bock, and Mariah Simoneaux have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 74.     THE OCTOBER 2006 ATTACK – BAGHDAD

**The Al-Taie Family**

3103.   Ahmed Al-Taie was born in Iraq but left that country in 1980 with his family. Prior to 2004 he moved to the United States.

3104.   In 2004, Ahmed Al-Taie enlisted in the U.S. Army Reserves. He was deployed to Baghdad in 2005 as part of a Provincial Reconstruction Team, where he served as a translator.

3105.   On May 15, 2006, Ahmed Al-Taie was naturalized as a United States citizen.

3106.   In October 2006, Ahmed Al-Taie was visiting his wife in the Karrada neighborhood of Bagdad. While there, the AAH abducted Ahmed Al-Taie and held him captive.

3107.   In February 2007, an affiliate of the AAH posted a video of Ahmed Al-Taie in captivity.

3108.   Sometime prior to February 22, 2012, while the AAH held Ahmed Al-Taie prisoner, the AAH murdered him.

3109.   On February 22, 2012, the AAH released Ahmed Al-Taie's remains to the Iraqi government as part of a prisoner exchange.

3110.   Plaintiff Kousay Al-Taie is a citizen of the United States and domiciled in the State of Michigan. He is the father of Ahmed Al-Taie.

3111.   Plaintiff Kousay Al-Taie brings an action individually and on behalf of the Estate of Ahmed Al-Taie, as its legal representative.

3112.   Plaintiff Nawal Al-Taie is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Ahmed Al-Taie.

3113.   Plaintiff Bashar Al-Taie is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Ahmed Al-Taie.

3114.   Plaintiff Hathal K. Taie is a citizen of the United States and domiciled in the State
of Michigan. He is the brother of Ahmed Al-Taie.

3115.   As a result of the attack, and the death of Ahmed Al-Taie, Plaintiffs Kousay Al-
Taie, Nawal Al-Taie, Bashar Al-Taie and Hathal K. Taie have experienced severe mental anguish,
extreme emotional pain and suffering, and loss of their son's/brother's society, companionship,
comfort, advice and counsel.

### 75.   THE NOVEMBER 2, 2006 ATTACK – BAGHDAD

#### The Kruger Family

3116.   Eric Kruger was a citizen of the United States and domiciled in the State of Texas
when he was killed in Iraq.

3117.   On November 2, 2006, Eric Kruger, aged 44, was serving in the United States
military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3118.   Eric Kruger was killed in the attack.

3119.   The weapon used to kill Eric Kruger was a Hezbollah-designed and Iranian-
manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using
specialized training and components supplied by Hezbollah and the IRGC.

3120.   Plaintiff Lawrence Kruger is a citizen of the United States and domiciled in the
State of Texas. He is the father of Eric Kruger.

3121.   Plaintiff Lawrence Kruger brings an action individually and on behalf of the Estate
of Eric Kruger, as its legal representative, for his death and any suffering and/or economic loss
he/his Estate sustained as a result of the attack.

3122.   Plaintiff Carol Kruger is a citizen of the United States and domiciled in the State of
Missouri. She is the mother of Eric Kruger.

3123.    Plaintiff C.K., a minor represented by his conservator, Lawrence Kruger, is a citizen of the United States and domiciled in the State of Colorado. He is the son of Eric Kruger.

3124.    Plaintiff E.K., a minor represented by her conservator, Lawrence Kruger, is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of Eric Kruger.

3125.    Plaintiff Douglas Kruger is a citizen of the United States and domiciled in the State of Texas. He is the brother of Eric Kruger.

3126.    Plaintiff Kristy Kruger is a citizen of the United States and domiciled in the State of Texas. She is the sister of Eric Kruger.

3127.    As a result of the attack, and the death of Eric Kruger, Plaintiffs Lawrence Kruger, Carol Kruger, C.K., E.K., Douglas Kruger and Kristy Kruger have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice and counsel.

