# 21-2019

IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE SECOND CIRCUIT

◆◆◆

ROBERT BARTLETT, TERREL CHARLES BARTLETT, LINDA JONES, SHAWN
BARTLETT, MAXINE E. CROCKETT, INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF RICKY LEON CROCKETT, MARVISE L. CROCKETT, TRACIE ARSIAGA,
INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ROBERT R. ARSIAGA,
SYLVIA MACIAS, GILBERT ARSIAGA, JR., GEORGE ARSIAGA, MATTHEW
ARSIAGA, ANGEL MUNOZ, ROBI ANN GALINDO, PATRICIA ARSIAGA, ON
BEHALF OF THE ESTATE OF JEREMY ARSIAGA, CEDRIC HUNT, STEVEN
GREENWOOD, STEVEN W. HILLER, INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF STEPHEN DUSTIN HILLER, JEREMY CHURCH, SANDRA HANKINS,
INGRID FISHER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF STEVEN
SCOTT FISHER, KRISTIN WALKER, STEVEN T. FISHER, KATHLEEN GRAMKOWSKI,

*(Caption continued on inside covers)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME V OF V
### (Pages A-1201 to A-1296)

MICHAEL RADINE
DINA GIELCHINSKY
GARY M. OSEN
AARON A. SCHLANGER
OSEN LLC
190 Moore Street, Suite 272
Hackensack, New Jersey 07601
(201) 265-6400

*Attorneys for Plaintiffs-Appellees*

DAVID B. RIVKIN, JR.
ELIZABETH PRICE FOLEY
MARK W. DELAQUIL
KENDALL E. WANGSGARD
BAKER & HOSTETLER LLP
Washington Square
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
(202) 816-1500

*Attorneys for Movant-Appellant
and Defendant-Appellant*

DANIEL CARVILL, MARY CARVILL, PEGGY CARVILL-LIGUORI, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF FRANK T. CARVILL, PAMELA ADLE-WATTS, JOHN WATTS, GLORIA NESBITT, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DEFOREST L. TALBERT, D.J.H., A MINOR, TAWANNA TALBERT DARRING, LATASHA MARBLE, JAMES TALBERT, MIRANDA PRUITT, VELINA SANCHEZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MOSES ROCHA, ALOYSIUS SANCHEZ, JR., ROMMEL ROCHA, PHILLIP SANCHEZ, GLORIA P. REYNOSO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF YADIR G. REYNOSO, JASMIN REYNOSO, PATRICIA REYNOSO, JOSE REYNOSO, ASHLEY WELLS SIMPSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF LARRY LLOYD WELLS, CHAD WELLS, CRYSTAL STEWART, CHASITY WELLS-GEORGE, CANDICE MACHELLA, BILLY DOAL WELLS, HOPE ELIZABETH VEVERKA, DONNA JEAN HEATH, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DAVID MICHAEL HEATH, LOLA JEAN MODJESKA, JOHN DAVID HEATH, OLGA LYDIA GUTIERREZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JACOB DAVID MARTIR, ISMAEL MARTIR, NATHANIEL FOLEY, MICHAEL SCOTT DEWILDE, STEVEN MORRIS, DANIELLE DECHAINE-MORRIS, NICHOLAS MORRIS, K.M., A MINOR, MONICA ARIZOLA, ROBERTO AARON ARIZOLA, ROBERTO ARIZOLA, SR., CECILIA ARIZOLA, DANNY ARIZOLA, RICARDO ARIZOLA, GREG KLECKER, RAYMOND MONTGOMERY, PATRICIA MONTGOMERY, TONY WOOD, JOEDI WOOD, ADAM WOOD, MEGAN WOOD, LISA RAMACI, LISA RAMACI INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF STEVEN VINCENT, ISABELL VINCENT, CHARLES VINCENT, MARIA VIDAL, TAMARA HASSLER, RICHARD E. HASSLER, JOANNE SUE HASSLER, SCOTT HUCKFELDT, KATHRYN HUCKFELDT, ALISHA HUCKFELDT, MATTHEW HUCKFELDT, TIMOTHY NEWMAN, PADRAIC J. NEWMAN, AMENIA JONAUS, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JUDE JONAUS, GERNESSOIT JONAUS, DAPHNIE JONAUS MARTIN, RICKY JONAUS, MARCKENDY JONAUS, CLAIRE JONAUS, SHAREN JONAUS MARTIN, MASINA TULIAU, AUDELIA MORIN, ESTEBAN MORIN, ESTAVAN MORIN, SR., BRIANNA RENEE NAVEJAS, MARGARITO A. MARTINEZ, AMY LYNN ROBINSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JEREMIAH ROBINSON, FLOYD BURTON ROBINSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JEREMIAH ROBINSON, JACOB MICHAEL ROBINSON, LUCAS WILLIAM ROBINSON, JODEE JOHNSON, JAMES HIGGINS, WENDY COLEMAN, BRIAN RADKE, NOVA RADKE, STEVEN VERNIER, JR., CLIFFORD L. SMITH, JR., INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KEVIN J. SMITH, GEORGIANNA STEPHENS-SMITH, CORENA MARTIN, ADAM MATTIS, TERRANCE PETERSON, III, PETRA SPIALEK, DAVID G. CARDINAL, JR., INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ANTHONY CARDINAL, RICHELLE HECKER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF WILLIAM F. HECKER, III, VICTORIA HECKER, W.H., A MINOR, C.H., A MINOR, WILLIAM F. HECKER, JR., NANCY HECKER, JOHN D. HECKER, ROBERT F. MARIANO, DEBRA MARIANO, BOBBIE D. MARIANO, VICKIE MICHAY WHITE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF STEPHEN J. WHITE, GLADYS E. REYES CENTENO, VERONICA LOPEZ REYES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JASON LOPEZ REYES, ZORAIMA LOPEZ, JENNIFER LINK, SHARON JOHNSTON, KENNY LEE, TOM B. LEE, LING P. LEE, DEBORAH NOBLE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHARLES E. MATHENY, IV, DAVID NOBLE, CHARLES E. MATHENY, III, JUDY COLLADO, KAIYA COLLADO, JUSTIN WALDECK, TANJA KUHLMEIER, INDIVIDUALLY AND

ON BEHALF OF THE ESTATE OF DANIEL KUHLMEIER, ROBERT J. KUHLMEIER, THERESA A. KUHLMEIER, THERESA ANN KUHLMEIER, EDWARD KUHLMEIER, THOMAS KUHLMEIER, JOHN KUHLMEIER, ROBERT W. KUHLMEIER, PATRICK FARR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CLAY P. FARR, SILVER FARR, CARROL ALDERETE, ANTHONY ALDERETE, CHAD FARR, RAYANNE HUNTER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF WESLEY HUNTER, W.H., A MINOR, T.H., A MINOR, FABERSHA FLYNT LEWIS, CHRISTOPHER ANTHONY BERSHEFSKY, LORENZO SANDOVAL, JR., INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ISRAEL DEVORAGARCIA, LORENZO SANDOVAL, JR., ADRIAN SANDOVAL, ROSA ESTHER SANDOVAL, HENRY J. BANDHOLD, SR., INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SCOTT BANDHOLD, AFONSO BANDHOLD, MARIANA BANDHOLD, H. JOSEPH BANDHOLD, DONALD C. BANDHOLD, JOSHUA P. STEIN, NICOLE B. STEIN, NICOLE B. STEIN, A MINOR, J.S.S., A MINOR, JESSE P. STEIN, ERIK ROBERTS, E.C.R, A MINOR, ROBIN ROBERTS, JAMES CRAIG ROBERTS, CARA ROBERTS, COLIN ROBERTS, LUKE MURPHY, WILLETTE MURPHY, SHANE IRWIN, T.R., A MINOR, HELEN MARGUERITE IRWIN, NICOLE IRWIN, MARIA GOMEZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOSE GOMEZ, JOHN DANA GREER, STEPHANIE SANDER, CHRISTOPHER D. GREER, JOSEPH L. GREER, CARL K. GREER, CHRISTOPHER JOYNER, ANNE P. JOYNER, BRIAN MONTOGMERY, K.K, A MINOR, NECOLE DUNLOW SMITH, MICHAEL R. MILLS, M.R.M., A MINOR, EDDIE JO PALINSKY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JERRY A. PALINSKY, JR., JERRY A. PALINSKY, II, ADINA PALINSKY, JERRY A. PALINSKY, SR., KATHLEEN HOKE, JOEL PALINSKY, KARALEEN HERB, ERIC BRANDON STONEKING, CARRIE SUE STONEKING, FAITH RENEE STONEKING, NANETTE SAENZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CARLOS N. SAENZ, JUAN SAENZ, JOAQINA SAENZ CHORENS, LUZ MARIA ESTRADA-PULIDO, FRANCES CATHERINE CASTRO, ELVA ESPINOZA, AMANDA VACHO, ON BEHALF OF THE ESTATE OF NATHAN J. VACHO AND ON BEHALF OF E.V., A MINOR, BAYLI VACHO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF NATHAN J. VACHO, JOHN VACHO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CAROL VACHO, ASHLEY VACHO LESLIE, RONALD VEVERKA, CAROL POLLEY, DOUGLAS VEVERKA, SANDRA SOLIDAY, JEANETTE WEST, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ROBERT H. WEST, SHELBY WEST, DONNA ENGEMAN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOHN W. ENGEMAN, SHANNON SHUMATE, LAUREN SHUMATE, L.S., A MINOR, NICOLE DICENZO, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DOUGLAS ANDREW DICENZO, D.D., A MINOR, LARRY DICENZO, KATHY CRANE, JOHNNY ALLEN BLAIR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ROBERT EDWARD BLAIR, CHARLEE BLAIR WEBB, C.L., A MINOR, ARNE EASTLUND, TINA EASTLUND, SVEN EASTLUND, TAYLOR EASTLUND, ELIZABETH JO EASTLUND, MATTHEW ADAMSON, R.A., A MINOR, KATHY ADAMSON, RICHARD ADAMSON, CHRISTOPHER ADAMSON, JEFFREY ADAMSON, JUSTIN ADAMSON, JAMES SHEPARD, JOHN P. SKLANEY,, III, KATHY CRABTREE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DANIEL CRABTREE, M.C., A MINOR, JUDY ANN CRABTREE, RONALD WAYNE CRABTREE, DEBRA WIGBELS, JUDY HUENINK, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF BENJAMIN J. SLAVEN, SEAN SLAVEN, NICOLE LANDON, MISTI FISHER, STEVEN J. FRIEDRICH, A.F., A MINOR, PHILIP ALAN DERISE, NORMA ALICIA CONTRERAS, JONATHAN

CONTRERAS, JR., CARLOS CONTRERAS, CESAR CONTRERAS, HERNAN
CONTRERAS, NOEL CONTRERAS, DANNYEL CONTRERAS, SHARON M. PUGH,
INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KENNETH IRVING PUGH,
BRITNEY E. CARTER, ALICIA PEARSON, DANIEL J. EVANS, JUSTIN EVANS,
KEVIN GRAVES, NICHOLAS GENE KOULCHAR, MICHAEL KOULCHAR, SUHEIL
CAMPBELL, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF EDGARDO
ZAYAS, A.Z.C., A MINOR, CATHY ANDINO, INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF EDWIN A. ANDINO JR., LUIS JUNIOR PUERTAS, LIDIA SULLIVAN,
GABRIELA D. PUERTAS VERGARA-DONOSO, CHRISTOPHER MICHAEL
MELENDEZ, NARCISO MELENDEZ, CHRISTINA MELENDEZ, LAUREL
BARATTIERI, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF GUY
BARATTIERI, PATRICIA WHEATLEY, REBECCA BARATTIERI, NICOLE BARATTIERI,
GINA TESNAR, GLORIA L. MAGANA, INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF KENNY FRANCES STANTON JR., MARIO STANTON, BRANDIE
STANTON, TERRYMARIE STANTON, FRED FRIGO, NANNETTE BRYNE-HAUPT,
LYNN FOREHAND, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF RYAN
HAUPT, LANCE HAUPT, RHONDA HAUPT, TIFANY THOMPSON, SABRINA CUMBE,
WILLIAM WITTE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KEVIN
M. WITTE, MICHAEL MOCK, TAMMY DORSEY, ERIC PHYE, JAMES
GMACHOWSKI, CONSTANCE BRIAN, AMBER HENSLEY, DAVID W. HAINES, DAWN
HAINES, MACKENZIE HAINES, KARAR ALABSAWI, MICHELLE TAYLOR,
INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DAVID G. TAYLOR, JR., J.T.,
A MINOR, PHYLLIS TAYLOR, JOHN TAYLOR, BRIAN B. TAYLOR, JUDAS
RECENDEZ, TYLER NORAGER, SHALEE NORAGER, M.N., A MINOR, HARRY
RILEY BOCK, JILL ANN BOCK, MARIAH SIMONEAUX, KOUSAY AL-TAIE,
INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF AHMED AL-TAIE, NAWAL
AL-TAIE, BASHAR AL-TAIE, HATHAL K. TAIE, LAWRENCE KRUGER,
INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ERIC KRUGER, CAROL
KRUGER, C.K., A MINOR, E.K., A MINOR, DOUGLAS KRUGER, JACKIE FARRAR-
FINKEN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF PAUL FINKEN,
EMILIE FINKEN, C.F., A MINOR, J.F., A MINOR, STEPHEN FINKEN, ALAN FINKEN,
RICHARD FINKEN, DAVID FINKEN, MARK FINKEN, JEAN PRUITT, JOAN
HENSCHEID, PETER FINKEN, LORI ANN MCCOY, INDIVIDUALLY AND ON BEHALF
OF THE ESTATE OF GREGORY MCCOY, L.M., A MINOR, T.M., A MINOR, GLENN
MICHAEL COX, SANGSOON KIM, SEOP STEVE KIM, INDIVIDUALLY AND ON
BEHALF OF THE ESTATE OF JANG HO KIM, MICHELLE KIM, KURTISS LAMB,
FRANCIS L. COTE, NANCY COTE, CHRISTOPHER COTE, SAMANTHA DUNFORD,
MAXIMILLIAN SHROYER, SAMANTHA DUNFORD, CASEY REUBEN, BREE
REUBEN, PATRICK REUBEN, JACKIE STEWART, MARK MUNNS, CRISTA MUNNS,
SHARON DEBRABANDER, DENNIS DEBRABANDER, NICOLE DEBRABANDER,
JOELLA PRATT, HELEN FRASER, RICHARD FRASER, INDIVIDUALLY AND ON
BEHALF OF THE ESTATE OF DAVID M. FRASER, TRICIA ENGLISH, NATHAN
ENGLISH, N.C.E., A MINOR, A.S.E., A MINOR, TODD DAILY, ON BEHALF OF THE
ESTATE OF SHAWN L. ENGLISH, JOSHUA STARKEY, BRENT HINSON, WILLIAM
HINSON, FRAN HINSON, HILARY WESTERBERG, JOHN GIBSON, STEPHANIE
GIBSON WEBSTER, SEAN ELLIOTT, TRAVIS GIBSON, WILLIAM RONALD LITTLE,
BRENDA LITTLE, INDIVIDUALLY AND ON BEHALF OF WILLIAM RONALD
LITTLE, JR., KIRA SIKES, RANDOLPH DELBERT NANTZ, JOSHUA RYAN NANTZ,
CHAQUITA TALBERT, ALOYSIUS SANCHEZ, SR., VICTORIA M. FOLEY,

INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ALEXANDER SCOTT ARREDONDO, GWENDOLYN MORIN-MARENTES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF STEVE MORIN, JR., ALVIS BURNS, KEITH VEVERKA, SUZZETTEE LAWSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ISAAC S. LAWSON, CHASTITY DAWN LAFLIN, ALEXANDER ZAYAS, COLIN HAINES, LORI ANN MCCORMICK, LORI ANN MCCORMICK INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CLINTON MCCORMICK, DEBORAH BEAVERS, DENISE VENNIX, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ALAN R. BLOHM, JEREMY BLOHM, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHRIS BLOHM, KIANA BLOHM, JAMES SMITH, MAUK MAUK, ROBERT VACCARO, JOANNE GUTCHER, CHARLOTTE FREEMAN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF BRIAN S. FREEMAN, G.F., A MINOR, I.F., A MINOR, KATHLEEN SNYDER, RANDOLPH FREEMAN, KATHALEEN FREEMAN, ALBERT SNYDER, RICHARD LEE, DANNY CHISM, ELIZABETH CHISM, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOHNATHAN B. CHISM, VANESSA CHISM, JULIE CHISM, RUSSELL J. FALTER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SHAWN P. FALTER, LINDA FALTER, MARJORIE FALTER, RUSSELL C. FALTER, JOHN SACKETT, JASON SACKETT, MICHAEL LUCAS, MARSHA NOVAK, DAVID LUCAS, TIM LUCAS, ANDREW LUCAS, SHANNON MILLICAN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOHNATHON M. MILLICAN, PAUL MITCHELL MILLICAN, NOALA FRITZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JACOB FRITZ AND THE ESTATE OF LYLE FRITZ, DANIEL FRITZ, ETHAN FRITZ, BILLY WALLACE, BILLY WALLACE, STEFANIE WALLACE, AUSTIN WALLACE, DEVON WALLACE, C.W., A MINOR, EVAN KIRBY, MARCIA KIRBY, STEVEN KIRBY, JOHNNY WASHBURN, MARVIN THORNSBERRY, CYNTHIA THORNSBERRY, A.B., A MINOR, TRACY ANDERSON, JEFFREY ANDERSON, ADAM G. STOUT, ANDREW JEFFREY ANDERSON, ELIZABETH LYNN ISLAS, ANASTASIA FULLER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ALEXANDER H. FULLER, A.F., A MINOR, L.R.-W., A MINOR, HEATH DAMON HOBSON, JODI MICHELLE HOBSON, SAMANTHA BALSLEY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MICHAEL C. BALSLEY, JODI MICHELLE HOBSON, M.D.H., A MINOR, NICHOLE GARRIGUS, DEADRA GARRIGUS, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MICKEL D. GARRIGUS, DAVID GARRIGUS, KYLA OSTENSON, MATTHEW GARRIGUS, SHAWN RYAN, SHARON Y. DUNN SMITH, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TERRENCE DUNN, DENNIS DUNN, RICHARD LANDECK, VICTORIA LANDECK, LAVONNA HARPER, MELBA ANNE F. HARRIS, PAUL D. HARRIS, HYUNJUNG GLAWSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CURTIS E. GLAWSON, YOLANDA BROOKS, CURTIS GLAWSON,, SR., KIERRA GLAWSON, SABRINA GLAWSON, ON BEHALF OF THE ESTATE OF CORTEZ GLAWSON, JAZMON REYNA, RYAN SABINISH, R.J.S., A MINOR, S.J.S., A MINOR, CARRIE THOMPSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SEAN M. THOMAS, A.T., A MINOR, DANIEL THOMAS, SR., DIANA THOMAS, DANIEL THOMAS, JR., KELLY GILLIS, MELINDA FLICK, ANN CHRISTOPHER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KWESI CHRISTOPHER, NANCY FUENTES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DANIEL A. FUENTES, ARMANDO FUENTES, JULIO FUENTES, TATYANA FUENTES, EMMA MCGARRY, D.J.F., A MINOR, JOHN KIRBY, MICHAEL MURPHY-SWEET, ELIZABETH MURPHY-SWEET, ANONA GONELLI, LINDSAY YOUNG, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF BRETT A. WALTON,

Leasa Dollar, Eugene Delozier, Michelle Klemensberg, Individually And On Behalf Of The Estate Of Larry R. Bowman, Scott Lilley, Frank Lilley, Jolene Lilley, Matthew Lilley, Ava Tomson, Individually And On Behalf Of The Estate Of Lucas V. Starcevich, Richard Tomson, Glenda Starcevich, Ariana Starcevich, Trenton Starcevich, Samantha Tomson, Andrew Tomson, Jared S. Stevens, S.W., a minor, Bradley Starcevich, Susan Maria Doskocil Hicks, Individually And On Behalf Of The Estate Of Glenn Dale Hicks, Jr., Glenn Dale Hicks, Jr., David James Hicks, John Christopher Hicks, S.L.H., a minor, Karen Funcheon, Individually And On Behalf Of The Estate Of Alexander J. Funcheon, Robert Funcheon, Dwight Martin, Individually And On Behalf Of The Estate Of Jay E. Martin, Dove Deanna Adams, Raven Adams, Lark Adams, Holly Burson, Individually And On Behalf Of The Estate Of Jerome Potter, Nancy Umbrell, Individually And On Behalf Of The Estate Of Colby J. Umbrell, Mark Umbrell, Casey Boehmer, Jeremy D. Smith, Daniel Dixon, Individually And On Behalf Of The Estate Of Ilene Dixon And The Estate Of Robert J. Dixon, Jessica Hubbard, On Behalf Of The Estate Of Robert J. Dixon, M.R., a minor, L.R., a minor, David Dixon, Daniel Austin Dixon, Gretchen Lang, Rebecca J. Oliver, Daniel C. Oliver, Kimberlee Austin-Oliver, Tiffany M. Little, Individually And On Behalf Of The Estate Of Kyle A. Little, K.L., a minor, Shelley Ann Smith, Dakota Smith-Lizotte, Kimberlee Austin-Oliver, Tiffany M. Little, Individually And On Behalf Of The Estate Of Kyle A. Little, K.L., a minor, Shelley Ann Smith, Dakota Smith-Lizotte, Shyanne Smith-Lizotte, Erin Lee Dructor, individually and on behalf of the Estate of Blake Stephens, Trent Stephens, Kathleen Stephens, Derek Stephens, Rhett Stephens, Summer Stephens, Brittani Hobson, Cynthia Conner, William Farrar, Sr., Individually and on behalf of the Estate of William Farrar, Joshua Brooks, Joyce Brooks, Daniel Tyler Brooks, Delilah Brown, individually and on behalf of the Estate of Scott J. Brown, Tonya K. Dressler, Ardith Cecil Dressler, Melissa Dressler, Tanya Suzzette Dressler, Daniel Dressler, Elizabeth Masterson, individually and on behalf of the Estate of Joshua D. Brown, Marian Brown, Wayne Brown, Danielle Sweet, A.B., a minor, G.B., a minor, Donna Kuglics, individually and on behalf of the Estate of Matthew J. Kuglics, Les Kuglicis, Emily Adams, Derek Gajdos, Tammy Denboer, Brandeaux Campbell, Ryan Wilson, Jami Lin Wilson, Matthew Lammers, Alicia Lammers, Barbara Lammers, Gary Lammers, Stacy Pate, Angel Gomez, Denise Jackson, Scott Hood, Flora Hood, Dixie Flagg, Stephanie Hood, Cheyenne Flagg, William Parker, Meghan Parker-Crockett, Andrew Moores, Sheila Tracy, Individually and behalf of the Estate of Jacob Tracy, Donald Tracy, Nichole Sweeney, Christina Sheridan, Matthew Benson, Melissa Benson, C.B., a minor, B.B., a minor, Daniel P. Benson, Carol Benson, Daniel R. Benson, Raymond Nigel Spencer, Jr., Sylvia Johnson Spencer, Michael Dean Moody, individually and on behalf of the Estate of Michael Dean Moody, Jr., Connie Moody, Kedrick Dante Moody, Drew Edwards, Donielle Edwards, Arifah Hardy, T.C., a

MINOR, AUNDRA CRAIG, JOYCE CRAIG, DEBRA COOK-RUSSELL, NASHIMA WILLIAMS CRAIG, JONATHAN CRAIG, ANDRE BROWN, MICHAEL COOK, VALENCIA COOK, KATHERINE M. CROW, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF WILLIAM J. CROW, K.A.C., A MINOR, CANDACE CATHRYN HUDSON, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF KATHRYN ANN MONDINI, K.E.C, A MINOR, JOHN TAYLOR, CARROL ALDERETE, TRACYANDERSON, J.J., R.J.S., LORI ANN McCORMICK, TINA EASTLUND, NANETTE SAENZ, BARBARAFARLEY, JACKIE MERK HLASTAN, KATHRYN HUCKFELDT, RANDOLPH FREEMAN, MAXINE E.CROCKETT, CAMERON FARLEY, JUAN SAENZ, THOMAS SMITH, JENNIFER RENEE YORK, BOONCHOB PRUDHOME, STEPHANIE MCCULLEY, DREW EDWARDS, RHONDA KEMPER, DANIEL C. OLIVER, CECILIA ARIZOLA, JACOB MICHAEL ROBINSON, MICHELLE TAYLOR, T.M.(A MINOR), DEREK STEPHENS, BRUCE LUKOW, KATHY KUGLER, STEPHANIE HOOD, M.R.(A MINOR), TONYA FREEMAN, MICHELLE BENAVIDEZ, EDWARD KUHLMEIER, JUSTIN ADAMSON, NICHOLE LOHRIG, ANTHONY ALDERETE, NAWAL ALTAIE, WILLIAM WITTE, ANNE P. JOYNER, CLIFFORD VAUGHN, A.F.(A MINOR), LAUREN SHUMATE, TAWANNA TALBERT DARRING, DANIEL BENAVIDEZ, SKYLAR HAKE, MICHAEL LUKOW, CHARLEE BLAIR WEBB, HENRY J. BANDHOLD, SR, JEFFREY D. PRICE, MARC STEARNS, BRANDON ARNOLD, ADAM WOOD, CHRISTOPHER LEVI, I.W., NICHOLAS GENE KOULCHAR, WAYNE BROWN, C.S.(A MINOR), B.B., GREG KLECKER, GLENN DALE HICKS, SR, ROBERT FUNCHEON, NANCY UMBRELL, COLLEEN CZAPLICKI, JOAQINA SAENZ CHORENS, DANIELCARVILL, ALOYSIUS SANCHEZ, SR, AVA TOMSON, NATHANIEL FOLEY, DONNA JEAN HEATH,AUDELIA MORIN, KATRINA COE, G.H., PHILIP ALAN DERISE, MARLYNN GONZALES, JOSHUADENMAN, CORY SMITH, ANGELA M. LAIRD, MEGAN WOOD, L.W., MATTHEW CRAIG, JUDY ANN CRABTREE, ANDREW LUKOW, DARLENE SHELTON, WESLEY WILLIAMSON, LUKE MURPHY, RAYMOND NIGEL SPENCER, SR., DEADRA GARRIGUS, KATHRYN HEAD, DENISE VENNIX, K.A.C., LARRY DiCENZO, JOYCE CRAIG, CESAR CONTRERAS, EMILY LEVI, JOEDI WOOD, JOSEPH LUKOW, CANA HICKMAN, ROBIN ROBERTS, SARAH DUDEK, S.S., SEAN ELLIOTT, GEORGIANNA STEPHENSSMITH, JORDAN M. LAIRD, CHRISTOPHER BOUTEN, PATRICK WARD, MELISSA DRESSLER, TATYANA FUENTES, TANJA KUHLMEIER, ERIC PHYE, GLORIA P REYNOSO, JOAN HENSCHEID, NICHOLAS MORRIS, STEVEN J. FRIEDRICH, G.L., MATTHEW MENKE, ROBERT KUGLER, TERREL CHARLES BARTLETT, CATHY ANDINO, ADAM MATTIS, PHYLLIS TAYLOR, J.M.H., AMBER HABSIEGER, ARIANA STARCEVICH, K.A., HEATH DAMON HOBSON, S.L.H., BRENT HINSON, TIMOTHY TIFFNER, E.R., KIMBERLEE AUSTINOLIVER, MARK HURST, LISA RAMACI, KELLY GILLIS, NORMA ALICIA CONTRERAS, M.B.S., J.L.(A MINOR), JOSEPH T. MILLER, JEREMY D. SMITH, DONALD MAYES, ALAN BURKS, MEGAN PEOPLE, JOHN RICHARD TULLY, II, BRETT FARLEY, CHRISTOPHER JOYNER, ANGELICA ANDRADE, MATTHEW GARRIGUS, STEVEN T. FISHER, JENNIFER ROOSE, CASSANDRA BAILEY, ERIC NEIBERGER, SHAREN JONAUS MARTIN, TRENT STEPHENS, LEE WOLFER, NICHOLAS PROWSE, THERESA DAVIS, KAIYA COLLADO, TABITHA McCOY, JUSTIN WALDECK, JONI ARIEL REEVES LITTLE, TAMMY DORSEY, JODEE JOHNSON, ROBERTO ARIZOLA, SR, NATHAN ENGLISH, ALISON BURKS McRUIZ, CYNTHIA DELGADO, ANDREW BRADLEY, KEDRICK DANTE MOODY, DON JASON STONE, DONNA LEWIS, ANDY POOL, JERRY L. MYERS, JEFFREY C. MANN, GEORGE ARSIAGA, JOHN STEARNS, BRIDGET JUNEAU, BREANNA LYNN GASPER, DONNA FARLEY, AUSTIN