**The Finken Family**

3128.    Paul Finken was a citizen of the United States and domiciled in the State of Iowa when he was killed in Iraq.

3129.    On November 2, 2006, Paul Finken, aged 40, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3130.    Paul Finken was killed in the attack.

3131.    The weapon used to kill Paul Finken was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3132.   Plaintiff Jackie Farrar-Finken is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Paul Finken.

3133.   Plaintiff Jackie Farrar-Finken brings an action individually and on behalf of the Estate of Paul Finken, as its legal representative.

3134.   Plaintiff Emilie Finken is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

3135.   Plaintiff C.F., a minor represented by her legal guardian, Jackie Farrar-Finken, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

3136.   Plaintiff J.F., a minor represented by her legal guardian, Jackie Farrar-Finken, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

3137.   Plaintiff Stephen Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3138.   Plaintiff Alan Finken is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Paul Finken.

3139.   Plaintiff Richard Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3140.   Plaintiff David Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3141.   Plaintiff Mark Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3142.   Plaintiff Peter Finken is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Paul Finken.

3143.   Plaintiff Jean Pruitt is a citizen of the United States and domiciled in the State of Iowa. She is the sister of Paul Finken.

3144.   Plaintiff Joan Henscheid is a citizen of the United States and domiciled in the State of Iowa. She is the sister of Paul Finken.

3145.   As a result of the attack, and the death of Paul Finken, Plaintiffs Jackie Farrar-Finken, Emilie Finken, C.F., J.F., Stephen Finken, Alan Finken, Richard Finken, David Finken, Mark Finken, Peter Finken, Jean Pruitt and Joan Henscheid have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/brother's society, companionship, comfort, advice and counsel.

**76.**   **THE NOVEMBER 9, 2006 ATTACK – BAGHDAD**

**The McCoy Family**

3146.   Gregory McCoy was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

3147.   On November 2, 2006, Gregory McCoy, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3148.   Gregory McCoy was killed in the attack.

3149.   The weapon used to kill Gregory McCoy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3150.   Plaintiff Lori Ann McCoy is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Gregory McCoy.

3151.   Plaintiff Lori Ann McCoy brings an action individually and on behalf of the Estate of Gregory McCoy, as its legal representative.

3152.   Plaintiff Logan McCoy is a citizen of the United States and domiciled in the State of Colorado. He is the son of Gregory McCoy.

3153.   Plaintiff T.M., a minor represented by his legal guardian, Lori Ann McCoy, is a citizen of the United States and domiciled in the State of Colorado. He is the son of Gregory McCoy.

3154.   As a result of the attack, and the death of Gregory McCoy, Lori Ann McCoy, Logan McCoy and T.M. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Cox Family**

3155.   Plaintiff Glenn Michael Cox is a citizen of the United States and domiciled in the State of Florida.

3156.   On November 9, 2006, Glenn Michael Cox, then 45, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3157.   The weapon used to injure Glenn Michael Cox was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3158.   As a result of the attack, Mr. Cox received multiple shrapnel injuries to his right side.

3159.   Mr. Cox's right ulna was shattered, as were most of the bones in his right hand. As a result, Mr. Cox has an artificial knuckle in his right hand. Shrapnel severed a nerve in his right forearm, and he still has a large amount of scarring on his arm and hand.

3160.   Mr. Cox also suffers from hearing loss as a result of the attack.

3161.   As a result of the attack, and the injuries he suffered, Plaintiff Glenn Michael Cox has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 77.   THE NOVEMBER 13, 2006 ATTACK – BAGHDAD

**The Kim Family**

3162.   Jang Ho Kim was domiciled in the State of California when he was killed in Iraq. He became a citizen of the United States posthumously.

3163.   On November 13, 2006, Jang Ho Kim, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3164.   Jang Ho Kim was killed in the attack.

3165.   The weapon used to kill Jang Ho Kim was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3166.   Plaintiff Sangsoon Kim is a citizen of the United States and domiciled in the State of California. She is the mother of Jang Ho Kim.