WALLACE, BRIAN T. SHELTON, AFONSO BANDHOLD, MARY NEIBERGER, NANCY HECKER, KIRA SIKES, RICHARD TOMSON, MACKENZIE HAINES, CHRISTOPHER BOGART, LUZ MARIA EstradaPulido, JESSICA H. WILLIAMS, NICHOLAS BAUMHOER, SANDRA HANKINS, ESTEBAN MORIN, MICHAEL KOULCHAR, GINA TESNAR, LINDSAY YOUNG, REBECCA J. OLIVER, CHARLES B. GREGSTON, JAMES SMITH, JACKIE FarrarFINKEN, SABRINA GLAWSON, MICHAEL SCOTT DEWILDE, SHANNON SHUMATE, JOHN D HECKER, LILLIAN HURST, DAVID WAYNE HARTLEY, RYAN WILSON, LOLA JEAN MODJESKA, BEVERLEY WOLFER, DENICE YORK, FABERSHA FLYNT LEWIS, KERI HAKE, PAMELA AdleWatts, ROBI ANN GALINDO, BRANDIE STANTON, KURTISS LAMB, BRYAN S. SHELTON, M.R.M, JOHNNY JAVIER MILES, JR, JACQUELINE A. SMITH, MELISSA BENSON, MARK MUNNS, CARL K. GREER, CARRIE THOMPSON, TOM B. LEE, RICHARD FRASER, JOANNE SUE HASSLER, ANDREW LUCAS, HUNTER L. LAIRD, JONATHAN CONTRERAS, SR, MARIA ALVAREZ, ALEXANDER ZAYAS, NANNETTE BryneHaupt, CONNIE HADDOCK, JENNIFER LINK, DOVE DEANNA ADAMS, CHARLOTTE FREEMAN, HOLLY BURSON, CHRISTOPHER WATTS, NATALIA WHITE, ZACHARY HAKE, T.S. (A MINOR), SEAN HARRINGTON, TAMARA RUNZEL, SHYANNE SmithLizotte, K.B., SUZZETTEE LAWSON, CEDRIC HUNT, E.C.R., GLADYS E. REYES CENTENO, LAVONNA HARPER, DAWN HAINES, ROBERT NEIBERGER, JENNIFER MORMAN, HARRY RILEY BOCK, CARLOS CONTRERAS, DEVON WALLACE, TIFFANY M. LITTLE, MARY JANE VANDEGRIFT(INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MATTHEW R. VANDEGRIFT), SAMANTHA DUNFORD, CHRISTINA MELENDEZ, CALVIN CANINE, LES KUGLICIS, WAYNE NEWBY, REBECCA BARATTIERI, KYLA OSTENSON, FRANCES CATHERINE CASTRO, JUDY HOFFMAN, BRENDA LITTLE, PAULA MENKE, CONNIE MOODY, DEBRA WIGBELS, JEAN DAMMANN, DONNA ENGEMAN, STEPHANIE KIDDER, SYLVIA JOHNSON SPENCER, DEBORAH SMITH, DEBRA CookRussell, MICHAEL HABSIEGER, H. JOSEPH BANDHOLD, I.F., MEGAN MAUK, ESTAVAN MORIN, SR, J.T.B., RAYANNE HUNTER, DANIEL BENAVIDEZ, JR, HERNAN CONTRERAS, TAYLOR EASTLUND, CHRISTINA SMITH, MICHEAL PAUL ALLEN SHELSWELL, J.M., JUDY COLLADO, DIXIE FLAGG, CHASTITY DAWN LAFLIN, ASHLEY VACHO LESLIE, RICKY JONAUS, M.R.M., TANYA EVRARD, COLIN HAINES, LUCAS WILLIAM ROBINSON, JOHN RICHARD TULLY, MARK UMBRELL, P.A., JEAN PRUITT, VERONICA PENA ANDRADE, RICHARD LEE, CAROL BENSON, ROBERTO AARON ARIZOLA, TIMOTHY NEWMAN, COLIN ROBERTS, ROBERTO ANDRADE, SR., SVEN EASTLUND, SABRINA CHAPMAN, SHANE IRWIN, SCOTT LILLEY, CRYSTAL TUTWILER, SUHEIL CAMPBELL, DOUGLAS KRUGER, DAVID FINKEN, MARIANA BANDHOLD, PETRA SPIALEK, VELINA SANCHEZ, DANIEL THOMAS, SR, PATRICIA MONTGOMERY, JAMES VAUGHN, A.L.R., K.K, DAVID C. IVERSON, KAYTRINA JACKSON, L.R., N.C.E., T.C., DIANNE O'NEILL, WILLIAM PARKER, ETHAN FRITZ, EDNA LUZ BURGOS, WILLIAM FARRAR,SR., BRANDEAUX CAMPBELL, CHRISTINA SHERIDAN, JERRY A. PALINSKY, SR, STEVE WADLEIGH, KATHLEEN HOKE, MICHELLE WEST, TIFANY THOMPSON, JESSECA LYN TSOSIE, KEVIN GRAVES, JUDAS RECENDEZ, CORENA MARTIN, DANIEL FRITZ, MIRANDA PRUITT, JAMES KINSEY, KEMELY PICKETT, JARRETT WARD, D.A.S., MARY CARVILL, JEFFREY ANDERSON, VICTOR RAY WISE II, BILLY DOAL WELLS, NICOLE BARATTIERI, NICHOLE GARRIGUS, VICTORIA LANDECK, DONNA KUGLICS, CHRISTOPHER SONGER, JESSALYN HOLT, VALENCIA COOK, LING P. LEE, ROSEMARIE ALFONSO, DANIEL

DRESSLER, LARK ADAMS, RICHARD E. HASSLER, ERIK ROBERTS, PATRICIA WHEATLEY, A.M.H., MARGARITA ARISTIZABAL, THERESA HART, MARY JANE VANDEGRIFT(INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOHN VANDEGRIFT), DANIEL MENKE, JOSEPH L. GREER, SHELLEY ANN CASEY, CHRISTOPHER MILLER, RENE POOL, JARED S. STEVENS, KENNY LEE, A.Z.C., MELINDA FLICK, JOHN GIBSON, OLGA LYDIA GUTIERREZ, FRED FRIGO, NICOLE A. KAPLAN, REBECCA L. SAMTENFINCH, TAMMY VANDERWAAL, TYLER NORAGER, BRITNEY E. CARTER, DAVID JAMES HICKS, SHANNON MILLICAN, R.A., CARLLIE PAUL, THEODORE LESTER, LORI ANN MCCOY, K.L., BOBBIE D. MARIANO, C.L.(A MINOR), ANASTASIA FULLER, RICHARD FINKEN, JOSHUA SCHICHTL, KIERRA GLAWSON, FAITH RENEESTONEKING, PATRICIA REYNOSO, BRIANNA RENEE NAVEJAS, POLOKA AIETI, DONIELLE EDWARDS, SHELBY WEST, VICTORIA M. FOLEY, RUSSEL HICKS, JR., ELVA ESPINOZA, CHAD FARR, CRISTA MUNNS, DAVID ARNOLD, ANTHONY HUDSON, JOSEPH HELTON, SR., JOHN D. LAMIE, GEORGE D. WHITE, C.F., BASHAR ALTAIE, MATTHEW LILLEY, VIVIAN PICKETT, BILLY JOHNSON, CARA ROBERTS, C.B., CHRIS FARLEY, JESSICA HUBBARD, RANDALL GEIGER, ROBERT CANINE, JOHN SACKETT, J.T., LEASA DOLLAR, JOHN MCCULLEY, CANDICE MACHELLA, MATTHEW LAMMERS, WILLIAM RONALD LITTLE, CASSIE COLLINS, CHRISTOPHER COTE, NICOLE LANDON, JOSHUA P. STEIN, CARRIE SUE STONEKING, URSULA ANN JOSHUA, MATTHEW BENSON, JAMES CANINE, CHRISTINA BIEDERMAN, MARIO STANTON, VERONICA DENISSE ANDRADE, BILLY WALLACE, DIANA THOMAS, MONICA ARIZOLA, DAKOTA SMITHLIZOTTE, LEAANN WADLEIGH, LESLIE K. REEVESHARDCASTLE, A.S.E., TONY GONZALEZ, JENNIFER LYNN HUNT, SLADE VICTOR TULLY, DOUGLAS VEVERKA, THOMAS KUHLMEIER, JOHN VACHO, KIMBERLY VESEY, ELIZABETH CHISM, AVA LANETTE BRADLEY, HILARY WESTERBERG, M.C., DEBORAH BEAVERS, MAX W. HURST, TANYA SUZZETTE DRESSLER, JAMIE BARNES, PEGGY CARVILLLIGUORI, JEFFREY ADAMSON, SAMANTHA BALSLEY, ELIZABETH JO EASTLUND, ANGEL MAYES, ALOYSIUS SANCHEZ, JR, JUDITH TIFFNER, T.R., HOPE ELIZABETH VEVERKA, A.S., ARIFAH HARDY, JUSTIN EVANS, GILBERT ARSIAGA, JR, SELICIA FIELD, A.B.(A MINOR), FRANK LILLEY, JEANNINE VAUGHN, NOEL CONTRERAS, ADINA PALINSKY, BRIAN MONTGOMERY, EMANUELA FLOREXIL, STEPHEN FINKEN, RUSSELL J. FALTER, CASEY REUBEN, M.A.H., STEVEN GREENWOOD, SEOP KIM, PAUL MITCHELL MILLICAN, JAMES TALBERT, GEORGE J. WHITE, ANITA BAKER, KARALEEN HERB, PAM MARION, KELLI D. HAKE, BRIAN G. TAYLOR, MATTHEW ARSIAGA, DONALD C. BANDHOLD, JEANNE RHEA MCMANUS, DANIEL PRICE, MARK FINKEN, K.M., VICKIE MICHAY WHITE, REBEKAH SCOTT, ERIC BILLITER, MICHAEL J. MILLER, RICHELLE HECKER, STEVEN KIRBY, MARLEN PICKETT, SHAYLYN C. REECE, GLORIA L. MAGANA, ROMMEL ROCHA, T.H., MARILYN LOUISE TULLY, TAMARA HASSLER, DAVID DIXON, BRITTANI HOBSON, HELEN FRASER, JOHN DAVID HEATH, JOHN KUHLMEIER, P.H., KIMBERLY SONGER, MATTHEW FIESER, BRIAN COKE, DEREK ALLEN HOLLCROFT, ADAM MAGERS, JOYCE BROOKS, MARICEL MURRAY, SEBASTIAN NIUMAN, SAMANTHA TUCKER, JOSHUA P.G. WOLD, ANDREW TOMSON, JACOB BAUER, JOHNNY JAVIER MILES, SR, CLAIRE JONAUS, DANNYEL CONTRERAS, STEPHANIE C. SANDER, ROBERT WHITE, CHRISTOPHER D. GREER, DANNY CHISM, MICHAEL DEAN MOODY, ROBERT VACCARO, SHALEE NORAGER, MICHAEL LUCAS, ARDELL THOMSEN, TIMOTHY W. ELLEDGE, ARNE EASTLUND, DAVID W.

HAINES, MELBA ANNE F. HARRIS, JESSE P. STEIN, RALPH THOMSEN, MICHAEL WEATHERLY, SUSAN MARIA DOSKOCIL HICKS, VERONICA LOPEZ REYES, AUNDRA CRAIG, SANDRA SOLIDAY, ANDREW MOORES, L.R.W., RONALD SLOAN, KATHLEEN SNYDER, HATHAL K. TAIE, SHEILA TRACY, ROBERT F. MARIANO, JUDY HUENINK, MICHAEL SMITH, DENNIS DUNN, CYNTHIA CONNER, IMO AIETI, CONSTANCE BRIAN, JOHN O'NEILL, DAVID KAPLAN, ELENA SHAW, G.B.(A MINOR), ANGELA ALVAREZ, AMI NEIBERGER, JOLENE LILLEY, JENNIE L. MORIN, JONATHAN CRAIG, ANDRE BROWN, JAMES DRESSLER, KATHY ADAMSON, RHETT MURPHY, MICHAEL R. MILLS, CAROL POLLEY, CYNTHIA THORNSBERRY, ALAN FINKEN, CELESTE YANTIS, KRISTIN WHITE, JASON ROBINSON, JODI MICHELLE HOBSON, SCOTT HOOD, SHAULA SHAFFER, DANIEL J. EVANS, C.W., MARION CRIMENS, GABRIELA D. PUERTAS VERGARADONOSO, DONALD TRACY, DONALD FIELD, CHRISTOPHER GOLEMBE, ANGELICA FIELD, LANI D. BOGART, FRANK L. CONVERSE, RUSSELL C. FALTER, MARVISE L. CROCKETT, JEAN MARIANO, SENOVIA FIELD, JESSICA CABOT, LORENZO SANDOVAL, JR, EUGENE DELOZIER, SHARON JOHNSTON, STACY PATE, SHILYN JACKSON, VICTORIA HECKER, MARIO BOWEN, SETH TIFFNER, JOHN P. SKLANEY, III, JOELLA PRATT, PRESTON SHANE REECE, JEREMY BAUER, DAVID G. CARDINAL, JR, JEREMY CHURCH, LAUREL BARATTIERI, EDDIE JO PALINSKY, CHEYENNE FLAGG, JOEL PALINSKY, S.J.S., BRENDA CHAND, SAMANTHA TOMSON, MICHELLE KIM, JERRY A. PALINSKY, II, LATASHA MARBLE, PHILLIP SANCHEZ, LUIS GARZA, CHRISTOPHER MICHAEL MELENDEZ, JOHN DANA GREER, PADRAIC J. NEWMAN, ALICIA PEARSON, LINDA GIBSON, CHRISTOPHER ADAMSON, ELIZABETH MASTERSON, GREGORY BAUER, M.N., KATHY CRABTREE, J.R., EVAN D. BOGART, MAXIMILLIAN SHROYER, CHASITY WELLSGEORGE, MICHELLE KLEMENSBERG, JOHNNY WASHBURN, G.F., ISABELL VINCENT, MICHAELMURPHYSWEET, MARGARITO A. MARTINEZ, JR, STEFANIE WALLACE, NATHAN NEWBY, VANESSA CHISM, ZORAIMA LOPEZ, SUSAN ARNOLD, EMILIE FINKEN, VICKIE MCHONE, JOSHUA TIFFNER, MATTHEW HUCKFELDT, JAYDEAN HAMILTON, MARIAH SIMONEAUX, SHARON M. PUGH, DONNIE MARION, JAMES CRAIG ROBERTS, AMBER HENSLEY, AMENIA JONAUS, MELISSA DOHENY, SHELLEY ANN SMITH, NOEL S. FARLEY, TAMMY KINNEY, GLORIA NESBITT, KIMBERLY MILLER, SEAN SLAVEN, ERIC BRANDON STONEKING, JULIE CHISM, DWIGHT MARTIN, KATHY CRANE, RONALD VEVERKA, TRAVIS GIBSON, NOALA FRITZ, MATTHEW L. MERGELE, LAWRENCE KRUGER, SHARON Y. DUNN SMITH, JOSE REYNOSO, BRADLEY STARCEVICH, DANIEL P. BENSON, KEITH VEVERKA, PATRICIA SMITH, E.W., SHIRLEY STEARNS, ADAM G. STOUT, ARMANDO FUENTES, RONALD WAYNE CRABTREE, SANDRA VALENCIA, KAREN FUNCHEON, ISMAEL MARTIR, E.K., BRYANT BEARFIELD, WILLIAM J. LEE, MARVIN THORNSBERRY, ANN CHRISTOPHER, CHRISTOPHER DAVID, TAUSOLO AIETI, BENJAMIN DANIEL CARRINGTON, NANCY COTE, JANET JONES, MERLESE PICKETT, NICOLE IRWIN, AMANDA VACHO, RICHARD CASEY, PERRY WHITE, SHARON DEBRABANDER, ADRIAN SANDOVAL, JAMI LIN WILSON, HYUNJUNG GLAWSON, LINDA FALTER, KARAR ALABSAWI, JASON SACKETT, ROADY LANDTISER, JEREMY BLOHM, PETER FINKEN, TERRANCE PETERSON, III, ANGELINE JACKSON, ERIC LEVI, FRANCES ROBINSON, RYAN SABINISH, SHELBY WHITE, ASHLEY GUDRIDGE HOUPPERT, JOSHUA BROOKS, MICHAEL COOK, NICHOLE SWEENEY, SARAH CROSBY, JAMES SHEPARD, STEPHANIE JUNEAU, ROBERT W. KUHLMEIER, GARY LAMMERS, LINDA JONES, SHAWN BARTLETT, TEMIKA SWINTON, JOHN

Daggett, Lynn Forehand, Janet L. Rios, Mark E. Thomsen, Lauren Niquette, Joel Hernandez, Victoria Hernandez, Athena Hall, Matthew C. Beatty, Andrew Charles Major, H.K., Kiersten Hall, Jerrin Matthew Ogden, Ronald Alldridge, Brooke Kenney, K.R.G., Todd Alldridge, Rene Gutel, Abigail Hall, Joann Alldridge, Andrew James Raymond, Kandi Danielle Whiteside, Thomas Niquette, A.M.M., Ana M. Gomez, Randall Klingensmith, Sharon Smithey Whiteside, Kaitlyn Adams, Angela M. Garcia, Ryan Bowman, Michael Pasco, Andrew Hall, Daniel Kenney, Christopher Whiteside, Sean M. Niquette, Christopher Satterfield, Grant H. Von Letkemann, II, Ashley Meikel Major, Brian Clark Alldridge, Sheryl Ann Chen, Tara Hutchinson, Randi Jean Martz, J.K., K.M.G., M.J.H., Stephen W. Evans, Jackson Wiley Whiteside, Tyler Nicholas Ogden, M.T.W., Richard Hedgecock, II, Matthew Whiteside, Mackenzie G. Hall, Dianna Alldridge, Mary Niquette, Mark A. Hall, Gary Douglas Fishbeck, Toni Attanasio,

*Plaintiffs-Appellees,*

—against—

Dr. Muhammad Baasiri,

*Movant-Appellant,*

Jammal Trust Bank SAL,

*Defendant-Appellant.*

# TABLE OF CONTENTS

PAGE

EDNY Docket Entries Docket No.19-cv-00007 .......................... A-1

Amended Complaint, filed August 2, 2019 ............................ A-45

    Attachment A to Amended Complaint—
    Proposed Summons to Fenicia Bank ............................ A-867

    Exhibit 1 to Amended Complaint—
    Sale and Purchase Agreement between Lebanese Canadian
    Bank S.A.L. and Societe Generale De Banque Au Liban S.A.L.,
    dated June 22, 2011............................................ A-868

    Exhibit 2 to Amended Complaint—
    English and Arabic copies of ISRO's Donation Program Form .... A-872

Exhibit A to Response in Opposition to the Motion to Dismiss—
    U.S. Department of the Treasury Press Release – "Treasury
    Labels Bank Providing Financial Services to Hizballah as
    Specially Designated Global Terrorist", dated August 29, 2019 ... A-879

Pre-Motion Conference Letter to Hon. Carol B. Amon from Jammal
    Trust Bank S.A.L., dated September 1, 2020 ..................... A-887

Letter to Hon. Carol B. Amon from Gary M. Osen in Response
    to the September 1, 2020 Letter by Jammal Trust Bank S.A.L.,
    dated September 8, 2020 ....................................... A-889

August 31, 2020 Court Hearing Transcript before
    Hon. Carol B. Amon ........................................... A-891

October 26, 2020 Court Hearing Transcript before
    Hon. Carol B. Amon ........................................... A-947

Declaration of Dr. Muhammad Baasiri, filed December 30, 2020 ...... A-957

PAGE

Exhibit A to Declaration of Muhammad Baasiri—
Law 110 issued on July 11, 1991 – Reform of the Banking Sector . A-964

Exhibit B to Declaration of Muhammad Baasiri—
Central Bank of Lebanon's Notification,
dated September 27, 2019 ........................................ A-989

Second Declaration of Dr. Muhammad Baasiri,
filed December 30, 2020 ........................................ A-993

Appendix to Second Declaration of Muhammad Baasiri—
Law of 1 Aug. 1963, Code of Money and Credit, (Leb.)........... A-994

Declaration of David B. Rivkin, Jr., filed December 30, 2020 ........ A-1129

Declaration of Patrick Duprey, filed December 30, 2020 ............. A-1130

Exhibit 1 to Declaration of Patrick Duprey—
Article titled "Lebanon Picks New Premier in Bid to Break
Political Deadlock," published on The Wall Street Journal's
website on December 19, 2019 ................................. A-1133

Exhibit 2 to Declaration of Patrick Duprey —
Article titled "Lebanon's Government Resigns After Protests,
Deadly Beirut Explosion," published on The Wall Street
Journal's website on August 10, 2020.......................... A-1138

Exhibit 3 to Declaration of Patrick Duprey—
Article titled "NY-based Company Pulls out of Lebanon Bank's
Forensic Audit," published by the Associated Press on
November 20, 2020 ........................................... A-1146

Exhibit 4 to Declaration of Patrick Duprey—
Article titled "Lebanon's Central Bank Fuels Corruption,
Extremism Concerns," published on The Wall Street Journal's
website on November 30, 2020 ................................. A-1152

iii

PAGE

Exhibit 5 to Declaration of Patrick Duprey —
Article titled "Behind the Beirut Explosion: Seven Years of
Official Neglect," published on The Wall Street Journal's
website on August 7, 2020 ..................................... A-1160

Exhibit 6 to Declaration of Patrick Duprey—
Capital Market Development Technical Note,
dated December 2013 .......................................... A-1173

Exhibit 7 to Declaration of Patrick Duprey—
Article titled "Lebanese Judge Orders 'Protective Freeze' on
Assets of C. Bank Governor," published by Reuters
on July 20, 2020 .............................................. A-1177

Exhibit 8 to Declaration of Patrick Duprey —
Article titled "Lebanese Central Bank Governor Inflated Assets
as Liabilities Grew – Audit," published by Reuters on
July 23, 2020 ................................................. A-1188

Exhibit 9 to Declaration of Patrick Duprey —
News Investigation "Lebanon's Offshore Governor" by
Organized Crime and Corruption Reporting Project ("OCCRP"),
published on their website on August 11, 2020 ................. A-1200

Second Amended Complaint Excerpts, filed on December 31, 2020 ... A-1220

January 26, 2021 Court Hearing Transcript before
Hon. Carol B. Amon ........................................... A-1228

Memorandum and Order of the Hon. Carol B. Amon,
dated August 6, 2021 ......................................... A-1272

Notice of Interlocutory Appeal, filed August 19, 2021 ............... A-1296

 **OCCRP**   INVESTIGATIONS · LEBANON'S OFFSHORE GOVERNOR



Lebanon's Offshore Governor

Riad Salame and his son, Nady, in a family picture. Credit: Daraj.com

by **Hazem Ameen and Alia Ibrahim (Daraj.com) and Tom Stocks, Riad Kobaissi, and Rana Sabbagh (OCCRP)**

*11 August 2020*

Offshore companies owned by the governor of the Central Bank of Lebanon have quietly invested in overseas assets worth nearly US$100 million in recent years, even as he has encouraged others to invest in his economically devastated country.

Rumors of Central Bank Governor Riad Salame's offshore wealth have swirled around Beirut for years, but the extent of the investments by one of Lebanon's most prominent public officials has remained secret — until now.



**READ THIS STORY IN ARABIC**

تقصي ثروة رياض سلامة في أوروبا: شركات وعقارات و"5 أبعاد من المتعة"

OCCRP and its Lebanese partner,  , tracked Salame's vast overseas investments, finding multiple real estate deals in the United Kingdom, Germany, and Belgium made over the course of a decade. Company accounts suggest the investments were often financed by borrowing, with tens of millions of euros in credit sometimes secured without collateral.

Much of his money went to the U.K., a favorite destination for overseas investors looking for a discreet place to make their money grow. Foreign corporations with undisclosed

ownership now hold property valued at more than 84 billion pounds ($104 billion) in England and Wales, which has prompted calls for greater transparency in the U.K.

When contacted by OCCRP, Salame said he has broken no laws — that he amassed "significant private wealth" before he joined the central bank in 1993, and that "nothing prevents me from investing it."

It's unclear if the offshoring violates any Lebanese laws, but revelations about Salame's investments come amid a financial crisis that many in Beirut blame on his management of the Banque du Liban (BdL). In a recent Financial Times analysis of leaked audit reports, the governor was accused of using dubious accounting measures to artificially boost the institution's assets by at least $6 billion. Salame attributes any criticism to politics and a "systematic campaign" against him.

A group of Lebanese lawyers in July formally accused Salame of various violations of Lebanon's penal code, including embezzlement of BdL assets and mismanagement of public funds. A judge has set an October hearing date. Salame's assets, including properties and several vehicles, have been ordered frozen.

In an email to OCCRP, Salame described the lawsuit and decision as "groundless."



Credit: Daraj

Street graffiti in Beirut's Hamra district says "Salame is a thief" and "Down with the Governor.

## *Governor Under Fire*

In Hamra, a bustling central business district near the American University of Beirut, newly installed heavy concrete blocks mounted with barbed wire signal a new normal. The wall around the Banque du Liban building protects a financial institution — and a man — now under public attack.

For nearly three decades, Salame was seen as a financial genius and undisputed guarantor of a robust Lebanese economy, a national hero often discussed as a candidate for the presidency.

# A-1203

That image has been tarnished in recent months.

"Riad Salame is a thief" and "down with the governor" are common themes among the countless slogans and caricatures sprayed on walls and windows across Beirut.

Raoul Nehme, Lebanon's economy minister until this week, described Lebanon in July as a "failed state," in reference to the ongoing economic crisis.



Credit: AFP

**Riad Salame sits at his desk.**

Anger boiled over into violent street scenes in central Beirut following last week's devastating explosion of abandoned ammonium nitrate stored at the port. Protesters stormed government buildings and erected gallows to hang effigies of the president, the parliamentary speaker, and the leader of the Hezbollah military group and political party.

On Monday, Prime Minister Hassan Diab and his entire cabinet resigned. Salame, who is not a cabinet minister, remains in office.

But the port disaster is seen by many as only the latest outrage suffered by a country already grappling with an array of crises and an economic collapse blamed on endemic corruption and the negligence of ruling politicians.

In November, the World Bank warned that half the Lebanese population could fall into poverty. The crisis has triggered economic disarray, a first-ever sovereign debt default,

yawning unemployment, and soaring food prices. The Lebanese pound has lost 70 percent of its value against the dollar since October. Street demonstrations have raged for months. Protesters hurl Molotov cocktails at banks and ATMs. Security forces respond with rubber bullets.

Among the complaints: Salame for years has backed bank loan policies that drove excessive government borrowing, leaving Lebanon unable to make crushing debt payments. When the economy collapsed in 2019, the country's elites transferred their fortunes to offshore accounts as restrictions on transfers and withdrawals left ordinary people cut off from savings and struggling to survive. Alain Bifani, who resigned as director general of public finance in June, says that up to $6 billion has been "smuggled" out of Lebanon since the crisis began.

Lebanese prosecutors in January asked a central bank investigation commission to determine how much money had been sent to Switzerland since last October, and to determine whether the source of the funds was suspicious.

Salame launched an investigation but said nothing publicly about his own substantial wealth, safely invested in Europe well before the current crisis and the period covered by the probe.



Credit: Daraj

**Graffiti of Riad Salame in Beirut.**

## *Family Affairs*

Just six days after the central bank's investigation was announced, a Luxembourg company beneficially owned by Salame pocketed 11 million pounds ($14.3 million) through the sale of a core U.K. asset acquired in 2013.

The deal went unnoticed in Lebanon. Riad Salame's name appeared nowhere in the land records.

# A-1205

For years, the central banker has been able to shield investments like this from public scrutiny, often by placing them in the names of close family members who manage companies on his behalf.

Other Salame investments are handled through companies incorporated in offshore jurisdictions that require little or no public disclosure of beneficial ownership.

One property reviewed by OCCRP involved both family and concealed beneficial ownership: A 3.5 million pound ($4.1 million) apartment in Broadwalk House, which overlooks Hyde Park near the Royal Albert Hall in one of London's most enviable postcodes.

The spacious apartment made an impressive home for Nady Salame, the son of the bank governor, but the 26-year-old was not the legal owner of the apartment that he listed as his address in official documents in 2013.



Credit: OCCRP
Broadwalk House, near Hyde Park in London.

The property was owned by Merrion Capital S.A., an obscure company registered in Panama that bought the luxury apartment early in 2010. This company's real owners were hidden behind Panamanian subscribers — stand-ins who executed the articles of

incorporation of thousands of companies on behalf of clients — and the founder of a Liechtenstein trust company, who was listed as Merrion Capital's director and president.

Nady Salame became a director of Broadwalk House Residents Ltd, the building's management company, in 2014. He wasn't the legal owner of the flat until January 2017, when the unmortgaged property was transferred into his name exactly a month after his 30th birthday.

Title transfer documents filed with the U.K.'s Land Registry show that Merrion Capital transferred the property on January 3, 2017, to Riad Salame, who signed a statement saying the transfer was "not for money or anything that has a monetary value." Given that no money changed hands, the statement suggests that Merrion Capital was connected to Salame.

The following day Riad Salame transferred the property to his son. Merrion Capital was dissolved two months later.

OCCRP asked Riad Salame if he was the beneficial owner of Merrion Capital. He did not answer.

The property at Broadwalk House was not the only example of a mingling of assets between Salame and his son.

Beginning in 2011, Nady Salame was appointed as a director of several European investment companies. He approved a slew of property investments across Europe, including a prime office building in London's legal district.

The real beneficiary of these deals was his father, Riad Salame, who invested tens of millions of euros in real estate opportunities in three European countries under his son's signature.

Riad Salame's ultimate interest in the deals is now public because Luxembourg in 2019 changed its previously opaque corporate registry law to comply with EU standards for disclosure of beneficial owners .

According to the Luxembourg registry, Riad Salame owns or controls three companies: BR 209 Invest S.A., Fulwood Invest S.a.r.l., and Stockwell Investissement S.A. Since 2011, his son has been a director of two of these Luxembourg companies, as well as five subsidiaries of BR 209 Invest in Luxembourg, Germany, and Belgium.

Nady Salame has experience in managing the wealth of high-net-worth individuals. Three years before he started handling deals for his father, he took a job with Crossbridge Capital, a London-based company started in 2008 by former members of Credit Suisse's U.K. wealth management unit.

# A-1207

Crossbridge Capital had strong ties to Lebanon's banking and business elite. Its founding shareholders included Nabil Aoun, former president of the Lebanese Broker Association. Rami El Nimer, chairman and general manager of Lebanon's First National Bank (FNB), and Roland El Hraoui, another FNB shareholder, later invested in the firm. Banque Audi Suisse S.A., a Swiss subsidiary of Lebanon's Bank Audi, invested in about 2016 and Philippe Sednaoui, the Swiss subsidiary's CEO, became a director.