3167.   Plaintiff Seop (Steve) Kim is a citizen of the United States and domiciled in the State of California. He is the father of Jang Ho Kim.

3168.   Plaintiff Seop (Steve) Kim brings an action individually and on behalf of the Estate of Jang Ho Kim, as its legal representative.

3169.   Plaintiff Michelle Kim is a citizen of the United States and domiciled in the State of California. She is the sister of Jang Ho Kim.

3170.   As a result of the attack, and the death of Jang Ho Kim, Plaintiffs Sangsoon Kim, Seop (Steve) Kim and Michelle Kim have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Lamb Family**

3171.   Plaintiff Kurtiss Lamb is a citizen of the United States and domiciled in the State of Tennessee.

3172.   On November 13, 2006, Kurtiss Lamb, then 24, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3173.   The weapon used to injure Kurtiss Lamb was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3174.   As a result of the blast, Kurtiss Lamb suffered partial paralysis to his arm and bulging disks in his lumbar spine. Mr. Lamb was also diagnosed with a TBI.

3175.   As a result of the attack, and the injuries he suffered, Plaintiff Kurtiss Lamb has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**78.     THE NOVEMBER 16, 2006 ATTACK – BASRA**

**The Coté Family**

3176.  Jonathon M. Coté was a citizen of the United States and domiciled in the State of New York when he was kidnapped and killed in Iraq.

516

3177.   On November 16, 2006, Jonathon Coté was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3178.   Mr. Coté's remains were mutilated after he was executed. On April 23, 2008, the FBI announced that it had identified the remains of Mr. Coté – which were recovered four days prior – and made arrangements to return Mr. Coté's remains to his family.

3179.   Jonathon M. Coté was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3180.   Plaintiff Francis L. Coté is a citizen of the United States and domiciled in the State of New York. He is the father of Jonathon Coté.

3181.   Plaintiff Nancy Coté is a citizen of the United States and domiciled in the State of New York. She is the stepmother of Jonathon Coté.

3182.   Plaintiff Christopher Coté is a citizen of the United States and domiciled in the State of New York. He is the brother of Jonathon Coté.

3183.   Plaintiff Samantha Dunford is a citizen of the United States and domiciled in the State of New York. She is the stepsister of Jonathon Coté.

3184.   Plaintiff Maximillian Shroyer is a citizen of the United States and domiciled in the State of Ohio. He is the stepbrother of Jonathon Coté.

3185.   As a result of the November 16, 2006 attack, and the subsequent kidnapping and execution of Jonathon Coté, Plaintiffs Francis L. Coté, Nancy Coté, Christopher Coté, Samantha Dunford and Maxilillian Shroyer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Johnson-Reuben Family**

3186.   Paul Johnson-Reuben was a citizen of the United States and domiciled in the State of Minnesota when he was kidnapped and killed in Iraq.

3187.   On November 16, 2006, Paul Johnson-Reuben was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3188.   Mr. Johnson-Reuben's remains were mutilated after he was executed. In April 2008, Mr. Johnson-Reuben's remains were returned to his family.

3189.   Paul Johnson-Reuben was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3190.   Plaintiff Casey Reuben is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Paul Johnson-Reuben.

3191.   Plaintiff Bree Reuben is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Paul Johnson-Reuben.

3192.   Plaintiff Patrick Reuben is a citizen of the United States and domiciled in the State of Wisconsin. He is the twin brother of Paul Johnson-Reuben.

3193.   As a result of the attack, and the death of Paul Johnson-Reuben, Plaintiffs Casey Reuben, Bree Reuben and Patrick Reuben have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/brother's society, companionship, comfort, advice and counsel.

**The Munns Family**

3194.   Joshua Munns was a citizen of the United States and domiciled in the State of California when he was kidnapped and killed in Iraq.

3195.   On November 16, 2006, Joshua Munns was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3196.   Mr. Munn's remains were mutilated after he was executed. In April 2008, Mr. Munn's remains were returned to his family.

3197.   Joshua Munns was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3198.   Plaintiff Jackie Stewart is a citizen of the United States and domiciled in the State of California. She is the mother of Joshua Munns.