Nady Salame, then 21 and fresh from internships at Merrill Lynch, Credit Suisse, and Julius Baer, was among Crossbridge Capital's early employees. Within three years he was credited with attracting 100 million pounds ($158 million) in assets to the firm's $2 billion portfolio, according to a 2011 wealth management industry publication. The origin of these reported funds is not known.

Nady Salame was awarded a minority share in the company's Maltese parent company, Crossbridge Capital (Holding) Co Ltd. He remains a shareholder, though he left the firm in 2015. Nady Salame declined to comment when contacted by OCCRP. Crossbridge Capital said in an email that "at no time was Mr. Riad Salame directly or indirectly responsible for any client assets."



Credit: United States Marine Corps

**Marine Corps Brig. Gen. Carl Jensen with U.S. Ambassador to Lebanon Jeffrey Feltman in Beirut in July 2006.**

## *'A Penchant For Secrecy'*

While something of an international banking superstar, Riad Salame has been criticized for his management style. U.S. diplomatic cables made public by Wikileaks reveal deep concerns over the possibility that Salame might be elected president of Lebanon.

In a March 2007 cable, former U.S. Ambassador to Lebanon Jeffrey Feltman was critical of Salame's "penchant for secrecy and extralegal autonomy at the Central Bank, past closeness with Syrian leaders, unwillingness to disclose the amount of Lebanon's net foreign exchange reserves, and resistance to the oversight of an IMF program."

# A-1208

Feltman concluded that "aspects of Salame's record may not bode well for a transparent presidency."

Recently contacted by Daraj.com about these remarks, Feltman said only, "I prefer not to comment on information that was intended to be private."

## Presidential Aspirations

During years of intense turbulence in the region, Riad Salame continued to do what had always worked for him: rising above political controversies to present himself as the undisputed guarantor of the country's economic stability — and a useful banker to the country's elite.

One of the world's longest-serving central bank governors, Salame has maintained a grip on Lebanon's economy during five successive terms since 1993. He has repeatedly shaken off controversies in Lebanon's secretive banking sector, winning unanimous backing for reappointment.

He first spoke publicly about his ambition to become president of Lebanon at a Rotary Club dinner in February 2007. Asked what his policies would be if elected, he reportedly told his audience, "Get me the presidency, and I'll tell you."

A national poll by Ipsos in 2014 found that 75 percent of respondents believed Salame would have a positive impact on the economy if elected president.

The governor has also won international support. In 2009, he was voted Banker of the Year for Middle East by The Banker magazine, and won a similar accolade from Euromoney magazine in 2006.

In 2011, Salame successfully managed the sale of Lebanese Canadian Bank, which was hit with a $102 million fine after it was accused of laundering hundreds of millions in drug money through the U.S. financial system.

Little was said in 2016 when Salame introduced "financial engineering," which shifted dollars from local banks at high interest rates to keep the government afloat — an approach now widely blamed for contributing to Lebanon's current economic crisis.

"Between the '90s and up until 2012, and by whatever genius or whatever miracle or whatever coincidence Riad Salame wasn't doing very badly at all, and that's why his terms were renewed time after time," Thomas Schellen, the editor-at-large of Executive Magazine in Lebanon, told Daraj.com in an interview.

Others, like Jeffrey Feltman, the former U.S. ambassador to Lebanon, question the central bank's management by Salame and believe his financial engineering postponed the day of reckoning for Lebanon.

"The mystery for me is why he wanted to continue in his position for so many years, given what he must have known about the true state of Lebanon's financial condition," he told Daraj.com.

Salame never ran for president. Complaints about his secretive management increased after his name appeared in the Swiss Leaks, a cache of bank records made public in 2015 by an HSBC whistleblower.

The leak exposed his beneficial ownership of an account at HSBC's private banking arm in Geneva. The account was registered to a British Virgin Islands company, Naranore Limited, and had a balance of nearly $4.6 million in 2006–2007.

# A-1209

Salame's profession was listed as "Director de Merill Lynch a Paris," though the files indicate Naranore's Geneva account was opened in 2003, a decade after Salame left Merrill Lynch for the central bank.

Asked about the discrepancy, Salame said via email that the account was opened in 1989 — apparently a reference to a separate personal account, also exposed in Swiss Leaks, that he opened in 1988. Naranore did not even exist until 2003. He declined to answer additional questions about the account, saying only, "Your information is inaccurate."

Swiss Leaks also revealed that Raja Salame, the governor's younger brother, was the beneficial owner of an HSBC Geneva private account opened in early 2002.

That account belonged to Forry Associates Ltd, a company established in the British Virgin Islands in 2001. Forry's account balance was more than $5.8 million in 2006–2007.

Both Naranore and Forry were owned by the same nominee shareholder, Nomihold Securities Inc. Both were administered by Mossack Fonseca, the infamous and now-defunct Panamanian company formation agent exposed in the 2016 leak of documents known as the Panama Papers.

In an email to OCCRP, Raja Salame said, "I own private businesses and investments in the real estate and hospitality sector, locally and internationally, using solely my own private funds."



Credit: Daraj

**The Central Bank of Lebanon's office in Beirut, shielded by graffiti-clad protective walls.**

## *'A Well-funded Private Investor'*

Speculation about Riad Salame's personal finances exploded earlier this year when Lebanese media outlets reported claims that his close associates helped move a massive fortune offshore.

# A-1210

The reports were based on a dossier said to have been compiled by Cristal Credit, a French business intelligence company.

Cristal Credit did not respond to OCCRP interview requests, but in press reports the company has denied any involvement in producing the dossier. While widely reported, the unsubstantiated dossier cannot be independently verified. Salame calls it "forged."

But it is true that Riad Salame has invested a fortune offshore.

Described as a "well-funded private investor" by one business associate, Salame has spent the past decade snapping up investment opportunities across Europe.

By the end of 2018, the assets were valued at more than $94 million, according to balance sheets for Luxembourg companies controlled by Riad Salame. The assets have been acquired with borrowed money, reflected as liabilities, though the source of the funding is not revealed in company filings.

Appearing on television in Beirut on April 8, after the reputed Cristal Credit dossier went viral, Salame said his net worth was $23 million when he went to work for the central bank in 1993. He said that included earnings from his successful commercial banking career and inheritances in 1978 and 1982.

He didn't address the offshore investments, and it's unclear if the $94 million in investment assets are related to the $23 million he spoke of.

"As the law stipulates, I cannot engage in any [business] activity as I need to dedicate my time to my work as central bank governor," he said in the interview with Lebanese broadcaster MTV. "I gave this money to people with expertise and people I trust who invested them over the last 27 years."

The law in question is Article 20 of Lebanon's Money and Credit Law, which states "The governor and his deputies are banned during their tenure to keep or to take any gains from a private company."

"Gains" are defined as "any participation or membership in any form or manner even if it is a small loan." The governor is allowed to hold a portfolio of securities issued by anonymous companies.

Ali Zbeeb, a Beirut-based lawyer and expert in international banking and financial regulation, said he believes Salame's offshore investment violates the law and raises "suspicions over a Politically Exposed Person (PEP) holding such investments since it insinuates and reflects malicious intentions and attempts to hide actual sources of money.

"The Lebanese law is very clear and concise in terms of banning the governor and his deputies from engaging in any type of business and from having, acquiring or receiving or

enjoying any benefits, which includes but not limited to offshore investments," Zbeeb said.

Nizar Saghieh, a Lebanese lawyer and founder of the Legal Agenda, a Beirut-based law and public policy monitor, agreed with Zbeeb's assessment.

"The mere fact of owning an offshore company in countries largely perceived as tax havens is in itself a suspicious act and raises questions about the intention behind making secret and opaque investments that are much lacking in transparency," Saghieh said.

But Ibrahim Najjar, Lebanon's former justice minister, told Daraj.com that he does not think Riad Salame violated Article 20 by offshoring his wealth. But he faults Salame for being too bullish about Lebanon's economy when trying to win financial support from international investors and expatriates.



Credit: Mauritius Images / Alamy Stock Photo

**The State Theatre on Gärtnerplatz square, in the trendy Munich neighborhood where Stockwell Investissement bought retail property.**

## *Concealed Interests*

When it comes to business, Riad Salame's identity and the relationship between his corporate interests are obscured in various ways.

Established in mid-2015 with a share capital of 5 million euros ($5.5 million), Stockwell Investissement S.A. looked like any other Luxembourg investment company. The profession of its sole shareholder, Riad Salame, was recorded only as "directeur de banque," without naming the bank.

Four months later, Stockwell Investissement paid 6.38 million euros ($6.76 million) for upscale commercial properties and four parking spaces at Feilitzschstrasse 7-9 in Central Munich.

The firm made its second property investment in January 2017, paying 3.4 million euros ($3.64 million) for a retail property in Munich's trendy Gärtnerplatz neighborhood.

# A-1212

At the end of 2018, Stockwell Investissement declared 14.4 million euros ($16.4 million) in current assets — almost all invested in securities, its balance sheet shows. Including the Munich properties, Stockwell Investissement's total assets approached 24.2 million euros ($27.6 million).

Big as they are, Stockwell Investissement's deals are eclipsed by those of Fulwood Invest S.a.r.l., a Luxembourg company owned by Riad Salame, whose involvement was first disclosed in 2019 when the country's law on beneficial ownership changed. Until then, company documents showed only its directors, including Nady Salame and Marwan Issa El Khoury, Riad Salame's nephew.

Nady Salame and El Khoury each manage several investment companies now known to be beneficially owned by Riad Salame. Together, they hid the governor's involvement through Fulwood Invest in more than 30.8 million pounds (about $39.15 million) in U.K. commercial property investments.

The investments included Fulwood House, a prime office building in the heart of London's legal district acquired in 2012 for 5.9 million pounds ($9.44 million), and an office building in Bristol for which Fulwood Invest paid 10.5 million pounds (nearly $16 million) in 2013.

Both deals were approved by Nady Salame, as was the purchase of a seven-story commercial property in Leeds for just over 10 million pounds (about $16 million) in November 2013. The company also bought an office building in Birmingham for 5.45 million pounds (almost $6.9 million) in 2016.

In January the company sold the Leeds property, with El Khoury signing off on the 11-million-pound ($14.3 million) deal.

Stockwell Investissement is linked to other Salame family investments through its manager, Gabriel Jean, the Belgian owner of CFT Consulting, an audit firm in Luxembourg. Before Stockwell Investissement, Jean also managed another company with ties to the family, Bet S.A.

Established in early 2007, Bet S.A. owned 99 percent of ZEL, a French property investment company. Riad Salame's brother, Raja, was ZEL's sole director, owning 1 percent.

Records show ZEL bought property worth 2.4 million euros ($3.23 million) in Paris' posh 16th arrondissement, but ZEL shareholder's filings suggest the deal was just a fraction of its investment activity.

Over several years starting in 2007, Bet S.A. loaned millions of euros to ZEL. During Raja Salame's eight years as ZEL's sole director, the total ballooned to 17.2 million euros ($18.8 million). With interest, ZEL came to owe its parent company more than 20 million euros ($22 million) by 2015.



Credit: OCCRP

**The Fulwood House in London.**

The purpose of this funding was not disclosed in available filings but ZEL's legal form suggests it was for investment in property assets.

Riad Salame never held shares, directly or indirectly, in Bet S.A. or ZEL. Raja Salame, in an email to OCCRP, called himself a "completely independent investor" who owns companies "using solely my own private funds."



Credit: Eye35 / Alamy Stock Photo

**The shopping street of Avenue Louise in the center of Brussels, Belgium.**

## *Continental Operations*

Running almost 3 kilometers from central Brussels to Bois de la Cambre park, Avenue Louise is lined with Art Nouveau buildings, embassies, and shops selling luxury fashion brands. That's where a subsidiary of one of Riad Salame's Luxembourg companies saw money to be made in 2012.

"[We] received a very fair offer from a well funded private investor," Ardstone Capital, a European property investment management company, said in a news release about the sale of a seven-story building on the Brussels thoroughfare. "It was sold to a private Middle Eastern buyer."

The sale price was about 8 million euros ($9.5 million), Ardstone said.

The buyers were Louise 209A 1 and Louise 209A 2, Belgian companies created a few months earlier with Nady Salame and El Khoury as directors. The real beneficiary of both companies was Riad Salame, though his name appeared nowhere in company documents.

The companies' shares were owned by BR 209 Invest S.A., a Luxembourg firm beneficially owned by Riad Salame but directly owned by Cometec S.A., another Luxembourg company that shared an address with BR209 Invest and was managed by employees of an audit firm.

On its website, Ardstone shows another transaction linked to Riad Salame.

Speditionstrasse 13a is a striking red-brick office building in a sought-after commercial redevelopment area in Dusseldorf's traditional Rhine River docks.

# A-1215

The property was acquired for 4.85 million euros ($6.3 million) "on behalf of a private client," according to an Ardstone news release in October 2012. Ardstone also said it had acquired Fulwood House in London on behalf of the same private client. That was the year Riad Salame's Fulwood Invest bought Fulwood House. Ardstone declined comment for this story.

The Dusseldorf building appears linked to Dock 13-Villa GmbH, a Germany company first established in 2005 by a Swiss real estate investment company.

In 2012, 94 percent of shares in Dock 13-Villa GmbH were acquired by BR 209 Invest. Nady Salame and El Khoury acquired the remainder.

Dock 13-Villa GmbH's latest balance sheet shows total assets of 4.03 million euros ($4.7 million), of which 3.12 million euros ($3.6 million) are fixed assets.

BR 209 Invest is also majority shareholder in H-Invest GmbH, another German company directed by Nady Salame. H-Invest GmbH's most recent balance sheet lists total assets of more than 8.9 million euros ($10 million).

Accounts for BR 209 Invest made up to December 2018 suggest that the company has secured tens of millions of euros in credit without putting up collateral on the loans. The source of the financing was not disclosed.



Credit: Daraj
**Graffiti marking an entrance to the Central Bank of Lebanon.**

## *Offshore Associates*

Marianne Houwayek has been a public figure in Beirut since 2007, when the one-time Miss Lebanon runner-up was appointed to lead Salame's Executive Office at age 27.

Described by the Lebanaese lifestyle publication Official Bespoke as Salame's "right hand" and "protégée," Houwayek landed the prestigious post after an internship at the central bank. Her stated responsibilities included "any specific task upon the request of his

Excellency." In April, Salame announced Houwayek's appointment as his senior executive adviser, a position specially created to implement "any project the governor finds suitable."

The purported Cristal Credit dossier claims that Houwayek helped Salame offshore a massive fortune to private banks in Switzerland and Liechtenstein. In an email to OCCRP, Houwayek called the dossier a "fabricated false report."

But Houwayek has been involved in other offshore financial activity. Documents leaked in the Panama Papers seen by OCCRP and Daraj.com reveal that she was sole shareholder of Rise Invest S.A., a company formed in Panama late in 2011.

Rise Invest was designed to be secretive. The company issued bearer shares, a type of equity security that allows the owner to remain anonymous. The practice has since been banned in Panama.

One month after Rise Invest's incorporation, Houwayek was granted general power of attorney. Weeks later, Rise Invest authorized the opening of an account with the Geneva branch of Banca della Svizzera Italiana (BSI), a Swiss private bank. Minutes of a company meeting in Panama on February 17, 2012, show Houwayek was to have "sole discretion" over the account.

The leaked documents don't show a balance or purpose for the account, but such accounts typically require a minimum deposit equaling hundreds of thousands of dollars, a Zurich-based banker told OCCRP. By contrast, Houwayek recently disclosed that her monthly central bank salary was "not more than 12 million Lebanese pounds," or about $8,000 per month.

The Swiss bank account has never been declared by BdL as part of Houwayek's official duties or those of the Executive Office, nor has she publicly disclosed her connection to any Swiss private banking assets

An unsigned Rise Invest document submitted in 2011 to Mossack Fonseca said the company's purpose was "holding of shares." Houwayek later signed a statement describing the company's activity as a "personal holding company holding my investments in bonds and shares."

In an email to OCCRP, Houwayek said she reported her ownership of Rise Invest to BdL in 2012, and that "my personal wealth is from my family and my own resources."

The leaked documents show that Rise Invest's bearer shares were reported "lost or destroyed" in 2015 and a new share certificate was issued in Houwayek's name.

The company remains active, but the status of its Swiss account is unclear. BSI was taken over by another Swiss bank, EFG International, following a criminal investigation in 2016.

# A-1217

Houwayek's husband, Alexandros Andrianopoulos, is the founder of Onima, a high-end restaurant in London's Mayfair neighborhood. Onima promises diners "five dimensions of pleasure" in a venue that includes a private members' club and a rooftop terrace.

Lemonthree Limited, a U.K.-registered company, appears to stand behind the restaurant. Documents filed with U.K.'s Companies House list Houwayek as a "person of significant control" over Lemonthree, while another document filed in 2018 shows she and Andrianopoulos each owned half of the company.

Despite this, Houwayek denied holding any interest in Lemonthree.

"I do not have any business activity outside Lebanon including my husband's business," she wrote in an email.

As of late 2018, Lemonthree's total assets, less current liabilities, topped 1.8 million pounds ($2.36 million), according to unaudited accounts approved by Andrianopoulos. The company also reports a bank loan of 4.2 million pounds ($5.4 million). Company documents do not specify the terms or the lender.

Houwayek was not the only senior colleague of Riad Salame named in the 2016 Panama Papers leak. Saad Andary, second vice-governor to Salame from 2009 to 2019, was revealed as a shareholder in Finavestment Holdings S.A., a British Virgin Islands company.

Under Lebanese law, the central bank governor's deputies are also prohibited from holding interests in private companies. Andary did not respond to OCCRP requests for comment.



Credit: Bailey-Cooper Photography / Alamy Stock Photo
**London's financial district.**

## A Call For Transparency

Greater transparency of property ownership in the U.K. is seen by civil society activists as one of the most urgent reforms needed to prevent financial crime.

# A-1218



Credit: Facebook

A Facebook picture of Marianne Houwayek.

Like Luxembourg, the U.K. has in recent years introduced a register of beneficial owners of companies. In 2019 it committed to a similar public register for real owners of U.K. properties.

More than 96,000 properties in England and Wales are owned by overseas companies, according to data published by Her Majesty's Land Registry in July. The names of the ultimate owners of these properties are not published.

Many of the corporations are domiciled in tax havens like Panama and British Virgin Islands, where no ownership information is available. Many others are registered in low-transparency jurisdictions like Luxembourg that are only now beginning to open up.

While providing secrecy, offshore ownership can also enable financial crime such as money laundering and tax evasion — one of the key reasons behind campaigns to open up information on ownership in the U.K.'s property sector.

"The ability to acquire U.K. property anonymously is one of the main reasons Britain, especially London, is a destination of choice for those seeking to conceal their assets," said Ben Cowdock of Transparency International U.K.

Last December, in the Queen's Speech to parliament, she proposed legislation that would close the loophole allowing anonymous companies to own property by introducing a public register of beneficial ownership.

**This story drew on data from the Panama Papers, a set of documents that were leaked from an offshore services provider called Mossack Fonseca to the German newspaper Süddeutsche Zeitung and shared by the International Consortium of Investigative Journalists (ICIJ).**

 

### Join the fight.
### Hold power to account.

Support from readers like you helps OCCRP expose organized crime and corruption around the world.

**By donating, you'll be directly supporting investigative journalism as a public good. You'll also gain access to exclusive insights and benefits.**

DONATE TODAY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
ROBERT BARTLETT, TERREL CHARLES                          :
BARTLETT, LINDA JONES, SHAWN BARTLETT,                   :
MAXINE E. CROCKETT, *individually and on behalf of*      :
*the* ESTATE OF RICKY LEON CROCKETT,                     :          **SECOND AMENDED**
MARVISE L. CROCKETT, TRACIE ARSIAGA,                     :          **COMPLAINT**
*individually and on behalf of the* ESTATE OF ROBERT     :
R. ARSIAGA, SYLVIA MACIAS, GILBERT                       :          **JURY TRIAL DEMANDED**
ARSIAGA, JR., GEORGE ARSIAGA, MATTHEW                    :
ARSIAGA, ANGEL MUNOZ, ROBI ANN GALINDO,                  :          **19-cv-007 (CBA) (VMS)**
PATRICIA ARSIAGA *on behalf of the* ESTATE OF            :
JEREMY ARSIAGA, CEDRIC HUNT, STEVEN                      :
GREENWOOD, STEPHEN W. HILLER, *individually*             :
*and on behalf of the* ESTATE OF STEPHEN DUSTIN          :
HILLER, JEREMY CHURCH, SANDRA HANKINS,                   :
INGRID FISHER, *individually and on behalf of the*       :
ESTATE OF STEVEN SCOTT FISHER, KRISTIN                   :
WALKER, STEVEN T. FISHER, KATHLEEN                       :
GRAMKOWSKI, MARY CARVILL, PEGGY                          :
CARVILL-LIGUORI, *individually and on behalf of the*     :
ESTATE OF FRANK T. CARVILL, DANIEL                       :
CARVILL, PAMELA ADLE-WATTS, *individually and*           :
*on behalf of the* ESTATE OF PATRICK ADLE, JOHN          :
WATTS, GLORIA NESBITT, *individually and on behalf*      :
*of the* ESTATE OF DEFOREST L. TALBERT, D.J.H., *a*      :
*minor*, CHIQUITA TALBERT, TAWANNA TALBERT               :
DARRING, LATASHA MARBLE, JAMES TALBERT,                  :
MIRANDA PRUITT, VELINA SANCHEZ, *individually*           :
*and on behalf of the* ESTATE OF MOSES ROCHA,            :
ALOYSIUS SANCHEZ, SR., ROMMEL ROCHA,                     :
PHILLIP SANCHEZ, ALOYSIUS SANCHEZ, JR.,                  :
GLORIA P. REYNOSO, *individually and on behalf of*       :
*the* ESTATE OF YADIR G. REYNOSO, JASMIN                 :
REYNOSO, PATRICIA REYNOSO, JOSE REYNOSO,                 :
ASHLEY WELLS SIMPSON, *individually and on behalf*       :
*of the* ESTATE OF LARRY LLOYD WELLS, CHAD               :
WELLS, CRYSTAL STEWART, CHASITY WELLS-                   :
GEORGE, CANDICE MACHELLA, BILLY DOAL                     :
WELLS, HOPE ELIZABETH VEVERKA, DONNA                     :
JEAN HEATH, *individually and on behalf of the*          :
ESTATE OF DAVID MICHAEL HEATH, LOLA JEAN                 :
MODJESKA, JOHN DAVID HEATH, OLGA LYDIA                   :
GUTIERREZ, *individually and on behalf of the* ESTATE    :
OF JACOB DAVID MARTIR, ISMAEL MARTIR,                    :

month from the Imam Khomeini Foundation that subsidized costs to patients and urged voters to cast ballots for those who protect the country with "blood and medicine."

521.    The Martyrs Foundation–Lebanon also controls several other major hospitals in Lebanon including Baalbek Hospital, Bahman Hospital, West Bekaa Hospital, and Saint George Hospital.

522.    Several such installations are reported to serve a secondary function as Hezbollah command-and-control facilities, effectively shielded from Israeli airstrikes by their proximity to the hospitals they are situated in.

**b.  Atlas Holding SAL**

523.    The Martyrs Foundation–Lebanon also owns a holding company, Atlas Holding SAL, which it formally established in 2006 but operated in other forms previously.

524.    Atlas Holding SAL is effectively the investment arm of the Martyrs Foundation–Lebanon.

525.    On February 26, 2020, the U.S. Department of the Treasury designated Atlas Holding SAL as an SDGT "for being owned or controlled by the Martyrs Foundation."[43]

526.    Notwithstanding Atlas Holding SAL being owned and controlled by the Martyrs Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendants SGBL and BANK AUDI maintained an account for, and provided financial services to, Atlas Holding SAL.

527.    According to the U.S. Department of the Treasury:

> Atlas Holding — a company controlled by the Martyrs Foundation and subordinate to Hezbollah's Executive Council — along with several of its subsidiaries banked freely at Jammal Trust Bank despite their open

---

[43]    *See Treasury Designates Martyrs Foundation Companies and Officials as Global Terrorists* (U.S. Department of the Treasury, February 26, 2020), *available at* https://home.treasury.gov/news/press-releases/sm917 and incorporated by reference into the Complaint.

affiliation with previously designated Hezbollah entities. In fact, Jammal Trust Bank facilitated hundreds of millions of dollars in transactions through the Lebanese financial system on behalf of Atlas Holding and its subsidiaries, and aided Hezbollah officials in evading scrutiny on these accounts from Lebanese banking authorities.[44]

528.     According to the U.S. Department of the Treasury, Hezbollah's Executive Council "takes advantage of its entities' legitimate and civilian appearance to conceal money transfers for Hezbollah's military use. **Although the funding from these Executive Council companies went into Hezbollah's coffers and military activities**, Hezbollah hoped that the seemingly legitimate business funds could protect Hezbollah from sanctions."[45] (Emphasis added.)

529.     Atlas Holding SAL was co-founded by Hezbollah operative and Al-Rasul al-Azam Hospital CEO, Muhammad Ali Bashir, and Sheikh Yusuf Aasi (SDGT); is managed by Hezbollah operative Qassem Muhammad Ali Bazzi (SDGT); and was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.[46]

530.     Atlas Holding SAL makes no effort to conceal the fact that it is owned by the Martyrs Foundation–Lebanon, and the latter publicly advertises the affiliation.

531.     Atlas Holding SAL has a sister company (located at the same address) called Atlas for Trade and Industry Ltd.

532.     Atlas for Trade and Industry Ltd. was co-founded by Qassem Aliq, who, as noted above, was designated an SDGT on July 24, 2007, as "a Hezbollah official who was previously the director for the Martyrs Foundation branch in Lebanon. In addition to overseeing Martyrs

---

[44]     *Id.*

[45]     *Id.*

[46]     According to the U.S. Department of the Treasury, "Bazzi serves as the CEO and Chairman of the Board of Atlas Holding as of 2019 and is the company's largest shareholder. Additionally, according to corporate registration information, he serves as an official for several of Atlas Holding subsidiaries, including Amana, Amana Plus, Medic, Shahed Pharm, City Pharma, al Kawthar, and Global Touristic Services." *Id.*

Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendant LEBANON AND GULF BANK maintained an account for, and provided financial services to, this Atlas Holding SAL sub-company, City Pharma SARL.

### viii.   Global Touristic Services SAL

554.   Global Touristic Services SAL is owned by the Martyrs Foundation–Lebanon through Atlas Holding SAL. It was founded in 2008, after the Martyrs Foundation–Lebanon was designated as an SDGT. The company claims to invest in tourism and hotel projects, hotels, restaurants, motels, furnished apartments, and restaurants in Lebanon and abroad. It also claims to invest in restaurants, cafes, snack bars, coffee and tea lounges of all grades, as well as zoos, amusement parks and games, art museums, craft festivals and tourism festivals.

555.   Al-Rasul al-Azam Hospital's CEO Muhammad Ali Bashir and Martyrs Foundation–Lebanon Director (until 2009) Shawki Nur al-Din were co-founders of the company along with Hezbollah operative Qassem Muhammad Ali Bazzi.

556.   Jihad Muhammad Qansu, a U.S.-designated SDGT associated with Adham Tabaja, was listed as the company's auditor, and one of Hezbollah's lawyers, Ali Hassan Berro, is listed as the company's attorney.

557.   Notwithstanding Atlas Holding SAL being owned and controlled by the Martyrs Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendant BYBLOS BANK maintained an account for, and provided financial services to, this Atlas Holding SAL sub-company, Global Touristic Services SAL.

558.   The U.S. Department of the Treasury also noted that:

> Hezbollah put the Lebanese banking sector at risk through its deep coordination with Jammal Trust Bank, which was designated as an SDGT in August 2019. Atlas Holding — a company controlled by the Martyrs Foundation and subordinate to Hezbollah's Executive Council — along

with several of its subsidiaries banked freely at Jammal Trust Bank despite their open affiliation with previously designated Hezbollah entities. In fact, Jammal Trust Bank facilitated hundreds of millions of dollars in transactions through the Lebanese financial system on behalf of Atlas Holding and its subsidiaries, and aided Hezbollah officials in evading scrutiny on these accounts from Lebanese banking authorities.[47]

### 4.     AL-MABARRAT CHARITABLE SOCIETY

559.    Al-Mabarrat Charitable Society (a/k/a Benevolent Charity Society) was established in 1978 and was founded by Hezbollah's spiritual leader, Sheikh Muhammad Hussein Fadlallah, who, as noted above, was designated an SDT in 1995.

560.    Al-Mabarrat operates a chain of schools, orphanages, clinics, educational and vocational centers, mosques and hospitals, including the Al-Hadi Institute.

561.    Just as Sheikh Fadlallah provided "spiritual guidance" and Islamic legal justifications for Hezbollah's terrorist activities but denied being a formal member of the organization, Al-Mabarrat has long maintained the pretense that it is sympathetic to, but not part of, Hezbollah.

562.    Sheikh Fadlallah's brother, Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah, serves as the organization's general manager.

563.    Sheikh Fadlallah's son, Ali al-Sayyid Muhammad Hussein Fadlallah, serves as the organization's president.

564.    During the relevant period, the Al-Mabarrat Society maintained one or more accounts at Defendant LCB and was exempted from signing CTSs for cash transactions up to $55,000 per day at the Airport Road branch.

---

[47]    *See Treasury Designates Martyrs Foundation Companies and Officials as Global Terrorists* (U.S. Department of the Treasury, February 26, 2020), *available at* https://home.treasury.gov/news/press-releases/sm917 and incorporated by reference into the Complaint.