3199.   Plaintiff Mark Munns is a citizen of the United States and domiciled in the State of California. He is the father of Joshua Munns.

3200.   Plaintiff Crista Munns is a citizen of the United States and domiciled in the State of California. She is the stepmother of Joshua Munns.

3201.   As a result of the attack, and the death of Joshua Munns, Plaintiffs Jackie Stewart, Mark Munns and Crista Munns have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**The Young Family**

3202.   John Young was a citizen of the United States and domiciled in the State of Missouri when he was kidnapped and killed in Iraq.

3203.   On November 16, 2006, John Young, aged 44, was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3204.   Mr. Young's remains were mutilated after he was executed. In March 2008, Mr. Young's remains were returned to his family.

3205.   John Young was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3206.   Plaintiff Sharon DeBrabander is a citizen of the United States and domiciled in the State of Arizona. She is the mother of John Young.

3207.   Plaintiff Dennis DeBrabander is a citizen of the United States and domiciled in the State of Arizona. He is the stepfather of John Young.

3208.   Plaintiff Nicole DeBrabander is a citizen of the United States and domiciled in the State of Arizona. She is the sister of John Young.

3209.   Plaintiff Joella Pratt is a citizen of the United States and domiciled in the State of Missouri. She is the sister of John Young.

3210.   As a result of the attack, and the death of John Young, Plaintiffs Sharon DeBrabander, Dennis DeBrabander, Nicole DeBrabander and Joella Pratt have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 79.   THE NOVEMBER 26, 2006 ATTACK – BAGHDAD

**The Fraser Family**

3211.   David M. Fraser was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3212.   On November 26, 2006, David M. Fraser, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3213.   David M. Fraser was killed in the attack.

520

3214.   The weapon used to kill David M. Fraser was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3215.   Plaintiff Helen Fraser is a citizen of the United States and domiciled in the State of Texas. She is the mother of David M. Fraser.

3216.   Plaintiff Richard Fraser is a citizen of the United States and domiciled in the State of Texas. He is the father of David M. Fraser.

3217.   Plaintiff Richard Fraser brings an action individually and on behalf of the Estate of David M. Fraser, as its legal representative.

3218.   As a result of the attack, and the death of David M. Fraser, Plaintiffs Helen Fraser and Richard Fraser have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 80.    THE DECEMBER 3, 2006 ATTACK – BAGHDAD

**The English Family**

3219.   Shawn L. English was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

3220.   On December 3, 2006, Shawn L. English, aged 35, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3221.   Shawn L. English was killed in the attack.

3222.   The weapon used to kill Shawn L. English was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3223.   Plaintiff Tricia English is a citizen of the United States and domiciled in the State

of Ohio. She is the widow of Shawn L. English.

3224.   Plaintiff Nathan English is a citizen of the United States and domiciled in the State of Ohio. He is the son of Shawn L. English.

3225.   Plaintiff N.C.E., a minor represented by his legal guardian Tricia English, is a citizen of the United States and domiciled in the State of Ohio. He is the son of Shawn L. English.

3226.   Plaintiff A.S.E., a minor represented by his legal guardian Tricia English, is a citizen of the United States and domiciled in the State of Ohio. He is the son of Shawn L. English.

3227.   Todd Daily is a citizen of the United States and domiciled in the State of Ohio. He brings an action on behalf of the Estate of Shawn L. English, as its legal representative.

3228.   As a result of the attack, and the death of Shawn L. English, Plaintiffs Tricia English, Nathan English, N.C.E. and A.S.E. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Starkey Family**

3229.   Plaintiff Joshua Starkey is a citizen of the United States and domiciled in the State of Georgia.

3230.   On December 3, 2006, Joshua Starkey, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3231.   The weapon used to injure Joshua Starkey was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3232.   As a result of the attack, shrapnel impacted Joshua Starkey's body on his right shoulder and right side of his face. He also sustained burns to his face and shoulder.

522