L.      **JAMMAL TRUST BANK SAL**

1826.   On August 29, 2019, the U.S. Department of the Treasury designated Defendant

JAMMAL TRUST BANK as an SDGT finding that:

> Jammal Trust knowingly facilitates the banking activities of U.S.-
> designated entities openly affiliated with Hezbollah, Al-Qard al-Hassan and
> the Martyrs Foundation, in addition to services it provides to Hezbollah's
> Executive Council. Hezbollah has used accounts at Jammal Trust to pay its
> operatives and their families, and Jammal Trust has actively attempted to
> conceal its banking relationship with numerous wholly owned Martyrs
> Foundation subsidiaries. When opening purportedly "personal accounts" at
> Jammal Trust, Al-Qard al-Hassan officials clearly identified themselves to
> Jammal Trust as senior members of the terrorist group. Jammal Trust then
> facilitated these accounts to be used to conduct business on Al-Qard al-
> Hassan's behalf. Such a scheme is representative of the deep coordination
> between Hezbollah and Jammal Trust, which dates back to at least the mid-
> 2000s and which spans many of the bank's branches in Lebanon.[132]

1827.   Defendant JAMMAL TRUST BANK has maintained an account for, and provided

vital financial services to, the IRSO, an SDGT that it knows to be widely and publicly associated

with Hezbollah and its IJO.

1828.   The IRSO has openly advertised and solicited donations published with its

JAMMAL TRUST BANK account 140/028355.28/0/5 at its branch in Ghobeiry (Hezbollah's

stronghold in the southern suburbs of Beirut).

1829.   As noted above, the IRSO is the most explicit and notorious fundraising arm of

Hezbollah's IJO.

1830.   Defendant JAMMAL TRUST BANK has knowingly held an account for, and

provided vital financial services to, Car Escort Services (Offshore) SAL, the prominent Hezbollah

automotive company which is itself an SDGT and is owned by three prominent members of

---

[132]    *See Treasury Labels Bank Providing Financial Services to Hizballah as Specially Designated Global
Terrorist* (U.S. Department of the Treasury, August 29, 2019), *available at* https://home.treasury.gov/news/press-
releases/sm760.

Hezbollah's BAC, Ali Muhammad Kharrubi, Ali Youssef Charara and Muhammad Ibrahim Bazzi – all designated SDGTs by the U.S. Department of the Treasury.

1831.  Defendant JAMMAL TRUST BANK has knowingly held accounts for, and provided vital financial services to, Spectrum International Investment Holding SAL and Spectrum Investment Group Holding SAL—both designated SDGTs and both controlled by well-known Hezbollah financier and BAC leader, Ali Charara.

1832.  Defendant JAMMAL TRUST BANK has knowingly held accounts for, and provided vital financial services to, New All Pharma SARL, part of Hezbollah's network of pharmaceutical companies.

1833.  Defendant JAMMAL TRUST BANK has also knowingly held accounts for, and provided vital financial services to, Medical Equipments and Drugs International Corporation SAL MEDIC, another entity that is part of Hezbollah's network of pharmaceutical companies. Although the company was established after the period relevant to this action, because it is owned by Atlas Holding SAL – i.e., Martyrs Foundation–Lebanon – Defendant JAMMAL TRUST BANK's willingness to provide material support to one of Hezbollah's most prominent organizations in recent years confirms that Defendant JAMMAL TRUST BANK continues to provide material support to Hezbollah even when its customers' ties to it are glaring.

1834.  Defendant JAMMAL TRUST BANK also knowingly held accounts for, and provided vital financial services to, Musa Muhammad Ahmad that received illicit funds in U.S. dollars directed by Nazim Ahmad's network via Rilton Traders in Dubai and Primogems through correspondent banks in the United States.

1835.  According to published reports, managers of at least two branches of JAMMAL TRUST BANK named Samih Nayef Khalaf and Adnan Ahmad Suheil served as facilitators and coordinators for Hezbollah inside the bank.

1836.  In sum, Defendant JAMMAL TRUST BANK fully understands its role in The System, and its roster of customers who are either notorious Hezbollah fundraising institutions or BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the bank's extensive commitment to substantially assist Hezbollah's operations (including – in the case of the IRSO – explicitly its violent terrorist activities) by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

## M.   FENICIA BANK

1837.  Defendant FENICIA BANK agreed to participate in The System, maintained accounts for and provided material support that aided and abetted Hezbollah's BAC operatives and companies, and laundered millions of U.S. dollar-denominated funds on Hezbollah's behalf.

1838.  For example, according to the U.S. Department of the Treasury, Defendant FENICIA BANK allowed its Abbassieh branch in Lebanon to facilitate the movement of more than a million dollars in narcotics sales proceeds for Ayman Joumaa and Abbas Hussein Harb.

1839.  In June 2012, Ibrahim Chebli, manager of the Abbassieh branch of FENICIA BANK in Lebanon, was designated an SDNTK by the U.S. Department of the Treasury for facilitating the movement of millions of dollars for (among others) for Ayman Joumaa's narcotics trafficking network.

1840.  According to FinCEN, Mr. Chebli regularly coordinated and executed financial transactions—including bulk cash transfers—that were processed through the Halawi Exchange.

1

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
                                     19-CV-0007(CBA)
 3   ROBERT BARTLETT, ET AL.,
                                     United States Courthouse
 4          Plaintiffs,             Brooklyn, New York

 5          -against-               January 26, 2021
                                     2:00 p.m.
 6
     SOCIETE GENERALE DE BANQUE AU LIBAN
 7   SAL, ET AL.,

 8          Defendants.
     --------------------------------x
 9

10          TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
               BEFORE THE HONORABLE CAROL B. AMON
11                UNITED STATES DISTRICT JUDGE

12   APPEARANCES
     Attorney for Plaintiff:  OSEN LLC
13                            2 University Plaza, Suite 402
                              Hackensack, New Jersey 07601
14                            BY:  MICHAEL RADINE, ESQ.
                              GARY M. OSEN, ESQ.
15                            ARI UNGAR, ESQ.

16   Attorney for Jammal Trust Bank SAL
     and Dr. Muhammad Baasiri
17                            BAKER & HOSTETLER LLP
                              Washington Square, Suite 1100
18                            1050 Connecticut Avenue, NW
                              Washington, D.C. 20036
19                            BY:  ELIZABETH PRICE FOLEY, ESQ.
                                   DAVID RIVKIN, ESQ.
20

21   Court Reporter:         Georgette K. Betts, RPR, FCRR, CCR
                              Phone:  (718)804-2777
22                            Fax:    (718)804-2795
                              Email:  Georgetteb25@gmail.com
23

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25
```

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

PROCEEDINGS

1          THE LAW CLERK:  Counsel, can you state your

2   appearances.

3          MR. RADINE:  This is Michael Radine, R-A-D-I-N-E of

4   Osen LLC on behalf of plaintiffs.  I'm joined by Gary Osen and

5   Ari Ungar.

6          MS. FOLEY:  Elizabeth Foley, that's F-O-L-E-Y, with

7   Baker Hostetler for the defendants.

8          MR. RIVKIN:  You also have David Rivkin, R-I-V-K-I-N

9   representing the defendants.  My colleague, Ms. Foley, will

10  handle the argument but I may participate depending on the

11  questions that are being posed.

12         THE LAW CLERK:  Great.  Thank you.

13         Ms. Foley, I just wanted to clarify, you represent

14  Jammal Trust Bank and also you guys represent the putative

15  defendant, right, Mister -- or Dr. Muhammad Baasiri.

16         MS. FOLEY:  That's correct.  We represent both the

17  liquidator and JTB.

18         THE LAW CLERK:  Okay, great.  Thank you.

19         THE COURT:  Good afternoon.  This is Judge Amon I'm

20  joining the call.  I would ask for my law clerk, Ms. Morse, to

21  please call the case.

22         THE LAW CLERK:  This is case number 19-CV-0007.

23  Bartlett, et al. versus Societe Generale de Banque Au Livan

24  Sal, et al. on for oral argument on defendants' motions to

25  substitute, intervene and dismiss.

PROCEEDINGS

1          Representing plaintiffs are Michael Radine, Gary

2    Osen and Ari Ungar.  And representing Dr. Muhammad Baasiri and

3    Jammal Trust Bank are Elizabeth Foley and David Rivkin.

4          THE COURT:  I just would caution the parties ahead

5    of time, pursuant to our local rules there is to be no

6    independent recording of this session.  We have a court

7    reporter here so -- and that applies to everyone who may be

8    listening in as well.  There is to be no independent

9    recording.  If anyone wants to have a transcript of this, they

10   can get that from the court reporter.

11         All right.  Ms. Foley, these are your motions,

12   correct.

13         MS. FOLEY:  Yes, yes, Your Honor.

14         THE COURT:  Ms. Foley, let me just begin by asking

15   you, assuming that the motion to intervene and also

16   substitution were not granted, and so that assumes that the

17   liquidator is not in the case, you, nonetheless, have motions

18   to dismiss that are made just on behalf of the liquidator, or

19   do you contend that JTB itself could assert, and which are

20   those.

21         MS. FOLEY:  Well, all of the substantive motions

22   have in fact been asserted by JTB as well as the liquidator.

23         THE COURT:  So how would -- assuming that JTB was

24   the only one who remained in the case, assuming for example

25   that I were to deny the substitution motion and the motion to

PROCEEDINGS

1    intervene, how does JTB have an argument based on sovereign

2    immunity, for example.

3                MS. FOLEY:  Well, again, Your Honor, one of the

4    reasons why in fact we wanted the liquidator to come in to

5    this case procedurally, either through intervention or

6    substitution, was precisely because we recognized that those

7    defenses, which are sovereignty-related defenses, both

8    sovereign immunity and international comity, will lose force

9    if they are not allowed -- if the liquidator is not allowed in

10   the case.

11               THE COURT:  What do you mean by lose force?  Do you

12   mean you can't assert them?

13               MS. FOLEY:  Well --

14               THE COURT:  I mean, I don't know how JTB would have

15   sovereign immunity absent --

16               MS. FOLEY:  It would be very difficult, your Honor,

17   to make the case, that's correct.

18               THE COURT:  And the same is true for comity,

19   correct?

20               MS. FOLEY:  That's correct, Your Honor.

21               THE COURT:  So then let me ask you a different

22   question.  Assuming that I granted your motion to intervention

23   but not the motion for substitution, you would have the kind

24   of unusual situation where the liquidator might be able to

25   assert sovereign immunity but that means that he entered the

PROCEEDINGS

1   case and then leave it.  If he's just permitted to intervene,

2   does that sovereign immunity that he might have doesn't

3   translate to or carryover to JTB just because he's an

4   intervenor, is that accurate, and the same would be true of

5   comity.

6           Do you agree with that?

7           MS. FOLEY:  That's an interesting question, Your

8   Honor.  If he is allowed to intervene it is because the Court

9   recognizes that he does have an interest under Lebanese law

10  and JTB's property.  And it would be odd I think for the Court

11  to grant sovereign immunity on behalf of the liquidator

12  recognizing that under Lebanese law he does own and control

13  the disposition of JTB's property and not allow that sovereign

14  immunity to also carryover to JTB.  That is why, your Honor,

15  we believe the correct procedural -- the best procedural

16  mechanism to recognize the reality of the situation is to

17  allow the liquidator to be substituted as the real party in

18  interest for JTB.

19          And if I may for a moment, if I may go back to the

20  comity question you raised a moment ago.  It seems to me that

21  comity is a recognition by the Court of the sort of respect

22  for the pendency of the Lebanese liquidation proceeding and as

23  a matter of theory that comity should remain equally viable to

24  JTB alone even if the liquidator is not allowed procedurally

25  into this case.  The only --

PROCEEDINGS

1    MR. RIVKIN:  Your Honor --

2    THE COURT:  I'm sorry.  Did someone say something?

3    MR. RIVKIN:  Excuse me, your Honor.  This is David

4 Rivkin, I'm Ms. Foley's partner.  If I may be allowed to weigh

5 in for one second.

6    THE COURT:  Well, who is going to argue, Ms. Foley

7 or you, Mr. Rivkin?

8    MR. RIVKIN:  Ms. Foley.  Unfortunately, because of

9 COVID we're not in the same place, we're in different

10 locations.  I just thought I would add one sentence in

11 response to your question about the ability of JTB to argue

12 sovereign immunity --

13    THE COURT:  Yes.

14    MR. RIVKIN:  -- if it pleases the Court.

15    There is no doubt, as Ms. Foley explained and we

16 explain in our briefing, that it is much cleaner for the

17 liquidator to assert this, but I would say as a fall back at

18 this point in time, given the Lebanese law, the liquidator

19 speaks for JTB, so to the extent that the sovereign immunity

20 argument belongs to the liquidator, it also derivatively

21 belongs to JTB, nobody else speaks for JTB.  This is no

22 different, your Honor, than an ability of an instrumentality

23 of a sovereign state to speak on its behalf through his head

24 or a subordinate, appropriate official within that

25 instrumentality.

PROCEEDINGS                              7

1          THE COURT:  But that hasn't been briefed by you,

2   that argument has not been briefed or put forth by you in the

3   papers, not that I saw.

4          MR. RIVKIN:  That is correct, but I wanted to be a

5   fully responsive to your question, your Honor.

6          THE COURT:  Okay, thank you.

7          Let me ask just another sort of technical question.

8   So Ms. Foley, we're talking -- one of the questions deals with

9   the adequacy of representation, I think that applies when

10  we're talking about intervention.  You represent both parties,

11  correct, you're representing Mr. Baasiri and you will continue

12  to represent JTB, correct?

13         MS. FOLEY:  That is correct, your Honor.  And --

14         THE COURT:  But you think they have some conflicting

15  interests?

16         MS. FOLEY:  Again, your Honor, a couple of points,

17  if I may.

18         First is that, according to the declaration that was

19  submitted by Mr. Rivkin, we have had no conversations with

20  anybody at JTB.  JTB, under Lebanese law, is no longer an

21  ongoing concern.  All of our communications as defense counsel

22  have been solely with the liquidator and the Central Bank

23  officials, so that's number one.  Perhaps that highlights

24  really the reality again that JTB is not an ongoing concern.

25         As for the adequate representation prong of

# A-1235

PROCEEDINGS

1  Rule 24(a), the case law, you know, makes clear that if in

2  fact there is someone -- if there is a legal defense or a

3  legal argument that can be made by the proposed intervenor

4  that cannot be equally asserted by the existing parties, then

5  by definition those existing parties do not adequately

6  represent the proposed intervenor, and we believe that is the

7  case here.  As we just had a colloquy on, it seems patent, at

8  least with regard to the sovereign immunity defense, that that

9  sovereign immunity defense is going to lose a lot of its force

10  if the liquidator is not allowed to assert his interests as

11  the liquidator on behalf of the Central Bank as the real party

12  in interest here.  So we believe that if the liquidator were

13  not allowed in this case, there would be a problem of adequate

14  representation in asserting that particular defense.

15          THE COURT:  Returning to my original question, which

16  is your motion to dismiss, this is -- I'm doing this

17  separately now from the motion to intervene or the motion for

18  substitution.

19          You also have grounds for dismissing that -- or

20  pertain to JTB without consideration of the liquidator,

21  correct?

22          MS. FOLEY:  Could you clarify your question, your

23  Honor, I'm not quite sure --

24          THE COURT:  Well, you're moving to dismiss and one

25  of the grounds --

1          MS. FOLEY:  Yes.

2          THE COURT:  -- on which you're moving to dismiss is

3    redressability and I take it that argument applies to JTB

4    whether or not the liquidator comes into the picture.

5          MS. FOLEY:  Yes.  I mean, when we're not talking

6    about the sovereign immunity and comity defenses, you're

7    talking about the other defenses of redressability and the

8    advisory opinion doctrine, yes, those defenses would remain

9    active whether or not the liquidator is allowed into this

10   case.

11         THE COURT:  Well, tell me a bit about your argument

12   on the redressability.  It seems to me it just boils down to

13   that you won't -- that plaintiff won't be able to recover, but

14   that doesn't mean that it's not a redressable injury.  The

15   fact that -- I mean, often people may not have money to pay a

16   judgment but why does that mean it's not redressable.

17         MS. FOLEY:  Well, your Honor, this is not the

18   typical case where you're simply trying to execute on the

19   judgment, this is a situation where we're asserting that

20   redressability is not likely here to remedy the harms, even if

21   plaintiff should win on the merits because there are -- and

22   not in the case, there are third parties that are not before

23   the Court here.  In the case of the domestic asset, the New

24   York correspondent account, that would be OFAC, and there are

25   also independent legal obstacles present here in the case of

PROCEEDINGS

1   the Lebanese asset.  We're talking about the independent legal

2   obstacle of Lebanese law which does not allow the plaintiffs

3   having an unliquidated claim to obtain priority over others,

4   therefore --

5           THE COURT:  Why isn't that just difficulty

6   collecting the judgment, I don't understand.

7           MS. FOLEY:  Because it's not merely difficulty

8   collecting a judgment.  So, for example, normally if

9   plaintiffs won on the merits they would sort of march to

10  Lebanese courts and seek recognition of that claim.  And

11  normally the Lebanese courts would just make sure, I assume

12  that the U.S. courts provided some sort of procedural fairness

13  to JTB in that proceeding and would, at least in good faith,

14  acknowledge the validity of that U.S. judgment and enforce it

15  by levying against JTB's Lebanese assets.  But here it's not

16  that simple because what would stop the Lebanese court from

17  doing that normal routine is that the Lebanese courts would

18  say, well, hold on a second, you are asking for me to

19  liquidate this debt but I cannot liquidate the debt under

20  Lebanese law because there is no surplus available to pay it.

21           So the independent obstacle here is the operation of

22  Lebanese law which does place the plaintiffs in a much lower

23  priority than they would like to be, but that Lebanese policy

24  choice is a policy choice of Lebanon and it's not something

25  that this Court should second guess and that's sort of the

PROCEEDINGS

1　classic basis, for example, for invocation of comity.

2　　　　So, the independent legal obstacle with regard to

3　the Lebanese asset is this operation of Lebanese law.

4　　　　THE COURT:  But it's still boils down to there's not

5　enough money in the pot.  If there was enough money there that

6　operation of bar wouldn't apply.  You just explained to me a

7　whole procedure where they could actually collect on it if

8　there were sufficient money in the pot.  And that's all kind

9　of speculative, I mean a bit speculative, we don't know

10　precisely --

11　　　　MS. FOLEY:  Well, Your Honor, I would disagree with

12　that a little bit in the sense that in the ordinary situation

13　what would stop the execution, the recognition of the U.S.

14　judgment, is a fact and the fact would be there's no money to

15　pay.  Here, it's not a fact, it's actually an independent

16　legal obstacle, the fact that they received lower

17　prioritization.

18　　　　Look, there is money in JTB, that's not the issue.

19　The issue is that in the prioritization of the payment of

20　liquidated claims under Lebanese law, the plaintiffs' claims

21　are, you know, toward the bottom of the list, and because

22　there is no surplus as a matter of fact to pay it, it's the

23　Lebanese law that keeps the redressability from occurring.

24　　　　THE COURT:  What about the 8 million in the United

25　States bank account?

PROCEEDINGS

1          MS. FOLEY:  Yes, you know, so there is that

2   correspondent account in Standard Chartered in New York.  Our

3   best factual development suggests there is around $8 million

4   in that.  The problem with redressability with regard to that

5   domestic asset is that, while the liquidator has an interest

6   in that asset under Lebanese law, it's been blocked by OFAC,

7   and for the plaintiffs to be able to redress their injury

8   through that domestic account they would have to get a license

9   from OFAC.  So in that case it's the third parties that stand

10  in the way of redressability via that asset.

11         THE COURT:  Couldn't they get it under the TRIA, I

12  guess, that act.

13         MS. FOLEY:  Oh, the TRIA Act?

14         THE COURT:  Yes.

15         MS. FOLEY:  Yes.  The Terrorism Risk Insurance Act?

16         THE COURT:  Right.

17         MS. FOLEY:  No, Your Honor, I mean we really believe

18  rather strongly that TRIA does not make plaintiffs' claims

19  redressable here.  If you look at the TRIA, TRIA is pretty

20  simple.  It requires three things to reach a frozen asset,

21  right, when OFAC blocks it like here.  You have to have a

22  judgment, okay.  So let's assume plaintiff gets the judgment

23  on the merit, but you also have -- that judgment has to be

24  based on an act of terrorism, so that's the second

25  requirement, and the third one is that that act of terrorism

1   has to be committed by a terrorist party.

2           And so the plaintiffs here are arguing that that

3   second and third requirement, the act of terrorism and the

4   terrorist party, they don't have any relationship to each

5   other and that their argument is that if somebody somewhere

6   committed an act of terrorism, all they need to do to unfreeze

7   the assets under TRIA is just to get a judgment against the

8   terrorist party.

9           So if you take the plaintiffs' argument to its

10  logical extreme, for example, you could have like the IRA

11  committing some act of terrorism in Northern Ireland, and then

12  plaintiffs here in this case could unfreeze JTB's assets

13  because they would get a judgment against JTB based on an act

14  of terrorism.  And that de-links number two and number three,

15  the act of terrorism from the terrorist party.  That's

16  construction --

17          THE COURT:  Aren't they arguing here that there

18  were, in fact, acts, specific acts of terrorism not just an

19  act of terrorism somewhere out there in world, that they aided

20  or abetted that are set forth in the complaint.

21          MS. FOLEY:  Yeah, that's exactly what they argue,

22  but that's dead wrong in terms of what TRIA says.  So TRIA's

23  definition of act of terrorism, and the part that's relevant

24  here, is the part that incorporates the INA, Section 1182 and

25  that Section 1182 defines terrorist activities.  And so that

PROCEEDINGS

1    gets incorporated into TRIA, right, and if you look at

2    Section 1182 of the INA it lists seven things.  It's got like

3    hijacking and sabotage, kidnapping, violent attacks on

4    internationally protected persons, assassinations, biological,

5    chemical, nuclear weapon use.  And then the one that the

6    plaintiff relies on here, is it says if you use an explosive,

7    firearm or dangerous device to harm people or cause

8    substantial damage to property, so that's the one they're

9    focusing on, and then there's a seventh thing that says if you

10   threaten or attempt or engage in a conspiracy to do any of

11   those things, that also is an act of terrorism, right.  But

12   our point here is that JTB has done none of those seven

13   things, none of them.  All JTB has done here, as plaintiff

14   alleges, is to provide material support to Hezbollah and thus

15   aiding and abetting it under the ATA.

16          And here, this is not what Congress allowed in TRIA.

17   The act of terrorism definition in TRIA, the one that we just

18   sort of went through with the seven things that are

19   enumerated, it doesn't include material support or aiding and

20   abetting.  It only includes conspiracy, which hasn't been

21   alleged here.  JTB has not done the first six things.  It did

22   not use firearms or explosives or dangerous devices.  It also

23   didn't threaten to or attempt to engage in conspiracy to.

24   And, your Honor, honestly it makes says sense that Congress

25   would choose a narrower definition of act of terrorism in

PROCEEDINGS

1 TRIA.  Because think about it, unfreezing assets, you know, it

2 is by definition meaning that the Executive Branch of the

3 government can no longer, like, use those assets for

4 diplomatic leverage against the bad guys.  And so Congress

5 specified in TRIA that we're only going to unfreeze assets for

6 specific -- for carefully enumerated acts of terrorism and

7 that enumeration doesn't include material support.

8 I'll give you an example.  There is a case out of

9 the DDC, we didn't cite it in our briefing but I'll cite it to

10 you now to the extent that it's helpful.  It's called *Jerez*

11 *versus Republic of Cuba*, it's D.D.C. 2011.  And the district

12 court there said that an act of terrorism under TRIA, under

13 that provision we just talked about, does not include torture.

14 And the Court said, you know, that's an egregious act but

15 unfortunately torture was not in the specific enumerations of

16 Section 1182 in TRIA.  And it's the same thing here, right,

17 material support is not enumerated in TRIA.  And, frankly,

18 material financial support is far less egregious than torture

19 is.

20 So I know that plaintiff doesn't like the statute

21 that Congress wrote, but if Congress wants to write another

22 statute it can, but this Court --

23 THE COURT:  All right.

24 MS. FOLEY:  -- can be --

25 THE COURT:  Thank you, Ms. Foley.  You want to

1  address briefly why you should be able to be substituted in

2  here --

3          MS. FOLEY:  Yes, your Honor.

4          THE COURT:  -- by the intervention or substitution.

5          MS. FOLEY:  So Rule 25(c), right, the substitution

6  rule says that if an interest is transferred that the Court

7  may order the transferee to be substituted or joined as the

8  original party.

9          So here, it's undisputed actually that JTB's

10 interests in its property have been transferred by operation

11 of Lebanese law to the Central Bank and its liquidator.  And

12 we cited a bunch of cases where courts routinely hold that

13 liquidators and receivers, trustees, and these types of

14 individuals who marshal and control and sort of dispose of

15 property, are transferees of that property.  And most of the

16 courts call them the real party in interest.  Technically,

17 real party in interest is governed by Rule 17, as we explain

18 in our briefing, so it's a little bit of a misnomer but the

19 courts kind of colloquially use that phrase.  Rule 17 deals

20 with prosecution and therefore plaintiffs.

21         But they routinely use the phrase real party in

22 interest.  So let me -- I'll give you a couple of examples.

23         In *Banco Economico* and *Galadari*, these are both

24 Second Circuit cases, both of those cases involved foreign

25 liquidators.  And the Second Circuit said those foreign

# A-1244

1    liquidators are the real parties in interest.

2           And the plaintiff tries to make a big deal, like

3    these cases don't mention Rule 25 or cite it explicitly, but

4    as we explain in our reply brief that's really not surprising

5    because Rule 25 clearly does not require any motion.  All it

6    requires is that if a court concludes that a transferee is the

7    real party in interest, they may just proceed to litigate on

8    behalf of the original party.

9           The best example I can give you of that, your Honor

10   is *Galadari*.  So in *Galadari* we had a Dubai liquidation

11   committee and they simply answered the complaint in federal

12   court on behalf of *Galadari* and once they answered the

13   complaint on behalf of them, they asserted subject matter

14   jurisdiction, comity and act of state doctrine.  They never

15   filed a Rule 25 motion.  But the court in *Galadari*

16   acknowledged that they were the real party in interest.

17   And --

18           THE COURT:  Was it litigated?  In other words, did

19   the other side say they weren't?

20           MS. FOLEY:  No, in *Galadari* the parties actually

21   agreed that the liquidation committee was an agent or

22   instrumentality under the FSIA and they proceeded apace.  The

23   Second Circuit did, however, agree explicitly with the

24   district court's conclusion to recognize or to allow the Dubai

25   liquidation committee to proceed as the real party in

PROCEEDINGS

1    interest.  So it was just not an issue.

2          THE COURT:  But this is a liquidator though, I mean

3    the one difference here, it seems to me, is this is a

4    liquidator who doesn't have control over all the assets.  So

5    if you let JTB out and you let the liquidator in, then those

6    assets are not being -- they are not the subject of the suit

7    in any way.  So that seems to be a problem with complete

8    substitution here.

9          MS. FOLEY:  Well, again, your Honor, while he may

10   not -- and I assume when you say he doesn't have control over

11   the assets, you're referring to the New York correspondent

12   account.

13         THE COURT:  The 8 million sitting here in New York.

14         MS. FOLEY:  Yes, that's what I thought.  That's

15   correct, he doesn't have control over them because OFAC has

16   blocked them, but it's not whether he has control, it's

17   whether he has an interest and he clearly does have an

18   interest under Lebanese law.

19         THE COURT:  Why wouldn't intervention, either

20   permissive intervention or intervention as a matter of right

21   take care of all of those interests that he might have without

22   substitution and JTB no longer being in the case.

23         MS. FOLEY:  Well, again, your Honor, I think either

24   procedural mechanism is an appropriate way under the facts of

25   this case to bring the liquidator into the case.  They have

1   separate, you know, black letter elements, as your Honor is

2   well aware, but we believe that those elements are satisfied

3   with regard to both Rule 24 and Rule 25(c).

4          We would prefer substitution because we think it's

5   conceptually cleaner in terms of recognizing the type of

6   interests that the liquidator has.  We think that substitution

7   also would more accurately track the Second Circuit precedent

8   in *Banco Economico* and *Galadari*.  So either one is fine with

9   us, which is why we've made both motions, but we do believe

10  that the interests that the liquidator has satisfies both

11  rules.

12         THE COURT:  All right.  But either way any -- if

13  you're allowed into the case either by a substitution or

14  intervention, all the protections that you're talking about

15  are satisfied by either one of those, correct?

16         MS. FOLEY:  Yes, because if we are allowed to

17  intervene, for example, especially as of right, but either

18  way, what we would do and what we are trying to do is assert,

19  as the liquidator for the Central Bank, the

20  sovereignty-related defenses directly.  And certainly with

21  regard to that sovereign immunity defense, it has much more

22  effect, as you and I have discussed, if the liquidator

23  directly asserts it.

24         With regard to comity, though, I do believe that

25  that defense is going to have viability whether or not the

PROCEEDINGS

1    liquidator asserts it directly.

2            THE COURT:  Well, if I permitted you to intervene

3    and not substitute, your sovereign immunity defense would only

4    mean that you would not -- that the case couldn't proceed

5    against the liquidator, so where does that get you?

6            MS. FOLEY:  Well, again, I do think there is a logic

7    to this that if we recognize that the liquidator has an

8    interest in JTB's property, and that interest is ownership or

9    control over that -- ownership rights over that property, the

10   ability to control them under Lebanese law, then I think that

11   at that point it would be kind of absurd just from a logical

12   perspective to grant sovereign immunity for the liquidator but

13   not also to allow it derivatively to pass to JTB, which is by

14   definition controlled by the liquidator.

15           THE COURT:  Okay.

16           MS. FOLEY:  Which is, again, why we prefer Rule 25.

17           (Continued on the next page.)

18

19

20

21

22

23

24

25

PROCEEDINGS

1    THE COURT:  When you talk about comity, comity

2  suggests that there is a parallel action in Lebanon where

3  plaintiffs could seek relief.  But how is that true?  How

4  could they possibly prevail in the liquidation action in

5  Lebanon?

6    MS. FOLEY:  Well, again, I -- I don't agree that

7  comity requires that there be a parallel action in which they

8  can succeed.

9    I think what comity is, is a common law doctrine

10 that recognizes the need for our courts to defer to ongoing

11 proceedings of a similar nature in a foreign court out of

12 respect to that foreign sovereign.

13   THE COURT:  But the plaintiff -- how could the

14 plaintiff be in that action?  They won't have -- I mean they

15 can't -- they wouldn't be in that action until they had gotten

16 a judgment.  And they can't go to Lebanon and get a judgment

17 in their favor.  So I don't understand how -- I mean that just

18 would cut plaintiffs out all together using comity in that

19 way, correct?

20   MS. FOLEY:  Well, but again, Your Honor, first of

21 all, the Second Circuit does encourage comity dismissal when

22 there is a bankruptcy-like proceeding in a foreign

23 jurisdiction.  And *Banco Económico* says it's particularly

24 appropriate, quote/unquote, to grant comity dismissal when

25 there is a foreign proceeding that functions similarly to a

1  bankruptcy proceeding.

2          THE COURT:  But this is not a bankruptcy proceeding

3  here.  Our case is not a bankruptcy proceeding.  The case here

4  before me.

5          MS. FOLEY:  Right.  Right, but that's not required,

6  right?  What's required under comity essentially that there be

7  an ongoing foreign liquidation proceeding, which does function

8  similarly.

9          THE COURT:  Similarly to what?

10          MS. FOLEY:  To a U.S. bankruptcy proceeding.

11          THE COURT:  But wouldn't this have to be -- wouldn't

12  the proceeding in the U.S. have to be a bankruptcy proceeding

13  or something similar to that?

14          MS. FOLEY:  No, I don't think so.  Because the point

15  of comity is not that you got a U.S. bankruptcy proceeding

16  ongoing and you've got a foreign bankruptcy proceeding

17  ongoing.

18          That kind of parallelness, which I think is what

19  you're focusing on, is the subject of Chapter 15 of the

20  Bankruptcy Code.  And, in fact, the plaintiffs argue that

21  substitution and intervention should not be allowed because of

22  Chapter 15.  But as we point out, Chapter 15 is simply, you

23  know, in apposite here, because we don't have an ongoing U.S.

24  bankruptcy proceeding.

25          Instead what we do have is a comity motion, and a

PROCEEDINGS

1    comity motion is -- is this Court's way of expressing respect

2    for the fact that some other foreign jurisdiction is

3    proceeding in a manner that may not -- that should be deferred

4    to because it may conflict with the court's ongoing

5    proceeding.

6              And here what we're saying is the conflict is with a

7    liquidation proceeding and --

8              THE COURT:  But how does it -- doesn't it have to

9    further U.S. policy and it's assuming that the plaintiff

10   ultimately has a viable case here, how would it further U.S.

11   policy to deny that case to them, which is recovering for acts

12   of for, what their claim is, that the bank aided and abetted

13   terrorism.

14             How would comity here further any policy of that --

15   in this country?

16             MS. FOLEY:  Well, I think it actually would further

17   U.S. policy, if you think about it.

18             This liquidation proceeding in Lebanon, it means,

19   under Lebanese law, that JTB is no longer an ongoing

20   banking -- it means that JTB has been punished in the most

21   severe possible way for any business entity that's been shut

22   down.

23             And that seems to be in furtherance of U.S. foreign

24   policy.  In fact, the reason why JTB had to enter Lebanese

25   liquidation is because it was designated.  And that

PROCEEDINGS

1  designation caused it to not be able to operate.  And so it

2  being shut down is exactly what presumably U.S. foreign policy

3  would want.

4          And there's nothing about Lebanese liquidation

5  procedure that's not equitable, orderly or systemic or even

6  procedurally unfair as protective to try to argue.

7          Lebanon's process is very orderly and systemic.  It

8  inventories the assets and liabilities.  It divides the

9  liabilities between liquidated and unliquidated ones.  It pays

10  debt on a pro rata basis.  And so there's nothing about it

11  that's fundamentally unfair.  It's pretty typical type of

12  liquidation procedure.

13          I think the plaintiffs are just upset that under

14  Lebanon's policy choices, under its prioritization of claims,

15  it's towards the bottom of the list.  But, again, that is

16  Lebanon's policy choice to make not this Court's.

17          THE COURT:  All right.  Thank you, Ms. Foley.

18          Let me hear your adversary in response.  And this is

19  Mr. Radine.

20          Did I pronounce your name correctly?

21          MR. RADINE:  Yes, Your Honor, perfectly.

22          THE COURT:  Okay.

23          MR. RADINE:  Yes.  So I'm happy to jump in or answer

24  any specific questions you have.

25          THE COURT:  Well, maybe you just -- I mean I raised

PROCEEDINGS

1 some of the points I was concerned about, maybe you want to

2 address those.

3          MR. RADINE:  Sure.

4          So I'll start with sovereign immunity, which as Your

5 Honor noted, would not be available to JTB, and they don't

6 suggest otherwise in their briefs, and certainly intervention

7 wouldn't change that.  JTB wouldn't become sovereign, even if

8 it somehow could.  *Dole Foods* teaches that the sovereignty is

9 affected at the time of the filing of the complaint.

10          THE COURT:  But JTB wouldn't be entitled to

11 sovereign immunity at this moment either; would it?

12          MR. RADINE:  No, no.  I mean just under the theory

13 that Mr. Rivkin was beginning to develop that because Baasiri

14 has a role running JTB, that sovereignty sort of, you know,

15 moves this over to JTB would not be correct either.  So it

16 would not be correct and it would not matter.

17          And as Your Honor noted, if Baasiri made the

18 argument for sovereign immunity on intervention, it would just

19 kick him back out of the case without having accomplished

20 anything else.

21          The redressability arguments, as Your Honor

22 mentioned, this is a money judgment case.  The problems with

23 collection, however they see them, are not an issue for

24 subject matter jurisdiction.  Of course that being said, TRIA

25 is available to us.

PROCEEDINGS

1          The standard use of TRIA is in cases where the

2    defendant has alleged to have assisted terrorists.  There are

3    very few ATA cases that are brought against terrorist

4    organizations.  They exist but they are, by and large, against

5    those who assist terrorist organizations.  We referenced some

6    in our brief, but that's standard practice.

7          And, of course, we've alleged that JTB assisted

8    terrorist organizations here, not that an unrelated

9    organization like the IRA is injured by plaintiff.

10          As for the Rule 25, the optional -- those were cases

11    in which -- that they mentioned, not in which a party showed

12    up and it was not a motion, it was just allowed to

13    participate.  In *Galaradi*, the plaintiffs brought an amended

14    complaint against the liquidation committee and the sovereign.

15    That was a choice they made that we don't.

16          And in another case they cited, the issue was

17    bringing an enforcement action on a judgment.  To bring a

18    lawsuit, you do not have to move for substitution.

19          THE COURT:  What is the main -- I mean there has

20    been some transferal here of inferences as a result of the

21    litigation.

22          What is your principle reason for arguing to the

23    Court that I shouldn't exercise my discretion to substitute

24    the parties?

25          MR. RADINE:  Well, the most practical effect it

PROCEEDINGS

1  would have is that we would no longer have a defendant who

2  owns the 8 million-dollar asset in New York.

3          And that's only counting the assets that they have

4  shared with us.  We haven't gone into Rule 69 discovery.  We

5  have no idea what their other assets are.

6          But as to that asset, they admit that while Baasiri

7  has some ephemeral interest in it, it's JTB's asset.  And

8  should we get a judgment against JTB -- well, if they were

9  substituted, a judgment against Dr. Baasiri, then I don't know

10 that that would be effective as to that asset.

11         Of course, in any event, we sued JTB.  We did not

12 sue JTB's assets.  We're not suing over a note that is part of

13 the bankrupt estate.  We're suing an entity that currently

14 exists.  And the fact that Baasiri may have control over it or

15 not, that's unclear to us.

16         THE COURT:  I take it there would be a difference,

17 too, in discovery.  If JTB is out, then you would have to be

18 invoking third-party discovery against someone who was a

19 nonparty, correct, whereas now they're a party.

20         MR. RADINE:  Right.

21         THE COURT:  Would it complicate your ability to get

22 discovery?

23         MR. RADINE:  Yes.  And in cases like *Potvin v.*

24 *Speedway*, the Court has noted that it does not -- it will not

25 substitute if that is going to lead to unnecessary problems

PROCEEDINGS

1   with complications in discovery, even where the -- or in this

2   case, the substitution of a judgment per defendant, as Baasiri

3   would be, if you were right about sovereign immunity.

4          THE COURT:  What about -- what problems in discovery

5   would exist?  What complications in discovery?

6          MR. RADINE:  Well, JTB would no longer be a

7   defendant, so there would be a third party.  Documents that

8   are -- it may have that aren't in Baasiri's own possession,

9   whoever's possession they would be in, would presumably create

10  additional problems.

11         There are additional issues immunity-wise with

12  attaching assets, requesting documents.  I don't know what

13  effect it would have on letters rogatory.  But I would imagine

14  it would complicate things where JTB's no longer a defendant.

15         THE COURT:  Why should -- assuming that you're right

16  that it doesn't meet the actual substitution and there are all

17  these problems with substitution, how are you prejudiced at

18  all by even a permissive intervention?  Why shouldn't Baasiri

19  be able to intervene?

20         You know, he has an interest in the assets of JTB.

21  You are certainly trying to go after those assets in this

22  case.  Those assets, one, are presumably somewhat limited.

23  Why would I -- why should I deny a motion to -- for permissive

24  intervention, or even intervention as a matter of right?

25  You're not losing JTB, you're just gaining --

PROCEEDINGS

1        MR. RADINE:  That's right.

2        THE COURT:  You're gaining another defendant.  What

3 more could you ask for?

4        MR. RADINE:  Sounds like a wedding.

5        THE COURT:  Yes, exactly.

6        MR. RADINE:  Right.

7        I think it would do nothing but complicate this case

8 and slow down what is already a very large case.  In fact, one

9 of the grounds that Ms. Foley gave for bringing this motion so

10 late was that it's very difficult and slow to communicate with

11 Dr. Baasiri from his hiding place in the mountains.

12        None of our other defendants had any trouble

13 communicating or -- or doing motion practice in this case in a

14 timely fashion.  This was bringing a party that is evidently

15 unable to do so and would slow down proceedings for no

16 benefit.

17        His interest is -- in the absence is gained by the

18 fact that he is reporting to counsel running JTB any way.

19        THE COURT:  Well, I -- I don't understand.  I mean

20 you say it would slow it down.  At the moment it's not --

21 things are slowed down as a result of the decision until

22 what -- it's not like we're in the middle of active discovery

23 now.

24        He would be coming in at a time where not that much

25 has been done, and it seems that the Court could deal with any

PROCEEDINGS

1   motion practice by just simply saying if he, you know, can't

2   be contacted in the mountains to answer something, well then

3   it's -- you know, ways that, you know, you could appeal to the

4   Court to deal with those kinds of delays.

5          MR. RADINE:  Yeah, I don't think the intervention of

6   him is a -- you know, would be problematic as substitution.

7   It seems that it's still adds complications to the case where

8   he has not met the other elements of the case.

9          For instance, that, according to the Second Circuit,

10  among the most important factors is timeliness, and of the

11  timeliness decision is the length of time the applicant knew

12  or should have known of his interests before making a motion.

13         Also the fact that once sovereignty and comity are

14  out, then JTB adequately protects his interest inasmuch as JTB

15  would be litigating the merits of the case.  That puts his

16  interests at some sort of risk, although he's already told the

17  Court that it is a certainty that we will not be collecting on

18  any Lebanese assets.  So it's unclear to me what his interests

19  would be even be in that case.

20         THE COURT:  All right, did you want to address any

21  of the other arguments?

22         MR. RADINE:  Yes, thank you.

23         As Your Honor noted, these are not parallel

24  proceedings by any stretch of the imagination.  Even in the

25  cases where the U.S. action is not a bankruptcy action but the

PROCEEDINGS

1  foreign one, is like *Banco Económico* or *Allstate*, you have

2  plaintiffs who had brought claims in that foreign bankruptcy

3  and are able to adjudicate them there.  That's in both those

4  cases.

5          That factor's obviously not here.  We're not a part

6  of that bankruptcy action abroad.  And they, Baasiri explained

7  many times in the papers that we would not be able to bring a

8  claim at all over there.

9          The Chapter 15 distinction that requires bankruptcy

10  action in both the U.S. and abroad is wholly invented.  The

11  standard in 1501(b)(1) is that assistance is sought from this

12  court.

13          The other grounds for invoking Chapter 15 involve

14  banks in multiple countries, not that one.  Anyway, as far as

15  Baasiri has requested the assistance of this Court in their

16  brief, the liquidator claims an interest that will as a

17  practicable matter be impaired or impeded by this lawsuit.  A

18  lawsuit involving property that is subject to liquidation will

19  as a practical matter directly impair or impede the

20  liquidator's ability to protect their interest in such

21  property.

22          So he's asking for this Court's assistance.  The

23  case law shows in our brief that he must do a Chapter 15

24  recognition petition before seeking debt assistance; whether

25  it's substitution, intervention, or the motionless version

PROCEEDINGS

1  that he's suggesting.

2          They have no answer for cases of ours like *Orchard*

3  *v. Megabop* in which the U.S. action is a breach of contract

4  and there's a foreign -- a British bankruptcy action.

5          The liquidator wrote a letter, much like here,

6  asking for a stay of the U.S. action.  And the U.S. court

7  refused because it does not -- quote, it does not comport with

8  the strict statutory requirements of Chapter 15.  They had

9  no --

10          THE COURT:  How do you deal with the decision in

11  *Trikona Advisers*?  It seems that to use Chapter 15, a party

12  has to be seeking assistance of the district court in

13  enforcing a judgment.  And that's not what the liquidator

14  wants to do here.

15          MR. RADINE:  All *Trikona* -- so *Trikona's* holding is

16  that Chapter 15 does not apply because there was no foreign

17  representative seeking any assistance from that court.  That

18  argument was being made by a non-foreign representative.

19          Moreover, the Second Circuit held that collateral

20  estoppel is a doctrine that operates regardless of bankruptcy

21  law.  Collateral estoppel is just always true.

22          It does not hold that there has to be a specific

23  judgment, although here, of course, there is an order.

24  Dr. Baasiri said he has an order essentially from the Central

25  Bank of Lebanon telling him to dispose of assets that he needs

PROCEEDINGS

1  assistance from this Court in carrying out because we are

2  somehow impeding those assets.  Although, once again, he

3  states we will be able to acquire them.

4          So *Trikona* does not stand for -- in the other use of

5  Chapter 15 that they're suggesting.  Nor does it suggest that

6  it overrides cases like *Orchard v. Megabop*.

7          THE COURT:  All right, anything further, Counsel?

8          MR. RADINE:  I think that's -- that covered it, Your

9  Honor.

10          Obviously we find this motion to have been

11  profoundly meritless.  I would just point out that if Baasiri

12  is permitted to intervene, our concern is that we'd be slowed

13  down by further meritless motion practice like this.

14          THE COURT:  Well, he's apparently raised all the

15  issues he would raise if he intervenes.  So why do you think

16  there would be more motion practice?

17          MR. RADINE:  If that's true, and I can't imagine

18  what he needs to intervene for, he has access to anything

19  happening in this case.  According to defendants' -- or sorry,

20  Judge, this set of counsel as opposed to JTB's other counsel,

21  he is running the show at JTB.

22          But, of course, we don't have a corporate officer

23  intervene where the corporation's already a defendant.  He

24  just runs the corporation.  So it would seem unusual to me to

25  have him intervene if that's their theory.

PROCEEDINGS

1    THE COURT:  All right.  Thank you.

2    Ms. Foley, is there anything that you absolutely

3    have to respond to, or do I have your arguments?

4    MS. FOLEY:  Your Honor, I'd like to briefly respond,

5    if you would indulge me for a moment.

6    THE COURT:  Yes, if it's just not to repeat

7    everything that you've already said, that's fine.  I mean, if

8    there's one point that counsel has raised that you want to --

9    one or two points that you want to comment on, that's fine,

10    but I don't need to hear the argument over again.

11    MS. FOLEY:  No, I will definitely just simply rebut.

12    So I do have a few points of rebuttal.

13    First, we raise the issue of discovery.  And you're

14    correct that if, in fact, the liquidators are not allowed

15    procedural into this case, discovery actually would become

16    more difficult.  Because JTB, again, is not an ongoing

17    concern.

18    We, as their lawyer, don't even have any

19    communication with anybody there.  And so I don't know how

20    discovery would be effectuated against an entity that

21    functionally doesn't exist as a bank any more.

22    The records are under the control, just like the

23    rest of the property of JTB, the records of JTB are under the

24    control of the liquidator and the Central Bank.  So I think it

25    would help should we get that far.

PROCEEDINGS

1      Also with regard to permissive intervention or
2  intervention as of right, it's definitely not going to slow
3  down or complicate this case. We're in the early stages.
4  We're already raising and laying our cards on the table. So I
5  would agree with Your Honor's point on that.
6      With regard to comity. I believe that plaintiffs'
7  counsel just cited *Banco Económico,* and going back over *Banco*
8  *Económico,* I'll just call attention to the fact that that
9  case, the Second Circuit case, dismissed the complaint under
10  the doctrine of international comity in favor of an ongoing
11  liquidation in Brazil, just like here. And it did so, it
12  dismissed a case that was not a bankruptcy, U.S. bankruptcy
13  proceeding. It wasn't a parallel proceeding. That underlying
14  proceeding that got dismissed was a contract action. It was
15  default on a note guaranty.
16      So the comity doctrine is not a doctrine of parallel
17  proceedings the way Chapter 15 is. It's simply a doctrine of
18  respect to an ongoing foreign proceeding that could affect --
19  be affected by the judgment in the U.S.
20      Chapter 15 is simply not applicable no matter how
21  many times plaintiff says so. If you look at the language of
22  Chapter 15, which is contained in Title 11 of the Bankruptcy
23  Code, none of the four enumerations is present here.
24      We are not seeking assistance. We don't have to
25  seek assistance to the foreign liquidator. There is no case

PROCEEDINGS

1   under this title.  There is no case under Title 11 that is

2   pending.  So Chapter 15 is simply not applicable.

3           And that's it, Your Honor.

4           THE COURT:  All right.  My thanks to everyone for

5   very interesting arguments on very interesting issues, and

6   I'll reserve decision.  Okay, thank you.

7           MS. FOLEY:  Thank you.

8           (Whereupon, the matter was concluded.)

9                   *    *    *    *    *

10  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

11

12  s/ Georgette K. Betts              September 9, 2021

13  GEORGETTE K. BETTS                 DATE

14

15

16

17

18

19

20

21

22

23

24

25

**MR. RADINE: [17]** 2/3 24/21 24/23 25/3 25/12 26/25 27/20 27/23 28/6 29/1 29/4 29/6 30/5 30/22 32/15 33/8 33/17
**MR. RIVKIN: [6]** 2/8 6/1 6/3 6/8 6/14 7/4
**MS. FOLEY: [41]** 2/6 2/16 3/13 3/21 4/3 4/13 4/16 4/20 5/7 7/13 7/16 8/22 9/1 9/5 9/17 10/7 11/11 12/1 12/13 12/15 12/17 13/21 15/24 16/3 16/5 17/20 18/9 18/14 18/23 19/16 20/6 20/16 21/6 21/20 22/5 22/10 22/14 23/16 34/4 34/11 36/7
**THE COURT: [60]** 2/19 3/4 3/14 3/23 4/11 4/14 4/18 4/21 6/2 6/6 6/13 7/1 7/6 7/14 8/15 8/24 9/2 9/11 10/5 11/4 11/24 12/11 12/14 12/16 13/17 15/23 15/25 16/4 17/18 18/2 18/13 18/19 19/12 20/2 20/15 20/18 21/13 22/2 22/9 22/11 23/8 24/17 24/22 24/25 25/10 26/19 27/16 27/21 28/4 28/15 29/2 29/5 29/19 30/20 32/10 33/7 33/14 34/1 34/6 36/4
**THE LAW CLERK: [4]** 1/25 2/12 2/18 2/22

**$**
**$8 [1]** 12/3
**$8 million [1]** 12/3

**-**
**---------------------------------x [2]** 1/2 1/8
**-against [1]** 1/5

**0**
**0007 [2]** 1/2 2/22
**07601 [1]** 1/13

**1**
**1050 [1]** 1/18
**11 [2]** 35/22 36/1
**1100 [1]** 1/17
**1182 [4]** 13/24 13/25 14/2 15/16
**15 [14]** 22/19 22/22 22/22 31/9 31/13 31/23 32/8 32/11 32/16 33/5 35/17 35/20 35/22 36/2
**1501 [1]** 31/11
**17 [2]** 16/17 16/19
**19-CV-0007 [2]** 1/2 2/22

**2**
**20036 [1]** 1/18
**2011 [1]** 15/11
**2021 [2]** 1/5 36/12
**24 [2]** 8/1 19/3
**25 [7]** 16/5 17/3 17/5 17/15 19/3 20/16 26/10
**26 [1]** 1/5
**2777 [1]** 1/21
**2795 [1]** 1/22
**2:00 [1]** 1/5

**4**
**402 [1]** 1/13

**6**
**69 [1]** 27/4

**7**
**718 [2]** 1/21 1/22

**8**
**8 million [2]** 11/24 18/13
**8 million-dollar [1]** 27/2
**804-2777 [1]** 1/21
**804-2795 [1]** 1/22

**A**
**abetted [2]** 13/20 23/12
**abetting [2]** 14/15 14/20
**ability [5]** 6/11 6/22 20/10 27/21 31/20
**able [9]** 4/24 9/13 12/7 16/1 24/1 28/19 31/3 31/7 33/3
**above-entitled [1]** 36/10
**abroad [2]** 31/6 31/10
**absence [1]** 29/17
**absent [1]** 4/15
**absolutely [1]** 34/2
**absurd [1]** 20/11
**access [1]** 33/18
**accomplished [1]** 25/19
**according [3]** 7/18 30/9 33/19
**account [5]** 9/24 11/25 12/2 12/8 18/12
**accurate [1]** 5/4
**accurately [1]** 19/7
**acknowledge [1]** 10/14
**acknowledged [1]** 17/16
**acquire [1]** 33/3
**act [18]** 12/12 12/13 12/15 12/24 12/25 13/3 13/6 13/11 13/13 13/15 13/19 13/23 14/11 14/17 14/25 15/12 15/14 17/14
**action [14]** 21/2 21/4 21/7 21/14 21/15 26/17 30/25 30/25 31/6 31/10 32/3 32/4 32/6 35/14
**active [2]** 9/9 29/22
**activities [1]** 13/25
**acts [4]** 13/18 13/18 15/6 23/11
**actual [1]** 28/16
**add [1]** 6/10
**additional [2]** 28/10 28/11
**address [3]** 16/1 25/2 30/20
**adds [1]** 30/7
**adequacy [1]** 7/9
**adequate [2]** 7/25 8/13
**adequately [2]** 8/5 30/14
**adjudicate [1]** 31/3
**admit [1]** 27/6
**adversary [1]** 24/18
**Advisers [1]** 32/11
**advisory [1]** 9/8
**affect [1]** 35/18
**affected [2]** 25/9 35/19
**after [1]** 28/21
**afternoon [1]** 2/19
**against [13]** 1/5 10/15 13/7 13/13 15/4 20/5 26/3 26/4 26/14 27/8 27/9 27/18 34/20
**agent [1]** 17/21

**ago [1]** 5/20
**agree [4]** 5/6 17/23 21/6 35/5
**agreed [1]** 17/21
**ahead [1]** 3/4
**aided [3]** 1/24 13/19 23/12
**aiding [2]** 14/15 14/19
**al [4]** 1/3 1/7 2/23 2/24
**alleged [3]** 14/21 26/2 26/7
**alleges [1]** 14/14
**allow [5]** 5/13 5/17 10/2 17/24 20/13
**allowed [14]** 4/9 4/9 5/8 5/24 6/4 8/10 8/13 9/9 14/16 19/13 19/16 22/21 26/12 34/14
**Allstate [1]** 31/1
**alone [1]** 5/24
**always [1]** 32/21
**amended [1]** 26/13
**AMON [2]** 1/10 2/19
**another [4]** 7/7 15/21 26/16 29/2
**answer [3]** 24/23 30/2 32/2
**answered [2]** 17/11 17/12
**Anyway [1]** 31/14
**apace [1]** 17/22
**apparently [1]** 33/14
**appeal [1]** 30/3
**appearances [1]** 1/12 2/2
**applicable [2]** 35/20 36/2
**applicant [1]** 30/11
**applies [3]** 3/7 7/9 9/3
**apply [2]** 11/6 32/16
**apposite [1]** 22/23
**appropriate [3]** 6/24 18/24 21/24
**argue [5]** 6/6 6/11 13/21 22/20 24/6
**arguing [3]** 13/2 13/17 26/22
**argument [14]** 1/10 2/10 2/24 4/1 6/20 7/2 8/3 9/3 9/11 13/5 13/9 25/18 32/18 34/10
**arguments [4]** 25/21 30/21 34/3 36/5
**ARI [3]** 1/15 2/5 3/2
**around [1]** 12/3
**assassinations [1]** 14/4
**assert [6]** 3/19 4/12 4/25 6/17 8/10 19/18
**asserted [3]** 3/22 8/4 17/13
**asserting [2]** 8/14 9/19
**asserts [2]** 19/23 20/1
**asset [11]** 9/23 10/1 11/3 12/5 12/6 12/10 12/20 27/2 27/6 27/7 27/10
**assets [20]** 10/15 13/7 13/12 15/1 15/3 15/5 18/4 18/6 18/11 24/8 27/3 27/5 27/12 28/12 28/20 28/21 28/22 30/18 32/25 33/2
**assist [1]** 26/5
**assistance [9]** 31/11 31/15 31/22 31/24 32/12 32/17 33/1 35/24 35/25
**assisted [2]** 26/2 26/7
**assume [3]** 10/11 12/22 18/10
**assumes [1]** 3/16
**assuming [6]** 3/15 3/23 3/24 4/22 23/9 28/15
**ATA [2]** 14/15 26/3
**attaching [1]** 28/12
**attacks [1]** 14/3
**attempt [2]** 14/10 14/23
**attention [1]** 35/8

**A**

**Attorney [2]** 1/12 1/16
**AU [2]** 1/6 2/23
**available [3]** 10/20 25/5 25/25
**Avenue [1]** 1/18
**aware [1]** 19/2

**B**

**Baasiri [16]** 1/16 2/15 3/2 7/11 25/13 25/17 27/6 27/9 27/14 28/2 28/18 29/11 31/6 31/15 32/24 33/11
**Baasiri's [1]** 28/8
**back [4]** 5/19 6/17 25/19 35/7
**bad [1]** 15/4
**BAKER [2]** 1/17 2/7
**Banco [6]** 16/23 19/8 21/23 31/1 35/7 35/7
**bank [12]** 1/16 2/14 3/3 7/22 8/11 11/25 16/11 19/19 23/12 32/25 34/21 34/24
**banking [1]** 23/20
**bankrupt [1]** 27/13
**bankruptcy [19]** 21/22 22/1 22/2 22/3 22/10 22/12 22/15 22/16 22/20 22/24 30/25 31/2 31/6 31/9 32/4 32/20 35/12 35/12 35/22
**bankrupcy-like [1]** 21/22
**banks [1]** 31/14
**BANQUE [2]** 1/6 2/23
**bar [1]** 11/6
**BARTLETT [2]** 1/3 2/23
**based [3]** 4/1 12/24 13/13
**become [2]** 25/7 34/15
**begin [1]** 3/14
**beginning [1]** 25/13
**behalf [8]** 2/4 3/18 5/11 6/23 8/11 17/8 17/12 17/13
**belongs [2]** 6/20 6/21
**benefit [1]** 29/16
**best [3]** 5/15 12/3 17/9
**Betts [3]** 1/21 36/12 36/13
**between [1]** 24/9
**big [1]** 17/2
**biological [1]** 14/4
**bit [4]** 9/11 11/9 11/12 16/18
**black [1]** 19/1
**blocked [2]** 12/6 18/16
**blocks [1]** 12/21
**boils [2]** 9/12 11/4
**bottom [2]** 11/21 24/15
**Branch [1]** 15/2
**Brazil [1]** 35/11
**breach [1]** 32/3
**brief [4]** 17/4 26/6 31/16 31/23
**briefed [2]** 7/1 7/2
**briefing [3]** 6/16 15/9 16/18
**briefly [2]** 11/1 34/4
**briefs [1]** 25/6
**bring [3]** 18/25 26/17 31/7
**bringing [3]** 26/17 29/9 29/14
**British [1]** 32/4
**Brooklyn [1]** 1/4
**brought [3]** 26/3 26/13 31/2

**bunch [1]** 16/12
**business [1]** 23/21

**C**

**call [4]** 2/20 2/21 16/16 35/8
**called [1]** 15/10
**cannot [2]** 8/4 10/19
**cards [1]** 35/4
**care [1]** 18/21
**carefully [1]** 15/6
**CAROL [1]** 1/10
**carrying [1]** 33/1
**carryover [2]** 5/3 5/14
**case [50]** 2/21 2/22 3/17 3/24 4/5 4/10 4/17 5/1 5/25 8/1 8/7 8/13 9/10 9/18 9/22 9/23 9/25 12/9 13/12 15/8 18/22 18/25 18/25 19/13 20/4 22/3 22/3 23/10 23/11 25/19 25/22 26/16 28/2 28/22 29/7 29/8 29/13 30/7 30/8 30/15 30/19 31/23 33/19 34/15 35/3 35/9 35/9 35/12 35/25 36/1
**cases [12]** 16/12 16/24 16/24 17/3 26/1 26/3 26/10 27/23 30/25 31/4 32/2 33/6
**cause [2]** 1/10 14/7
**caused [1]** 24/1
**caution [1]** 3/4
**CBA [1]** 1/2
**CCR [1]** 1/21
**Central [6]** 7/22 8/11 16/11 19/19 32/24 34/24
**certainly [3]** 19/20 25/6 28/21
**certainty [1]** 30/17
**certify [1]** 36/10
**change [1]** 25/7
**Chapter [14]** 22/19 22/22 22/22 31/9 31/13 31/23 32/8 32/11 32/16 33/5 35/17 35/20 35/22 36/2
**Chapter 15 [11]** 31/9 31/13 31/23 32/8 32/11 32/16 33/5 35/17 35/20 35/22 36/2
**Chartered [1]** 12/2
**chemical [1]** 14/5
**choice [4]** 10/24 10/24 24/16 26/15
**choices [1]** 24/14
**choose [1]** 14/25
**Circuit [8]** 16/24 16/25 17/23 19/7 21/21 30/9 32/19 35/9
**cite [3]** 15/9 15/9 17/3
**cited [3]** 16/12 26/16 35/7
**CIVIL [1]** 1/10
**claim [4]** 10/3 10/10 23/12 31/8
**claims [5]** 11/20 11/20 12/18 24/14 31/2 31/16
**clarify [2]** 2/13 8/22
**classic [1]** 11/1
**cleaner [2]** 6/16 19/5
**clear [1]** 8/1
**clearly [2]** 17/5 18/17
**clerk [1]** 2/20
**Code [2]** 22/20 35/23
**collateral [2]** 32/19 32/21
**colleague [1]** 2/9
**collect [1]** 11/7
**collecting [3]** 10/6 10/8 30/17

**collection [1]** 25/23
**colloquially [1]** 16/19
**colloquy [1]** 8/7
**coming [1]** 29/24
**comity [26]** 4/8 4/18 5/5 5/20 5/21 5/23 9/6 11/1 17/14 19/24 21/1 21/1 21/7 21/9 21/18 21/21 21/24 22/6 22/15 22/25 23/1 23/14 30/13 35/6 35/10 35/16
**comment [1]** 34/9
**committed [2]** 13/1 13/6
**committee [4]** 17/11 17/21 17/25 26/14
**committing [1]** 13/11
**common [1]** 21/9
**communicate [1]** 29/10
**communicating [1]** 29/13
**communication [1]** 34/19
**communications [1]** 7/21
**complaint [6]** 13/20 17/11 17/13 25/9 29/14 35/9
**complete [1]** 18/7
**complicate [4]** 27/21 28/14 29/7 35/3
**complications [3]** 28/1 28/5 30/7
**comport [1]** 32/7
**computer [1]** 1/24
**computer-aided [1]** 1/24
**conceptually [1]** 19/5
**concern [4]** 7/21 7/24 33/12 34/17
**concerned [1]** 25/1
**concluded [1]** 36/8
**concludes [1]** 17/6
**conclusion [1]** 17/24
**conflict [2]** 23/4 23/6
**conflicting [1]** 7/14
**Congress [5]** 14/16 14/24 15/4 15/21 15/21
**Connecticut [1]** 1/18
**consideration [1]** 8/20
**conspiracy [3]** 14/10 14/20 14/23
**construction [1]** 13/16
**contacted [1]** 30/2
**contained [1]** 35/22
**contend [1]** 3/19
**continue [1]** 7/11
**Continued [1]** 20/17
**contract [2]** 32/3 35/14
**control [11]** 5/12 16/14 18/4 18/10 18/15 18/16 20/9 20/10 27/14 34/22 34/24
**controlled [1]** 20/14
**conversations [1]** 7/19
**corporate [1]** 33/22
**corporation [1]** 33/24
**corporation's [1]** 33/23
**correct [19]** 2/16 3/12 4/17 4/19 4/20 5/15 5/4 7/11 7/12 7/13 8/21 18/15 19/15 21/19 25/15 25/16 27/19 34/14 36/10
**correctly [1]** 24/20
**correspondent [3]** 9/24 12/2 18/11
**counsel [8]** 1/25 7/21 29/18 33/7 33/20 33/20 34/8 35/7
**counting [1]** 27/3
**countries [1]** 31/14

**C**
**country [1]** 23/15
**couple [2]** 7/16 16/22
**course [5]** 25/24 26/7 27/11 32/23 33/22
**court [30]** 1/1 1/21 3/6 3/10 5/8 5/10 5/21 6/14 9/23 10/16 10/25 15/12 15/14 15/22 16/6 17/6 17/12 17/15 21/11 26/23 27/24 29/25 30/4 30/17 31/12 31/15 32/6 32/12 32/17 33/1
**court's [5]** 17/24 23/1 23/4 24/16 31/22
**Courthouse [1]** 1/3
**courts [8]** 10/10 10/11 10/12 10/17 16/12 16/16 16/19 21/10
**covered [1]** 33/8
**COVID [1]** 6/9
**create [1]** 28/9
**Cuba [1]** 15/11
**currently [1]** 27/13
**cut [1]** 21/18
**CV [2]** 1/2 2/22

**D**
**D.C [1]** 1/18
**D.D.C [1]** 15/11
**damage [1]** 14/8
**dangerous [2]** 14/7 14/22
**DATE [1]** 36/13
**DAVID [4]** 1/19 2/8 3/3 6/3
**DDC [1]** 15/9
**de [3]** 1/6 2/23 13/14
**de-links [1]** 13/14
**dead [1]** 13/22
**deal [4]** 17/2 29/25 30/4 32/10
**deals [2]** 7/8 16/19
**debt [4]** 10/19 10/19 24/10 31/24
**decision [4]** 29/21 30/11 32/10 36/6
**declaration [1]** 7/18
**default [1]** 35/15
**defendant [8]** 2/15 26/2 27/1 28/2 28/7 28/14 29/2 33/23
**defendants [4]** 1/8 2/7 2/9 29/12
**defendants' [2]** 2/24 33/19
**defense [8]** 7/21 8/2 8/8 8/9 8/14 19/21 19/25 20/3
**defenses [6]** 4/7 4/7 9/6 9/7 9/8 19/20
**defer [1]** 21/10
**deferred [1]** 23/3
**defines [1]** 13/25
**definitely [2]** 34/11 35/2
**definition [6]** 8/5 13/23 14/17 14/25 15/2 20/14
**delays [1]** 30/4
**deny [3]** 3/25 23/11 28/23
**depending [2]** 2/10
**derivatively [2]** 6/20 20/13
**designated [1]** 23/25
**designation [1]** 24/1
**develop [1]** 25/13
**development [1]** 12/3
**device [1]** 14/7
**devices [1]** 14/22
**difference [2]** 18/3 27/16

**different [3]** 4/21 6/9 6/22
**difficult [3]** 4/16 29/10 34/16
**difficulty [2]** 10/5 10/7
**diplomatic [1]** 15/4
**directly [4]** 19/20 19/23 20/1 31/19
**disagree [1]** 11/11
**discovery [11]** 27/4 27/17 27/18 27/22 28/1 28/4 28/5 29/22 34/13 34/15 34/20
**discretion [1]** 26/23
**discussed [1]** 19/22
**dismiss [5]** 2/25 3/18 8/16 8/24 9/2
**dismissal [2]** 21/21 21/24
**dismissed [3]** 35/9 35/12 35/14
**dismissing [1]** 8/19
**dispose [2]** 16/14 32/25
**disposition [1]** 5/13
**distinction [1]** 31/9
**district [6]** 1/1 1/1 1/11 15/11 17/24 32/12
**divides [1]** 24/8
**doctrine [8]** 9/8 17/14 21/9 32/20 35/10 35/16 35/16 35/17
**documents [2]** 28/7 28/12
**Dole [1]** 25/8
**dollar [1]** 27/2
**domestic [3]** 9/23 12/5 12/8
**done [2]** 16/14 14/13 14/21 29/25
**doubt [1]** 6/15
**down [10]** 9/12 11/4 23/22 24/2 29/8 29/15 29/20 29/21 33/13 35/3
**Dr [3]** 1/16 2/15 3/2
**Dr. [3]** 27/9 29/11 32/24
**Dr. Baasiri [3]** 27/9 29/11 32/24
**Dubai [2]** 17/10 17/24

**E**
**early [1]** 35/3
**EASTERN [1]** 1/1
**Economico [2]** 16/23 19/8
**Económico [4]** 21/23 31/1 35/7 35/8
**effect [3]** 19/22 26/25 28/13
**effective [1]** 27/10
**effectuated [1]** 34/20
**egregious [2]** 15/14 15/18
**either [10]** 4/5 18/19 18/23 19/8 19/12 19/13 19/15 19/17 25/11 25/15
**elements [3]** 19/1 19/2 30/8
**ELIZABETH [3]** 1/19 2/6 3/3
**Email [1]** 1/22
**encourage [1]** 21/21
**enforce [1]** 10/14
**enforcement [1]** 26/17
**enforcing [1]** 32/13
**engage [2]** 14/10 14/23
**enough [1]** 11/5 11/5
**enter [1]** 23/24
**entered [1]** 4/25
**entitled [1]** 25/10 36/10
**entity [3]** 23/21 27/13 34/20
**enumerated [3]** 14/19 15/6 15/17
**enumeration [1]** 15/7
**enumerations [2]** 15/15 35/23
**ephemeral [1]** 27/7
**equally [2]** 5/23 8/4
**equitable [1]** 24/5

**especially [1]** 19/17
**ESQ [5]** 1/14 1/14 1/15 1/19 1/19
**essentially [2]** 22/6 32/24
**estate [1]** 27/13
**estoppel [2]** 32/20 32/21
**et [4]** 1/3 1/7 2/23 2/24
**event [1]** 27/11
**everything [1]** 34/7
**evidently [1]** 29/14
**exactly [3]** 13/21 24/2 29/5
**example [8]** 3/24 4/2 10/8 11/1 13/10 15/8 17/9 19/17
**examples [1]** 16/22
**Excuse [1]** 6/3
**execute [1]** 9/18
**execution [1]** 11/13
**Executive [1]** 15/2
**exercise [1]** 26/23
**exist [3]** 26/4 28/5 34/21
**existing [2]** 8/4 8/5
**exists [1]** 27/14
**explain [6]** 6/16 16/17 17/4
**explained [3]** 6/15 11/6 31/6
**explicitly [2]** 17/3 17/23
**explosive [1]** 14/6
**explosives [1]** 14/22
**expressing [1]** 23/1
**extent [2]** 6/19 15/10
**extreme [1]** 13/10

**F**
**F-O-L-E-Y [1]** 2/6
**fact [19]** 3/22 4/4 8/2 9/15 11/14 11/14 11/15 11/16 11/22 13/18 22/20 23/2 23/24 27/14 29/8 29/18 30/13 34/14 35/8
**factor's [1]** 31/5
**factors [1]** 30/10
**facts [1]** 18/24
**factual [1]** 12/3
**fairness [1]** 10/12
**faith [1]** 10/13
**fall [1]** 6/17
**far [3]** 15/18 31/14 34/25
**fashion [1]** 29/14
**favor [2]** 21/17 35/10
**Fax [1]** 1/22
**FCRR [1]** 1/21
**federal [1]** 17/11
**few [2]** 26/3 34/12
**filed [1]** 17/15
**filing [1]** 25/9
**financial [1]** 15/18
**find [1]** 33/10
**fine [3]** 19/8 34/7 34/9
**firearm [1]** 14/7
**firearms [1]** 14/22
**first [4]** 7/18 14/21 21/20 34/13
**focusing [1]** 14/9 22/19
**FOLEY [15]** 1/19 2/6 2/9 2/13 3/3 3/11 3/14 6/6 6/8 6/15 7/8 15/25 24/17 29/9 34/2
**Foley's [1]** 6/4
**Foods [1]** 25/8
**force [3]** 4/8 4/11 8/9

**F**
foregoing [1] 36/10
foreign [18] 16/24 16/25 21/11 21/12
21/22 21/25 22/7 22/16 23/2 23/23 24/2
31/1 31/2 32/4 32/16 32/18 35/18 35/25
forth [2] 7/2 13/20
four [1] 35/23
frankly [1] 15/17
frozen [1] 12/20
FSIA [1] 17/22
fully [1] 7/5
function [1] 22/7
functionally [1] 34/21
functions [1] 21/25
fundamentally [1] 24/11
further [6] 23/9 23/10 23/14 23/16
33/7 33/13
furtherance [1] 23/23

**G**
gained [1] 29/17
gaining [2] 28/25 29/2
Galadari [7] 16/23 17/10 17/10 17/12
17/15 17/20 19/8
Galaradi [1] 26/13
GARY [3] 1/14 2/4 3/1
gave [1] 29/9
GENERALE [2] 1/6 2/23
Georgette [3] 1/21 36/12 36/13
Georgetteb25 [1] 1/22
given [1] 6/18
gmail.com [1] 1/22
good [2] 2/19 10/13
governed [1] 16/17
government [1] 15/3
grant [3] 5/11 20/12 21/24
granted [2] 3/16 4/22
great [2] 2/12 2/18
grounds [4] 8/19 8/25 29/9 31/13
guaranty [1] 35/15
guess [2] 10/25 12/12
guys [2] 2/14 15/4

**H**
Hackensack [1] 1/13
handle [1] 2/10
happening [1] 33/19
happy [1] 24/23
harm [1] 14/7
harms [1] 9/20
having [2] 10/3 25/19
head [1] 6/23
hear [2] 24/18 34/10
held [1] 32/19
help [1] 34/25
helpful [1] 15/10
Hezbollah [1] 14/14
hiding [1] 29/11
highlights [1] 7/23
hijacking [1] 14/3
hold [3] 10/18 16/12 32/22
holding [1] 32/15
honestly [1] 14/24
Honor [31] 3/13 4/3 4/16 4/20 5/8 5/14
6/1 6/3 6/22 7/5 7/13 7/16 8/23 9/17

11/11 12/17 14/24 16/3 17/9 18/9 18/23
19/1 21/20 24/21 25/5 25/17 25/21
30/23 33/9 34/4 36/3
Honor's [1] 35/5
HONORABLE [1] 1/10
HOSTETLER [2] 1/17 2/7

**I**
idea [1] 27/5
imagination [1] 30/24
imagine [2] 28/13 33/17
immunity [20] 4/2 4/8 4/15 4/25 5/2
5/11 5/14 6/12 6/19 8/8 8/9 9/6 19/21
20/3 20/12 25/4 25/11 25/18 28/3 28/11
immunity-wise [1] 28/11
impair [1] 31/19
impaired [1] 31/19
impede [1] 31/19
impeded [1] 31/17
impeding [1] 33/2
important [1] 30/10
in [151] 3/8 3/17 3/22 3/24 4/4 4/4 4/9
5/17 6/5 6/9 6/9 6/10 6/16 6/18 7/2 8/1
8/12 8/13 8/14 9/22 9/23 9/25 10/13
10/13 10/22 11/5 11/8 11/12 11/12
11/18 11/19 11/24 12/2 12/2 12/4 12/6
12/9 12/10 13/11 13/12 13/18 13/19
13/20 13/22 14/10 14/16 14/17 14/23
14/25 15/5 15/9 15/15 15/16 15/17 16/1
16/10 16/16 16/17 16/18 16/21 16/23
17/1 17/4 17/7 17/10 17/11 17/15 17/16
17/18 17/20 17/25 18/5 18/7 18/13
18/22 19/5 19/8 20/8 21/2 21/4 21/4
21/7 21/11 21/14 21/15 21/17 21/18
21/22 22/12 22/20 22/23 23/3 23/15
23/18 23/20 23/23 23/24 24/18 24/23
25/6 26/1 26/6 26/11 26/11 26/13 26/16
27/2 27/7 27/11 27/17 27/23 28/1 28/1
28/4 28/5 28/8 28/9 28/20 28/21 29/8
29/11 29/13 29/13 29/17 29/22 29/24
30/2 30/19 30/24 31/3 31/4 31/7 31/10
31/11 31/14 31/15 31/20 31/23 32/3
32/10 32/12 33/1 33/4 33/19 34/14 35/3
35/10 35/11 35/19 35/22 36/10
INA [2] 13/24 14/2
inasmuch [1] 30/14
include [3] 14/19 15/7 15/13
includes [1] 14/20
incorporated [1] 14/1
incorporates [1] 13/24
independent [7] 3/6 3/8 9/25 10/1
10/21 11/2 11/15
individuals [1] 16/14
indulge [1] 34/5
inferences [1] 26/20
injured [1] 26/9
injury [2] 9/14 12/7
instance [1] 30/9
Instead [1] 22/25
instrumentality [3] 6/22 6/25 17/22
Insurance [1] 12/15
interest [22] 5/9 5/18 8/12 12/5 16/6
16/16 16/17 16/22 17/1 17/7 17/16 18/1
18/17 18/18 20/8 20/8 27/7 28/20 29/17
30/14 31/16 31/20

interesting [3] 5/7 36/5 36/5
interests [9] 7/15 8/10 16/10 18/21
19/6 19/10 30/12 30/16 30/18
international [2] 4/8 35/10
internationally [1] 14/4
intervene [13] 2/25 3/15 4/1 5/1 5/8
8/17 19/17 20/2 28/19 33/12 33/18
33/23 33/25
intervenes [1] 33/15
intervenor [3] 5/4 8/3 8/6
intervention [18] 4/5 4/22 7/10 16/4
18/19 18/20 18/20 19/14 22/21 25/6
25/18 28/24 28/24 30/5 31/25
35/1 35/2
invented [1] 31/10
inventories [1] 24/8
invocation [1] 11/1
invoking [2] 27/18 31/13
involve [1] 31/13
involved [1] 16/24
involving [1] 31/18
IRA [2] 13/10 26/9
Ireland [1] 13/11
isn't [1] 10/5
issue [6] 11/18 11/19 18/1 25/23 26/16
34/13
issues [3] 28/11 33/15 36/5
itself [1] 3/19

**J**
Jammal [3] 1/16 2/14 3/3
January [1] 1/5
Jerez [1] 15/10
Jersey [1] 1/13
joined [2] 2/4 16/7
joining [2] 2/20
JTB [51] 2/17 3/19 3/22 3/23 4/1 4/14
5/3 5/14 5/18 5/24 6/11 6/19 6/21 6/21
7/12 7/20 7/20 7/24 8/20 9/3 10/13
11/18 13/13 14/12 14/13 14/21 18/5
18/22 20/13 23/19 23/20 23/24 25/5
25/7 25/10 25/14 25/15 26/7 27/8 27/11
27/17 28/6 28/20 28/25 29/18 30/14
30/14 33/21 34/16 34/23 34/23
JTB's [10] 5/10 5/13 10/15 13/12 16/9
20/8 27/7 27/12 28/14 33/20
JUDGE [3] 1/11 2/19 33/20
judgment [21] 9/16 9/19 10/6 10/8
10/14 11/14 12/22 12/22 12/23 13/7
13/13 21/16 21/16 25/22 26/17 27/8
27/9 28/2 32/13 32/23 35/19
jump [1] 24/23
jurisdiction [4] 17/14 21/23 23/2 25/24

**K**
keeps [1] 11/23
kick [1] 25/19
kidnapping [1] 14/3
kind [5] 4/23 11/8 16/19 20/11 22/18
kinds [1] 30/4
knew [1] 30/11
know [19] 4/14 8/1 11/9 11/21 12/1
15/1 15/14 16/20 19/1 22/23 25/14 27/9
28/12 28/20 30/1 30/3 30/3 30/6 34/19
known [1] 30/12

**L**

**language** [1]  35/21
**large** [2]  26/4 29/8
**late** [1]  29/10
**law** [20]  2/20 5/9 5/12 6/18 7/20 8/1 10/2 10/20 10/22 11/3 11/20 11/23 12/6 16/11 18/18 20/10 21/9 31/23 32/21
**lawsuit** [3]  26/18 31/17 31/18
**lawyer** [1]  34/18
**laying** [1]  35/4
**lead** [1]  27/25
**least** [2]  8/8 10/13
**leave** [1]  5/1
**Lebanese** [27]  5/9 5/12 5/22 6/18 7/20 10/1 10/2 10/10 10/11 10/15 10/16 10/17 10/20 10/22 10/23 11/3 11/3 11/20 11/23 12/6 16/11 11/8 18/18 20/10 23/19 23/24 24/4 30/18
**Lebanon** [6]  10/24 21/2 21/5 21/16 23/18 32/25
**Lebanon's** [3]  24/7 24/14 24/16
**legal** [6]  8/2 8/3 9/25 10/1 11/2 11/16
**length** [1]  30/11
**less** [1]  15/18
**letter** [2]  19/1 32/5
**letters** [1]  28/13
**leverage** [1]  15/4
**levying** [1]  10/15
**liabilities** [2]  24/8 24/9
**LIBAN** [1]  1/6
**license** [1]  12/8
**likely** [1]  9/20
**limited** [1]  28/22
**links** [1]  13/14
**liquidate** [2]  10/19 10/19
**liquidated** [2]  11/20 24/9
**liquidation** [14]  5/22 17/10 17/21 17/25 21/4 22/7 23/7 23/18 23/25 24/4 24/12 26/14 31/18 35/11
**liquidator** [40]  2/17 3/17 3/18 3/22 4/4 4/9 4/24 5/11 5/17 5/24 6/17 6/18 6/20 7/22 8/10 8/11 8/12 8/20 9/4 9/9 12/5 16/11 18/2 18/4 18/5 18/5 18/24 19/10 19/19 19/22 20/1 20/5 20/7 20/12 20/14 31/16 32/5 32/13 34/24 35/25
**liquidator's** [1]  31/20
**liquidators** [4]  16/13 16/25 17/1 34/14
**list** [2]  11/21 24/15
**listening** [1]  3/8
**lists** [1]  14/2
**litigate** [1]  17/7
**litigated** [1]  17/18
**litigating** [1]  30/15
**litigation** [1]  26/21
**little** [2]  11/12 16/18
**Livan** [1]  2/23
**LLC** [2]  1/12 2/4
**LLP** [1]  1/17
**local** [1]  3/5
**locations** [1]  6/10
**logic** [1]  20/6
**logical** [2]  13/10 20/11
**longer** [7]  7/20 15/3 18/22 23/19 27/1

28/6 28/14
**look** [4]  11/18 12/19 14/1 35/21
**lose** [3]  4/8 4/11 8/9
**losing** [1]  28/25
**lot** [1]  8/9
**lower** [2]  10/22 11/16

**M**

**main** [1]  26/19
**manner** [1]  23/3
**many** [2]  31/7 35/21
**march** [1]  10/9
**marshal** [1]  16/14
**material** [5]  14/14 14/19 15/7 15/17 15/18
**matter** [12]  5/23 11/22 17/13 18/20 25/16 25/24 28/24 31/17 31/19 35/20 36/8 36/10
**maybe** [2]  24/25 25/1
**mean** [18]  4/11 4/12 4/14 9/5 9/14 9/15 9/16 11/9 12/17 18/2 20/4 21/14 21/17 24/25 25/12 26/19 29/19 34/7
**meaning** [1]  15/2
**means** [3]  4/25 23/18 23/20
**mechanical** [1]  1/24
**mechanism** [2]  5/16 18/24
**meet** [1]  28/16
**Megabop** [2]  32/3 33/6
**mention** [1]  17/3
**mentioned** [2]  25/22 26/11
**merely** [1]  10/7
**merit** [1]  12/23
**meritless** [2]  33/11 33/13
**merits** [3]  9/21 10/9 30/15
**met** [1]  30/8
**MICHAEL** [3]  1/14 2/3 3/1
**middle** [1]  29/22
**might** [3]  4/24 5/2 18/21
**million** [4]  11/24 12/3 18/13 27/2
**misnomer** [1]  16/18
**Mister** [1]  2/15
**moment** [5]  5/19 5/20 25/11 29/20 34/5
**money** [7]  9/15 11/5 11/5 11/8 11/14 11/18 25/22
**more** [6]  19/7 19/21 29/3 33/16 34/16 34/21
**Moreover** [1]  32/19
**Morse** [1]  2/20
**most** [4]  16/15 23/20 26/25 30/10
**motion** [21]  3/15 3/25 3/25 4/22 4/23 8/16 8/17 8/17 17/5 17/15 22/25 23/1 26/12 28/23 29/9 29/13 30/1 30/12 33/10 33/13 33/16
**motionless** [1]  31/25
**motions** [5]  2/24 3/11 3/17 3/21 19/9
**mountains** [2]  29/11 30/2
**move** [1]  26/18
**moves** [1]  25/15
**moving** [2]  8/24 9/2
**Mr. Baasiri** [1]  7/11
**Mr. Radine** [1]  24/19
**Mr. Rivkin** [3]  6/7 7/19 25/13
**Ms. Foley** [11]  2/9 3/11 3/14 6/6 6/8 6/15 7/8 15/25 24/17 29/9 34/2

**Ms. Foley's** [1]  6/4
**Ms. Morse** [1]  2/20
**much** [5]  6/16 10/22 19/21 29/24 32/5
**Muhammad** [3]  1/16 2/15 3/2
**multiple** [1]  31/14
**must** [1]  31/23

**N**

**name** [1]  24/20
**narrower** [1]  14/25
**nature** [1]  21/11
**need** [3]  13/6 21/10 34/10
**needs** [2]  32/25 33/18
**never** [1]  17/14
**NEW** [8]  1/1 1/4 1/13 9/23 12/2 18/11 18/13 27/2
**next** [1]  20/17
**nobody** [1]  6/21
**non** [1]  32/18
**non-foreign** [1]  32/18
**none** [4]  14/12 14/13 29/12 35/23
**nonetheless** [1]  3/17
**nonparty** [1]  27/19
**Nor** [1]  33/5
**normal** [1]  10/17
**normally** [2]  10/8 10/11
**Northern** [1]  13/11
**note** [2]  27/12 35/15
**noted** [4]  25/5 25/17 27/24 30/23
**nothing** [3]  24/4 24/10 29/7
**nuclear** [1]  14/5
**number** [4]  2/22 7/23 13/14 13/14
**NW** [1]  1/18

**O**

**obstacle** [4]  10/2 10/21 11/2 11/16
**obstacles** [1]  9/25
**obtain** [1]  10/3
**obviously** [2]  31/5 33/10
**occurring** [1]  11/23
**odd** [1]  5/10
**OFAC** [5]  9/24 12/6 12/9 12/21 18/15
**officer** [1]  33/22
**official** [1]  6/24
**officials** [1]  7/23
**often** [1]  9/15
**Oh** [1]  12/13
**once** [3]  17/12 30/13 33/2
**ones** [1]  24/9
**ongoing** [12]  7/21 7/24 21/10 22/7 22/16 22/17 22/23 23/4 23/19 34/16 35/10 35/18
**operate** [1]  24/1
**operates** [1]  32/20
**operation** [4]  10/21 11/3 11/6 16/10
**opinion** [1]  9/8
**opposed** [1]  33/20
**optional** [1]  26/10
**oral** [2]  1/10 2/24
**Orchard** [2]  32/3 33/6
**order** [3]  16/7 32/23 32/24
**orderly** [2]  24/5 24/7
**ordinary** [1]  11/12
**organization** [1]  26/9
**organizations** [3]  26/4 26/5 26/8

**O**

original [3]  8/15 16/8 17/8
OSEN [5]  1/12 1/14 2/4 2/4 3/2
otherwise [1]  25/6
overrides [1]  33/6
own [2]  5/12 28/8
ownership [2]  20/8 20/9
owns [1]  27/2

**P**

p.m [1]  1/5
page [1]  20/17
papers [2]  7/3 31/7
parallel [5]  21/2 21/7 30/23 35/13 35/16
parallelness [1]  22/18
part [4]  13/23 13/24 27/12 31/5
participate [2]  2/10 26/13
particular [1]  8/14
particularly [1]  21/23
parties [9]  3/4 7/10 8/4 8/5 9/22 12/9 17/1 17/20 26/24
partner [1]  6/4
party [20]  5/17 8/11 13/1 13/4 13/8 13/15 16/8 16/16 16/17 16/21 17/7 17/8 17/16 17/25 26/11 27/18 27/19 28/7 29/14 32/11
pass [1]  20/13
patent [1]  8/7
pay [4]  9/15 10/20 11/15 11/22
payment [1]  11/19
pays [1]  24/9
pendency [1]  5/22
pending [1]  36/2
people [2]  9/15 14/7
per [1]  28/2
perfectly [1]  24/21
Perhaps [1]  7/23
permissive [4]  18/20 28/18 28/23 35/1
permitted [3]  5/1 20/2 33/12
persons [1]  14/4
perspective [1]  20/12
pertain [1]  8/20
petition [1]  31/24
Phone [1]  1/21
phrase [2]  16/19 16/21
picture [1]  9/4
place [3]  6/9 10/22 29/11
plaintiff [13]  1/12 9/13 9/21 12/22 14/6 14/13 15/20 17/2 21/13 21/14 23/9 26/9 35/21
plaintiffs [16]  1/4 2/4 3/1 10/2 10/9 10/22 12/7 13/2 13/12 16/20 21/3 21/18 22/20 24/13 26/13 31/2
plaintiffs' [4]  11/20 12/18 13/9 35/6
Plaza [1]  1/13
pleases [1]  6/14
point [8]  6/18 14/12 20/11 22/14 22/22 33/11 34/8 35/5
points [4]  7/16 25/1 34/9 34/12
policy [10]  10/23 10/24 23/9 23/11 23/14 23/17 23/24 24/2 24/14 24/16
posed [1]  2/11
possession [2]  28/8 28/9

possible [1]  23/21
possibly [1]  21/4
pot [2]  11/5 11/8
Potvin [1]  27/23
practicable [1]  31/17
practical [2]  26/25 31/19
practice [5]  26/6 29/13 30/1 33/13 33/16
precedent [1]  19/7
precisely [2]  4/6 11/10
prefer [2]  19/4 20/16
prejudiced [1]  28/17
present [2]  9/25 35/23
presumably [3]  24/2 28/9 28/22
pretty [2]  12/19 24/11
prevail [1]  21/4
PRICE [1]  1/19
principle [1]  26/22
prioritization [3]  11/17 11/19 24/14
priority [2]  11/3 10/23
pro [1]  24/10
problem [2]  8/13 12/4 18/7
problematic [1]  30/6
problems [5]  25/22 27/25 28/4 28/10 28/17
procedural [5]  5/15 5/15 10/12 18/24 34/15
procedurally [3]  4/5 5/24 24/6
procedure [3]  11/7 24/5 24/12
proceed [3]  17/7 17/25 20/4
proceeded [1]  17/22
proceeding [22]  5/22 10/13 21/22 21/25 22/1 22/2 22/3 22/7 22/10 22/12 22/12 22/15 22/16 22/24 23/3 23/5 23/7 23/18 35/13 35/13 35/14 35/18
proceedings [6]  1/24 21/11 29/15 30/24 35/17 36/10
process [1]  24/7
produced [1]  1/24
profoundly [1]  33/11
prong [1]  7/25
pronounce [1]  24/20
property [11]  5/10 5/13 14/8 16/10 16/15 16/15 20/8 20/9 31/18 31/21 34/23
proposed [2]  8/3 8/6
prosecution [1]  16/20
protect [1]  31/20
protected [1]  14/4
protections [1]  19/14
protective [1]  24/6
protects [1]  30/14
provide [1]  14/14
provided [1]  10/12
provision [1]  15/13
punished [1]  23/20
pursuant [1]  3/5
put [1]  7/2
putative [1]  2/14
puts [1]  30/15

**Q**

question [8]  4/22 5/7 5/20 6/11 7/5 7/7 8/15 8/22
questions [3]  2/11 7/8 24/24

quite [1]  8/23
quote [2]  21/24 32/7
quote/unquote [1]  21/24

**R**

R-A-D-I-N-E [1]  2/3
R-I-V-K-I-N [1]  2/8
RADINE [4]  1/14 2/3 3/1 24/19
raise [2]  33/15 34/13
raised [4]  5/20 24/25 33/14 34/8
raising [1]  4/3
rata [1]  24/10
rather [1]  12/18
reach [1]  12/20
real [9]  5/17 8/11 16/16 16/17 16/21 17/1 17/7 17/16 17/25
reality [5]  5/16 7/24
really [3]  7/24 12/17 17/4
reason [2]  23/24 26/22
reasons [1]  4/3
rebut [1]  34/11
rebuttal [1]  34/12
received [1]  11/16
receivers [1]  16/13
recognition [4]  5/21 10/10 11/13 31/24
recognize [3]  5/16 17/24 20/7
recognized [1]  4/6
recognizes [2]  5/9 21/10
recognizing [2]  5/12 19/5
record [1]  36/10
recorded [1]  1/24
recording [2]  3/6 3/9
records [2]  34/22 34/23
recover [1]  9/13
recovering [1]  23/11
redress [1]  12/7
redressability [8]  9/3 9/7 9/12 9/20 11/23 12/4 12/10 25/21
redressable [3]  9/14 9/16 12/19
referenced [1]  26/5
referring [1]  18/11
refused [1]  32/7
regard [8]  8/8 11/2 12/4 19/3 19/21 19/24 35/1 35/6
regardless [1]  32/20
related [2]  4/7 19/20
relationship [1]  13/4
relevant [1]  13/23
relief [1]  21/3
relies [1]  14/6
remain [2]  5/23 9/8
remained [1]  3/24
remedy [1]  9/20
repeat [1]  34/6
reply [1]  17/4
reporter [3]  1/21 3/7 3/10
reporting [1]  29/18
represent [6]  2/13 2/14 2/16 7/10 7/12 8/6
representation [3]  7/9 7/25 8/14
representative [2]  32/17 32/18
representing [4]  2/9 3/1 3/2 7/11
Republic [1]  15/11
requested [1]  31/15

**R**

**requesting [1]** 28/12
**require [1]** 17/5
**required [2]** 22/5 22/6
**requirement [2]** 12/25 13/3
**requirements [1]** 32/8
**requires [4]** 12/20 17/6 21/7 31/9
**reserve [1]** 36/6
**respect [4]** 5/21 21/12 23/1 35/18
**respond [2]** 34/3 34/4
**response [2]** 6/11 24/18
**responsive [1]** 7/5
**rest [1]** 34/23
**result [2]** 26/20 29/21
**Returning [1]** 8/15
**right [27]** 2/15 3/11 12/16 12/21 14/1
14/11 15/16 15/23 16/5 18/20 19/12
19/17 22/5 22/5 22/6 24/17 27/20 28/3
28/15 28/24 29/1 29/6 30/20 33/7 34/1
35/2 36/4
**rights [1]** 20/9
**risk [2]** 12/15 30/16
**RIVKIN [7]** 1/19 2/8 3/3 6/4 6/7 7/19
25/13
**ROBERT [1]** 1/3
**rogatory [1]** 28/13
**role [1]** 25/14
**routine [1]** 10/17
**routinely [2]** 16/12 16/21
**RPR [1]** 1/21
**rule [13]** 8/1 16/5 16/6 16/17 16/19
17/3 17/5 17/15 19/3 19/3 20/16 26/10
27/4
**Rule 17 [2]** 16/17 16/19
**Rule 24 [2]** 8/1 19/3
**Rule 25 [6]** 16/5 17/3 17/15 19/3 20/16
26/10
**Rule 69 [1]** 27/4
**rules [2]** 3/5 19/11
**running [3]** 25/14 29/18 33/21
**runs [1]** 33/24

**S**

**sabotage [1]** 14/3
**SAL [3]** 1/7 1/16 2/24
**satisfied [2]** 19/2 19/15
**satisfies [1]** 19/10
**saying [2]** 23/6 30/1
**says [7]** 13/22 14/6 14/9 14/24 16/6
21/23 35/21
**second [13]** 6/5 10/18 10/25 12/24
13/3 16/24 16/25 17/23 19/7 21/21 30/9
32/19 35/9
**Section [4]** 13/24 13/25 14/2 15/16
**Section 1182 [4]** 13/24 13/25 14/2
15/16
**see [1]** 25/23
**seek [3]** 10/10 21/3 35/25
**seeking [4]** 31/24 32/12 32/17 35/24
**seem [1]** 33/24
**sense [2]** 11/12 14/24
**sentence [1]** 6/10
**separate [1]** 19/1
**separately [1]** 8/17

**September [1]** 36/12
**session [1]** 3/6
**set [2]** 13/20 33/20
**seven [3]** 14/2 14/12 14/18
**seventh [1]** 14/9
**severe [1]** 23/21
**shared [1]** 27/4
**shouldn't [2]** 26/23 28/18
**show [1]** 33/21
**showed [1]** 26/11
**shows [1]** 31/23
**shut [2]** 23/21 24/2
**side [1]** 17/19
**similar [2]** 21/11 22/13
**similarly [3]** 21/25 22/8 22/9
**simple [2]** 10/16 12/20
**simply [8]** 9/18 17/11 22/22 30/1 34/11
35/17 35/20 36/2
**sitting [1]** 18/13
**situation [4]** 4/24 5/16 9/19 11/12
**six [1]** 14/21
**slow [5]** 29/8 29/10 29/15 29/20 35/2
**slowed [2]** 29/21 33/12
**SOCIETE [2]** 1/6 2/23
**solely [1]** 7/22
**somewhat [1]** 28/22
**somewhere [2]** 13/5 13/19
**sorry [2]** 6/2 33/19
**sort [9]** 5/21 7/7 10/9 10/12 10/25
14/18 16/14 25/14 30/16
**sought [1]** 31/11
**Sounds [1]** 29/4
**sovereign [23]** 4/1 4/8 4/15 4/25 5/2
5/11 5/13 6/12 6/19 6/23 8/8 8/9 9/6
19/21 20/3 20/12 21/12 25/4 25/7 25/11
25/18 26/14 28/3
**sovereignty [5]** 4/7 19/20 25/8 25/14
30/13
**sovereignty-related [2]** 4/7 19/20
**speak [1]** 6/23
**speaks [2]** 6/19 6/21
**specific [5]** 13/18 15/6 15/15 24/24
32/22
**specified [1]** 15/5
**speculative [2]** 11/9 11/9
**Speedway [1]** 27/24
**Square [1]** 1/17
**stages [1]** 35/3
**stand [2]** 12/9 33/4
**standard [4]** 12/2 26/1 26/6 31/11
**start [1]** 25/4
**state [3]** 2/1 6/23 17/14
**states [5]** 1/1 1/3 1/11 11/25 33/3
**statute [2]** 15/20 15/22
**statutory [1]** 32/8
**stay [1]** 32/6
**stenography [1]** 1/24
**still [2]** 11/4 30/7
**stop [2]** 10/16 11/13
**stretch [1]** 30/24
**strict [1]** 32/8
**strongly [1]** 12/18
**subject [5]** 17/13 18/6 22/19 25/24
31/18
**submitted [1]** 7/19

**subordinate [1]** 6/24
**substantial [1]** 14/8
**substantive [1]** 3/21
**substitute [4]** 2/25 20/3 26/23 27/25
**substituted [4]** 5/17 16/1 16/7 27/9
**substitution [19]** 3/16 3/25 4/6 4/23
8/18 16/4 16/5 18/8 18/22 19/4 19/6
19/13 22/21 26/18 28/2 28/16 28/17
30/6 31/25
**succeed [1]** 21/8
**sue [1]** 27/12
**sued [1]** 27/11
**sufficient [1]** 11/8
**suggest [2]** 25/6 33/5
**suggesting [2]** 32/1 33/5
**suggests [2]** 12/3 21/2
**suing [2]** 27/12 27/13
**suit [1]** 18/6
**Suite [5]** 1/13 1/17
**support [5]** 14/14 14/19 15/7 15/7
15/18
**surplus [2]** 10/20 11/22
**surprising [1]** 17/4
**systemic [2]** 24/5 24/7

**T**

**table [1]** 35/4
**teaches [1]** 25/8
**technical [1]** 7/7
**Technically [1]** 16/16
**terms [2]** 13/22 19/5
**terrorism [17]** 12/15 12/24 12/25 13/3
13/6 13/11 13/14 13/15 13/18 13/19
13/23 14/11 14/17 14/25 15/6 15/12
23/13
**terrorist [8]** 13/1 13/4 13/8 13/15
13/25 26/3 26/5 26/8
**terrorists [1]** 26/2
**theory [3]** 5/23 25/12 33/25
**therefore [2]** 10/4 16/20
**third [6]** 9/22 12/9 12/25 13/3 27/18
28/7
**third-party [1]** 27/18
**though [2]** 18/2 19/24
**thought [2]** 6/10 18/14
**threaten [2]** 14/10 14/23
**three [2]** 12/20 13/14
**through [4]** 4/5 6/23 12/8 14/18
**time [5]** 3/5 6/18 25/9 29/24 30/11
**timeliness [2]** 30/10 30/11
**timely [1]** 29/14
**times [2]** 31/7 35/21
**title [3]** 35/22 36/1 36/1
**Title 11 [2]** 35/22 36/1
**together [1]** 21/18
**told [1]** 30/16
**torture [3]** 15/13 15/15 15/18
**toward [1]** 11/21
**towards [1]** 24/15
**track [1]** 19/7
**transcript [4]** 1/10 1/24 3/9 36/10
**transcription [1]** 1/24
**transferal [1]** 26/20
**transferee [2]** 16/7 17/6
**transferees [1]** 16/15

**T**

transferred [2]  16/6 16/10
translate [1]  5/3
TRIA [17]  12/11 12/13 12/18 12/19 12/19 13/7 13/22 14/1 14/16 14/17 15/1 15/5 15/12 15/16 15/17 25/24 26/1
TRIA's [1]  13/22
tries [1]  17/2
Trikona [3]  32/11 32/15 33/4
Trikona's [1]  32/15
trouble [1]  29/12
true [5]  4/18 5/4 21/3 32/21 33/17
Trust [3]  1/16 2/14 3/3
trustees [1]  16/13
try [1]  24/6
trying [3]  9/18 19/18 28/21
type [2]  19/5 24/11
types [1]  16/13
typical [2]  9/18 24/11

**U**

U.S [19]  10/12 10/14 11/13 22/10 22/12 22/15 22/23 23/9 23/10 23/17 23/23 24/2 30/25 31/10 32/3 32/6 32/6 35/12 35/19
ultimately [1]  23/10
unable [1]  29/15
unclear [2]  27/15 30/18
under [25]  5/9 5/12 7/20 10/19 11/20 12/6 12/11 13/7 14/15 15/12 15/12 17/22 18/18 18/24 20/10 22/6 23/19 24/13 24/14 25/12 34/22 34/23 35/9 36/1 36/1
underlying [1]  35/13
undisputed [1]  16/9
unfair [2]  24/6 24/11
unfortunately [2]  6/8 15/15
unfreeze [3]  13/6 13/12 15/5
unfreezing [1]  15/1
UNGAR [3]  1/15 2/5 3/2
UNITED [4]  1/1 1/3 1/11 11/24
University [1]  1/13
unliquidated [2]  10/3 24/9
unnecessary [1]  27/25
unquote [1]  21/24
unrelated [1]  26/8
unusual [2]  4/24 33/24
up [1]  26/12
upset [1]  24/13
us [4]  19/9 25/25 27/4 27/15

**V**

validity [1]  10/14
version [1]  31/25
versus [2]  2/23 15/11
via [1]  12/10
viability [1]  19/25
viable [2]  5/23 23/10
violent [1]  14/3

**W**

wants [3]  3/9 15/21 32/14
Washington [2]  1/17 1/18
ways [1]  30/3
weapon [1]  14/5

wedding [1]  29/4
weigh [1]  6/4
whereas [1]  27/19
whoever's [1]  28/9
whole [1]  11/7
wholly [1]  31/10
why [14]  4/4 5/14 9/16 10/5 16/1 18/19 19/9 20/16 23/24 28/15 28/18 28/23 28/23 33/15
win [1]  9/21
wise [1]  28/11
within [1]  6/24
without [3]  8/20 18/21 25/19
won [1]  10/9
won't [3]  9/13 9/13 21/14
words [1]  17/18
world [1]  13/19
wouldn't [8]  11/6 18/19 21/15 22/11 22/11 25/7 25/7 25/10
write [1]  15/21
wrong [1]  13/22
wrote [2]  15/21 32/5

**Y**

YORK [7]  1/1 1/4 9/24 12/2 18/11 18/13 27/2

# A-1272

Clerk's Office
Filed Date:  8/6/21

U.S. DISTRICT COURT
EASTERN DISTRICT OF
NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ROBERT BARTLETT, et al.,

                Plaintiffs,

     -against-

SOCIÉTÉ GÉNÉRALE DE BANQUE AU
LIBAN SAL, et al.,

                Defendants.

-------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
19-CV-00007 (CBA) (TAM)

**AMON, United States District Judge:**

       Plaintiffs brought this case under the Anti-Terrorism Act, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), against a group of Lebanese banking institutions. I previously granted in part and denied in part a motion to dismiss brought by all Defendants for lack of personal jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  Presently before the Court is Defendant Jammal Trust Bank ("JTB") and proposed intervenor Dr. Muhammad Baasiri's (collectively, "Moving Defendants'") Motion to Substitute, Intervene, and Dismiss.  For the reasons stated below, the motion is DENIED in part and GRANTED in part.

## BACKGROUND

       I assume the parties' familiarity with the facts, which are set forth more fully in the Memorandum and Order denying the previous motion to dismiss.  (See ECF Docket Entry ("D.E.") # 163.)  In short, Plaintiffs or their family members are United States service members who were allegedly injured in a series of terror attacks perpetrated by Hezbollah in Iraq between 2004 and 2011.  Defendants are Lebanese banks that Plaintiffs allege provided financial services to

1

Hezbollah and Hezbollah affiliates.  Hezbollah is an entity dedicated to religiously inspired terrorism, and in 1997 was designated by the United States as a Foreign Terrorist Organization. Plaintiffs allege that Defendants knowingly provided Hezbollah with financial services, including access to the U.S. financial system through correspondent bank accounts in New York, and facilitated Hezbollah's terrorist attacks by enabling the organization's operational funding.

Plaintiffs filed their complaint on January 1, 2019.  Approximately nine months later, Defendant JTB was designated by the United States government as a Specially Designated Global Terrorist ("SDGT").  Authorities froze the bank's assets—including at least $8 million in a New York bank account.  In September 2019, JTB sought liquidation and was placed in receivership pursuant to Article 17 of Law 110 of Lebanese law.  Lebanon's Central Bank confirmed a liquidator, Dr. Baasiri, who is statutorily charged with overseeing JTB's liquidation under the supervision and control of the Lebanese Central Bank.  The Lebanese Central Bank is a public entity established under Lebanese law.

The liquidator must prioritize JTB's depositors in disbursing its assets.  Plaintiffs are not depositors.  As non-depositors, they may submit claims to the liquidator; but those claims will not be paid if there is no surplus after the bank's depositors have been paid.  Moving Defendants anticipate that in JTB's liquidation there will be no surplus.  Specifically, they expect JTB's assets to pay about 90% of depositors, with the remainder to be paid by the Lebanese Government.  If Plaintiffs were to obtain a judgment and sought to submit a claim to the liquidator based upon that judgment, they would need to obtain recognition of the judgment by a Lebanese court before the bank's liquidation was complete.  A typical Lebanese bank liquidation takes approximately two to five years.

2

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a complaint for "lack of subject-matter jurisdiction."  A motion to dismiss for lack of standing is properly brought under Rule 12(b)(1) because a party must have standing in order to invoke a court's power to adjudicate cases under Article III of the United States Constitution.  See McCrory v. Adm'r of Fed. Emergency Mgmt. Agency, 600 F. App'x 807, 808 (2d Cir. 2015) (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)).  "Because standing is challenged on the basis of the pleadings, [the Court] accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the [plaintiff]." Connecticut v. Physicians Health Servs. of Conn., Inc., 287 F.3d 110, 114 (2d Cir. 2002) (citation and internal quotation marks omitted).  To survive a motion to dismiss for lack of Article III standing, a plaintiff must allege facts that, when accepted as true, "affirmatively and plausibly suggest that it has standing to sue." Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011).

## DISCUSSION

### I.      Motion to Substitute

Moving Defendants first move to substitute Dr. Baasiri for JTB pursuant to Federal Rule of Civil Procedure 25(c).  That Rule provides for substitution upon transfer of interest: "If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party."  "Substitution of a successor in interest . . . under Rule 25(c) is generally within the sound discretion of the trial court."  Organic Cow, LLC v. Ctr. for New Eng. Dairy Compact Research, 335 F.3d 66, 71 (2d Cir. 2003) (quoting Prop-Jets, Inc. v. Chandler, 575 F.2d 1322, 1324 (10th Cir. 1978)).  The "primary consideration" is "whether substitution will expedite and simplify the action."

Advanced Mktg. Grp., Inc., v. Bus. Payment Sys., LLC, 269 F.R.D. 355, 359 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting Taberna Capital Mgmt. v. Jaggi, 1:08-CV-11355 (DLC), 2010 WL 1424002 at *2 (S.D.N.Y. Apr. 9, 2010)).   When substitution would cause complications in discovery, this may prejudice the non-moving party such that substitution should be denied.   See Potvin v. Speedway LLC, 891 F.3d 410, 416 (1st Cir. 2018); Fashion G5 LLC v. Anstalt, No. 1:14-cv-5719-GHW, 2016 WL 7009043, at *3 (S.D.N.Y. Nov. 29, 2016) (denying substitution which would "impede plaintiff's ability to take discovery").   Substitution is inappropriate where it "would serve only to add duration, costs, and complexity to an action ... [and] would prolong rather than bring the litigation nearer to its conclusion." Advanced Mktg. Grp., 269 F.R.D. at 359.

Moving Defendants argue that a transfer of interest has occurred, because JTB's assets and rights are now controlled by the Central Bank of Lebanon and its liquidator.   Plaintiffs dispute that there has been a sufficient transfer of interest.   They argue that Dr. Baasiri is not JTB's successor and that he does not control JTB's assets outside of Lebanon—i.e., the $8 million in a New York account frozen by U.S. law.   I need not decide, however, whether the requisite transfer of interest has occurred because I agree with Plaintiffs' further contention that substitution here would complicate the proceedings and unfairly frustrate Plaintiffs' ability to obtain a judgment against the party they properly sued: JTB.   "The primary consideration in deciding a motion pursuant to Rule 25(c) is whether substitution will expedite and simplify the action." Id.   Defendants' only argument that substitution would simplify this case is that "it is legally more direct and appropriate to permit the Liquidator to raise the sovereignty-based defenses of sovereign immunity and international comity."   (D.E. # 185 at 23-24 (emphasis omitted).)   But as discussed infra, those arguments for dismissal are meritless whether they are asserted by JTB or Dr. Baasiri.

Removing JTB from this case would also needlessly complicate discovery.  See Fashion G5, 2016 WL 7009043, at *3; cf. SEC v. Collector's Coffee Inc., 451 F. Supp. 3d 294, 298 (S.D.N.Y. 2020) (granting substitution where "[t]here has been no suggestion . . . that the Dodgers will not be amenable to discovery as a nonparty through the Rule 45 subpoena process").  Removing JTB from this case would force Plaintiffs to seek third-party discovery from the bank rather than through the rules providing for automatic discovery from parties, e.g., Fed. R. Civ. P. 26.  (D.E. # 187 ("Opp'n") at 20.)  Clearing those procedural hurdles could prove especially challenging given JTB's ongoing liquidation in a distant country which, as JTB tells it, "has been in a political and economic crisis since 2019."  (D.E. # 182 ("Def. Br.") at 1.)  Indeed, JTB has been unable to communicate with its own counsel—making it all the more doubtful that the bank would readily provide third-party discovery.  (D.E. # 186 ¶ 3 ("I have never communicated with any individuals at JTB, as JTB has ceased operations pursuant to Lebanese liquidation law . . . .").)

In sum, Plaintiffs would be prejudiced by JTB's removal from this case, and Moving Defendants have identified no prejudice from JTB remaining in this case.  The motion for substitution is denied.[1]

**II.     Motion to Intervene**

Dr. Baasiri alternatively moves to intervene, either of right or permissively, pursuant to Rule 24 of the Federal Rules of Civil Procedure.  Plaintiffs oppose this motion on the merits, and also contend that the motion is procedurally defective because Dr. Baasiri has not first brought a petition pursuant to Chapter 15 of the United States Bankruptcy Code.

---

[1] Because I conclude that substitution would be inappropriate on the merits, I need not address Plaintiffs' alternate argument to deny substitution based on the application of Chapter 15 of the Bankruptcy Code.

### A.  A Chapter 15 Petition is Not Required for Dr. Baasiri to Intervene

Congress created Chapter 15 of the Bankruptcy Code through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  11 U.S.C. § 1501 et seq.  The statute adopts, nearly in its entirety, the Model Law on Cross-Border Insolvency promulgated in 1997 by the United Nations Commission on International Trade Law.  H.R. Rep. No. 109–31(1), at 105 reprinted in 2005 U.S.C.C.A.N. 88, 169 (2005).  "Chapter 15 addressed a persistent problem in cross-border liquidations: creditors would initiate multiple bankruptcy proceedings to recover assets from a debtor in jurisdictions other than the site of the principal liquidation."  Trikona Advisers Ltd. v. Chugh, 846 F.3d 22, 30 (2d Cir. 2017).  That situation "caused administrative inefficiency and also allowed creditors to bypass the priority restraints of the main bankruptcy proceeding and attempt to recover more than their fair share of the debtor's assets."  Id.  To redress these inefficiencies and debtor windfalls, Chapter 15 establishes a process by which a foreign representative of a debtor may petition a United States court and receive permission to pursue or participate in United States court proceedings in an effort to harmonize the transnational bankruptcies.  See generally 11 U.S.C. §§ 1509, 1515, 1517.

By its own terms, Chapter 15 applies only in limited circumstances.  Plaintiffs assert that Chapter 15 applies here because this is a case in which "assistance is [being] sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding."  Id. § 1501(b)(1).  The decision of the Second Circuit in Trikona Advisers undermines this claim.  846 F.3d at 30.  The district court in that case had given preclusive effect to the judgment of a Cayman Islands wind-up proceeding.  Id. at 29.  The plaintiff argued that the district court was precluded by Chapter 15 from applying collateral estoppel to that proceeding.  Id.  The Second Circuit rejected the argument: "the requirements of Chapter 15

[did] not apply," because no party was "seeking the assistance of the district court in enforcing or administering a foreign liquidation proceeding." Id. at 30.  Accordingly, to decide whether "assistance is sought . . . in connection with a foreign proceeding," 11 U.S.C. § 1501(b)(1), requires asking whether Dr. Baasiri, through his intervention, seeks assistance "in enforcing or administering a foreign liquidation proceeding," Trikona Advisers, 846 F.3d at 30.

The strictures of Chapter 15 are inapplicable here because Dr. Baasiri's motion cannot be fairly characterized as an attempt to enforce or administer a foreign liquidation proceeding. Plainly he does not seek to "enforce" the Lebanese proceeding—for example, to "seek the assistance of [this Court] in enforcing any judgment of the [Lebanese] court." Id. at 31 n.2.  Nor is his motion to intervene an attempt to "administer" the Lebanese liquidation in this Court—for example, to seek a stay of this action pursuant to Lebanese liquidation law.  E.g., United States v. J.A. Jones Constr. Grp., LLC, 333 B.R. 637, 638-39 (E.D.N.Y. 2007) (declining to grant an indefinite "stay of this action in accordance with Canadian bankruptcy law" where movant had not commenced a Chapter 15 proceeding); Orchard Enter. NY, Inc. v. Megabop Records Ltd., No. 9-cv-9607, 2011 WL 832881, at *2-3 (S.D.N.Y. Mar. 4, 2011) (same, where movant sought stay pursuant to English law).   Rather, Dr. Baasiri seeks principally to intervene so that he may assert directly the sovereign immunity–related defenses which JTB could assert only indirectly.

Chapter 15 was created to address situations in which "creditors would initiate multiple bankruptcy proceedings to recover assets from a debtor in jurisdictions other than the site of the principal liquidation."  Trikona Advisers, 846 F.3d at 30.  This is not a bankruptcy proceeding. Plaintiffs' reading would bring within Chapter 15's ambit any case involving a party undergoing a foreign bankruptcy—even where the intervenor did not seek to enforce any aspect of the foreign proceeding or to administer that proceeding in the United States court.  Should Dr.

Baasiri ever seek to enforce or administer the Lebanese liquidation in this Court without first

making a Chapter 15 petition, Plaintiffs are free to renew their objection at that time.

**B.  Dr. Baasiri May Intervene of Right.**

Dr. Baasiri moves in the alternative to intervene pursuant to Federal Rule of Civil

Procedure 24(a).  That Rule provides for "Intervention of Right":

> On timely motion, the court must permit anyone to intervene who:
>
> (1) is given an unconditional right to intervene by a federal statute;
>
> or
>
> (2) claims an interest relating to the property or transaction that is
> the subject of the action, and is so situated that disposing of the
> action may as a practical matter impair or impede the movant's
> ability to protect its interest, unless existing parties adequately
> represent that interest.

Fed. R. Civ. P. 24(a).  In considering a motion to intervene, courts "accept as true non-

conclusory allegations of the motion."  SEC v. Callahan, 2 F. Supp. 3d 427, 436 (E.D.N.Y.

2014).  Courts construe Rule 24(a)(2) liberally.  Davis v. Smith, 431 F.Supp. 1206, 1209

(S.D.N.Y. 1977), aff'd, 607 F.2d 535 (2d Cir. 1978); see 7C Fed. Prac. & Proc. Civ. (Wright &

Miller) § 1904 (3d ed.).

Dr. Baasiri is entitled to intervention of right.  First, he "claims an interest relating to the

property or transaction that is the subject of the action."  Fed. R. Civ. P. 24(a).  Specifically, by

operation of Lebanese law, Dr. Baasiri is charged with disposing of all of JTB's assets.  Plaintiffs

seek to recover from those assets in this lawsuit.  Dr. Baasiri therefore has an interest in the

outcome of this litigation.  The Second Circuit has repeatedly recognized that a liquidator has an

interest in a suit brought against the entity undergoing liquidation.  Finanz AG Zurich v. Banco

Economico S.A., 192 F.3d 240, 245 (2d Cir. 1999); Drexel Burnham Lambert Grp. Inc. v.

Galadari, 12 F.3d 317, 327-28 (2d Cir. 1993).

Because Lebanese law requires Dr. Baasiri to prioritize the claims of JTB's depositors, "disposing of the action may as a practical matter impair or impede [Dr. Baasiri's] ability to protect [his] interest." Fed. R. Civ. P. 24(a). If Plaintiffs can recover damages from JTB—and if their doing so involves a prolonged litigation requiring substantial legal defense costs—Dr. Baasiri's ability to disburse JTB's assets to its depositors may be impeded. See In re Reliance Grp. Holdings, Inc. Sec. Litig., No. 00-CV-4653 (TPG), 2004 WL 601973, at *1 (S.D.N.Y. Feb. 24, 2004) (granting intervention by liquidator of insurance company); In re $6,871,042.36, 217 F. Supp. 3d 84, 94 (D.D.C. 2016) (granting intervention of right because "this action threatens to impair the Liquidator's interest in the resolution of its claim to the [funds at issue].").

Dr. Baasiri's interest also may be inadequately represented by other parties in this litigation, including JTB. See Fed. R. Civ. P. 24(a). His status vis a vis the government of Lebanon differs from that of JTB, enabling him to make different arguments. Moreover, JTB's and Dr. Baasiri's legal interests diverge to the extent that only Dr. Baasiri is statutorily charged with disbursing the assets with priority to JTB's depositors. And since entering liquidation, JTB is no longer an ongoing banking concern—a status with practical effects that may lead to inadequate representation; for example, counsel for Moving Defendants has averred that he has "never communicated with any individuals at JTB, as JTB has ceased operations pursuant to Lebanese liquidation law and there is no one with whom I could communicate relating to this matter." (D.E. # 186 ¶ 3.) The foregoing satisfies Dr. Baasiri's "minimal" burden as to the adequacy of representation. Trbovich v. United Mine Workers of Am., 404 U.S. 528, 538 n.10 (1972).

Plaintiffs lastly argue that the motion to intervene is untimely. Moving Defendants first raised these arguments in September 2020, nearly a year after Dr. Baasiri was appointed

liquidator.  But this is not, as Plaintiffs contend, a case in which Dr. Baasiri "hid in the tall grass" until the timing was most advantageous to emerge and file the motion.  Mastercard Int'l Inc. v. FIFA, No. 06-cv-3036 (LAP), 2006 WL 3065598, at *2 (S.D.N.Y. Sept. 26, 2006), aff'd sub nom. Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377 (2d Cir 2006).  Moving Defendants' counsel began identifying potential bases for dismissal after taking over from JTB's prior counsel in January 2020.  Counsel faced communications challenges due to severe civil strife in Lebanon, which forced their client to retreat into a mountainous region where he could not easily be reached.  Even if their delay in bringing this motion ordinarily would be untimely, these are "unusual circumstances militating for" a finding of timeliness.  Floyd v. City of New York, 770 F.3d 1051, 1058 (2d Cir. 2014).

Crucially, Plaintiffs have failed to articulate any plausible prejudice that they would suffer from granting Dr. Baasiri's motion to intervene.  See Farmland Dairies v. Comm'r of N.Y. Dep't of Agric., 847 F.2d 1038, 1044 (2d Cir. 1988).[2]  The motion to intervene is granted.

### III.    Motion to Dismiss

Moving Defendants raise three arguments for dismissal: (1) that Plaintiffs lack standing to sue; (2) that the claims are barred by sovereign immunity, either under the Foreign Sovereign Immunities Act ("FSIA") or the sovereign immunity provision of the Anti-Terrorism Act, 18 U.S.C. § 2337(2); and (3) that I should exercise my discretion to dismiss the action against Moving Defendants in the interests of international comity.  I consider each argument in turn.

---

[2] Nor would Dr. Baasiri's intervention apparently require Plaintiffs to conduct additional motions practice, as the parties have already briefed his motion to dismiss.  Plaintiffs contend that they are prejudiced by having to address motions to dismiss "piecemeal."  (Opp'n at 26.)  But they can hardly complain now, having prevailed on Dr. Baasiri's motion to dismiss as is discussed infra.

### A.  JTB's Post-Filing Insolvency Does Not Deprive Plaintiffs of Standing.

Moving Defendants' first argument is that Plaintiffs lack constitutional standing to sue. Under Article III of the United States Constitution, federal courts are courts of limited jurisdiction and may hear only "cases or controversies."  U.S. Const. Art. III.  "The case-or-controversy limitation on our jurisdiction . . . manifests in three distinct legal inquiries: standing, mootness, and ripeness."  Klein v. Qlik Techs., Inc., 906 F.3d 215, 221 (2d Cir. 2018).  The standing inquiry requires plaintiff to have suffered an injury in fact, which is fairly traceable to the conduct alleged and is likely to be redressed by the judgment sought.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 559-61 (1992).  A corollary to these requirements is that courts may not issue advisory opinions. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998).  The bar of establishing redressability is real, though not especially high: even "an award of nominal damages by itself can redress a past injury."  Uzuegbunam v. Preczewski, 141 S. Ct. 792, 796 (2021).

Defendants argue that Plaintiffs lack standing because their claims against JTB are not redressable.  They assert that JTB would be unable to pay any judgment due to its insolvency, so there is no use in proceeding with this case.  The reasons why JTB could not pay differ for its U.S. and Lebanese assets.  The U.S. assets—$8 million in a New York bank account—are currently frozen because of JTB's designation as an SDGT.  Their disposition is within the discretion of United States government officials, which Moving Defendants contend is too speculative to confer standing.  The Lebanese assets would be unavailable because they are being liquidated to JTB's depositors; and there is no surplus from which Plaintiffs could be paid.  Because JTB could not pay, the argument goes, Plaintiffs' claims are not likely to be redressed by a money judgment.

In Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652 (2019), the Supreme Court rejected the argument that a case had become moot when a "bankruptcy estate has

recently distributed all of [the defendant's] assets" and the plaintiff would "be unable to convert any judgment in its favor to hard cash." Id. at 1661. The Court observed that "courts often adjudicate disputes whose 'practical impact' is unsure at best, as when 'a defendant is insolvent.'" Id. (quoting Chafin v. Chafin, 568 U. S. 165, 175 (2013)). "For better or worse, nothing so shows a continuing stake in a dispute's outcome as a demand for dollars and cents." Id. at 1660. Because mootness and standing are distinct inquiries, Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000), Tempnology does not automatically dispose of the arguments here. But courts have "an independent obligation to determine that standing exists," Summers v. Earth Island Inst., 555 U.S. 488, (2009), and so the Supreme Court's sanctioning of cases "whose practical impact is unsure at best" implicitly recognizes that the potential inability to satisfy a judgment does not defeat standing. Tempnology, 139 S. Ct. at 1661; see Wells Fargo Equip. Fin., Inc. v. Titan Leasing, Inc., 768 F.3d 741, 742 (7th Cir. 2014) ("[T]he doubtful collectability of a judgment does not affect federal subject-matter jurisdiction."). Further, the standing inquiry is "focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." Davis v. FEC, 554 U.S. 724, 734 (2008) (emphasis added); see also In re SunEdison, Inc. No. 16-10992, 2019 WL 2572250, at *10 (Bankr. S.D.N.Y. June 21, 2019). If the ongoing mootness inquiry cares not about a defendant's mid-suit insolvency, then the temporally antecedent standing inquiry should likewise disregard a defendant's pecuniary state. See Choi's Beer Shop, LLC v. PNC Merchant Servs. Co., L.P., ___ F. App'x ___, 2021 WL 1235704, at *2 (2d Cir. Apr. 2, 2021) ("[Defendant]'s postcomplaint actions . . . are relevant to determining whether [Plaintiff]'s claims later became moot, but they have no bearing on whether the complaint was adequate to begin with.").

Under the foregoing principles, JTB's mid-suit insolvency does not render Plaintiffs'

injuries non-redressable.  In essence, Moving Defendants urge the adoption of a "de facto redressability" requirement.  That is, they would have the Court assess standing based on the likelihood that a defendant will actually satisfy a money judgment.  That is not the relevant question.  The relevant question is whether the requested judgment—assuming that judgment is satisfied—would redress Plaintiffs' injuries.  There is no dispute here that a satisfied money judgment would redress Plaintiffs' injuries. [3]

For similar reasons, I reject Moving Defendants' argument that any judgment of liability against them would be an advisory opinion.  Plaintiffs seek a judgment that Moving Defendants are liable under JASTA for acts allegedly committed in the past, and for which a judgment of money damages could redress Plaintiffs' injuries.  Such a judgment would not be advisory.

To the extent it is appropriate to consider the likelihood that Defendants will actually satisfy any judgment, Moving Defendants' arguments are too speculative to warrant dismissal.  By JTB's own admission, its liquidation will likely not be completed for several years.  And the liquidation might not disburse the $8 million which is frozen in the United States by government order.  Plaintiffs contend that they could attach JTB's U.S. assets pursuant to the Terrorism Risk Insurance Act ("TRIA"), a statute which "authorizes plaintiffs holding a judgment against a terrorist party to attach blocked assets of the terrorist party or any agency or instrumentality of the terrorist party." Calderon-Cardona v. Bank of N.Y. Mellon, 770 F.3d 993, 998-99 (2d Cir. 2014). Although it is premature to determine whether TRIA would apply to any hypothetical judgment, see id. at 1000 (assessing the statute's applicability based on the facts "[a]t the time the judgment

---

[3] This distinction between the effect of a satisfied judgment and the de facto likelihood of a judgment being satisfied also explains why this case is not, as Moving Defendants contend, one in which redress depends largely on policy decisions yet to be made by government officials.  Here, the "policy decisions" which Moving Defendants postulate would not bar Plaintiffs from obtaining relief through a money judgment, but are rather exogenous hurdles to satisfying a money judgment.  There is no dispute that money would redress Plaintiffs' injuries.

13

. . . was entered"), the possibility of its application is sufficient to confer standing on plaintiffs. Tempnology, 139 S. Ct. at 1660 ("If there is any chance of money changing hands, [the] suit remains live." (emphasis added)).

Moving Defendants cite several out-of-circuit cases for the proposition that seeking a money judgment does not necessarily confer standing.  None of those cases is binding on me, and each is distinguishable.  Most of the cases cited involve the same fact pattern: a plaintiff challenged a signage regulation which barred the plaintiff from posting an advertisement; but the injury was not redressable because the proposed advertisement would have been barred by other regulations which the plaintiff did not challenge.  See Midwest Media Prop., LLC v. Symmes Township, 503 F.3d 456, 461 (6th Cir. 2007); KH Outdoor, LLC v. Clay County, 482 F.3d 1299, 1303 (11th Cir. 2007); Int'l Outdoor, Inc. v. City of Troy, 361 F. Supp. 3d 713, 719 (E.D. Mich. 2019).  Because of those additional unchallenged regulations, the plaintiffs' injuries would not have been redressed by a judgment invalidating the one challenged regulation (i.e., they still could not post their advertisements).  The same is not true here.  If Plaintiffs ultimately obtain a money judgment against Moving Defendants that is satisfied, that will redress their claims.

Even further afield is ASARCO Inc. v. Kadish, 490 U.S. 605, 614-15 (1989).  That case involved the question of whether taxpayers had standing to challenge a statute on the basis that invalidating the statute would redound to their benefit in the form of lower taxes.  The Court held that even if the statute were invalidated and the state's treasuries increased, it was unpredictable how the state would use those funds.  Id. at 615.  The case did not involve a claim between private parties for statutory damages.  Here, if Plaintiffs receive a money judgment, they would be entitled to that damages award.  Although the administration of JTB's liquidation might make it difficult for Plaintiffs to convert any judgment into cash, their situation would be unlike that of the plaintiffs

in <u>Kadish</u>, who sought a judgment that would not legally entitle them to any money at all.

### B. Sovereign Immunity

#### a. Foreign Sovereign Immunities Act

Moving Defendants next claim that they are immune from suit pursuant to the Foreign Sovereign Immunities Act.  "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." <u>Saudi Arabia v. Nelson</u>, 507 U.S. 349, 355 (1993).  The FSIA provides immunity to foreign states as well as to any "agency or instrumentality" of a foreign state.  28 U.S.C. § 1603(a); 28 U.S.C. § 1604.  The FSIA defines "agency or instrumentality" as an entity:

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).  Moving Defendants claim that they qualify as an "agency or instrumentality" of Lebanon because JTB's liquidation is carried out under the supervision and control of the Central Bank of Lebanon.  Plaintiffs contend that the FSIA provides no immunity here under <u>Dole Food Co. v. Patrickson</u>, 538 U.S. 468 (2003), which directs courts to evaluate instrumentality status at the time a lawsuit is filed; JTB is only alleged to have come under government control many months after this lawsuit was filed.

In <u>Dole Food</u>, the Supreme Court considered "whether a corporation's instrumentality status is defined as of the time an alleged tort or other actionable wrong occurred or, on the other

hand, at the time suit is filed." 538 U.S. at 471. The defendant in <u>Dole Food</u> asserted immunity as an entity whose majority "shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). The plaintiffs disputed that the defendants could assert sovereign immunity because the defendants' shares were not government-owned— and they thus lacked instrumentality status–when the lawsuit was filed. The Court agreed: because "the plain text of this provision" is "expressed in the present tense . . . instrumentality status [must] be determined at the time suit is filed." 538 U.S. at 478. The Court grounded its holding in "the longstanding principle that 'the jurisdiction of the Court depends upon the state of things at the time of the action brought.'" <u>Id.</u> (quoting <u>Keene Corp. v. United States</u>, 508 U.S. 200, 207 (1993)).

    <u>Dole Food</u> thus militates toward denying Moving Defendants' motion under the FSIA. It is undisputed that JTB lacked instrumentality status "at the time suit [was] filed." <u>Id.</u> at 478. Nonetheless, Moving Defendants attempt to avoid the holding of <u>Dole Food</u> by urging a cabined reading of the Court's opinion. They characterize that case as being limited to the following underlined portion of 28 U.S.C. § 1603(b), defining a foreign agency or instrumentality as an entity "which is an organ of a foreign state or political subdivision thereof, <u>or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof</u>." Because Moving Defendants assert instrumentality status based on the non-underlined portion of the foregoing, they say that <u>Dole Food</u> is of no moment here.

    Nothing in the Court's opinion nor in the cases that have followed supports Moving Defendants' strained reading of <u>Dole Food</u>. The Court expressly endeavored to answer the broader question of "whether a corporation's instrumentality status is defined as of the time an alleged tort or other actionable wrong occurred or, on the other hand, at the time suit is filed." 538 U.S. at 471. The Second Circuit has characterized <u>Dole Food</u> as "holding unequivocally that an entity's

status as an instrumentality of a foreign state should be 'determined at the time of the filing of the complaint.'" <u>Abrams v. Societe Nationale des Chemins de Fer Francais</u>, 389 F.3d 61, 64 (2d Cir. 2004) (quoting <u>id.</u> at 480). That characterization makes sense in light of the Court's reasoning, which focused on the plain text of the statute being "expressed in the present tense." 538 U.S. at 478. Just "like the 'ownership interest' clause at issue in <u>Dole Food</u>, the clause immediately preceding it"—which Moving Defendants rely upon here—"is also expressed in the present tense." <u>Yousuf v. Samantar</u>, 552 F.3d 371, 382 (4th Cir. 2009).[4]

Moving Defendants rely on <u>Drexel Burnham Lambert Grp. Inc. v. Galadari</u>, 12 F.3d 317 (2d Cir. 1993), in which the Second Circuit affirmed that one of the defendants—a government-created committee—was an instrumentality entitled to FSIA immunity. But the timing of when instrumentality status should be assessed was not raised in that case. Indeed, "the parties [did] not dispute that the Committee [was] an 'agency or instrumentality' of the Emirate." <u>Galadari</u>, 12 F.3d at 324 (quoting 28 U.S.C. § 1603). <u>Galadari</u> is also distinguishable on its facts. The committee found to have instrumentality status there was not analogous to Moving Defendants here. That committee was "the successor to a provisional board . . . established by the government of Dubai." <u>Id.</u> at 320. After the lawsuit was filed the committee immediately began participating—filing an answer on behalf of the non-governmental defendants in liquidation. <u>Id.</u> The committee had thus existed as a government-created provisional board when the lawsuit was filed, and immediately

---

[4] I recognize that this case involves a defendant claiming it has attained post-filing instrumentality status, whereas <u>Dole Food</u> involved a defendant who claimed instrumentality status at the time of the tortious conduct. But <u>Dole Food</u> announced a clear rule: that instrumentality status is determined at the time of a lawsuit's filing. The Court grounded that rule in the longstanding jurisdictional time-of-filing rule, under which post-filing changes to "the condition of the party" are irrelevant in assessing jurisdiction. <u>Grupo Dataflux v. Atlas Glob. Grp., L.P.</u>, 541 U.S. 567, 574 (2004) (quoting <u>Conolly v. Taylor</u>, 27 U.S. 556, 565 (1829)); <u>Freeport-McMoRan, Inc. v. K N Energy, Inc.</u>, 498 U.S. 426, 428 (1991). Accordingly, courts have rejected the argument that a "post-filing change" can confer instrumentality status on a defendant who was not under sovereign control when the lawsuit was filed. <u>In re Air Cargo Shipping Servs. Antitrust Litig.</u>, No. MD 06-1775 (JG) (VVP), 2008 WL 5958061, at *39-40 (E.D.N.Y. Sept. 26, 2008), <u>report and recommendation adopted</u> 2009 WL 3443405, <u>aff'd on other grounds</u> 697 F.3d 154 (2d Cir. 2012); <u>Biton v. Palestinian Interim Self-Gov't Auth.</u>, 510 F. Supp. 2d 144, 147 (D.D.C. 2007).

began participating in the case.   The same is not true here.   JTB only entered liquidation approximately nine months after this lawsuit was filed.   At the time of filing, JTB was a solvent, private bank.[5]

Because Moving Defendants were not an agency or instrumentality of a foreign state at the time this suit was filed, their motion to dismiss based on sovereign immunity under the FSIA is denied.

**b. Anti-Terrorism Act**

Moving Defendants next argue that the claims against them should be dismissed under the separate sovereign immunity provision of the ATA:

> No action shall be maintained under section 2333 of this title against . . . a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority.

18 U.S.C. § 2337(2).   Moving Defendants contend, however, that the ATA should be construed consistent with the FSIA.   Accepting this invitation to treat the ATA as coextensive with the FSIA, Plaintiffs do not distinguish between the two in their opposition papers.   (See Opp'n at 13-15.) Moving Defendants likewise do not make distinct arguments for the two statutes in their reply; the ATA provision is mentioned only fleetingly.   (D.E. # 185 at 12.)

The Supreme Court has stated that "the Foreign Sovereign Immunities Act 'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.'"   OBB Personenverkehr v. Sachs, 577 U.S. 27, 30-31 (2015) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)).   Mindful of this guidance to "decide claims of sovereign immunity in conformity with [FSIA's] principles," Republic of Austria v. Altmann, 541

---

[5] In addition to having not directly confronted the issue presented here and being factually distinguishable, Galadari was decided a decade before Dole Food; to the extent they are inconsistent, I must follow Dole Food.

# A-1290

U.S. 677, 691 (2004), courts have regarded "an assertion of sovereign immunity under the ATA as being functionally equivalent to an assertion of sovereign immunity under the FSIA." Ungar v. Palestinian Liberation Org., 402 F.3d 274, 283 (1st Cir. 2005) (internal citation omitted); e.g., Sokolow v. Palestine Liberation Org., 583 F. Supp. 2d. 451, 457 (S.D.N.Y. 2008) ("The ATA's exclusion, of foreign states and governmental actors from its coverage, is consistent with, and to be applied in accordance with, the ordinary sovereign immunity principles codified in the FSIA."), vacated on different grounds sub nom. Waldman v. Palestinian Liberation Org., 835 F.3d 317 (2d Cir. 2016).  Moving Defendants have offered no reason to construe the ATA's sovereign immunity provision as being more expansive than the FSIA's.  Their motion to dismiss pursuant to the ATA's sovereign immunity provision is accordingly denied.

## C. International Comity

Moving Defendants finally move for dismissal pursuant to international comity.  They argue that allowing Plaintiffs' suit to move forward will undermine the Lebanese liquidation of JTB and the single, orderly proceeding it provides for disposition of claims against it.  This suit will also, they say, inevitably create conflict with a foreign sovereign's policy choices about prioritization of claim payment, potentially creating diplomatic and other tensions.

"American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings." Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713 (2d Cir. 1987).  That is because deferring to a foreign bankruptcy proceeding "enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion." Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB, 773 F.2d 452, 457 (2d Cir. 1985).  So although the "extension or denial of comity is within the court's discretion." Allstate Life Ins. Co. v. Linter Grp. Ltd., 994 F.2d 996, 999 (2d Cir. 1993), the existence of foreign

19

bankruptcy proceedings "generally requires the dismissal of parallel district court actions." Royal & Sun All. Ins. Co. of Can. v. Century Int'l Arms Inc., 466 F.3d 88, 92-93 (2d Cir. 2006). Courts will afford comity to foreign bankruptcies only if those proceedings do not "violate the laws or public policy of the United States," Banco Economico, 192 F.3d at 246, and if "the foreign court abides by 'fundamental standards of procedural fairness,'" Allstate, 994 F.2d at 999 (quoting Cunard, 773 F.2d at 457).

Outside the bankruptcy context there is no general preference favoring abstention—just the opposite: given the district courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them," Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976), "[t]he task of a district court evaluating a request for dismissal based on a parallel foreign proceeding is not to articulate a justification for the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of that jurisdiction." Royal, 66 F.3d at 93 (emphasis in original). Courts "should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency." Id.

## 1. The Lebanese Liquidation Would Not Provide an Adequate, Parallel Forum for Plaintiffs to Pursue Their Claims.

When the Second Circuit has sanctioned comity-based abstention, it has done so on the understanding that the plaintiffs may pursue their claims in the foreign forum. See Banco Economico, 192 F.3d at 244 ("It is undisputed that [Plaintiff] filed a timely claim to recover the value of the promissory notes in the Brazilian liquidation"); Allstate, 994 F.2d at 1000 ("[T]here is no indication that appellants would be prejudiced if they are required to maintain their actions in Australia."); Cunard, 772 F.3d at 459 ("[T]here is no indication that Cunard will be prejudiced or treated unjustly if it were to participate in the Swedish bankruptcy proceedings."). Courts

therefore determine whether there exists "a parallel action in an adequate foreign jurisdiction" before abstaining due to international comity.  <u>Royal</u>, 466 F.3d at 95-96 ("The existence of a parallel action in an adequate foreign jurisdiction must be the beginning, not the end, of a district court's determination of whether abstention is appropriate."); <u>JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.</u>, 412 F.3d 418, 424 (2d Cir. 2005); <u>see</u> <u>Bigio v. Coca-Cola Co.</u> 448 F.3d 176, 178 (2d Cir. 2006).  That remains true where the foreign proceedings are bankruptcy proceedings.  <u>See</u> <u>Royal</u>, 466 F.3d at 92-93.

Moving Defendants do not contend that Plaintiffs would be able to pursue their ATA claims against JTB in Lebanon.  Whatever the merits of Lebanon's liquidation law, Moving Defendants have not shown that it (or any other Lebanese law) offers Plaintiffs the ability to assert claims against JTB for having aided and abetted terrorist attacks.  This is thus a case in which deferring to the foreign proceeding "threatens the very enforceability of" Plaintiffs' claims.  <u>Banco Economico</u>, 192 F.3d at 244.  When courts defer to foreign bankruptcy proceedings, the plaintiff is typically seeking a predetermined sum.  <u>E.g.</u>, <u>id.</u> at 242 ("[Plaintiff] sought to recover on certain promissory notes allegedly guaranteed by the defendant . . . currently subject to an extrajudicial liquidation in Brazil . . . .").  Although a tort claimant is in some sense a creditor, <u>see</u> <u>In re Viking Offshore (USA)</u>, 405 B.R. 434 (Bankr. S.D. Tex. 2008) (dismissing based on international comity where Netherlands bankruptcy proceedings would permit plaintiffs to pursue their claim for tortious conversion), Moving Defendants have not shown that Lebanon would permit Plaintiffs to pursue the claims they bring here.  They state that creditors "may register their debts in the inventory for such pro rata payment."  (D.E. # 185 at 8.)  But Plaintiffs have no "debts" to "register."  Rather, they have a complex claim brought pursuant to U.S. law that may involve substantial discovery spanning years of underlying facts.  This is not a case of a creditor who can

simply collect on a promissory note in a foreign bankruptcy proceeding.

Moving Defendants further argue that the law does not require that the foreign bankruptcy be completely "parallel."   (Id. at 7).   For this proposition they cite to two cases approving of comity-based abstention where the U.S. case was not itself a bankruptcy proceeding.   (Id. (first citing Banco Economico, 192 F.3d at 242 (contract suit); and then citing Allstate, 994 F.2d at 999-1000 (securities suit))).   But in each of those cases, the court expressly noted that the Plaintiffs would be able to pursue their claims as part of the foreign proceeding.   Allstate, 994 F.2d at 1000 ("[T]here is no indication that appellants would be prejudiced if they are required to maintain their actions in Australia."); Banco Economico, 192 F.3d at 249 (plaintiff "received actual notice of the Brazilian proceeding . . . and subsequently filed a timely claim").   Moving Defendants must show that the foreign proceeding provides an adequate and sufficiently parallel forum such that abstention would not "threaten[] the very enforceability of" Plaintiffs' claims.   Banco Economico, 192 F.3d at 244.   They have not done so.[6]

### 2. Abstention Would Contravene the Laws and Public Policy of the United States.

Abstaining due to international comity would also be improper because it would violate the "public policy of the United States."   Id. at 246.   JASTA evinces a strong policy of holding accountable in United States courts those who enable terrorist attacks.   The statute allows plaintiffs to recover treble damages and "the cost of the suit, including attorney's fees."   18 U.S.C. § 2333(a). The stated purpose of JASTA is to provide "the broadest possible basis" for liability:

> The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries . . . that have provided material support . . . to foreign organizations or

---

[6] Plaintiffs further argue that the Lebanese liquidation process would be inadequate because Lebanon is a jurisdiction controlled by Hezbollah—the proverbial fox guarding the henhouse.   Moving Defendants contend that there is no "corruption exception" to international comity.   I need not reach and do not rely on Plaintiffs' corruption arguments, given the separate bases for denying the motion.

persons that engage in terrorist activities against the United States.

18 U.S.C. § 2333 Statutory Notes (emphasis added). The legislative history of the ATA confirms the strong public policy of providing recourse to victims of foreign terrorist attacks in United States courts, notwithstanding that the relevant events may have occurred abroad. See 138 Cong. Rec. S17254–01, S17260 ("[T]he first and best remedy is to bring these terrorists to justice in our courts of law.") (statement of Sen. Grassley) (emphasis added); see also Statement by President George H.W. Bush Upon Signing S. 1569, 1992 U.S.C.C.A.N. 3942, 1992 WL 475753 (Oct. 29, 1992) ("I am pleased that the bill explicitly authorizes an American national to file suit in the United States for the recovery of treble damages against the perpetrators of international terrorism.") (emphasis added); 136 Cong. Rec. S4568–01 at S4593 ("With the enactment of this legislation, we set an example to the world of how the United States legal system deals with terrorists.") (Statement of Sen. Grassley).[7] As the Honorable Charles P. Sifton once explained, "the legislative history as well as the language of the statute demonstrate that the ATA was designed to give American nationals broad remedies in a procedurally privileged U.S. forum." Goldberg v. UBS AG, 660 F. Supp. 2d 410, 422 (E.D.N.Y. 2009). Foreclosing Plaintiffs' claims against JTB would run afoul of the strong public policy of enabling American terrorism victims to pursue their claims in American courts.

Moving Defendants lastly argue that because "JTB's liquidation was precipitated by [the United States] designating it as an SDGT," that liquidation "is not contrary to U.S. policy but in

---

[7] Plaintiffs also raise the venue provision of the ATA, which states that a "district court shall not dismiss any action brought under section 2333 of this title on the grounds of the inconvenience or inappropriateness of the forum chosen, unless," inter alia, "that foreign court is significantly more convenient and appropriate [and] offers a remedy which is substantially the same as the one available in the courts of the United States." 18 U.S.C. § 2334(d). Although I agree with Moving Defendants that this provision appears to concern forum non conveniens motions rather than comity motions, it further reflects the strength of the United States policy to ensure that victims of terrorism receive relief in American courts. See also 28 U.S.C. § 1605A (disallowing the foreign sovereign immunity defense in cases alleging terrorist acts).

# A-1295

furtherance thereof." (Def. Br. at 38.)  But declining to dismiss this proceeding will not unduly impede the Lebanese liquidation.  Apart from gesturing at the possibility of incurring litigation costs, Moving Defendants have offered no reason to believe that the Lebanese proceeding will not continue apace.  Further, Moving Defendants focus on the wrong policy interest in arguing that dismissing this case would further "the United States' policy of punishing facilitators of terrorist acts."  As discussed, JASTA evinces not only a generalized policy of punishing terrorists, but a specific policy of providing a procedurally privileged domestic forum where victims of terrorist attacks may seek justice for the injuries they suffered.

* * *

In sum, comity-based dismissal would be inappropriate because the Lebanese liquidation does not provide an adequate parallel proceeding, and abstention would violate this country's public policy.  Indeed, Moving Defendants' redressability argument—that any eventual judgment in this case will wholly fail to redress Plaintiffs' injuries—belies the notion that allowing this case to proceed would hamper the ongoing liquidation, let alone upend the "amicable working relationships" between the United States and Lebanon.  Altos Hornos, 412 F.3d at 423.

## CONCLUSION

For the foregoing reasons, the motion to substitute is DENIED, the motion to intervene is GRANTED, and the motion to dismiss is DENIED.  The Clerk of Court is respectfully directed to enter Muhammad Baasiri as a defendant in this case.


SO ORDERED.

Dated: August 6, 2021
      Brooklyn, New York                  /s/ Carol Bagley Amon_____
                                        Carol Bagley Amon
                                        United States District Judge

**A-1296**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

ROBERT BARTLETT, *et al.*,

               Plaintiffs,

    v.

SOCIÉTÉ GÉNÉRALE DE BANQUE AU
LIBAN SAL, *et al.*,

          Defendants.

Case No. 1:19-cv-00007 (CBA) (TAM)

**NOTICE OF**
**INTERLOCUTORY APPEAL**

      Notice is hereby given that JAMMAL TRUST BANK SAL and DR. MUHAMMAD BAASIRI in his capacity as Liquidator, defendants in the above-named case, hereby appeal to the United States Court of Appeals for the Second Circuit from the *Order Denying in Part and Granting in Part Motion for Substitution of Party, to Intervene, and to Dismiss Based on Subject Matter Jurisdiction and International Comity* entered in this action on the 6th Day of August, 2021 which denied the motion to dismiss the claims on the ground, among others, that sovereign immunity under both the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* and the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq*. bar the claims.

Dated:  August 19, 2021
         Washington, DC

**BAKER & HOSTETLER LLP**

/s/ *David B. Rivkin, Jr.*
David B. Rivkin, Jr.
Elizabeth Price Foley
Mark W. DeLaquil
Kendall E. Wangsgard
1050 Connecticut Avenue, N.W. Ste. 1100
Washington, DC 20036-5304
Tel.: (202) 861-1500
Fax: (202) 861-1783
drivkin@bakerlaw.com

*Attorneys for Jammal Trust Bank SAL and*
*Dr. Muhammad Baasiri in his capacity as*
*Liquidator*